1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   BRIAN E. COCHRAN (286202)
   655 West Broadway, Suite 1900
3   San Diego, CA  92101
   Telephone:  619/231-1058
4   619/231-7423 (fax)
   bcochran@rgrdlaw.com
5
   Attorneys for Plaintiff
6

7              UNITED STATES DISTRICT COURT

8           CENTRAL DISTRICT OF CALIFORNIA

9               SOUTHERN DIVISION

| | |
|---|---|
| 10  CITY OF TAYLOR GENERAL<br>     EMPLOYEES RETIREMENT<br>11  SYSTEM, on Behalf of Itself and All<br>     Others Similarly Situated,<br>12                      Plaintiff,<br>13<br>        vs.<br>14<br>   XPONENTIAL FITNESS, INC.,<br>15  ANTHONY GEISLER, and JOHN<br>   MELOUN,<br>16<br>                  Defendants.<br>17 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

   Case No.  8:24-cv-00285

   <u>CLASS ACTION</u>

   COMPLAINT FOR VIOLATIONS OF
   THE FEDERAL SECURITIES LAWS

   <u>DEMAND FOR JURY TRIAL</u>

18

19

20

21

22

23

24

25

26

27

28

Plaintiff City of Taylor General Employees Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Xponential Fitness, Inc. ("Xponential" or the "Company"), the findings of Fuzzy Panda Research ("Fuzzy Panda"), securities analyst reports, press releases, and other public statements issued by, or about, the Company.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa.

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

3.     Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District, and the Company is headquartered in this District.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## NATURE OF THE ACTION

5.     This is a securities class action on behalf of purchasers of Xponential publicly traded Class A common stock between July 26, 2021 and December 7,

- 1 -

2023, inclusive (the "Class Period"), against Xponential and certain of the Company's officers for violations of the Exchange Act.

## PARTIES

6. Plaintiff City of Taylor General Employees Retirement System, as set forth in the accompanying certification incorporated by reference herein, purchased Xponential common stock during the Class Period and has been damaged thereby.

7. Defendant Xponential claims to be the largest global franchisor of boutique fitness brands. The Company maintains its principal executive offices in Irvine, California and its common stock trades on the NYSE under the ticker symbol "XPOF."

8. Defendant Anthony Geisler ("Geisler") is, and was at all relevant times, the founder, Chief Executive Officer ("CEO"), and a director of Xponential. Defendant Geisler is the former CEO of Interactive Solutions Corp. ("ISC"), a casino gaming software company.

9. Defendant John Meloun ("Meloun") is, and was at all relevant times, the founder and Chief Financial Officer ("CFO") of Xponential.

10. Defendants Geisler and Meloun are collectively referred to herein as the "Individual Defendants."

11. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, franchisees, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, franchisee reports, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors ("Board") meetings and committees thereof, and via reports and other information provided to them in connection therewith.

12.     Each of the above officers of Xponential, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and franchisee operating performance as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     The Individual Defendants, as officers and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, is traded on the NYSE, and is governed by the provisions of the federal securities laws, each had a duty to promptly disseminate accurate and truthful information with respect to the Company's franchisee performance, operations, business, markets, management, earnings, and present and future business prospects during the Class Period.  In addition, the Individual Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Xponential publicly traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants also participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and/or the omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board memberships and/or executive and managerial positions with Xponential, each of the Individual

Defendants had access to the adverse undisclosed information about Xponential's business, franchisees, prospects, operations, and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Xponential and its business and issued or adopted by the Company materially false and misleading.

15. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Xponential common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Xponential's business, operations, franchisees, present and future business prospects, and the intrinsic value of Xponential common stock; (ii) enabled Company insiders, including defendants, to sell Xponential common stock at artificially inflated prices; and (iii) caused plaintiff and other members of the Class (defined herein) to purchase Xponential common stock at artificially inflated prices.

## BACKGROUND

17. Xponential claims to be the largest global franchisor of boutique fitness brands, with a platform offering ten brands in categories that include Pilates, indoor cycling, barre, stretching, rowing, dancing, boxing, running, functional training, and yoga.

18.    The Company represents that its franchisees offer accessible and personalized workout experiences led by highly qualified instructors in over 2,600 studio locations across 48 U.S. states, the District of Columbia, and Canada. Xponential also maintains master franchise or international expansion agreements in 14 additional countries.

19.    As of December 31, 2022, Xponential had over 1,700 franchisees and licenses for more than 1,900 studios contractually obligated to be opened under existing franchise agreements in North America.

20.    Defendants represent that Xponential had built its portfolio of brands through a series of acquisitions, targeting select health and wellness providers. According to the Company's filings with the SEC, its portfolio of brands includes: (i) Club Pilates, the largest pilates brand in the United States; (ii) CycleBar, the largest indoor cycling brand in the United States; (iii) StretchLab, a concept offering one-on-one and group stretching services; (iv) Row House, the largest franchised indoor rowing brand in the United States; (v) AKT, a dance-based cardio workout combining toning, interval, and circuit training; (vi) YogaSix, the largest franchised yoga brand in the United States; (vii) Pure Barre, a total body workout that uses the ballet barre to perform small isometric movements, and the largest barre brand in the United States; (viii) Stride, a treadmill-based cardio and strength training concept; (ix) Rumble, a boxing-inspired full-body workout; and (x) Body Fit Training, a functional training and strength-based program.

21.    Xponential is familiar with the operations of its franchisees.  First, the Company chooses franchise partners through a rigorous vetting and selection process.  Then, through its Xponential Playbook, the Company provides franchisees with significant ongoing support, focused on maximizing studio-level productivity and profitability, as well as ensuring consistency in operational quality.  Franchisees are incorporated into the Company's corporate platform, through which they leverage integrated systems and shared services.  Nearly all of franchisee support

functions are integrated at the corporate level of Xponential, with the only exceptions being marketing and fitness programming that are specific to each brand.

22.    The Company's franchise agreements have an initial ten-year term, which it can terminate if a franchisee is in default thereunder, has failed to meet minimum monthly gross revenue quotas, or has failed to select a suitable studio site within a specified time period.

23.    Xponential expects its franchisees to meet and maintain minimum monthly gross revenue quotas by the first and second anniversary of their studio opening.  Failure to meet these quotas for 36 consecutive months at any time during the term of the franchise agreement can result in the institution of a mandatory corrective training program or termination of the franchise agreement.  From inception to December 31, 2022, approximately 600 of the Company's sold licenses in North America had been terminated and over 30 had been terminated internationally.

24.    The Company's revenues primarily consist of franchise license revenues and franchise related equipment, merchandise sales, and training revenue.  In addition, the Company earns on-demand revenue, service revenue, and other revenue.

25.    Xponential's SEC filings note that the Company does not record sales by franchisees as revenue and that such sales are not included in its consolidated financial statements.  Accordingly, Xponential routinely provides investors with a number of key performance indicators used by its management which defendants state are important in evaluating the Company's performance.  These key performance indicators, which include sales by franchisees that are not realized as revenue in the Company's financial statements, include, among others, same-store sales ("SSS") and average unit volume ("AUV").

26.    Xponential's SEC filings state its SSS reflect the change in period-over-period sales for its North America same-store base (defined as only sales from

studios in North America that have been open for at least 13 calendar months as of the measurement date).  Xponential calculates AUV by dividing sales during the applicable period for all studios being measured by the number of studios being measured.  AUV growth is primarily driven by changes in SSS and is also influenced by new studio openings.  Management uses AUV to assess studio economics.

27.    During the Class Period, defendants made materially false and misleading statements and omissions regarding Xponential's business, financial results, and prospects.  Specifically, defendants failed to disclose that the Company's franchisees – from whom Xponential derived substantially all of its revenue – were largely failing, with the majority of the Company's store brands losing money, dozens of studios operating at a loss (forcing some to close permanently), and more than 100 franchisees listed for sale at a fraction of their initial cost.  Despite this grim reality, Xponential snookered new franchisees to sign up with the Company with false and misleading promises of robust financial returns, misleading claims regarding past studio performance, and deceptive assurances of corporate support. To take one example, Xponential highlighted the purported success of a CycleBar studio in Florida to lure in new franchisees when the franchisee had in fact lost more than half a million dollars in running the business and was planning to file for bankruptcy.  According to the franchisee, Brent Zartler: "What they don't tell these franchisees is it's just been a slow, steady death with that studio. . . .  I've been working in gyms for 20 years, and I've never worked in a business where there's been such a high attrition rate."   Another franchisee owner has stated that Xponential's representations regarding studio performance "wasn't even close to reality."   Defendants concealed and failed to disclose these unfavorable studio dynamics to investors, instead misrepresenting the financial health of Xponential in order to raise hundreds of millions of dollars from the investing public at fraud-inflated prices.

28.   In July 2021, defendants took Xponential public through an initial public offering (the "IPO"), selling over ten million Xponential shares (including a partial exercise of the underwriters' overallotment option) at $12 per share. Subsequent to the IPO, Xponential conducted two additional registered stock offerings which allowed insiders - including defendant Geisler and Xponential's Chairman Mark Grabowski ("Grabowski") – to sell additional stock: (i) an April 2022 secondary stock offering at $20 per share; and (ii) a February 2023 secondary offering at $24.50 per share (the "SPOs").  In total, defendant Geisler and Grabowski sold nearly $270 million worth of Xponential stock in the SPOs and in secondary market transactions.

29.   Then, on June 26, 2023, short-biased analyst firm Fuzzy Panda published a research report titled "Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A House Of Cards'" (the "Fuzzy Panda Report").  The Fuzzy Panda Report claimed to be based on the examination of over 16,000 pages included among 64 Franchise Disclosure Documents ("FDDs") filed with the Federal Trade Commission and various state regulators, as well as a "multitude of interviews" and other information.  The Fuzzy Panda Report stated that the allegations contained therein "often had multiple sources tell us corroborating facts" and that the authors would "happily provide interview transcripts, contact information, and any other documentation received from those sources who have agreed we can share the information with the SEC, State Attorneys Generals, government regulators, or reputable journalists."

30.   Among other revelations, the Fuzzy Panda Report alleged that defendant Geisler has had a long history of misleading investors, including being exposed on camera for using "boiler room" tactics to mislead investors in connection with a prior venture and issuing false claims that Xponential "never closed a store." A boiler room is a scheme in which salespeople apply high-pressure sales tactics to persuade investors to purchase securities, often including speculative and fraudulent

securities.   The Fuzzy Panda Report disclosed that its examination of 64 FDDs demonstrated **8 of 10** Xponential brands are losing money monthly and ***more than 50%*** of its studios never make a positive financial return.   The Fuzzy Panda Report also revealed that ***more than 100*** of Xponential's franchises were for sale at a price 75% less than their initial cost and that the SSS and AUV the Company reports to investors selectively and misleadingly exclude underperforming stores.

31.    After the Fuzzy Panda Report was issued to the public, the price of Xponential common stock plummeted more than ***37%***, or $9.39 per share on heavy trading volume, to close at $15.72 per share on June 27, 2023, causing plaintiff and other Class members to suffer substantial economic losses and damages under the federal securities laws.

32.    Although Xponential attempted to deny the allegations in the Fuzzy Panda Report, on December 7, 2023, *Bloomberg Businessweek* ("*Businessweek*") published a damning exposé on the Company that largely corroborated the Fuzzy Panda Report's allegations titled "Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt."  The article stated that *Businessweek* had interviewed dozens of former business partners, employees, and franchisees of the Company who revealed that Xponential misled many franchisees into a "financial nightmare."  The article stated that defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way."  The article disclosed that these unscrupulous tactics caused "many of the company's franchisees . . . [to] have either declared bankruptcy or los[e] their retirement savings."

33.    Following the publication of the *Businessweek* article, the price of Xponential common stock fell more than 26% over two trading days on heavy trading volume to close at less than $9 per share on December 11, 2023, causing plaintiff and other Class members to suffer additional economic losses and damages under the federal securities laws.

34.     As of the filing of this complaint, the price of Xponential common stock has largely not recovered, indicating that the market finds the allegations in the Fuzzy Panda Report and the *Businessweek* article to be credible and the Company's denials and explanations to be insufficient to refute the allegations contained therein.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

35.     The Class Period begins on July 26, 2021.  On that date, Xponential filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of a registration statement signed by the Individual Defendants (the "Prospectus").  The Prospectus stated that Xponential had generated long-term "AUV of $449 thousand and $283 thousand in 2019 and 2020, respectively, and $453 thousand and $257 thousand for the three months ended March 31, 2020 and 2021, respectively."  The Prospectus further stated that Xponential provided "franchisees extensive support to help maximize the performance of their studios, while leveraging [its] corporate platform to accelerate growth and enhance profitability."

36.     On August 24, 2021, Xponential issued a press release announcing its financial results for the second fiscal quarter ending June 30, 2021 (the "2Q21 Release").  The 2Q21 Release stated the Company had achieved year-over-year system-wide SSS growth of 129% and a "[r]ecovery of nearly 90% run-rate AUVs as compared to January 31, 2020, placing the Company on track to reach pre-pandemic run-rate AUVs by early 2022."  (Footnote omitted.)

37.     On August 25, 2021, Xponential filed with the SEC its Form 10-Q for the quarter ended June 30, 2021 (the "Q2 2021 Form 10-Q") signed by defendant Meloun.  In addition, defendants Geisler and Meloun provided certifications pursuant to the Sarbanes-Oxley Act of 2002 thereon ("SOX certifications") that the filing was free from fraud, accurate, and materially complete.  The Q2 2021 Form

10-Q contained the statements regarding Xponential's purported quarterly results contained in the 2Q21 Release.

38.     On November 11, 2021, Xponential issued a press release announcing its financial results for the third fiscal quarter ending September 30, 2021 (the "3Q21 Release").   The 3Q21 Release stated the Company had achieved year-over-year North American SSS growth of 65% and a "[n]early 90% North American run-rate average unit volume (AUV) recovery compared to January 31, 2020."

39.     On November 12, 2021, Xponential filed with the SEC its Form 10-Q for the quarter ended September 30, 2021 (the "Q3 2021 Form 10-Q") signed by defendant Meloun.   In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete. The Q3 2021 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 3Q21 Release.

40.     On March 3, 2022, Xponential issued a press release announcing its financial results for the fourth fiscal quarter and year ending December 31, 2021 (the "FY21 Release").   The FY21 Release stated the Company had achieved year-over-year North American SSS growth of 53% and run-rate AUV of $446,000 for the quarter, compared to run-rate AUV of $286,000 in the prior-year period.

41.     On March 7, 2022, Xponential filed with the SEC its Form 10-K for the quarter and year ended December 31, 2021 (the "2021 Form 10-K") signed by defendants Geisler and Meloun.   In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete.   The 2021 Form 10-K contained the statements regarding Xponential's purported quarterly results contained in the FY21 Release.   The 2021 Form 10-K also stated: "Approximately 77% of our revenue in 2021 and 73% of our revenue in 2020 was considered recurring, and we believe this percentage will increase as franchise royalty fees are expected to account for a greater percentage of our revenue over time."

42.     Also on March 7, 2022, Xponential presented at the Raymond James Institutional Investors conference.   During the conference, defendant Geisler represented to investors that "[w]e have never permanently closed the store in the history of our business," stating in pertinent part as follows:

> So affluent, engaged customers, fastest-growing segment of the $97 billion fitness industry.   Through COVID, while the industry contracted by 30%, we actually grew.   ***We have never permanently closed the store in the history of our business***.   We actually closed about 1,500 stores temporarily for COVID, and we opened up 25% more than that when we reopened.

43.     On May 12, 2022, Xponential issued a press release announcing its financial results for the first fiscal quarter ending March 31, 2022 (the "1Q22 Release").   The 1Q22 Release stated the Company had achieved year-over-year North American SSS growth of 47% and run-rate AUV of $450,000 for the quarter.

44.     On May 13, 2022, Xponential filed with the SEC its Form 10-Q for the quarter ended March 31, 2022 (the "Q1 2022 Form 10-Q") signed by defendant Meloun.   In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete.   The Q1 2022 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 1Q22 Release.

45.     On July 27, 2022, Xponential issued a press release announcing it expected to deliver strong 2022 second quarter results and was then on track to meet or exceed 2022 full-year guidance.   The press release also set forth certain preliminary operating highlights for the second quarter of 2022, the period ending June 30, 2022, including 25% SSS growth and run-rate AUV of $480,000.

46.     On August 11, 2022, Xponential issued a press release announcing its financial results for the second fiscal quarter ending June 30, 2022 (the "2Q22

Release").  The 2Q22 Release stated the Company had achieved year-over-year North American SSS growth of 25% and run-rate AUV of $480,000 for the quarter.

47.    Later that day, the Individual Defendants held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, defendant Geisler highlighted the purported profitability of the Company's studio locations, stating in pertinent part as follows:

Importantly, *as we continue to open more studios and as AUVs continue to grow, our profitability increases*, driven by high-margin royalties from growing system-wide sales with an active pipeline of approximately 2,800 studios contractually obligated to open globally and only about 3/4 of our conservative North American total addressable market currently penetrated.

*Studio openings are not expected to slow anytime soon, continuing to drive profitability*.

48.    On August 12, 2022, Xponential filed with the SEC its Form 10-Q for the quarter ended June 30, 2022 (the "Q2 2022 Form 10-Q") signed by defendant Meloun.  In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete.  The Q2 2022 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 2Q22 Release.

49.    On November 10, 2022, Xponential issued a press release announcing its financial results for the third fiscal quarter ending September 30, 2022 (the "3Q22 Release").  The 3Q22 Release stated that the Company had achieved year-over-year North American SSS growth of 17% and run-rate AUV of $489,000 for the quarter.

50.    Later that day, the Individual Defendants held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, defendant Meloun highlighted the Company's purported

AUV and claimed that the figure could reach into the "high 600s" from its current level, stating in pertinent part as follows:

> AUVs will continue to increase over time. I do think long term or even in the short term, you'll see elevated same-store sales throughout 2023, probably getting back to that mid to high single digits at the end of next year.
>
> With that, obviously, AUVs will continue to climb. What is that ceiling at which you kind of – it's kind of like a car, right, and they can only go so fast because at some point, they're pushing through air and it's hard to move faster and faster. ***But I think our AUVs, we don't know where that's at yet. Is it possible that we do see getting to the high 600s? I do think that's definitely a possibility having the entire system pushing close to 600,000 AUV. We're at $500,000 roughly now, and we're definitely not slowing down from a growth perspective***.

51.    Also on November 10, 2022, Xponential filed with the SEC its Form 10-Q for the quarter ended September 30, 2022 (the "Q3 2022 Form 10-Q") signed by defendant Meloun. In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete. The Q3 2022 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 3Q22 Release.

52.    On March 2, 2023, Xponential issued a press release announcing its financial results for the fourth fiscal quarter and year ending December 31, 2022 (the "FY22 Release"). The FY22 Release stated that the Company had achieved year-over-year North American SSS growth of 17% and run-rate AUV of $522,000 for the fourth quarter.

53.    Later that day, the Individual Defendants held a conference call with analysts and investors to discuss the Company's operations and earnings release.

During the conference call, defendant Meloun stated that the Company's impressive AUV growth in 2022 had continued into 2023, stating in pertinent part as follows:

> *We had really strong AUV growth in 2022. The momentum so far into 2023 is very promising. So for us, the more studios we get open, the more our installed base continues to exceed expectations, 20%, 22%, 25% same-store sales, high teens in Q4. So far in Q1, we're seeing that carry into the year.*

54. On March 6, 2023, Xponential filed with the SEC its Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K") signed by defendants Geisler and Meloun, among others. In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete. The 2022 Form 10-K contained the statements regarding Xponential's purported quarterly results contained in the FY22 Release. The 2022 Form 10-K also stated: "Approximately 71% of our revenue in 2022 and 77% of our revenue in 2021 was considered recurring, and we believe this percentage will increase as franchise royalty fees are expected to account for a greater percentage of our revenue over time."

55. On May 4, 2023, Xponential issued a press release announcing its financial results for the first quarter ending March 31, 2023 (the "1Q23 Release"). The 1Q23 Release stated that the Company had achieved year-over-year North American SSS growth of 20% and run-rate AUV of $542,000 for the quarter.

56. Later that day, Xponential held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, defendant Geisler highlighted the Company's purported robust AUV and SSS growth, stating in pertinent part as follows:

> We believe that AUV growth is the most direct measure of the health of our franchise system, and *I am pleased to report the momentum in AUV growth has continued to build in the second quarter. We also*

1    *saw same-store sales growth of 20% in the first quarter, up from 17%*

2    *in the previous 2 quarters*.

3    57.    On May 5, 2023, Xponential filed with the SEC its Form 10-Q for the

4    quarter ended March 31, 2023 (the "Q1 2023 Form 10-Q") signed by defendant

5    Meloun.  In addition, defendants Geisler and Meloun provided SOX certifications

6    that the filing was free from fraud, accurate, and materially complete.  The Q1 2023

7    Form 10-Q contained the statements regarding Xponential's purported quarterly

8    results contained in the 1Q23 Release.

9    58.    The statements referenced in ¶¶35-57 above were each materially false

10    and misleading when made because they misrepresented and failed to disclose the

11    following adverse facts, which were known to defendants or recklessly disregarded

12    by them as follows:

13        (a)    that Xponential had permanently closed at least 30 stores;

14        (b)    that Xponential's reported SSS and AUV metrics had been

15    misstated by excluding underperforming stores;

16        (c)    that 8 out of 10 Xponential brands were losing money monthly;

17        (d)    that over 50% of Xponential studios did not make a positive

18    financial return;

19        (e)    that over 60% of Xponential's revenue was one-time and non-

20    recurring;

21        (f)    that more than 100 of the Company's franchises were for sale at

22    a price that is at least 75% less than their initial cost;

23        (g)    that Xponential had misled many of its franchisees into opening

24    franchises by misrepresenting the financial profile and profitability of its studios, as

25    well as the expected rate of return for new studio openings;

26        (h)    that many Xponential franchisees were substantially in debt,

27    suffering high attrition rates and running non-viable studios that had no realistic path

28    to profitability; and

1           (i)    that based on the foregoing, defendants lacked a reasonable

2    factual basis for their positive statements about Xponential's then-current business

3    operations and future financial prospects.

4         59.    Then, on June 26, 2023, Fuzzy Panda published the Fuzzy Panda

5    Report, which, among other things, represented that: (i) defendant Geisler has had a

6    long history of misleading investors; (ii) Xponential has issued a series of misleading

7    statements about its store closures and the overall financial health of its franchisee

8    base; (iii) more than 50% of the Company's studios never make a positive financial

9    return; (iv) more than 100 of Company's franchises are for sale at a price that is at

10   least 75% less than their initial cost; (v) 8 out of 10 Xponential brands are losing

11   money monthly; (vi) the Company's publicly reported SSS and AUV metrics

12   misleadingly exclude underperforming stores; (vii) over 60% of Xponential's

13   revenue is one-time and non-recurring; and (viii) at least 30 Xponential stores had

14   been permanently closed.

15        60.    In response to these revelations, the price of Xponential common stock

16   fell more than *37%*, or $9.39 per share on heavy trading volume of over 12 million

17   shares traded, to close at $15.72 per share on June 27, 2023.  However, because of

18   defendants' denials and continued dissemination of materially false and misleading

19   statements and omissions and failure to disclose the full truth, the price of Xponential

20   common stock remained artificially inflated.

21        61.    On June 28, 2023, Xponential issued a response to the Fuzzy Panda

22   Report.  Although the Company's response attempted to refute the Fuzzy Panda

23   Report, it did not address certain aspects of the Fuzzy Panda Report directly or

24   concretely – such as the allegation that eight out of ten of the Company's brands are

25   losing money or detail whether any stores had been permanently closed.  With

26   respect to the Company's calculation of SSS and AUV, the response stated in

27   pertinent part as follows:

28

AUV Calculation: Quarterly Run-rate AUV consists of average quarterly sales for all studios that are at least six months old at the beginning of the respective quarter, multiplied by four. Studios with zero sales in the period have always been excluded from the calculation. Inclusion of these studios would not result in a material difference. For Q1 2023, recalculating Xponential's systemwide AUV to include these studios would result in a 0.9% change to the AUV figure ($542,000 vs. $538,000).

SSS Calculation: Studios are not included in SSS calculations unless they have 13 months of continuous sales. This is a common method for calculating same store sales and is disclosed in Xponential's audited SEC filings. The Q1 2023 data set of almost 2,000 studios open continuously for 13 months or longer as of March 31, 2023 yielded robust Q1 2023 same store sales of 20%.

62.     As summarized by a Piper Sandler analyst report issued in support of the Company and relaying its conversations with management: "Any studio that generates zero sales for even just one month is removed until 13 consecutive months of sales are generated again." Although these responses sought to downplay the impact of the accounting tactic on Xponential's overall financial results, they essentially confirmed a key allegation of the Fuzzy Panda Report: that the Company excludes studios that have no sales in a given month even if the lack of sales is due to underperformance.

63.     After the Company's response was digested by the market, the price of Xponential common stock remained substantially below the price of the stock prior to the release of the Fuzzy Panda Report, indicating that the market found the Fuzzy Panda Report credible and the Company's response insufficient to effectively rebut the report's allegations. Even buy-side analysts such as Morgan Stanley who are generally supportive of the Company noted that the "issues raised around

economics/studio performance are likely to remain a focus for investors and would benefit from better disclosures."

64.     Then, on December 7, 2023, *Businessweek* published a damning exposé on the Company that largely corroborated the Fuzzy Panda Report's allegations titled "Club Pilates, Pure Barre Owners Say Xponential Left Them Bankrupt."  The article stated that *Businessweek* had interviewed dozens of former business partners, employees, and franchisees of the Company who revealed that Xponential misled many franchisees into a "financial nightmare."  The article stated that defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way."  The article disclosed that these unscrupulous tactics caused "many of the company's franchisees . . . [to] have either declared bankruptcy or los[e] their retirement savings" and described in detail the ways in which Xponential obscured the true financial health of its studios and induced franchisees to open new studios based on false and misleading information regarding their financial health and likely profitability.

65.     Following the publication of the *Businessweek* article, the price of Xponential common stock fell more than 26% over two trading days on heavy trading volume to close at less than $9 per share on December 11, 2023, causing plaintiff and other Class members to suffer additional economic losses and damages under the federal securities laws.

66.     As of the date of this complaint, the price of Xponential common stock remains substantially below the price of the stock prior to the issuance of the Fuzzy Panda Report.

### ADDITIONAL SCIENTER ALLEGATIONS

67.     As alleged herein, defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or

documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Xponential, their control over, and/or receipt and/or modification of Xponential's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xponential, participated in the fraudulent scheme alleged herein.

68. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their executive-level positions with Xponential, the Individual Defendants controlled the contents of Xponential's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants was responsible for the accuracy of Xponential's corporate statements and is, therefore, responsible and liable for the representations contained therein.

69. Plaintiff also alleges that the scienter of the Individual Defendants who, as executive officers of the Company, knew or recklessly ignored facts related to the core operations of Xponential, can be imputed to Xponential. In addition to being the executives most closely involved in the aspects of the Company's business at

issue – such as studio profitability and the reporting of SSS and AUV numbers – the Individual Defendants were also personally implicated in the fraud as revealed by the Fuzzy Panda Report and the *Businessweek* article.

70.    In addition, defendants were motivated to engage in the fraudulent course of conduct alleged herein to allow corporate insiders, including defendants Geisler and Meloun, to collectively sell more than 11.7 million Xponential common stock for gross proceeds of more than $269 million during the Class Period. Defendant Geisler alone sold over $46 million worth of his Xponential shares at prices as high as $33.49 in an approximately three-and-a-half month period, from February 10, 2023 to May 25, 2023.  These sales were suspicious in both timing and amount and out of line with his prior trading patterns.

71.    In addition, during the Class Period defendants conducted three registered offerings of Xponential Class A common stock in the IPO and the SPOs. In the IPO, Xponential sold over ten million Xponential shares (including a partial exercise of the underwriter's over-allotment option) at $12 per share.  In April 2022, Xponential conducted a secondary offering of stock which allowed certain insiders to sell $90 million (not including the exercise of any over-allotment option) worth of Xponential stock at $20 per share, as well as a February 2023 secondary offering of stock which allowed certain insiders to sell $122.5 million (not including the exercise of any over-allotment option) worth of Xponential stock at $24.50 per share.

72.    Further, the scienter of defendants is underscored by the SOX certifications of defendants Geisler and Meloun, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Xponential was made known to them and that the Company's disclosure-related controls were operating effectively.

## LOSS CAUSATION

73.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the

prices of Xponential common stock and operated as a fraud or deceit on Class Period purchasers of Xponential common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Xponential common stock declined significantly as the prior artificial inflation came out of the price of the Company's common stock.

74.    As a result of their purchases of Xponential common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had their intended effect and caused Xponential common stock to trade at artificially inflated levels throughout the Class Period, with Xponential's common stock price reaching a high of $33.58 per share on May 1, 2023 – more than **triple** the price of Xponential common stock in the immediate aftermath of the publication of the *Businessweek* article.

75.    By concealing from investors the adverse facts detailed herein, defendants presented a misleading picture of Xponential's business, franchisees, and operations.  When the truth about the Company was revealed to the market, the price of Xponential common stock fell significantly.  The price decline removed the inflation from the price of Xponential common stock, causing real economic loss to investors who had purchased Xponential common stock during the Class Period.

76.    The decline in the price of Xponential common stock after the corrective disclosure came to light was the direct result of the nature and extent of defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Xponential common stock negate any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

1    77.    The economic loss, *i.e.*, damages, suffered by plaintiff and the other

2    Class members was a direct result of defendants' fraudulent scheme to artificially

3    inflate the prices of Xponential common stock and the subsequent significant decline

4    in the value of Xponential common stock when defendants' prior misrepresentations

5    and other fraudulent conduct were revealed.

6                          **CLASS ACTION ALLEGATIONS**

7    78.    Plaintiff brings this action as a class action pursuant to Federal Rule of

8    Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who

9    purchased Xponential publicly traded Class A common stock during the Class

10   Period and who were damaged thereby (the "Class").  Excluded from the Class are

11   defendants and their families, the officers and directors of the Company, at all

12   relevant times, members of their immediate families and their legal representatives,

13   heirs, successors or assigns, and any entity in which defendants have or had a

14   controlling interest.

15   79.    The members of the Class are so numerous that joinder of all members

16   is impracticable.  While the exact number of Class members is unknown to plaintiff

17   at this time and can only be ascertained through appropriate discovery, plaintiff

18   believes that there are thousands of members in the proposed Class.  Record owners

19   and other members of the Class may be identified from records maintained by

20   Xponential or its transfer agent and may be notified of the pendency of this action

21   by mail, using the form of notice similar to that customarily used in securities class

22   actions.

23   80.    Plaintiff's claims are typical of the claims of the members of the Class,

24   as all members of the Class are similarly affected by defendants' wrongful conduct

25   in violation of federal law complained of herein.

26   81.    Plaintiff will fairly and adequately protect the interests of the members

27   of the Class and has retained counsel competent and experienced in class action and

28   securities litigation.

82.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Xponential;

(c)    whether the prices of Xponential common stock were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

83.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

84.    At all relevant times, the market for Xponential common stock was an efficient market for the following reasons, among others:

(a)    Xponential common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient stock market;

(b)    as a regulated issuer, Xponential filed periodic public reports with the SEC and the NYSE;

(c)    Xponential regularly communicated with public investors via established market communication mechanisms, including the regular dissemination

of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Xponential was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

85.    As a result of the foregoing, the market for Xponential common stock promptly digested current information regarding Xponential from all publicly available sources and reflected such information in the price of the common stock. Under these circumstances, all purchasers of Xponential common stock during the Class Period suffered similar injury through their purchase of Xponential common stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or deliberately disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices,

1  and a course of business that operated as a fraud and deceit upon the purchasers of
2  the Company's common stock during the Class Period.

3       89.    Plaintiff and the Class have suffered damages in that, in reliance on the
4  integrity of the market, they paid artificially inflated prices for Xponential common
5  stock.  Plaintiff and the Class would not have purchased Xponential common stock
6  at the prices they paid, or at all, if they had been aware that the market prices had
7  been artificially and falsely inflated by defendants' misleading statements.

8       90.    As a direct and proximate result of these defendants' wrongful conduct,
9  plaintiff and the other members of the Class suffered damages in connection with
10 their purchases of Xponential common stock during the Class Period.

11 **COUNT II**

12 **Violation of §20(a) of the Exchange Act**
13 **Against All Defendants**

14      91.    Plaintiff repeats and realleges each and every allegation contained
15 above as if fully set forth herein.

16      92.    The Individual Defendants acted as controlling persons of Xponential
17 within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of
18 their positions as officers and/or directors of Xponential, and their ownership of
19 Xponential stock, the Individual Defendants had the power and authority to cause
20 Xponential to engage in the wrongful conduct complained of herein.  Xponential
21 controlled the Individual Defendants and each of its employees.

22      93.    By reason of such conduct, defendants are liable pursuant to §20(a) of
23 the Exchange Act.

24 **PRAYER FOR RELIEF**

25     WHEREFORE, plaintiff prays for relief and judgment, as follows:

26     A.    Determining that this action is a proper class action, designating
27 plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule
28 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

- 26 -

1    B.    Awarding compensatory damages in favor of plaintiff and the other

2 Class members against all defendants, jointly and severally, for all damages

3 sustained as a result of defendants' wrongdoing, in an amount to be proven at trial,

4 including interest thereon;

5    C.    Awarding plaintiff and the Class their reasonable costs and expenses

6 incurred in this action, including counsel fees and expert fees; and

7    D.    Such other and further relief as the Court may deem just and proper.

8                              **JURY DEMAND**

9    Plaintiff hereby demands a trial by jury.

10 DATED: February 9, 2024              ROBBINS GELLER RUDMAN
                                          & DOWD LLP
11                                      BRIAN E. COCHRAN

12

13                                          s/ Brian E. Cochran
                                          BRIAN E. COCHRAN
14
                                        655 West Broadway, Suite 1900
15                                      San Diego, CA  92101-8498
                                        Telephone:  619/231-1058
16                                      619/231-7423 (fax)
                                        bcochran@rgrdlaw.com
17
                                        Attorneys for Plaintiff
18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

City of Taylor General Employees Retirement System ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of February, 2024.

City of Taylor General Employees
Retirement System

By: _____

Its:  Trustee _____

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/14/2023 | 389 | $28.76 |
| 06/15/2023 | 410 | $28.39 |
| 07/12/2023 | 530 | $20.01 |
| 07/13/2023 | 225 | $20.47 |

Prices listed are rounded up to two decimal places.