ROBBINS GELLER RUDMAN
  & DOWD LLP
X. JAY ALVAREZ (134781)
DOUGLAS R. BRITTON (188769)
JEREMY W. DANIELS (351347)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| CITY OF TAYLOR GENERAL EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   vs.<br><br>XPONENTIAL FITNESS, INC., ANTHONY GEISLER, JOHN MELOUN, MARK GRABOWSKI, BRENDA MORRIS, CHELSEA GRAYSON, BofA SECURITIES, INC., JEFFERIES LLC, MORGAN STANLEY & CO. LLC, GUGGENHEIM SECURITIES, LLC, PIPER SANDLER & CO., ROBERT W. BAIRD & CO. INCORPORATED, RAYMOND JAMES & ASSOCIATES, INC., ROTH CAPITAL PARTNERS, LLC, and R. SEELAUS & CO., LLC,<br><br>               Defendants. | Case No. 8:24-cv-00285-JWH (KESx)<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

4870-6046-8173.v5

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION AND VENUE .......................................................... 9

III.  CLASS ACTION ALLEGATIONS .................................................... 9

IV.   PARTIES .......................................................................................... 11

V.    LEAD PLAINTIFFS' COUNSEL'S INVESTIGATION ................... 14

VI.   BACKGROUND ............................................................................... 17

VII.  THE SCHEME AND FRAUDULENT COURSE OF CONDUCT *(LIABILITY UNDER RULE 10b-5(a) and (c))* .................................... 18

    A.    Artifice No. 1: Defendants Geisler and Grabowski Launch the Scheme by Intentionally Pursuing a Growth at All Costs Strategy ...................................................................................... 18

    B.    Artifice No. 2: Xponential Misrepresents Financial Prospects to Franchisees to Show Increasing License Sales and Studio Growth ...................................................................................... 19

    C.    Artifice No. 3: Xponential Conceals Geisler's Fraudulent History from Prospective Franchisees and Investors........................... 34

    D.    Artifice No. 4: Defendants Misrepresent the Financial Health of Xponential's Franchisees, Highlighting Non-Existent Studio Closures and Full SBA Loan Repayments .......................................... 40

    E.    Artifice No. 5: Xponential Actively Interferes with Franchisees Closing Stores and Conceals the Truth About Store Closures .......... 42

    F.    Artifice No. 6: Xponential, Geisler, and Grabowski Capitalize on the Scheme by Selling Massive Amounts of Stock to Unsuspecting Investors .............................................................. 54

VIII. DEFENDANTS "DENOUNCE" THE FUZZY PANDA REPORT AS THE TRUTH IS REVEALED ......................................................... 56

IX.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD *(LIABILITY UNDER RULE 10b-5(b))* ............................. 64

    A.    Defendants Issue Statements About Xponential's AUV Metric, License Sales, and Studio Openings While Concealing Numerous Risks Created by Their Scheme ................................. 64

    B.    Defendants' Misled Investors with False Claims that Xponential Had Not Experienced Any Studio Closures and Had Not Defaulted on a Single SBA Loan ............................................ 89

- i -

|  | | **Page** |
|---|---|---|
| C. | Defendants Continue to Mislead Investors Through Statements in Response to the Fuzzy Panda Report | 101 |
| X. | ADDITIONAL SCIENTER ALLEGATIONS | 103 |
| XI. | SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY | 114 |
| XII. | APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE | 115 |
| XIII. | LOSS CAUSATION | 116 |
| COUNT I | | 117 |
| COUNT II | | 120 |
| XIV. | LEAD PLAINTIFFS' NON-FRAUD CLAIMS FOR RELIEF UNDER THE SECURITIES ACT | 121 |
| A. | Securities Act Defendants | 121 |
| | 1. Defendants Xponential, Geisler, Meloun, and Grabowski | 121 |
| | 2. Director Defendants | 122 |
| | 3. Underwriter Defendants | 122 |
| B. | Materially False and Misleading Statements and Omissions in the Offering Documents | 124 |
| COUNT III | | 128 |
| COUNT IV | | 130 |
| COUNT V | | 133 |
| XV. | PRAYER FOR RELIEF | 134 |
| XVI. | JURY DEMAND | 135 |

- ii -

4870-6046-8173.v5

This is a securities class action on behalf of all persons who purchased shares of Xponential Fitness, Inc. ("Xponential" or the "Company") common stock between July 23, 2021 and May 10, 2024, inclusive (the "Class Period"), including all shares purchased in the July 2021 initial public offering (the "IPO"). Lead Plaintiffs Fort Lauderdale Police & Firefighters' Retirement System and City of West Palm Beach Police Pension Fund (collectively, "Lead Plaintiffs"), by Lead Plaintiffs' undersigned attorneys, allege the following based upon information and belief as to the investigation conducted by Lead Plaintiffs' counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by defendant Xponential, the findings of Fuzzy Panda Research ("Fuzzy Panda"), securities analyst reports, press releases, and other information issued by, or about, the Company. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. A company's revenue growth is a crucial metric that analysts and investors utilize to assess the value of a stock market investment. This metric often heavily influences investment decisions. When an emerging growth company demonstrates rapid and sustainable revenue growth, its executives, particularly those with equity stakes, are likely to attain significant wealth by selling those equity stakes. If revenue growth is demonstrated honestly and transparently, the market rewards those executives for creating shareholder value. But when abused with lies, half-truths, and deception, share values are distorted, resulting in unjust gains for dishonest executives and significant losses for shareholders when the truth comes to light. This latter scenario is exactly what played out in this case.

2. This case concerns defendants Anthony Geisler ("Geisler") and Mark Grabowski ("Grabowski") who, knowing these foundational concepts, schemed to take boutique fitness studio franchisor Xponential public through the IPO and then

- 1 -

4870-6046-8173.v5

inflate Xponential's stock price before unloading additional shares on unsuspecting investors.[1] Defendants raised $120 million from investors in the IPO and then sold more than *a quarter of a billion dollars in stock* through secondary offerings and impeccably timed secondary market sales after they had driven the price of Xponential's stock to all-time highs. The members of Xponential's Board of Directors (the "Board") and the Underwriter Defendants (as defined in ¶¶271-279) who signed off on the Registration Statement for the April 6, 2022 secondary offering (the "SPO") at issue in this case were effectively rubber stamps, blessing the offering without a reasonable investigation into the very core of the Company's operations.[2]

3. Geisler and Grabowski's success was based on a scheme to mislead working class people who Geisler called "'corporate refugees'" into believing in, and joining, the Xponential franchise concept. They then used the resulting franchise license purchases and studio openings to convince investors that Xponential was experiencing rapid revenue growth through "healthy, happy franchisees" who were using what defendants called the "Xponential Playbook," as reflected by a "key performance indicator" they termed "average unit volumes" ("AUVs") to measure annual studio sales. AUVs, as the Company and its executives described it, was driving the Company's royalty revenue and would aid investors "in understanding how we derive our royalty and marketing revenue and [was]

---

[1] During the Class Period, Xponential operated through ten separate franchise fitness brands, including: (i) Club Pilates; (ii) CycleBar; (iii) StretchLab; (iv) Row House; (v) AKT; (vi) YogaSix; (vii) Pure Barre; (viii) Stride; (ix) Rumble; and (x) Body Fit Training.

[2] Defendants Brenda Morris ("Morris") and Chelsea Grayson ("Grayson") are the Board members that signed the Registration Statement for the SPO in addition to defendants Geisler, John Meloun ("Meloun"), and Grabowski. The underwriters for that offering were the entities identified in ¶¶ 271-279. Defendants Morris, Grayson, and the Underwriter Defendants are not alleged to have acted with fraud, scienter, or recklessness. Lead Plaintiffs' claims for violations of the Securities Act of 1933 (the "Securities Act"), including the Securities Act Defendants, are detailed herein at §XIV.

- 2 -

4870-6046-8173.v5

important in evaluating our performance." Quarter after quarter throughout the Class Period, defendants reported increasing license sales, increasing studio openings, and growing AUVs – all "key initiatives" that Geisler told investors would "get more revenue and more royalty and reoccurring dollars" for Xponential as they moved "north." And to convince prospective franchisees and investors of the strength of Xponential's business, defendants Geisler and Meloun repeated during earnings calls and at multiple investor conferences that Xponential had "never permanently closed the store in the history of our business." With these statements, Xponential's stock price increased from an IPO price of $12 per share to a Class Period high of $33.58 per share.

4. But defendants knew, and concealed from investors, that Xponential secured its revenue growth by selling franchise licenses through grossly inaccurate sales pitches and financial disclosure documents ("FDDs"), which the Federal Trade Commission ("FTC") requires franchisors to file for potential franchisees to make an informed decision about investing in a franchise. Numerous franchisees have come forward in interviews with *Bloomberg Businessweek* ("*Bloomberg*") and *The Capitol Forum*, a Washington based investigative news organization that provides private investigation reports to paying clients, as well as through numerous lawsuits, revealing that Xponential was a scam. Defendants used sales pitches and FDDs to grossly misrepresent profitability estimates to its "'corporate refugee[]'" targets while omitting a wealth of information that would deter those targets from opening an Xponential franchise, including Geisler's history of being "held liable" in multiple lawsuits alleging fraud. As franchisees have alleged in lawsuits against Xponential brands YogaSix and AKT, they "would not have entered into the Agreements" had these defendants disclosed the truth.

5. For each of these franchisees, the story was the same – "the company inflated revenue and profit projections based on unrealistic membership numbers and grossly underestimated costs." Internal documents even reveal that defendants,

- 3 -

including Geisler in particular, had actual knowledge before the IPO that Xponential's license sales were based on fabricated revenue projections and cost estimates. Franchisees, in fact, told Geisler in a February 16, 2020 memo addressed directly to him – a full year before the IPO – that "[t]he revenue estimates in the FDD do not appear to match the reality being experienced by many studios." Just months later – again prior to the IPO – Geisler received another internal document that set forth three major issues with Xponential's Operating Model that caused open studios in Xponential's Row House brand to be unprofitable. Franchisees, in a June 22, 2020 letter that Geisler acknowledged receiving, wrote that "[t]he issues we've identified translate into delayed studio openings, unprofitable open studios, and deepening losses for both owners and Xponential."

6. The failed experience for franchisees that bought into defendants' scheme was the same on a wide scale – six of Xponential's ten brands and over 60% of its studios operated at a loss during the Class Period. Franchisees uniformly reported that they lost thousands of dollars each month, and were forced to close because of defendants' misrepresentations and omissions. And franchisees in Xponential's YogaSix brand that brought suit in Orange County Superior Court on November 22, 2023 against the Company, Geisler, Meloun, and Grabowski allege that the same issues "were not unique to Plaintiffs, but existed across the brand and across Xponential's other brands." The picture that defendants' public statements painted for investors did not match the reality behind Xponential's business.

7. Reports are remarkably consistent that Xponential, and Geisler in particular, also furthered the scheme through threats and intimidation to conceal that franchisees were struggling financially. Xponential even went so far as to sue franchisees that were forced to close and took back failing studios to support the narrative that Xponential's studios had never closed. As detailed in multiple articles published by *The Capitol Forum* and *Bloomberg*, one franchisee revealed that Geisler himself personally threatened him during a mediation, quoting Geisler as

- 4 -

stating that "I'm going to cut your f[***]ing head[] off and mount them on pikes in front of the building with the note, 'This is what happens when you f[***] with Anthony Geisler.'"  Another franchisee quoted an Xponential executive as stating: "'You have children in the room, so I'm not going to go into all the details, but the punchline is, you'll be f---ed if you close.'"  And in litigation against Anna Kaiser ("Kaiser") ("Kaiser Litigation"), the creator of all AKT branding, Xponential alleged in a counter-claim that she was an "unscrupulous, untrustworthy, unstable, and unhinged businessperson."  Defendants' threats and intimidation worked just long enough to fleece investors through deception, as Geisler had a long history of doing.

8.     After defendants' massive sell-off, the scheme began to unravel as the truth came out and the risks defendants concealed began to materialize.  Within days of Geisler's last sale at near-peak prices, a short-analyst named Fuzzy Panda revealed the truth about Xponential and its founder, reporting that Geisler had a long history of misleading investors, that a vast majority of Xponential's brands were losing money monthly, that more than 50% of its studios never make a positive financial return, and that more than 100 of Xponential's franchises were for sale at a price 75% less than their initial cost.  The report also revealed that Xponential had lied in sales pitches to prospective franchisees, made misleading projections in (and omitted key material facts from) the FDDs provided to prospective franchisees, and stated that Fuzzy Panda had identified more than 30 permanently closed stores to "[d]ebunk[]" the claim that "'[w]e've never closed a store.'"  Xponential's stock collapsed 37% in response.

9.     On June 28, 2023, Xponential issued a forceful denial, continuing its scheme to defraud investors.  That day, Xponential issued a press release in response to what it called the "misleading information in a short-seller report published on" or about June 27, 2023 – *i.e.*, the Fuzzy Panda report.  The release "'denounce[d] the misleading Report,'" stated that it "'contains inaccurate information,'" and "'caution[ed] investors not to rely on it.'"  It also denied the substance of the Fuzzy

- 5 -

Panda report, stating that "'[t]he Board and Management stand firmly behind the strength of the business and health of its franchisees'" and either denied the substantive allegations in the report or claimed that accurate allegations were "immaterial." As to Geisler, defendant Grabowski came to his defense, stating in the press release that "'[a]s an investor in high-performing businesses and high-integrity management teams, I've known and worked closely with Anthony Geisler, CEO of Xponential, since investing in Club Pilates at my prior firm. I couldn't speak more highly of his passion, commitment to excellence and professionalism.'"

10. Having elected to speak about the "'health of [Xponential's] franchisees'" and the "'professionalism'" of Geisler, defendants were obligated to disclose all facts necessary to not mislead, including that Xponential's license sales, studio growth, and increasing AUVs were based on a scheme to deceive prospective franchisees as well as Geisler's history of being "held liable" in lawsuits alleging fraud. Instead of meeting that obligation, Xponential's press release "refute[d] the related allegations in the [Fuzzy Panda] Report" and thus misrepresented the risks facing Xponential as an investment, preventing investors from fully understanding the truth behind Xponential's business, license sales, studio openings, and growing AUVs. Defendants would continue to refute the Fuzzy Panda report in later public statements.

11. In the weeks following the Fuzzy Panda revelation, the risks that defendants misrepresented by refuting the report materialized. In the third quarter of 2023 ("3Q 2023"), Xponential began off-loading the failed studios that it had taken back from franchisees during the Class Period to hide their true financial condition. By the end of 2023, Xponential would take $13.8 million in charges to earnings and disclosed that it expected to take additional charges of up to $27 million in 2024, because of the distressed financial condition of those studios. Xponential then began liquidating its failed brands, announcing on February 15, 2024 that it had

- 6 -

4870-6046-8173.v5

divested the entire Stride franchise *for no consideration*, admitting that it was worthless.

12. While Xponential was in the process of divesting itself of the brands that it had once claimed were profitable because of the "Xponential Playbook," additional risks that defendants misrepresented by refuting the Fuzzy Panda report continued to materialize. On November 1, 2023, BofA Securities, Inc. ("BofA Securities") downgraded its rating on Xponential stock (from Buy to Neutral) and cut its price target in half (from $35 to $16) after conducting its own investigation into Xponential's franchisees. The report was "[b]ased on our analysis of franchise disclosure documents and recent channel checks," estimated that "many franchisees across Pure Barre, Row House, AKT, and Stride that required financing may not be profitable," and stated that it anticipated "a deceleration in net unit growth . . . as less profitable units close." The report also contained an extensive analysis for each brand, estimating a "Payback Period" as high as *26 years* even for brands that were profitable.

13. BofA Securities' analysis of Xponential was particularly damning because BofA Securities served as a Lead Underwriter and underwriter representative for Xponential's public offerings. The market took note and Xponential's stock dropped another 8% in response. It closed at $13.11 per share on November 1, 2023, down $1.16 per share from its closing price of $14.27 the day before.

14. Next, on December 7, 2023, *Bloomberg* issued an article titled "How Xponential Turned Suburban Moms Into Bankrupt Franchisees (Correct)" (the "*Bloomberg* Article") after conducting its own investigation into Xponential. The *Bloomberg* Article was based on interviews with former business partners, employees, and franchisees of the Company who revealed that Xponential misled many franchisees into a "financial nightmare." The article stated that defendant Geisler "has a track record of combative management, deploying growth-at-all-costs

- 7 -

tactics and unleashing aggressive reprisals against anyone who gets in his way." The article further reported that "Xponential deliberately misled [the franchisees] and their peers about the strength of the individual franchises prior to signing the [franchise] agreement" and disclosed that "many of the company's franchisees . . . have either declared bankruptcy or lost their retirement savings." The article also disclosed that the SEC had begun an investigation of Xponential. According to the *Bloomberg* Article, "Xponential said the company is unaware of any investigation and hasn't been contacted by the SEC regarding one." However, on December 11, 2023, the next trading day, Xponential filed a Form 8-K with the SEC stating: "On December 5, 2023, Xponential . . . was contacted by the [SEC], requesting that the Company provide it with certain documents." In response to the *Bloomberg* Article and the Company's confirmation of the SEC request, Xponential's stock collapsed another 33.8% over three trading days on heavy trading volume to close at less than $9 per share on December 11, 2023.

15. Finally, on May 10, 2024, a stunning risk that defendants misrepresented by refuting the Fuzzy Panda report materialized. After issuing its forceful denial and reporting what the Company represented to be strong financial results in the three quarters following the Fuzzy Panda report, Xponential's Board announced that it had suspended Geisler indefinitely amid probes into its operations by the SEC, the United States Attorney's Office, and state regulators. The very founder that Xponential claimed in its IPO Prospectus to be "highly dependent" upon because he "is critical to the development of our business, vision and strategic direction" was summarily removed. Xponential's stock collapsed another 31% in response.

16. All told, defendants sold almost $400 million of inflated Xponential stock based on their fraudulent scheme. Investors, on the other hand, have suffered serious damage.

- 8 -

4870-6046-8173.v5

## II. JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa. Jurisdiction is further conferred by §22 of the Securities Act, 15 U.S.C. §77v.

18. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, as well as §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o.

19. Venue is proper pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §1391(b)-(d), §22 of the Securities Act, 15 U.S.C. §77v, as many of the acts and conduct complained of herein occurred in this District, the Company is headquartered in this District, the Company conducts business in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

20. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## III. CLASS ACTION ALLEGATIONS

21. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Xponential publicly traded Class A common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives,

- 9 -

4870-6046-8173.v5

heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

22.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Xponential or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

24.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Xponential;

(c)     whether the prices of Xponential common stock were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

- 10 -

4870-6046-8173.v5

26.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IV.     PARTIES[3]

27.     Lead Plaintiff Fort Lauderdale Police & Firefighters' Retirement System, as set forth in the certification attached hereto as Exhibit A, purchased Xponential common stock during the Class Period and has been damaged thereby.

28.     Lead Plaintiff City of West Palm Beach Police Pension Fund, as set forth in the certification attached hereto as Exhibit B, purchased Xponential common stock during the Class Period and has been damaged thereby.  City of West Palm Beach Police Pension Fund also purchased Xponential common stock in or traceable to the SPO and has been damaged thereby.  Specifically, Lead Plaintiff purchased 3,380 shares of Xponential stock on April 7, 2022 through Merrill Lynch Pierce Fenner & Smith, a sister company of Lead Underwriter BofA Securities, at the offering price of $20 per share and was not charged a commission.  City of West Palm Beach Police Pension Fund's $20 per share offering purchase price was lower than the lowest trading pricing of Xponential stock of $21.66 per share on the open market that trading day.

29.     Defendant Xponential claims to be the largest global franchisor of boutique fitness brands and operated during the Class Period through the franchise brands identified in ¶2, n.1.  The Company maintains its principal executive offices

---

[3]     The Securities Act Defendants are identified in ¶¶266-279.  Lead Plaintiff City of West Palm Beach Police Pension Fund's Securities Act allegations are pled in §XIV.

- 11 -

in Irvine, California and its common stock trades on the NYSE under the ticker symbol "XPOF."  Xponential is the issuer of the stock sold in the SPO.

30.     Defendant Anthony Geisler was at all relevant times, a founder, Chief Executive Officer ("CEO"), and a director of Xponential.  Defendant Geisler signed the Registration Statement for the SPO.

31.     Defendant John Meloun is, and was at all relevant times, the Chief Financial Officer ("CFO") of Xponential.   Defendant Meloun signed the Registration Statement for the SPO.

32.     Defendant Mark Grabowski is, and was at all relevant times a founder and director of Xponential.  Defendant Grabowski signed the Registration Statement for the SPO.

33.     Defendants Geisler, Meloun, and Grabowski are collectively referred to herein as the "Individual Defendants."

34.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, franchisees, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, franchisee reports, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

35.     Each of the above officers of Xponential, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and franchisee operating performance as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information

- 12 -

4870-6046-8173.v5

alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36. The Individual Defendants, as officers and controlling persons of a publicly-held company whose common stock is registered with the SEC pursuant to the Exchange Act, is traded on the NYSE, and is governed by the provisions of the federal securities laws, each had a duty to promptly disseminate accurate and truthful information with respect to the Company's franchisee performance, operations, business, markets, management, earnings, and present and future business prospects during the Class Period. In addition, the Individual Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Xponential publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37. The Individual Defendants also participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and/or the omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board memberships and/or executive and managerial positions with Xponential, each of the Individual Defendants had access to the adverse undisclosed information about Xponential's business, franchisees, prospects, operations, and performance as particularized herein, and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Xponential and its business and issued or adopted by the Company materially false and misleading.

38. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control

- 13 -

4870-6046-8173.v5

the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each individual defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

39. Defendants Geisler and Grabowski are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Xponential common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Xponential's business, operations, franchisees, present and future business prospects, and the intrinsic value of Xponential common stock; (ii) enabled Company insiders, including certain defendants, to sell Xponential common stock at artificially inflated prices; and (iii) caused Lead Plaintiffs and other members of the Class to purchase Xponential common stock at artificially inflated prices.

## V. LEAD PLAINTIFFS' COUNSEL'S INVESTIGATION

40. In addition to reviewing SEC filings, press releases, and analyst reports about the Company, Lead Plaintiffs' counsel's investigation also focused on findings by Fuzzy Panda, *The Capitol Forum*, *Bloomberg*, and a review of internal Xponential documents.

41. Fuzzy Panda is an organization that issues reports on companies in which its members, partners, employees, consultants, clients, and/or investors have a short position. Fuzzy Panda bases its reports "upon generally available information, field and online research, and inferences and deductions through due diligence and the analytical process." The organization represented in its report on Xponential, dated June 27, 2023, that it strives to ensure that "all information

- 14 -

contained in their reports is accurate and reliable, and has been obtained from public sources believed to be accurate and reliable."

42. With respect to its reporting on Xponential specifically, Fuzzy Panda stated that the information it presented often had multiple sources with corroborating facts. The confidential sources are described by Fuzzy Panda in sufficient detail to demonstrate they were in a position to have, and in fact had, actual knowledge of the facts included in the report. Those facts, as alleged herein, were also corroborated by objective sources, where possible, and by allegations in the numerous lawsuits described herein.

43. *The Capitol Forum* is an investigative news and legal analysis organization that provides its subscribers with detail-oriented reporting on issues like antitrust, merger control, corporate investigations, and the energy sector. As a paid for premium subscription service, *The Capitol Forum*'s in-depth analysis is not readily available to the public. Lead Plaintiffs understand, however, that *The Capitol Forum* article, dated March 10, 2023, was posted on *The Capitol Forum*'s website in May 2023. Upon information and belief, this is the only article about Xponential posted on *The Capitol Forum*'s website that is available without a subscription. None of *The Capitol Forum*'s reporters are allowed to have a financial interest in any of the companies that are covered by the organization.

44. *The Capitol Forum's* analysis relied in part on interviews with numerous current and former franchisees, its review of internal documents provided by the franchisees, and its review of materials filed by Xponential. Although *The Capitol Forum* represented that it reached out to Xponential prior to posting its articles, the Company typically declined to comment. Most franchisees who were interviewed by *The Capitol Forum* required anonymity because, as *The Capitol Forum* described in an article dated February 15, 2023, "Xponential only allows franchisees to walk away from their businesses if they sign a nondisparagement agreement that waives the franchisee's due process rights and imposes a hefty fine

- 15 -

4870-6046-8173.v5

if they say anything that the company deems disparaging." The Company was not issuing empty threats, as evidenced by a permanent injunction issued against a former franchisee on February 25, 2021 as part of an arbitration award for Xponential. The permanent injunction prohibited the former franchisee from "criticizing, denigrating, disparaging, or making any derogatory or negative comments" about the Company. Franchisees understandably took the threats seriously, withholding their identities. As a result, *The Capitol Forum* described interviewed franchisees in sufficient detail to demonstrate they were in a position to have, and in fact had, actual knowledge of the facts attributed to them in the articles.

45. *Bloomberg* is a business magazine that has been in circulation since 1929. *Bloomberg* promotes itself as covering "more companies, industries and markets in more depth than anybody else." With a staff of roughly 2,700 journalists, *Bloomberg* has achieved global recognition for its reputable reporting on companies around the world.

46. *Bloomberg* based its Xponential articles in part on interviews with defendant Geisler and "[m]ore than 30 former and current franchisees – not including some who are or were in active litigation with the company." However, as detailed in its December 7, 2023 article, *Bloomberg* was forced to maintain the anonymity of the interviewed franchisees because "they feared legal retribution," corroborating the same fear described by *The Capitol Forum*. Instead, the franchisees are described by *Bloomberg* in sufficient detail to demonstrate they were in a position to have, and in fact had, actual knowledge of the facts attributed to them in the reports.

47. The allegations in this complaint are also predicated upon counsel's review of internal documents referenced in *The Capitol Forum* reports or filed in litigation involving Xponential's business, including the February 16, 2020 Row House memo, the June 22, 2020 AKT letter, and the 2022 YogaSix slideshow presentation cited herein.

- 16 -

4870-6046-8173.v5

## VI.    BACKGROUND

48.    Xponential was founded by Geisler in 2017.  Geisler claimed in an interview with *CEO Magazine* published on March 6, 2019, to have been raised in a working-class family in Southern California, and witnessed his parents "work[ing] their butts off," to provide for the family.  As a result, Geisler vowed in an interview published in *Authority Magazine*, on May 5, 2021, "to never be broke again, and that fear propels and drives [him]."  Geisler's pursuit of "massive" wealth introduced him to the franchise world, which culminated in 2017 with the founding of Xponential, a boutique fitness franchisor.

49.    Geisler found his start in the fitness world when he purchased and opened a few LA Boxing gyms in or around 2001.  Subsequently, Geisler was introduced to the franchise concept by a franchise representative and shortly thereafter converted LA Boxing to a franchise system, selling licenses for individuals to open their own LA Boxing gym.

50.    Geisler's LA Boxing franchise concept was a success.  By 2012, Geisler had capitalized on the franchise concept, selling his interest in LA Boxing to Ultimate Fighting Championship Gym ("UFC Gym") for $25 million, while retaining for himself the position of President at LA Boxing.

51.    Geisler stepped away from UFC Gym and LA Boxing in 2014.  Not six months later, he was introduced to Club Pilates, a small boutique gym based in Newport Beach, California.  As the *Bloomberg* Article described it, "Geisler got a call from a small Newport Beach family office about a deal for another up-and-coming franchise, Club Pilates.  He bought it the next year and hired his LA Boxing team to roll out the chain nationally . . . ."  Not long after, Geisler witnessed the potential of the franchise concept and launched Xponential.  In a period of just two years, Geisler went from selling 70 Club Pilates licenses to 500 licenses.  He capitalized on the concept again in 2017 by selling a 70% stake in Club Pilates to TPG Group ("TPG") for a valuation of $100 million.

- 17 -

4870-6046-8173.v5

52. It was at TPG where Geisler befriended Grabowski, who was then a partner at TPG. By this time, Geisler had gained a reputation as an aggressive entrepreneur that would pursue growth at all costs. According to *Bloomberg*, it was seemingly too much for TPG – "a company famous for pushing its investments faster." As Geisler described it, "'TPG told me to essentially slow down, which then prompted me to buy them out.'"

**VII.  THE SCHEME AND FRAUDULENT COURSE OF CONDUCT** *(LIABILITY UNDER RULE 10b-5(a) and (c))*

53. In 2018, Grabowski left TPG to create Snapdragon Capital, but his eyes remained set on Xponential. Having found someone who shared his unbridled ambition, Grabowski collaborated with Geisler to buy out TPG's stake in Xponential. According to an article published by *Bloomberg* on December 17, 2017, Grabowski then tapped Geisler to be the CEO of the Company, who was no longer restrained by TPG's cautious approach to growth. It was then that Geisler and Grabowski hatched a six-artifice scheme to pursue massive wealth through the franchise engine using the capital markets.

**A.  Artifice No. 1: Defendants Geisler and Grabowski Launch the Scheme by Intentionally Pursuing a Growth at All Costs Strategy**

54. Both Geisler and Grabowski knew the importance of license and studio growth from Geisler's days at LA Boxing and Geisler and Grabowski's experience with Club Pilates. So they set out to collect as many concepts as they could under the heading "boutique" fitness. By 2019, Geisler and Grabowski had collected seven more studio concepts in addition to Club Pilates, including CycleBar, StretchLab, Row House, AKT, YogaSix, Pure Barre, and Stride. They would add Rumble and Body Fit Training in 2021. "Xponential bought them all out, planning to copy and paste the franchise model," according to *Bloomberg*. As Geisler described his approach in a 2019 interview, "'[t]he template that we used at Club Pilates has become a toolbox to solve problems in other brands.'" They were targeting the

- 18 -

4870-6046-8173.v5

public markets for an offering in 2020 where Geisler's plan was to "'build a massive company.'"

55.    But the pandemic presented a roadblock, at least for a while.  More than 1,000 Xponential locations closed temporarily due to the pandemic and Geisler and Grabowski's offering was put on hold.  Both were unacceptable.  As was Geisler's reputation, he refused to take no for an answer.  Instead of pausing in the face of a pandemic that would kill millions of people worldwide, Geisler stepped on the gas – he had to show strong growth to capitalize on the public markets.  So between January 2020 and July 2021 – the peak of the pandemic – Xponential opened over 350 new studios in North America and even used the pandemic to demonstrate the purported strength of Xponential's business model.  Geisler even stated publicly during Xponential's second quarter of 2021 ("2Q 2021") earnings call that "the power of our Xponential playbook" was one of "2 factors [that] have enabled us to provide robust and ongoing support to franchisees even in the midst of a global pandemic."

56.    Xponential finally went public in July 2021, selling ten million shares to investors in the IPO for proceeds of $120 million.

**B.    Artifice No. 2: Xponential Misrepresents Financial Prospects to Franchisees to Show Increasing License Sales and Studio Growth**

57.    Geisler knew that revenue growth was the key to inflating Xponential's value – and its stock price.  So he kept his foot on the gas, pushing for what analysts and investors wanted to see – revenue growth.  And he did so by luring unsuspecting individuals into what franchisees have labeled the Xponential "façade" while telling investors that its business was strong and growing.  In fact, Geisler sold investors on the concept of AUVs, which he claimed in an earnings call on March 2, 2023, "ultimately offer the most direct measure of the health of our franchise system."  And each quarter, Geisler highlighted Xponential's growing AUVs, increasing license

- 19 -

4870-6046-8173.v5

sales, and studio openings, claiming that "[a]s our AUVs grow and as we increase the number of studios, we become more profitable."

58.  Xponential's purported performance grabbed the attention of analysts, who described AUVs, license sales, and studio openings as "[k]ey metrics" that "illustrat[ed] a healthy franchise base" and that were driving increasing price targets for Xponential stock.  The following quotes are representative examples:

- November 21, 2021 Jefferies LLC ("Jefferies") analyst report: "Openings were strong and more importantly, mgmt continues to see robust new license sales (+~250), illustrating a healthy franchise base that's in high demand.  Looking ahead, we see club AUV reaching and exceeding pre-COVID levels and company sales/SSS/EBITDA upside. With strong fundamentals, we believe a much higher multiple should be paid for XPOF shares and raise our PT to $30 from $18."

- March 4, 2022 Roth Capital Partners, LLC ("Roth Capital") analyst report: "Key metrics: XPOF's momentum remains on-track. Membership (+70% yoy), visitation (+50%), run-rate AUVs (+56%), and studio sales/openings, all continued to grow rapidly.  Management commented that Omicron has not materially slowed AUV growth in 2022."

- November 20, 2022 Guggenheim Securities, LLC ("Guggenheim") analyst report: "A Virtuous Circle: the Portfolio, Partnerships, and AUV.  Although studio sales and openings are the lifeblood of the algo, AUV expansion will play a key role as well, in our view.  In North America, the AUV sits at $490k with average per-club membership of 260 and average per-member spending of $1,600."

- March 2, 2023 Evercore Group L.L.C. ("Evercore") analyst report: "We think XPOF continues to be misunderstood by the market, which is creating a compelling set-up for the stock to continue to outperform

- 20 -

as it continues to deliver across the key KPI of AUV growth, member growth, and studio openings this year."

59.     Increasing these metrics depended on Xponential selling its concept to prospective franchisees.  And from what *Bloomberg* reported, it "wasn't particularly hard" to do.  The Company's pitch was alluring – "[f]or a few hundred thousand dollars, [franchisees would] collect checks amounting to about $400,000 a year just by following the corporate playbook."  And to close the sale, Xponential would "woo prospective franchisees" by flying them out to Irvine, driving them around in luxury sprinter vans, and offering them indulgence – "tomahawk-cut steaks, fancy French wines and expensive tequilas."  To get prospective franchisees to bite, Xponential misrepresented the profitability of most of its brands.  As early as February 2020, franchisees in the Company's Row House brand sent a memo directly to defendant Geisler complaining that "[t]he revenue estimates in the FDD do not appear to match the reality being experienced by many studios."  They said that "[t]he buildout costs and timeline are higher & longer than the expectations being set during the franchisee sales process" and added that "[t]here are costs and build-out concerns being experienced by all studios that are not referenced in the original FDD (e.g. sound attenuation, signage costs, music licensing, updated revenue model, etc.)."

60.     By June 2020, franchisees in the Company's AKT brand made similar complaints in a letter that Geisler ultimately acknowledged receiving in a declaration he filed during the Kaiser Litigation.  The letter identified three major issues in Xponential's operating model: (i) development; (ii) marketing, sales, and pricing; and (iii) brand identity.  Similar to what other franchisees have revealed, the franchisees of AKT studios identified development and marketing costs not set forth in the FDD.  The franchisees told Geisler that "[d]evelopment is costly and disorganized, and carries significant risks.  The build-out overages are systemic, and we are in the hole financially from the beginning (50-80% above what is outlined in

- 21 -

4870-6046-8173.v5

the FDD)." The franchisees added "[t]here are issues in the operating model at every stage of the process, creating a vicious and costly cycle . . . .  Once sold, the development process is disastrous, putting every owner at a financial and operational disadvantage even before a studio opens."  They also stated that "[w]e are handicapped from the get-go because of the failures in the development process.  As a result, our openings are delayed and owners run out of cash before opening."  They explained that "[w]e are put in the position to create their own marketing, a significant expense not identified in the FDD and on top of the marketing fund to which we already contribute."  The franchisees concluded by stressing that "[t]he issues we've identified translate into delayed studio openings, unprofitable open studios, and deepening losses for both owners and Xponential.  This is a liability for future growth: We will not open more studios until these issues are fixed, and we are not able to provide good validations with prospective franchisees."

61.    Significantly, in an exhibit attached to the June 22, 2020 letter, AKT franchisees stated that Xponential's FDDs misrepresented key facts about studio profitability:

- "'We were ripped off.  Development costs were $250k more for buildout then outlined in the FDD.  This caused major delays in studio openings.'"
- "'This seems to be the XPo game – rip you off from the build-out.'"
- "'[T]he FDD does not line up with Franchisee experiences for development and operating costs.'"
- "'We've been given multiple financial models and toolkits to "re-do" numbers as our studios don't perform as originally planned.'"

62.    Franchisees interviewed by *Bloomberg* corroborated this aspect of defendants' scheme, reporting that "the company inflated revenue and profit projections based on unrealistic membership numbers and grossly underestimated costs."  Likewise, franchisees that spoke to *The Capitol Forum* – and who brought

- 22 -

lawsuits against Xponential, its operating entities, and executives – have all shared similar stories, as alleged below.  The result was an accumulation of an abundance of small businesses, many of which were misled into operating Xponential studios at significant losses.

63.    Lead Plaintiffs' proprietary analyses, set forth below, illustrate that the vast majority of Xponential's boutique studio brands were, on average, unprofitable and that the majority of Xponential's studios, on average, incurred operating losses. The following chart represents the average monthly revenue and average annualized operating losses, based on average monthly revenue and estimated monthly expenses, ***across six of Xponential's ten brands*** during the Class Period and demonstrates that these six brands, on average, suffered operating losses throughout the Class Period:[4]

| Row House ROW HOUSE | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Average monthly revenue per studio | $ 15,201 | $ 20,339 | $ 22,015 | $ 21,453 | $ 21,886 | $ 23,031 | $ 22,245 | $ 22,283 | $ 22,201 |
| Average annual operating profit (loss) per studio | $(189,588) | $(127,932) | $(107,820) | $(114,564) | $(109,368) | $ (95,628) | $(105,060) | $(104,604) | $(105,588) |

| AKT AKT | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Average monthly revenue per studio | $ 13,946 | $ 16,657 | $ 18,003 | $ 19,003 | $ 25,715 | $ 28,282 | $ 26,726 | $ 26,869 | N/A |
| Average annual operating profit (loss) per studio | $(204,648) | $(172,116) | $(155,964) | $(143,964) | $ (63,420) | $ (32,616) | $ (51,288) | $ (49,572) | N/A |

| Stride STRIDE FITNESS | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Average monthly revenue per studio | $ 22,327 | $ 28,819 | $ 25,409 | $ 26,474 | $ 27,097 | $ 29,176 | $ 22,466 | $ 23,653 | $ 26,640 |
| Average annual operating profit (loss) per studio | $(104,076) | $ (26,172) | $ (67,092) | $ (54,312) | $ (46,836) | $ (21,888) | $(102,408) | $ (88,164) | $ (52,320) |

---

[4]    An explanation of the methodology for the following chart is set forth in detail in Exhibit C, attached hereto.

- 23 -

| YogaSix | | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Average monthly revenue per studio | | $ 20,233 | $ 24,265 | $ 26,100 | $ 30,122 | $ 30,524 | $ 30,915 | $ 29,962 | $ 33,027 | $ 34,490 |
| Average annual operating profit (loss) per studio | | $(129,204) | $ (80,820) | $ (58,800) | $ (10,536) | $ (5,712) | $ (1,020) | $ (12,456) | $ 24,324 | $ 41,880 |

| PureBarre | | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Average monthly revenue per studio | | $ 18,494 | $ 21,292 | $ 22,228 | $ 24,497 | $ 24,671 | $ 24,876 | $ 24,490 | $ 26,430 | $ 27,063 |
| Average annual operating profit (loss) per studio | | $(150,072) | $(116,496) | $(105,264) | $ (78,036) | $ (75,948) | $ (73,488) | $ (78,120) | $ (54,840) | $ (47,244) |

| Cycle Bar | | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Average monthly revenue per studio | | $ 26,696 | $ 32,232 | $ 31,573 | $ 31,574 | $ 31,285 | $ 32,252 | $ 29,902 | $ 31,500 | $ 31,342 |
| Average annual operating profit (loss) per studio | | $ (51,648) | $ 14,784 | $ 6,876 | $ 6,888 | $ 3,420 | $ 15,024 | $ (13,176) | $ 6,000 | $ 4,104 |

64.	The chart set forth below depicts the average monthly revenue and average annualized operating losses *across Xponential's total studio base* during the Class Period.  Excluding the qualified studios from three brands, all remaining studios, representing over 60% of the Company's total studios, on average, incurred operating losses:[5]

| XPONENTIAL | FY 2021 | | | | FY 2022 | | | | FY 2023 |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Total studios (as reported) | 1,765 | 1,824 | 1,891 | 1,950 | 2,030 | 2,120 | 2,215 | 2,324 | 2,406 |
| Club Pilates, Stretch Lab, and Rumble qualified studios | 666 | 682 | 706 | 727 | 758 | 797 | 823 | 856 | 952 |
| Remaining Studios (excluding Club Pilates, Stretch Lab, and Rumble qualified studios) | 1,099 | 1,142 | 1,185 | 1,223 | 1,272 | 1,323 | 1,392 | 1,468 | 1,454 |
| as a % of total studios | 62% | 63% | 63% | 63% | 63% | 62% | 63% | 63% | 60% |
| Average monthly revenue per remaining studio (excluding Club Pilates, Stretch Lab, and Rumble qualified studios) | $ 19,549 | $ 23,335 | $ 24,394 | $ 26,244 | $ 25,501 | $ 26,622 | $ 26,425 | $ 27,904 | $ 28,268 |
| Average annual operating profit (loss) per remaining studio | $(137,409) | $ (91,977) | $ (79,271) | $ (57,076) | $ (65,993) | $ (52,538) | $ (54,899) | $ (37,152) | $ (32,789) |

---

[5]	An explanation of the methodology of the following chart is set forth in detail in Exhibit D, attached hereto.

- 24 -

4870-6046-8173.v5

65. Franchisee accounts of their experiences, as reported by *Bloomberg*, explain the data in the foregoing charts – Xponential "promised them the ability to run businesses as investors rather than as hands-on managers, oversold the success of other franchisees and was deceptive about the level of corporate support it would provide." The Row House memo, in fact, told Geisler that Xponential's "FDD painted a rosy picture of being profitable in a few months, which few/no studios have achieved" and gave specifics about what Xponential's FDDs were missing – the "FDD [was] missing many costs incurred by franchisees such as legal fees, SBA loan/finance cost, architect fees, flooring cost, sound engineering cost etc." The memo stated that "[m]any studios were not prepared for how much working capital they would need to have" and that "studios [were] burning through their reserves quickly and feeling the pinch (often drawing against money reserved for additional studios to keep the first one open)."

66. Samantha, a franchisee with whom *Bloomberg* spoke, shared that she too had been "'misled'" into purchasing a franchise. She told *Bloomberg* that she was reassured during due diligence calls with Xponential's team "that the business practically ran on autopilot and that she could keep her corporate day job." But the truth was much different. As *Bloomberg* reported, Samantha realized at Xponential's 2022 annual conference in Las Vegas that she had been misled:

> But in 2022, soon after buying the franchise, she attended Xponential's annual conference in Las Vegas and learned ***many of her peers were bleeding money, just as she was***. "That was my first big shock," Samantha says. "***I realized I had been misled***."

67. *Bloomberg* provided additional examples of deception, some tied directly back to Geisler. A franchisee named Vincent, for example, reported that he and his business partner were told that their YogaSix studio would become profitable within three months, that Xponential would waive the franchise fee, and potentially give the partners some stock. But Vincent said that "Geisler clarified that he couldn't

- 25 -

4870-6046-8173.v5

include it in the contract because of the quiet period ahead of the pending IPO," adding that "'Anthony was talking about promises he couldn't put in writing'" and "'[h]e was convincing. He's a charming guy.'" Vincent and his business partner closed after a year and a half, explaining that the financial statements the company represented "wasn't even close to reality'":

> Vincent and his partner, who'd reviewed many profit-and-loss statements over their careers, examined the one for YogaSix, which showed a healthy business apart from the pandemic blip. But after a year and a half, the partners got out. "It wasn't even close to reality," Vincent says of the financials the company presented. "Once we got in, the losses were much greater than what they showed on the spreadsheets, probably by 50%."

68. Other franchisees in the CycleBar brand spoke to *Bloomberg* about Xponential's habit of obscuring revenue and costs for their studios. According to *Bloomberg*, "Xponential told potential CycleBar franchisees that the build-out – real estate leases, equipment and merchandise – cost $400,000 to $500,000 on average" for their studios. "But many owners in the suburbs, where everything from rent to construction generally costs less than in major cities, found themselves paying hundreds of thousands more." And "[w]hen it came to money coming in, Xponential touted strong membership revenue numbers, but that didn't account for intense churn rates and discounted fees, some franchisees say." In fact, "[c]lasses often looked packed and even had waiting lists, but many members were paying lower rates from promotions." Xponential and, in particular Geisler, was securing franchisees, and perceived growth by investors, through outright deception.

69. Reports by other franchisees corroborate Xponential's scheme to increase license sales and studio openings by misrepresenting the profitability of its studios. In fact, franchisees in both the AKT and YogaSix brands filed lawsuits describing the same scheme. The YogaSix plaintiffs describe the scheme this way

- 26 -

4870-6046-8173.v5

– "Plaintiffs, having been promised a turnkey business with experienced leadership, all soon discovered there was no system and Xponential's leadership had no answers to Plaintiffs' inability to achieve the member numbers that they were told they would achieve and, in turn, the gross revenue they expected." The YogaSix franchisees allege a pattern of misrepresentation and omission "to induce Plaintiffs to sign franchise agreements and area development agreements with Y6 Franchisor." And having fallen for defendants' scheme, the franchisees now have "studios [that] are operating at losses of $8,000 to $23,000 per month and face imminent closure . . . as a direct result of material misrepresentations made by their franchisor, Y6 Franchisor, and its directors, officers, employees, and agents," including the Individual Defendants in this case.

70. The YogaSix franchisees' allegations are particular. They allege that the defendants in that case "repeated false representations" about membership numbers and rates, "effectively providing the monthly gross revenues that Plaintiffs would earn at their studios," while "grossly misrepresent[ing] (in their FDD and elsewhere) the cost that Franchisees would expend to open their studios" and "the time it would take to open the studios, representing they would be open and generating the represented revenues within twelve weeks." But the reality was different. "[T]he time . . . from signing of the franchise agreement to opening was more than eleven months" while the opening costs were off "by hundreds of thousands of dollars." The YogaSix plaintiffs now "continue to lose thousands and tens of thousands of dollars each month, making closure imminent" while the "misrepresentations made to Plaintiffs . . . have financially destroyed them."

71. Defendants' acts of deception similarly affected the entire AKT brand. Franchisees were misled into purchasing AKT franchise licenses and opening AKT studios based on defendants' misrepresentation that Kaiser, who created all of the AKT branding and is known for her personal training of celebrities, would be intimately involved in the AKT franchise system. Unbeknownst to franchisees,

- 27 -

however, the relationship between Kaiser and defendants was contentious from the outset and led to litigation.

72.    On December 6, 2021, Kaiser filed a second amended complaint against AKT Franchise, LLC, Xponential, and Geisler in Delaware District Court. The complaint alleges that defendants AKT Franchise, LLC and Xponential, through Geisler's actions, intentionally and materially breached their obligations as set forth in the Asset Purchase Agreement ("APA"), consulting agreement, and other purchase documents, by refusing to pay Kaiser hundreds of thousands of dollars owed under the signed purchase documents.

73.    In the complaint, Kaiser alleges that as a result of the success of her brand, in fall 2017, she flew to Los Angeles and met with Geisler who explained that Xponential intended to serve as the holding company of up to ten fitness brands and a franchise brokerage firm, which he expected to be a billion dollar business in three years. Geisler also claimed to be an expert in franchising. Shortly thereafter, on or about March 22, 2018, the parties entered into the APA. Pursuant to the APA, Kaiser agreed to the development of a franchise business built on her fitness technique, wellness brand, and the intellectual property assets she had developed. However, the relationship between Kaiser and AKT Franchise, LLC, Xponential, and Geisler quickly deteriorated.

74.    According to Kaiser, Geisler's representations to Kaiser prior to the signing of the APA were not true. For example, contrary to the representation that a model franchise studio would be open within three months of the APA closing, such a studio was not opened until 15 months later in June 2019. Thus, according to Kaiser, the commencement of sales of franchises was delayed and the growth of the business slowed. Kaiser filed a declaration in the Kaiser Litigation stating that "AKT Franchise's continuous delays resulted in a lack of revenue and a colossal waste of funds used to pay a full management team for a one-year period prior to the opening of the first franchise studio." She further explained that as of August 2020,

- 28 -

4870-6046-8173.v5

"while approximately 100 franchises have been sold across the United States, only approximately 6 franchise studios opened other than [Kaiser's] Studios."

75.   Kaiser's second amended complaint also detailed how Geisler and Xponential's attacks on Kaiser escalated as she attempted to escape from the partnership.  Kaiser alleged that Xponential personnel engaged in a hacking spree to steal assets from and harm Kaiser and the operation of her business.  The complaint alleged that Chris Neal, Vice President of Technology for Xponential, participated in hacking accounts owned by Kaiser and her related brands, including Kaiser Fitness's Shopify ecommerce account.  The hack disrupted Kaiser's ability to access the account for a period of approximately eight days and caused physical and emotional stress at a time that she was pregnant.

76.   On March 8, 2022, the parties entered into a confidential settlement agreement which included a payment to Kaiser for an amount that is confidential under the arbitration rules and terms of settlement.

77.   Defendants concealed all of this from prospective franchisees as they continued to sell AKT franchise licenses.  In fact, AKT franchisees filed a lawsuit in Orange County Superior Court on August 30, 2023 (the "2023 AKT Litigation"), explaining that "[a]s AKT Franchisor began franchising in late 2018, AKT Franchisor, Geisler, Grabowski, and Xponential were in active disputes with Anna Kaiser, the face and namesake of the AKT franchise.  Defendants concealed from Plaintiffs their disputes with Anna Kaiser . . . ."  The lawsuit also alleges "[w]ithout Anna Kaiser's involvement, the franchise system had no brand recognition."

78.   According to the AKT franchisees' complaint, "[f]rom the beginning, AKT Franchisor and its representatives promoted Kaiser as the face of the AKT brand, touting her celebrity connections with the likes of Shakira and Kelly Ripa."  The AKT franchisees were told that Anna Kaiser "would operate three studios as an AKT franchisee, and so would be involved both on the corporate franchisor side and on the franchisee side."  Their complaint emphasized that, "Anna Kaiser was the

- 29 -

AKT brand" and the franchisees "were sold on AKT because of the involvement that AKT Franchisor represented Anna Kaiser had and would continue to have in the franchise system." Prior to the signing of the franchise agreements, however, the AKT franchisees alleged that:

> Defendants pretended all was well with Anna Kaiser and did not disclose the disputes and lawsuits, nor the fact that, because they had ceased paying Anna Kaiser under her consulting agreement, she was no longer providing content for franchisee classes and was instead beginning to operate her own Anna Kaiser Studios brand.

79. The AKT franchisees alleged specifically that these misrepresentations "convinced Plaintiffs to execute the [franchisee] Agreements."

80. Defendants' misrepresentations to the AKT franchisees did not end with Kaiser's involvement. In their complaint against Xponential and its executives, including defendants in this case, the AKT franchisees involved in the 2023 AKT Litigation also alleged specifically that "AKT leadership (as well as the leadership of its ultimate parent, Xponential, Inc.) repeated false representations" about membership numbers and rates, "effectively providing the monthly gross revenues that Plaintiffs would earn at their studios" in order "to induce Plaintiffs to sign franchise agreements and area development agreements with AKT Franchisor." The misrepresentations also included "the cost that Franchisees would expend to open their studios" and "the time it would take to open the studios, representing they would be open and generating the represented revenues within twelve weeks of the signing of franchise agreements." And like YogaSix, the truth was different. The AKT franchisees detailed that "[i]n reality, the time to open was twelve months or more" and the opening costs were off "in almost every case by hundreds of thousands of dollars." In the end, the represented "numbers were never achieved by Plaintiffs." And they alleged, "upon information and belief" that the represented numbers "were not achieved, and certainly not maintained, by any other AKT studio,

- 30 -

whether franchisee- or corporate-run." Instead, "Plaintiffs continued to lose thousands and tens of thousands of dollars each month, finally requiring them to close their studios."

81. The franchisees who spoke to investigative analysts at *The Capitol Forum* similarly corroborated Xponential's deceptive sales practices with prospective franchisees. In an article entitled "Sales Pitch to Some Former Franchisees May Have Violated Franchise Disclosure Rules," dated March 10, 2023, *The Capitol Forum* reported, based on conversations with franchisees and screenshots provided to *The Capitol Forum* by a former franchisee, that "[f]itness Franchisor Xponential (XPOF) in some cases appears to provide financial projections as part of its sales pitch to perspective franchisees beyond those contained in its franchise disclosure documents – a potential violation of federal franchise rules," explaining that "[f]ormer franchisees told *The Capitol Forum* that company officials made the financial representations orally and before the franchisees had agreed to buy franchise licenses. In some cases, the projections were included as part of an interactive spreadsheet provided in the early stages of the Xponential sales pitch . . . ." And "[i]n each case, the representations, including revenue estimates based on membership fee rates and member acquisition timeline projections, were not part of the franchise disclosure documents that the customers received." According to the FTC Compliance Guide, franchisors are permitted, but not required, "to include representations about financial performance in their disclosure documents." But when "[a] franchisor elect[s] to make a financial performance representation [it] must, among other things, have a reasonable basis and written substantiation for the representation at the time it is made, and disclose the bases and assumptions underlying the representation in Item 19" of the Franchise Disclosure Document.

82. The March 10, 2023 article discussed the experience of a former Row House franchisee, who had provided *The Capitol Forum* with "copies of financial

- 31 -

estimates the former franchisee said they received prior to purchasing their franchise license and prior to receiving the franchise disclosure documents." Like the representations that Xponential and Geisler made to the other franchisees, the projections that Xponential gave this Row House franchisee were nowhere close to reality:

The franchisee said they were sent a blank version of an elaborate set of spreadsheets, then attended a virtual call with an Xponential official, who filled out the spreadsheets for the prospective franchisee during the call. The spreadsheets detail costs for building out a studio as well as regular monthly operating expenses and expected revenues once a studio is up and running.

The franchisee provided *The Capitol Forum* with screenshots showing that the Xponential official had shared his screen with the franchisee and showing that the date was several days before the franchisee was given the company's financial disclosure documents, according to a signed and dated document acknowledging the franchisee's receipt of the paperwork.

The franchisee said that during the call, the Xponential official input numbers into the spreadsheets indicating that the franchisee could expect a maximum membership of 1,300 people, with calculations demonstrating the associated profits. The franchisee said they later learned that a studio could only accommodate a maximum of 600 members. The franchisee's studio never reached even the 300-member threshold the Xponential official had assured them would exist by the studio's grand opening, the franchisee said.

83. The Row House franchisee was not alone. Former AKT franchisees made a similar allegation in a lawsuit filed on October 4, 2021 in Orange County Superior Court (the "2021 AKT Litigation") against various Xponential officials,

- 32 -

4870-6046-8173.v5

including Geisler.  The franchisees allege that Justin Lacava, the Director of Franchise Development of Xponential, had assisted the plaintiffs in filling out a business pro forma spreadsheet and had provided "material data and information necessary to generate the expected financial performance" of the franchisee's proposed location, including membership pricing tiers, member numbers, and earnings calculations.  According to their complaint, "[i]n the latter stages of 2019, Plaintiffs began to discover that the actual initial investment for a studio in AKT's system was drastically higher than what Defendants represented both in the FDD and directly to Plaintiffs."  This time, AKT franchisees alleged that "several categories were simply not accounted for in the FDD, including AKT's structural engineering design and sound engineering (standard requirements for an AKT studio)."   The franchisees also alleged that the "financial performance representations made by AKT and Defendants were false" and that "[t]he numbers of memberships AKT and Defendants represented Plaintiffs would achieve were not achieved by Plaintiffs nor by other AKT franchisees in the timeframes in which Defendants stated they would be achieved."  The AKT franchisees also alleged that had they known "the actual initial investment required for the franchise, and [the] actual membership numbers, rates, and gross revenues, [the AKT franchisees] would never have signed the Franchise Agreement or ADA."   The parties settled on March 31, 2022, with an affiliate of AKT Franchisor paying $375,000 to acquire all operating assets, lease rights, and franchise rights related to the studio at issue, as well as to resolve the claims.

84.    The foregoing franchisee accounts were not isolated incidents.  Multiple sources describe Xponential using the same misrepresentations across its many brands to fuel its growth.  The Row House franchisees revealed in their February 16, 2020 memo to Geisler that "a majority of Row House Owners" had "a nation-wide call to discuss growing concerns of studio unprofitability," that "[m]any of the Row House Owners purchased the franchise based on the 2018 FDD which

- 33 -

4870-6046-8173.v5

communicated significantly higher revenues, lower start-up costs, lower cash flow needs and an owner-operated model," and that "[m]any studios are in danger of closing after 6 months of unprofitability."  The YogaSix franchisees allege in their lawsuit that the same issues "were not unique to Plaintiffs, but existed across the brand and across Xponential's other brands."  They also allege in their lawsuit that they surveyed "nearly 100 operating YogaSix studios" and found that "the same holds true for 88% of these YogaSix franchisees, who, as of August 2022, had not reached breakeven," and that "[n]ot one of the 97 surveyed franchisees indicated they would be willing to build out and open another YogaSix studio."  AKT franchisees allege in the 2023 AKT Litigation that "[o]f 30 original franchisees in 2018 and 2019, it appears at best 7 remain in the AKT system," further noting "Anthony Geisler ultimately admitted that the AKT team was inadequate, stating he hired whom he could get because AKT was a startup and 'start ups do not attract talent.'"

### C. Artifice No. 3: Xponential Conceals Geisler's Fraudulent History from Prospective Franchisees and Investors

85.    According to *Bloomberg*, Geisler is proud of the fact that his business model targets "what he calls 'corporate refugees,' people who were tired of working the traditional 9-to-5 or wanted to invest their 401(k) savings in something more lucrative."  These folks display the type of frustration that lends itself to Geisler's scheme.  As Geisler himself explained in an interview with *Bloomberg*, "'[t]he things we hear from our franchisees all the time is, "I'm sick of making money for the man, I want to make money for myself, I want a second lease on life."'"  But to get these folks to join Geisler, he had to hide his history of fleecing investors for his personal gain.

86.    Geisler's history of using the capital markets started at a company called Interactive Solutions Corp. ("Interactive Solutions").  According to the Fuzzy Panda short report issued during the Class Period on or about June 27, 2023,

- 34 -

4870-6046-8173.v5

"Interactive Solutions was a stock promotion and reverse merger that was listed on the pink sheets and masqueraded as a gaming software company." The *Bloomberg* Article later added that Geisler had attained the position of CEO even though he had no experience in software. As the Fuzzy Panda report explained, "Interactive's only legacy is that of utilizing multiple boiler rooms, including the Brinton Group, an infamous Bangkok boiler room." According to the Financial Industry Regulatory Authority ("FINRA"), boiler room operations "are still used to pitch dubious investment schemes," are "[t]ypically run as outbound call centers," and "are characterized by high pressure sales pitches from promoters targeting retail investors with highly speculative – oftentimes fraudulent – investments."

87. Fuzzy Panda cited proof of its discovery, quoting from an ABC Australian investigative journalism show, Four Corners, that confirmed in a documentary called "Beyond the Boiler Room" that Interactive Solutions had, in fact, used the Brinton Group to raise funds. In the documentary, Interactive Solutions' Board Chairman, Ed Tracy, stated that "Interactive Solutions is a company that the Brinton Group has raised money for." The Bangkok boiler room was ultimately raided by a multi-national police effort involving the Federal Bureau of Investigation ("FBI"), SEC, Thai Royal Police, and the Australian Federal Police. Those investigators found evidence revealing that brokers in the boiler room were peddling Interactive Solutions' stock. And highlighting Geisler's involvement, ABC caught Geisler on camera refusing to answer questions about Interactive Solutions' involvement with the Bangkok boiler room:

> [ABC Question:] – Why were shares in your company being sold through Bangkok boiler rooms?
>
> [Geisler:] I decline to comment. Are these questions gonna keep going down this way, because I'm gonna get real busy if they, so . . . ?

*    *    *

- 35 -

[ABC Question:] – What, you can't tell me if those companies were authorised to sell shares in your company?

[Geisler:]  No.

[ABC Question:] – Why not?

[Geisler:]  Because I decline to comment on all of those things.

[ABC Question:] – But why?

[Geisler:]  Because I've been advised by counsel and as an officer and director of a public corporation I retain counsel in Australia and both in the United States and . . . .

* * *

[ABC Question:] – If somebody bought shares in your company ah and they were sold as being traded on the main NASDAQ board, you'd agree that was deception?

[Geisler:]  Um, I don't know, I'd have to decline to comment on that right now.

88.    Neither Xponential nor Geisler disclosed this aspect of Geisler's past to prospective franchisees or, ultimately, to investors in Xponential's FDDs or its SEC filings.[6]

89.    Geisler's next pursuit was LA Boxing.  And while Geisler's experience there was a success for Geisler, it was not so much for others who interacted with him.  And two filed suit against Geisler for fraud, which Geisler concealed from Xponential franchisees and, ultimately, investors.  The first was a suit in Orange County Superior Court, filed on April 8, 2009, by Christopher T. Poland ("Poland"), the National Director of Sales of LA Boxing, who alleged that Geisler made

---

[6]  Geisler will undoubtedly argue that he was not charged in connection with the investigation.  But the specifics concerning the charging decisions present factual questions that require discovery.  Geisler's involvement, however, is beyond question.

- 36 -

fraudulent promises relating to his pay and ownership interest in LA Boxing. Poland alleged that Geisler fraudulently promised him that he would receive a base pay of $1,000 per month in addition to one percent of the gross revenue of every franchisee in the LA Boxing franchise system, that he would be given a franchise in the LA Boxing franchise system, and that he would receive an ownership interest in the franchisor entity. Poland alleged that Geisler never intended to fulfill these promises.

90.     The case went to the jury, who on December 16, 2010, found Geisler liable for fraud. Judgment was entered against Geisler on April 4, 2011 for $97,465.16 plus costs. But Geisler concealed this aspect of his past. As franchisees in the 2023 AKT Litigation alleged, "Geisler was 'held liable' pursuant to the FTC Rule and, therefore, the judgment should have been disclosed in each AKT FDD until at least April 4, 2021." But "[t]he Fraudulent Promises Lawsuit and judgment were not disclosed in the 2018 FDD, 2019, FDD, 2020 FDD, or any other AKT Franchisor FDD (nor, upon information and belief, any other FDD of any Xponential brand)."

91.     Next up was Sean McCully ("McCully"), one of the founders of LA Boxing, who sued Geisler for fraud on July 17, 2013 also in Orange County Superior Court. According to the complaint, Geisler scammed McCully out of millions of dollars for his interest in LA Boxing. As alleged, Geisler agreed in 2007 to buy out McCully's interest in LA Boxing for $2.5 million, payable monthly in $10,000 increments, after he disagreed with Geisler's management style and the corporate structure. Over the ensuing years, Geisler and McCully negotiated the purchase price down, with Geisler agreeing to pay McCully $300,000, this time in $30,000 increments. But Geisler did so knowing of a pending sale of LA Boxing at the time of the last negotiation. And he concealed that sale at the time to enrich himself at McCully's expense. This is how McCully's complaint described Geisler's scam:

- 37 -

4870-6046-8173.v5

At the time that GEISLER approached Mr. McCully with the idea of paying him off early in 10 payments, Mr. McCully asked GEISLER, point blank, why GEISLER was making the proposition as the offer was entirely inconsistent with GEISLER's past practice of either ignoring the obligation or otherwise attempting to renegotiate the obligation.  GEISLER looked Mr. McCully in the eye and lied to him.  Specifically, GEISLER told Mr. McCully that GEISLER/LA BOXING weren't doing it for any particular reason, that GEISLER/LA BOXING were simply attempting to "clean up the books."  Based on their past friendship/business relationship, Mr. McCully trusted GEISLER and believed what he said.

The reality was that at the time GEISLER approached Mr. McCully, GEISLER and GROVE had inside knowledge of a pending sale of LA BOXING to certain defendants named herein and wanted Mr. McCully "out" of LA BOXING no later than December 2012 so that GEISLER and GROVE could consummate the sale transaction and could publicly announce the transaction without, in GEISLER and GROVE's mind, Mr. McCully involvement as an owner.

92.    Ultimately, Geisler sold his interest in LA Boxing for $25 million according to *Bloomberg*.  And after more than a year of litigating the case with McCully, the case was dismissed with prejudice on the stipulation of the parties on December 12, 2014.  According to the franchisees that sued Geisler in the 2023 AKT Litigation, Geisler did not disclose this information to them even though he was obligated to do so under the federal franchise rules.  As the franchisees involved in the 2023 AKT Litigation allege, "[t]he LA Boxing Fraud Lawsuit and terms of settlement were not disclosed in the 2018 FDD, 2019, FDD, 2020 FDD, or any other AKT Franchisor FDD (nor, upon information and belief, any other FDD of any Xponential brand)."

- 38 -

4870-6046-8173.v5

93. Finally, Geisler was also named as a defendant in 2018, this time by the founders of StretchLab, Saul Janson and Timothy Trost, who alleged fraudulent inducement in connection with Xponential's acquisition of StretchLab. According to the complaint, "Geisler formed Stretch Lab Franchise, LLC to purchase the assets of Stretch Lab LLC" and negotiated the purchase with those founders, including by representing that the founders "could continue to operate their three existing Stretch Lab locations, as well as two additional locations, as franchises." The parties reached an agreement in or around November 2017. Thereafter, in connection with opening a new studio, Stretch Lab Franchise, LLC "instructed Janson and Trost to purchase equipment from Stretch Lab Franchise, LLC's vendors." As alleged:

"The cost for that equipment included a $20,000 markup that was over and above the actual retail price. When Janson and Trost pushed back on this, they were told "franchisee cost is more expensive than when you guys scraped together a studio . . . . There is also our markup for sourcing and managing all these vendors. Franchising ain't free."

94. The founders thereafter continued to operate their StretchLab studios and opened others, according to the agreement. But Xponential alleged that the founders had not complied with the agreement and filed suit in or around September 2018. The founders filed a third-party complaint against Geisler on October 25, 2018, alleging that Geisler had misrepresented that the founders "could continue to operate their three existing Stretch Lab locations, as well as two additional locations, as franchises." Geisler settled the claim on or around September 11, 2019 for $6.5 million. But like the others, Xponential and Geisler failed to disclose any aspect of his involvement to prospective franchisees or investors. Franchisees in the 2023 AKT Litigation alleged that "[n]otwithstanding that Geisler, the CEO of AKT, was 'held liable,' the Stretch Lab Fraud Lawsuit was not disclosed in any AKT Franchisor FDD."

- 39 -

95.     Neither Xponential nor Geisler disclosed these lawsuits to prospective franchisees for any of its portfolio brands or to investors.  Geisler knew that if he disclosed his deceptive past, prospective franchisees would refuse to join Xponential, foreclosing the kind of growth that was necessary to inflate Xponential's stock price.  The AKT franchisees who filed suit in 2023 provide a good example.  They allege, reasonably, that "[h]ad Defendants disclosed the Fraud Lawsuits, Plaintiffs would not have signed their respective Agreements."

**D.    Artifice No. 4: Defendants Misrepresent the Financial Health of Xponential's Franchisees, Highlighting Non-Existent Studio Closures and Full SBA Loan Repayments**

96.     Defendants knew that Xponential had to project an image of healthy franchisees to both prospective franchisees and investors.  Xponential's own financial health and the value of its stock, after all, depended on it.  So they schemed to tell prospective franchisees and investors that existing franchisees were happy and strong financially and were fueling Xponential's growth.

97.     They did this in two ways.  First, they repeated the message that "[w]e have never permanently closed the store in the history of our business," a message that was "central to its identity," according to franchisees that spoke with *The Capitol Forum*.  Defendants even expressly stated on earnings calls and during investor conferences that studio closures were a way to gauge the financial health of Xponential's franchisees, explaining that studio closures were "the way to really think about how healthy are our franchisees."  And Geisler even boasted that the lack of closures, especially during the pandemic, highlighted that Xponential had "a great business model that actually works":

> That was evident going into COVID that we had selected really great
> franchisees that were doing really well, and the model was really great.
> Because how do you go into something like a pandemic, that you didn't
> plan for, with zero closed stores and come out with zero closed stores?
> The only way that happens is if you have great franchisees that are

- 40 -

4870-6046-8173.v5

doing a great job and a great business model that actually works – is the only answer for how you end up with those types of metrics.

98.    Second, on an August 11, 2022 earnings call, Geisler repeated the assertion that "[o]ur franchisees have borrowed over $200 million from the SBA without any non-repayments under our ownership," which was reflective of a "strong franchisee base."  And he used this purported Small Business Administration ("SBA") loan performance to highlight the success of Xponential's franchisees during a November 10, 2022 earnings call: "These individuals have the tenacity, courage, and capital to successfully run their businesses.  Our franchisees have also borrowed over $200 million from the SBA without any non-repayment under our ownership."

99.    Neither representation, as Defendants knew, was true.  Xponential had experienced many studio closures even before the IPO and its franchisees, in fact, had defaulted on SBA loans.  The February 16, 2020 Row House memo that the franchisees sent directly to Geisler – before the IPO and before the pandemic – confirmed that Row House franchisees were not successful, were "running negative P&Ls for over 4 – 12 months," and were on pace to close permanently.  The memorandum was based on "a nation-wide call" among "a majority of Row House Owners" to discuss, among other issues, "growing concerns of studio unprofitability . . . and the ability to keep studios open in the next coming months."  It warned that "[m]any studios [were] in danger of closing after 6 months of unprofitability," and explained that "[m]any/most open studios [did] not have enough revenue to cover their costs, even several months after being open."  By the end of 2020, of course, "17 studios – 31% of the open studio portfolio at the start of the year – had been handed over to the company" with an "additional five . . . reacquired by the company in 2021," according to *The Capitol Forum*'s research.

100.   The AKT franchisees that brought suit in 2023 against "AKT leadership (as well as the leadership of its ultimate parent, Xponential, Inc.)" for "repeat[ing]

- 41 -

false representations" about revenue and costs, confirmed that they, too, permanently closed their studios. In fact, they alleged that "Plaintiffs continued to lose thousands and tens of thousands of dollars each month, finally requiring them to close their studios." They closed ten studios during the Class Period and listed the specific dates that each studio closed, including (i) "Inman" on May 30, 2022; (ii) "East Florida 1st Location" on October 16, 2022; (iii) "East Florida 2nd Location" on November 13, 2022; (iv) "East Florida 3rd Location" on November 13, 2022; (v) "Royal Oak" on December 31, 2022; (vi) "Rochester Hills" on December 31, 2022; (vii) "Mason" on March 4, 2023; (viii) "Liberty" on March 4, 2023; (ix) "Chicago" on March 19, 2023; and (x) "Tampa" on March 20, 2023.

101. Geisler's studio closure claims were simply untrue. As were his representations about franchisee SBA loan repayments. A review of the SBA data published by the government contradicts Geisler's assertions. Loan defaults began as early as 2019, when a CycleBar franchisee in Plano, Texas, had $48,537 of a $350,000 loan charged off. In 2020, a California Pure Barre franchisee failed to pay $117,654 on a $150,000 loan. In 2022, a CycleBar franchisee in New Jersey defaulted on a $466,000 loan, resulting in a charge off of $385,981. Each of those defaults occurred before Geisler told investors, in an earnings call on August 11, 2022, that "[o]ur franchisees have borrowed over $200 million from the SBA without any non-repayments under our ownership."

102. Defendants' message was clear – Xponential's franchisees were uniformly successful, which meant more franchisees and more revenue growth for Xponential. And as Geisler continued to learn, more revenue growth meant a higher stock price, leading to the "massive" wealth that he desired.

**E.      Artifice No. 5: Xponential Actively Interferes with Franchisees Closing Stores and Conceals the Truth About Store Closures**

103. The no "permanent studio closure" representation was obviously an important message to Geisler and Xponential, as he and others repeated it often. And

- 42 -

as *Bloomberg* reported after consulting with multiple franchisees, "the company has gone to great lengths to make sure store closures don't happen."  But under any reasonable understanding of the term, "studio closure[s]" were a regular occurrence at Xponential.  Defendants just schemed to hide it.  *Bloomberg*, in fact, reported on an interview with a former CycleBar franchisee named Sydney who fell for defendants' deception and then experienced her own permanent studio closure in 2021, "fil[ing] for bankruptcy, after almost losing her house."  Sydney reported that "'[p]rior to getting involved, I tried doing my own due diligence and research of whether any studios have gone under'" and "'I couldn't find any evidence.'"

104.  But Sydney was duped because defendants furthered the scheme by interfering with studio closures, including by taking back failed studios (for pennies on the dollar), labeling them "transition" studios, and then dumping them on other franchisees with more false promises about profitability.  One franchisee with whom *The Capitol Forum* spoke said in response to Geisler's message, "'[t]hey're full of s[**]t,' . . . '[t]hey were like, we're looking for a new owner, which I guess is true, but really, the studios are closed.'"  And as *The Capitol Forum* reported based on its investigation, "[i]n some instances, studios have sat empty for months, with members complaining on online forums and to the Federal Trade Commission that they've been unable to reach studio managers to cancel auto-draft membership fees or requested refunds."

105.  Defendants specifically intervened to prevent franchisees from closing failing studios.  Xponential's studios did not close "'[be]cause they take them back,' said a former franchisee, who said he lost $600,000 on a failed studio that was taken over by Xponential before being resold to a new owner," according to *The Capitol Forum*.  As the franchisee put it, "'[t]hat's the only reason they do it, so they don't get a bad reputation for closing studios' . . . '[a]nd they got a free studio, which they were able to sell to someone else.'"  Another "franchisee who operates two studios in North Texas said investors aren't seeing studio closures because the company

- 43 -

isn't allowing them," telling *The Capitol Forum* that when their lease came up for renewal, "'corporate badgered us to renew it even though the members that we do have at that studio, they don't even cover the cost of the lease. They were pretty much like, "You will keep running this thing."'"

106. The experiences of different franchisees are remarkably similar. A franchisee who closed her Central Texas studio in November told *The Capitol Forum* that "'I feel like I was duped and was sold something that was never going to be profitable.'" Another reported the same, claiming to *The Capitol Forum* "'[t]hey should have closed it rather than let us purchase it, but they happily charged us $15,000 for a franchise transfer and said, "Have a nice day."'" And an AKT franchisee in Miami confirmed in the 2023 AKT Litigation that Xponential's AKT franchisor and its executives solicited the plaintiffs in that case "to take over the AKT studio in Miami that had closed" while concealing that the former Miami franchisee and AKT's former executives "were presently in the middle of the lawsuit . . . for misrepresentations about the cost to open the AKT Miami studio and the number of members the studio would achieve – the same sorts of representations that [AKT's executives] made to [Plaintiffs] about the AKT Miami studio."

107. When the franchisee took over the Miami studio and reopened, they learned that "AKT Franchisor had 'frozen' the members' membership charges and automatically began to charge them fees," that "nearly half of the studio's former members were sent to collections by AKT Franchisor" and that they were left "to manage the ensuing fallout, with one member spitting into [Plaintiff's] face and saying they were 'thieves' who should 'burn in hell,' a far cry from the eager members Defendants represented were awaiting [Plaintiffs] at the AKT Miami studio." The result was that franchisee's financial ruin. "The loss of funds and time ultimately caused [Plaintiffs] to close not only the Miami studio after scarcely eight months, but their remaining three studios in Southeast Florida as well, resulting in losses of more than $2 million" and "forced [them] to file for bankruptcy."

- 44 -

108.   Insider accounts thus reveal that "Xponential's focus [was] on keeping studios 'open' . . . to signal to investors the health of the rapidly growing company," regardless of the circumstances.  Defendants' scheme made sure that it was at the franchisees' expense, as more stories shared with *The Capitol Forum* confirm:

> Of four Pure Barre franchisees who recently shared their stories with *The Capitol Forum*, three of them said they were sold existing studios with the assurance that they would be profitable in a matter of months if they followed the Xponential formula.  The fourth, a longtime owner of a once-profitable studio, was encouraged to open a second studio and ultimately had to close both.

> The three franchisees who purchased existing studios from Xponential felt that they were deceived into believing that the businesses could be rehabilitated.  In some instances, they believed Xponential concealed from them the true member counts of the studios before they bought in and provided profitability projections that assured them that the membership levels required to turn the businesses around were achievable.

109.   Having told franchisees and investors that studio closures were an accurate way to assess the health of Xponential's franchisees, Xponential could ill afford to have even a single studio close.  So Xponential took other active steps to make sure closures did not happen, threatening litigation to prevent franchisees from throwing in the towel on losing studios.  Nine franchisees with whom *Bloomberg* spoke shared the same experience – "when they wanted to exit and couldn't find a buyer, Xponential threatened litigation due to breach of franchise agreement or told the owners they'd have to pay a huge exit fee – as much as $115,000 in some cases – to get out of their agreement and have Xponential take over their studios."  The *Bloomberg* Article added that "[f]or some of the luckier owners, the only way to get out of the business was to turn over the entire enterprise – the studio equipment

- 45 -

worth tens of thousands of dollars – for just $100 or less.  Xponential would either take over the studio or sell it to another franchisee."

110.    A CycleBar franchisee named Emily described her experience with Xponential's misrepresentations as well as its threatening behavior when she and her husband tried to get out of their contract.  *Bloomberg* reported that, like others, "Xponential told them in 2021 the cost to open their own studio would be between $400,000 and $500,000 and even gave them a loan."  But also like others, "it ended up costing the couple more than $700,000 to open the studio and, within a month, membership plummeted."  *Bloomberg* reported that "[i]t turned out this was a chronic problem for franchisees, in which revenue derived from memberships was often far below what Xponential projected."  And as it explained based on its interview with Emily, "[p]roblems were compounded by the company carpet-bombing promos for studios rather than helping them grow a sustainable membership base, Emily says."  Emily confirmed that when she tried to close her studio, an Xponential executive threatened her:  "'He said, "You have children in the room, so I'm not going to go into all of the details, but the punchline is, you'll be f---ed if you close,"' Emily says."  The threats from Xponential continued thereafter:

> A few months later, the couple emailed corporate, explaining they couldn't make payroll and would have to close their studio.  After months of ignoring their calls, Xponential's corporate team quickly responded by informing them they were in default and potentially subject to major liabilities.  Today the couple is more than $1 million in debt and narrowly avoided foreclosure on their home by filing for bankruptcy this fall.  "It has cost them zero dollars for me to open my studio, and they've made money off me, but I've lost everything," says Emily, who's now under the care of a psychiatric facility, which, she says, is largely because of the stress the business has caused.  "It's

- 46 -

cheaper for them to strong-arm me into gifting them my studio, sign everything over, and then they turn around and sell it again to somebody else and let them go through the same thing. They've done it so many times."

111. Other franchisees have corroborated that the Company brought suit against franchisees for closing their studios. The franchisees in the 2023 AKT Litigation, allege that "[i]n many instances, AKT Franchisor demanded Plaintiffs pay AKT Franchisor to take over their studios (into which Plaintiffs had invested hundreds of thousands of dollars), with the threat of suing Plaintiffs if they refused." Then, "[w]hen Plaintiffs closed their respective AKT studios (after, in each case, offering AKT Franchisor to take over the studio), AKT Franchisor and Xponential filed suit against all of Plaintiffs . . . in arbitration to send a message to them and make an example to other franchisees."

112. Defendants' threats were not limited to litigation. They also involved bullying and the use of stringent non-disparagement agreements, as *The Capitol Forum* reported in an article published July 7, 2023. "Current and former franchisees . . . say they've been bullied and silenced by the boutique fitness studio franchisor as the company has sought to protect its claim that franchisees are thriving and studios never close." *The Capitol Forum* reported that several former franchisees explained that "Xponential used legal leverage to force them to sign stringent nondisparagement agreements as a condition of letting them out of franchise contracts, preventing the franchisees from speaking publicly, and from giving prospective franchisees their honest opinions of the business." According to an article posted by *The Capitol Forum* on February 15, 2023, "[m]ost franchisees who spoke to *The Capitol Forum* did so on condition of anonymity," noting that "Xponential only allows franchisees to walk away from their businesses if they sign a nondisparagement agreement that waives the franchisee's due process rights and imposes a hefty fine if they say anything that the company deems disparaging."

- 47 -

Xponential made clear that it was serious when it issued those threats, as evidenced by a permanent injunction issued on February 25, 2021 against a former franchisee that barred them from "criticizing, denigrating, disparaging, or making any derogatory or negative comments" about Xponential.

113.    *Bloomberg* has tied this part of the scheme directly to Geisler, reporting on his use of Facebook to threaten franchisees if they say anything negative about Xponential.  The *Bloomberg* Article notes that "Geisler says he personally monitors Facebook groups to provide support, but some franchisees say it's to track any sign of dissent."  And it reported that "[s]ome franchisees have been threatened with fines as high as $100,000 for criticizing the company," quoting "a person knowledgeable of the matter":  "'It's not libel, slander, it's not saying something false.  It's targeting you if you say something that doesn't make him [Geisler] look good, which is petty' . . .  'This isn't even public stuff, it's within their own private groups where you think there's freedom to vent and talk about problems.'"  *Bloomberg* even offered an example of Geisler's use of Facebook to silence franchisees in connection with Xponential's failed sale of 66 Xponential studios:

> By late fall, Geisler was emailing fitness instructors at Brown's studios, pitching them to take over their boss's franchise licenses.  Meanwhile, as other franchisees caught on to the mess, one posted questions about it on the Facebook franchise group's page, stating he hoped Xponential wasn't trying to manipulate things to make its numbers look better.  Geisler intervened with a response.  "I'm sure in the absence of answers your mind tends to make them up but please be careful not to be someone creating or spreading more lies," he posted.  When a YogaSix owner chimed in to say she was new to the franchise and inquired if there would be a meeting about the issue, he shot back:  "No we've answered all the questions in the thread below.  Can you not see the replies?"

- 48 -

4870-6046-8173.v5

114. As *Bloomberg* notes Geisler sees lawsuits as "'just a part of doing business.'"

115. Keeping studios from closing at all costs, is also reflected in the allegations of Kaiser's lawsuit referenced in ¶¶7, 60-61, 72-76. The Kaiser Litigation alleges that Geisler himself was personally involved in attempting to keep "NOMAD," one of Kaiser's studios, open despite an economic analysis showing it was not financially feasible to do so. In January and February 2020 (prior to the onset of Covid), Kaiser reviewed the finances of the NOMAD studio with AKT franchise, including Geisler and Megan Moen, VP of Finance for Xponential. Kaiser stated in her declaration filed in the Kaiser Litigation that "Geisler promised to support the NOMAD studio with new marketing and sales initiatives, but nothing was provided or implemented." According to Kaiser, in May 2020, Grabowski "agreed with the economic analysis prepared by me with my strategic advisors, agreed that the studio should be closed, and made minor edits to my draft closing announcement."

116. Kaiser explained that "Geisler did not support the closure because he opined that the optics would be harmful" to the AKT franchise, but on behalf of AKT franchise he was "unwilling to extend financial support or take on any of the risks with continued operations of the NOMAD studio." As she described it, in May 2020, Geisler and Grabowski called Kaiser's strategic advisor and designated AKT Board Observer, Blair Crawford, to discuss the NOMAD closure. Kaiser stated that during the call, "Geisler said that if I closed the NOMAD studio, it would be my 'Pearl Harbor' moment." Kaiser also stated in her declaration that in the June 24, 2020 Zoom call with franchisees of AKT studios, Geisler said that Kaiser closed the NOMAD studio, although she had not yet made a formal announcement and Geisler did so in a manner suggesting that Kaiser's action was undertaken as part of an effort to damage AKT franchise. Additionally, Kaiser explained that in an August 6, 2020 call with franchisees of AKT studios, Geisler made misrepresentations about

- 49 -

Kaiser's conduct at a mediation in an effort to undermine her reputation among the AKT franchisees and to convince them that she did not support the AKT brand and that her actions were impairing the brand.  According to Kaiser, the NOMAD studio was eventually closed because "it became economically unfeasible for AKT inMotion to operate even before the onset of the COVID pandemic."

117.    Xponential's practice of threats and intimidation have worked.  As *The Capitol Forum* reported on July 7, 2023:

> The company's practice of requiring nondisparagement agreements as a condition of letting franchisees exit the franchise system is so widespread that most franchisees who've spoken with *The Capitol Forum* have said they knew of many others who had concerns about the company but who were fearful of sharing their stories due to aggressive liquidated damages provisions in their agreements that would allow Xponential to fine them immediately for saying anything the company deems to be negative or derogatory, even if true.

118.    And *Bloomberg* reported the same on December 7, 2023.  "More than 30 former and existing franchisees – not including some who are or were in active litigation with the company – spoke to *Businessweek* on the condition of anonymity because they feared legal retribution."  Xponential was not issuing empty threats either, as demonstrated by the permanent injunction that it obtained against a former Pure Barre franchisee on February 25, 2021.

119.    Xponential's scheme took matters a step further.  It did not just threaten litigation, it also threatened to use cross-default provisions in the franchise agreements to take back profitable studios if franchisees closed their unprofitable studios.  As *The Capitol Forum* reported on July 7, 2023, "[s]everal Pure Barre franchisees who own multiple studios have told *The Capitol Forum* that they've been prevented from closing failing studios or from allowing the leases on those studios to lapse, with Xponential threatening to invoke a cross-default clause that would

allow the company to acquire the franchisees' other, profitable studios." Analysis of Xponential's 2021 FDDs revealed that these cross-default provisions were included in FDDs provided to franchisees across Xponential's brands.

120.    Xponential's "'focus is on keeping the location open EVEN if you've done everything to follow their model and their sales playbook and you're still not profitable,' one franchisee opined in an email to *The Capitol Forum*." As *The Capitol Forum* described the interview in its July 7, 2023 article:

> [O]ne of [the franchisee's] studios is profitable while the other is not. The franchisee wants to close the unprofitable studio but has been told that doing so would mean having to pay damages to Xponential for violating the franchise agreement to operate the unprofitable studio, and that it would trigger a cross-default clause in their franchise agreement, which would allow Xponential to take over the profitable studio as well. The franchisee believes the profitable studio is worth at least $300,000.

121.    The franchisee summed up Xponential's approach this way:

> "They love threatening cross-default; as in, if you don't keep studio A open, we will automatically take studios B, C, etc that you own (even across XPO brands if you own more than one brand)," the franchisee wrote. "So one of your studios can be draining your life-savings and the other(s) doing fine, so you suck it up and are forced to stay open, no matter what. Unfortunately, this obfuscates the actual performance of the brand nationwide because this is how *many* studio owners are being forced to keep failed or oversaturated markets afloat despite the fact that they should have closed certain locations months or even years ago."

122.    Another franchisee shared a similar experience in the article. He had two Club Pilates studios, a Row House studio, was developing a StretchLab studio, and was known "as a model franchisee." In late 2020, the franchisee decided to

- 51 -

temporarily close his studio around the Thanksgiving holiday "to prevent the spread of Covid at a time of high travel." Xponential took his studios in response, claiming he had abandoned them. "The franchisee said that he spent months battling the company's decision because he didn't want to lose the studios, which he said cost him nearly $1 million to build out." The dispute ended up in mediation, and was contentious. As both *The Capitol Forum* and *Bloomberg* reported:

> The franchisee recalls that during a mediation, Geisler's attorney directed the mediator to relay a message from Geisler that, "I'm going to cut your f[***]ing heads off and mount them on pikes in front of the building with the note, 'This is what happens when you f[**]k with Anthony Geisler.'" The franchisee said the message was delivered by the mediator after the mediator had asked the attorney to modify the message but was rebuked.

*    *    *

> The franchisee said Xponential ultimately backed out of its deal to pay him for the studios and instead sold them to a new operator without ever paying him.

123. Concealing the truth about store closures was critical for Xponential and Geisler to pull off their scheme. By February 2023, *The Capitol Forum* initiated coverage on Xponential and had been inquiring of the Company about its franchisees for months. As *The Capitol Forum* reported on February 15, 2023, "Xponential has been aware of *The Capitol Forum's* investigation for several months" as it "sent three sets of written questions over that time and Xponential never provided answers or responses to those questions." *The Capitol Forum* was analyzing the Company's franchise disclosure documents in connection with its investigation into the Company.

124. The Company responded by restructuring, taking advantage of a loophole in the FTC's Franchise Rule that allowed the Company to replace its brand-

- 52 -

level financial disclosures with that of a guarantor.  The 2023 FDDs for CycleBar, Club Pilates, and Pure Barre confirmed that Xponential and its brands went from filing detailed financial statements to a single balance sheet for a "guarantor" that the Company recently created.  As *The Capitol Forum* described in an article published on April 21, 2023, Xponential "underwent a quiet 'internal reorganization' that allows it to avoid disclosing the financial statements of its 10 fitness franchise brands" and that it "made use of a loophole in franchise disclosure laws, providing a balance sheet for the newly created company rather than audited financials for the individual franchise systems. . . .  Xponential made no mention of the 'internal reorganization' in its most recent SEC filings, or in calls and presentations to investors, which occurred around the same time that the reorganization took place." According to *The Capitol Forum's* reporting, the reorganization "appeared designed to obfuscate the financials of the company and its individual brands" and "'appears to be calculated to conceal weaknesses in each of the brands.'"  Quoting a lawyer that had represented franchisees in their attempts to exit Xponential's brand franchise systems, *The Capitol Forum* reported that:

> "Many franchisees report they are on financial life support or franchisor forbearance agreements which would normally be visible if each brand had an individual audited financial statement.  This financial presentation is opaque to each brand.  Instead of transparency in financial reporting, the performance of each brand and their franchisees is obscured."

125.   This artifice of the Company's scheme resulted in outward appearances of "healthy, happy franchisees," as Geisler described it to investors, at the same time that many franchisees, across multiple brands were experiencing financial ruin. *Bloomberg* reported that to many of the franchisees with whom it spoke, it became clear that "the business model the company was selling didn't actually work."  As Brent Zartler, a franchisee, who sold two of his three Cycle Bar studios in Florida

- 53 -

4870-6046-8173.v5

and who the Company referenced as a franchise with 500 members before it opened, explained to *Bloomberg* "'[t]heir model is very broken, and they shouldn't be selling anyone on it'":

> "Their model is very broken, and they shouldn't be selling anyone on it," says Brent Zartler, a franchisee who closed two of his three CycleBar studios in Florida and is trying to sell the remaining one. He says Xponential often touted one of his studios to potential franchisees as having a record 500 members before it even opened. "What they don't tell these franchisees is it's just been a slow, steady death with that studio," says Zartler, who's lost more than half a million dollars on his business and is planning to file for bankruptcy. "I've been working in gyms for 20 years, and I've never worked in a business where there's been such a high attrition rate."

126.    *Bloomberg* quoted another franchisee named Kyle with a similar view: "'It's not your average entrepreneurs starting a business and failing, which is normal,' says Kyle, a former Xponential franchisee who lost $1 million on his CycleBar studio.  'This franchise is really sophisticated with their messaging and really good at getting new blood and sucking them dry.'"

**F.    Artifice No. 6: Xponential, Geisler, and Grabowski Capitalize on the Scheme by Selling Massive Amounts of Stock to Unsuspecting Investors**

127.    Defendants benefitted massively from their scheme.  Between the IPO in July 2021 and the disclosure of the truth in 2023, defendants collectively sold nearly $400 million in Xponential stock in formal offerings and in secondary market transactions.  Defendants tapped the markets three separate times to offer Xponential common stock to investors.  Xponential raised proceeds of $120 million in an IPO, selling 10 million shares at $12 per share in July 2021 and then conducted two additional registered stock offerings that allowed insiders, including defendants Geisler and Grabowski – to sell another $200 million of additional stock: (i) an April

- 54 -

2022 secondary stock offering of 4.5 million shares at $20 per share for proceeds of $90 million; and (ii) a February 2023 secondary offering of 5 million shares at $24.50 per share for proceeds of $122.5 million.

128.   Geisler, for his part, earned $9 million through a side transaction with the Company during the IPO and engaged in massive secondary market sales in 2023, dumping $21.8 million worth of stock between March 6, 2023 and May 25, 2023.  Geisler also perfectly timed his trades.  Not only did they occur shortly before the truth was revealed on or about June 27, 2023, but he sold nearly all of those shares just shy of Xponential's historic peak trading price of $33.58, selling most of his shares at prices above $30 per share.  He did so knowing that *The Capitol Forum* was inquiring about struggling franchisees (*see* ¶123) and shortly before Fuzzy Panda revealed the truth about Xponential's operations on or about June 27, 2023.

129.   Combined with his IPO and SPO proceeds, Geisler sold 79% of his Class A common stock holdings and 23.3% of all of his holdings for proceeds of $55.6 million, with all but one transaction occurring in just a six-month period in 2023.[7]  Grabowski did even better.  Through Xponential's two secondary offerings, Grabowski sold off 59.1% of his Class A common stock and 40.9% of his Class B common stock for massive proceeds of $219.8 million.  The scheme was wildly successful, fleecing investors to the tune of $400 million.

---

[7]   Pursuant to defendant Geisler's August 27, 2001 Form 4, the underwriters in the issuer's IPO exercised in part their option to purchase an aggregate of 904,000 shares of Class A common stock, resulting in additional net proceeds of approximately $10.12 million to the issuer.  The issuer then used $9.0 million of such net proceeds to purchase 750,000 LLC units from Geisler at a price of $12.00 per share.  Each of these LLC units were redeemable for, together with the cancellation of a share of Class B common stock, one share of Class A common stock.   As such, these shares are included in the calculation of defendant Geisler's aggregate figures for shares sold, proceeds, and percent of his respective holdings sold during the Class Period.

- 55 -

4870-6046-8173.v5

## VIII. DEFENDANTS "DENOUNCE" THE FUZZY PANDA REPORT AS THE TRUTH IS REVEALED

130. After Defendants sold nearly $400 million in stock, defendants' fraudulent scheme began to unravel.  On or about June 27, 2023, Fuzzy Panda published a research report titled "Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A House Of Cards.'"  The Fuzzy Panda report claimed to be based on the examination of over 16,000 pages included among 64 FDDs filed with the FTC and various state regulators, as well as a "multitude of interviews" and other information. The Fuzzy Panda report stated that the allegations contained therein "often had multiple sources tell us corroborating facts."

131.  Among other revelations, the Fuzzy Panda report alleged that defendant Geisler has had a long history of misleading investors, including being exposed on camera for using "boiler room" tactics to mislead investors in connection with a prior venture, and that interviews with "Geisler's former business partners, employees, and franchisees" as well as "multiple lawsuits . . . allege that Geisler lied, cheated, and stole from people regularly."  The Fuzzy Panda report disclosed that its examination of 64 FDDs demonstrated that *eight of ten* Xponential brands are losing money monthly, that *more than 50%* of its studios never make a positive financial return, and that *more than 100* of Xponential's franchises were for sale at a price 75% less than their initial cost.

132. The Fuzzy Panda report also claimed to have "[d]ebunked" Xponential's assertion that "'[w]e've never closed a store,'" stating that it had "found >30 permanently closed stores," further revealed that Xponential "is actively removing underperforming stores from the comp base" in its reporting of increasing AUVs, and added that Xponential had lied in sales pitches to prospective franchisees, including by using false and misleading FDDs:

**The Missing Stores! – XPOF's Appears to Have Invented New Creative Calculations for AUVs & SSS**

- 56 -

4870-6046-8173.v5

XPOF doesn't break out the individual 10 brands performance but likes to brag that Average Unit Value for studios continues to grow. "Q1 North American AUVs of $542,000 were up 21% from $450,000 in Q1 of 2022, our 11th straight quarter of AUV growth." (Q1-2023 CC)

We think it is easy to show constantly increasing AUVs and Same Store Sales (SSS) when a company is **actively removing underperforming stores from the comp base**.

* * *

**XPOF Misrepresentations to Us [Fuzzy Panda] & New Franchisees**:

**The False Stories**: what XPOF sales reps told us and other prospective franchisees in sales pitches.

- "This is just like [a] side hustle, super easy"

- "You will be cash flow positive within 3-6 months"

- "Less than 2% of franchisees want to sell"

**Multiple franchisees have sued Xponential for omitting key material facts from** the FDDs and for XPOF's sales reps making questionable statements including:

- Misrepresented the cost of opening a new franchise. Lawsuits show actual **costs were >200% higher!**

- Misrepresenting the number of members and the revenue the studios would generate.

- Broke franchisee disclosure rules by providing spreadsheets and forecasts about business performance that were NOT included in the FDDs.

* * *

- 57 -

- Mislead franchisees about the time to open a studio. One sales rep claimed it would be 4-8 weeks of renovation, it took 24 months!

133. After the Fuzzy Panda report was issued to the public, the price of Xponential common stock plummeted more than *37%*, or $9.39 per share on heavy trading volume, to close at $15.72 per share on June 27, 2023, causing Lead Plaintiffs and other Class members to suffer substantial economic losses and damages under the federal securities laws.

134. *The Capitol Forum* reported that the same day Fuzzy Panda issued its report, defendant Meloun appeared on a video hosted by Raymond James & Associates, Inc. ("Raymond James"). During that call, defendant Meloun admitted facts that contradicted defendants' earlier statements, including his own, that Xponential had not experienced a studio closure and that the lack of closures was evidence that "overall health of the franchisees is strong and getting stronger," as he had claimed just weeks earlier on March 15, 2023. To the contrary, while Meloun said that he was "not aware" of any studios that had been permanently closed, he acknowledged that buyers of some refranchised studios had been "'handed a studio that was already in trouble.'" In fact, defendant Meloun acknowledged that the Company was considering changing course and closing failing studios because reselling them is "'not a wise strategy.'" *The Capitol Forum* described Meloun's comments during that video call as follows:

> In a video call hosted by Raymond James on the day the Fuzzy Panda report was published, Xponential CFO John Meloun said he was "not aware" of any studios that had been permanently closed. He acknowledged that buyers of some refranchised studios had been "handed a studio that was already in trouble," and said the company had in 2023 "made a conscious decision not to refranchise those out until they get back to close to break even or profitable." Meloun also

- 58 -

indicated that the company might consider closing failing studios rather than reselling them. "We're going to start looking at that differently than we have because as we get bigger it's not a wise strategy."

135. On June 28, 2023, the Company responded to the Fuzzy Panda report, issuing a press release to "denounce the misleading Report" while "caution[ing] investors not to rely on it." As alleged in ¶9, the press release denied the substance of the Fuzzy Panda report, reiterated "the strength of the business and health of its franchisees," and defended Geisler's "'professionalism.'" While it acknowledged certain of Fuzzy Panda's allegations, it asserted that those allegations were "immaterial" and repeated the claim that that "Xponential's Q1 2023 average unit volume ('AUV') of $542,000 provides for healthy unit economics" and that "[f]ranchisee unit economics are strong, with an expected 25-30% operating margin and 40% cash on cash return," stating in pertinent part:

- **Studio Locations**. Studios remain open, thriving and tremendously popular. In certain circumstances, Xponential relocates and/or transitions underperforming studios to other franchisees in the Xponential franchise network, during which period the stores may be temporarily closed, but those stores represent an immaterial number of stores amongst the larger Xponential system.

- **Franchisee Resales**. The franchise model has been successful. While Xponential has in limited cases repurchased or assumed underperforming studios, this represents a very small number of Xponential's overall studio system.

- **Studios' Financial Returns**. Xponential's Q1 2023 average unit volume ("AUV") of $542,000 provides for healthy unit economics. Franchisee unit economics are strong, with an expected 25-30% operating margin and 40% cash on cash return.

- 59 -

4870-6046-8173.v5

- **Studios Reported in AUV and Same Store Sale ("SSS") Calculations**.  AUV and SSS have been consistently defined and calculated since the Company's IPO.

    - AUV Calculation:    Quarterly Run-rate AUV consists of average quarterly sales for all studios that are at least six months old at the beginning of the respective quarter, multiplied by four.  Studios with zero sales in the period have always been excluded from the calculation.  Inclusion of these studios would not result in a material difference.  For Q1 2023, recalculating Xponential's system wide AUV to include these studios would result in a 0.9% change to the AUV figure ($542,000 vs. $538,000).

136.   Having elected to speak about Xponential's first quarter of 2023 ("1Q 2023") AUV and "healthy unit economics," defendants were obligated to disclose all facts necessary to not mislead, including that Xponential's license sales, studio growth, and increasing AUVs were based on a scheme to deceive prospective franchisees and that Xponential had, in fact, experienced permanent store closures throughout the Class Period.  Instead of meeting that obligation, as alleged above, Xponential's press release "refute[d] the related allegations in the [Fuzzy Panda] Report" and thus misrepresented the risks facing Xponential as an investment, preventing investors from fully understanding the truth behind Xponential's business, license sales, studio openings, and growing AUVs.

137.   Over the ensuing months, the risks that defendants misrepresented by denouncing the Fuzzy Panda report materialized.  Beginning in 3Q 2023, the Company announced a restructuring plan designed to rid itself of the failing studios of which it had denied existence since the IPO.  The Company's Form 10-Q, filed

- 60 -

4870-6046-8173.v5

on November 8, 2023, disclosed that the restructuring plan "involves exiting company-owned transition studios and other measures designed to reduce costs" and that the "[t]he plan was approved and initiated in the third quarter of 2023" – the quarter after Fuzzy Panda published its report. The Company's Form 10-K, filed on March 4, 2024, disclosed that the Company had taken nearly $14 million in charges to dispose of these failing studios and expected to take another $23 to $27 million in restructuring charges in 2024.

138.    On November 1, 2023, BofA Securities issued a report on Xponential, downgrading its investment thesis from Buy to Neutral while cutting its price target for the stock more than half, from $35 per share to $16 per share. Based on its "analysis of franchise disclosure documents and recent channel checks," BofA Securities corroborated portions of Fuzzy Panda's analysis, estimating that "many franchisees across Pure Barre, Row House, AKT, and Stride that required financing may not be profitable" reporting that "[w]e also see a deceleration in net unit growth . . . as less profitable units close," stating its belief that de-franchised studios "are oftentimes struggling studios." BofA Securities also noted that just two of Xponential's franchises – Club Pilates and StretchLab – were "driving near-term average unit volumes (AUVs) & openings" and "are supporting overall consolidated returns." The BofA Securities report also offered an analyses of brand-by-brand level economics that revealed the effect of loan repayments on franchisee performance with some indicating a "Payback Period" of up to 26 years. The report was particularly significant to the market because BofA Securities served as a Lead Underwriter and underwriter representative for Xponential's public offerings.

139.    Following the publication of the BofA Securities report, the price of Xponential common stock fell more than 8% on heavy trading volume. It closed at $13.11 per share on November 1, 2023, down $1.16 per share from its closing price of $14.27 the day before, causing Lead Plaintiffs and other Class members to suffer additional economic losses and damages under the federal securities laws.

- 61 -

4870-6046-8173.v5

140. A month later, on December 7, 2023, *Bloomberg* published an article titled "How Xponential Turned Suburban Moms Into Bankrupt Franchisees (Correct)," after conducting its own investigation. The *Bloomberg* Article stated that *Bloomberg* had interviewed dozens of former business partners, employees, and franchisees of the Company who revealed that Xponential misled many franchisees into a "financial nightmare." The article also stated that defendant Geisler "has a track record of combative management, deploying growth-at-all-costs tactics and unleashing aggressive reprisals against anyone who gets in his way." The *Bloomberg* Article disclosed that these unscrupulous tactics caused "many of the company's franchisees . . . [to] have either declared bankruptcy or lost their retirement savings." The *Bloomberg* Article also reported on interviews with franchisees who have filed lawsuits, closed their studios, filed for bankruptcy, and discussed additional threats that defendants used to conceal the existence of closed studios. The *Bloomberg* Article also disclosed that "the [SEC] is starting to investigate claims against the company." According to the article, "Xponential said the company is unaware of any investigation and hasn't been contacted by the SEC regarding one." However, on the next trading day, December 11, 2023, Xponential filed a Form 8-K with the SEC, stating that "[o]n December 5, 2023, Xponential . . . was contacted by the [SEC], requesting that the Company provide it with certain documents."

141. Following the publication of the *Bloomberg* Article and the Company's confirmation of the SEC request, the price of Xponential common stock fell more than 33.8% over three trading days on heavy trading volume to close at less than $9 per share on December 11, 2023, causing Lead Plaintiffs and other Class members to suffer additional economic losses and damages under the federal securities laws.

142. Risks that defendants misrepresented through its denial of the Fuzzy Panda report continued to materialize into 2024 as Xponential effectively gave away brands that defendants once claimed were profitable. On February 15, 2024, the

- 62 -

Company announced in a press release that it had completed the divestiture of its brand Stride, adding that "Xponential did not receive any consideration for the divestiture."

143.   Then on May 10, 2024, additional risks that defendants misrepresented by denying the Fuzzy Panda report materialized.  That day, Xponential shocked the market, announcing that "[t]he Board has removed Anthony Geisler from his duties and suspended him indefinitely as CEO, also effective immediately."  While the press release did not specifically attribute Geisler's dismissal to the wrongdoing, it stated in the immediately following paragraph that "[t]he Company received notice on May 7, 2024 of an investigation by the United States Attorney's Office for the Central District of California" and that "[t]he Company previously disclosed an investigation by the [SEC]."  In a lawsuit that Xponential filed against Geisler on May 24, 2024, it explained the scope of the SEC investigation, alleging that "[o]n December 5, 2023, the [SEC] issued a subpoena to Xponential requiring production of documents and communications related to studio closures, communications with franchise owners, financial reporting, and insider trading policies."  It also alleged that "[o]n May 7, 2024, the United States Attorneys Office for the Central District of California issued a grand jury subpoena to the Company in connection with the FBI's criminal investigation."  Xponential's stock plunged another 31% in response.

144.   As of the filing of this complaint, the price of Xponential common stock has largely not recovered, indicating that the market finds the allegations in the Fuzzy Panda report and the *Bloomberg* Article to be credible and the Company's denials and explanations to be insufficient to refute the allegations contained therein.

- 63 -

4870-6046-8173.v5

## IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD *(LIABILITY UNDER RULE 10b-5(b))*

### A. Defendants Issue Statements About Xponential's AUV Metric, License Sales, and Studio Openings While Concealing Numerous Risks Created by Their Scheme

145. Throughout the Class Period, defendants Geisler and Meloun repeatedly focused analysts and investors on a growing AUV metric – which they claimed is "the most direct measure of the health of our franchise system" – and on increasing license sales and growing studio openings. As they described it, these growing metrics were all a result of the Xponential Playbook, which they claimed was "designed to help franchisees achieve compelling Average Unit Volumes ('AUVs'), strong operating margins and an attractive return on their invested capital." As alleged below in ¶¶146-185, they repeated these metrics quarter after quarter in Xponential's press releases, during the Company's quarterly earnings calls, and frequently during investor conferences. And as alleged below in ¶¶186-191, each time, they omitted the material fact that they had secured those metrics by deceiving prospective franchisees while concealing from investors material risks to their Xponential investment, including governmental and Wall Street investigations, franchisee lawsuits, and ultimately the termination of executives involved in the underlying scheme.[8]

146. The Class Period starts on July 23, 2021, after Xponential filed with the SEC a Registration Statement signed by the Individual Defendants and a Prospectus for the IPO. The Prospectus focused investors on Xponential's AUV, which they explained "consists of the average sales for the trailing 12 calendar months for all

---

[8] For ease of reference in this section of the complaint, Lead Plaintiffs list in ¶¶146-185 all of the statements concerning Xponential's reported AUV metric, license sales, and studio openings alleged to be false and misleading and then provide an explanation in ¶¶186-191 on why those statements were false and misleading when made. For each statement, Lead Plaintiffs identify the portion of each statement alleged to be false and misleading in bold and italics with the remaining portion of each statement provided for context.

- 64 -

4870-6046-8173.v5

studios in North America that have been open for at least 13 calendar months as of the measurement date" and explained that AUV was among the measures that "aid in understanding how we derive our royalty and marketing revenue and are important in evaluating our performance."  The Prospectus highlighted Xponential's AUV results, as well as significant growth in studio openings and franchise licenses sold as follows:

> Highlights of our platform's recent financial results and growth include:
>
> • **increased the number of open studios in North America from 813 as of December 31, 2017 to 1,712 as of December 31, 2020**, representing a compound annual growth rate ("CAGR") of 28% and **increased the number of open studios in North America from 1,527 as of March 31, 2020 to 1,765 as of March 31, 2021**;
>
> • **increased cumulative North American franchise licenses sold from 1,498 as of December 31, 2017 to 3,273 as of December 31, 2020**, representing a CAGR of 30%, and **increased North American franchise licenses sold to 3,371 as of March 31, 2021.  As of March 31, 2021, franchisees were contractually obligated to open a further 1,391 studios in North America** . . .; [and]
>
>             *        *        *
>
> • **generated LTM AUV of $449 thousand and $283 thousand in 2019 and 2020, respectively, and $453 thousand and $257 thousand for the three months ended March 31, 2020 and 2021, respectively**.

147.  On August 24, 2021, Xponential issued a press release announcing its financial results for the second quarter of 2021 ("2Q 2021").  The 2Q 2021 release stated the Company had achieved a "[r]ecovery of nearly 90% run-rate AUVs as compared to January 31, 2020, placing the Company on track to reach pre-pandemic run-rate AUVs by early 2022."  (Footnote omitted.)

- 65 -

148.   The Company held an earnings call the same day for investors.  During the call, Geisler discussed the number of franchise licenses sold in the quarter:

Becoming a public company last month was a significant milestone and positions us to continue to execute our strategy and mission for years to come.  Xponential had a very strong second quarter, **highlighted by our North American performance with 197 franchise licenses sold**, **59 studio openings** and 179% increase in system-wide sales year-over-year for a total of $171.6 million.

\* \* \*

**[F]rom January of 2020 through July of 2021, we have successfully opened 354 new studios across our 9 brands in North America and sold an additional 554 new licenses, including 338 licenses sold year-to-date in 2021**.

**Today, we have over 1,500 licenses contractually obligated to open in North America.  If we were to never sell an additional license, we'd still be able to nearly double our North American studio count over the next several years on these 1,500-plus license obligations alone**.

149.   Defendant Meloun similarly highlighted Xponential's franchise licenses sold and studio openings during the call:

As Anthony mentioned, we had a very strong second quarter **with 197 licenses sold and 59 studios opened** compared to 46 licenses sold and 56 studios opened in North America during the prior year period.

The significant improvement in licenses sold during the quarter bodes well for our growth in open studios in the future.  During July alone, we set a record month for systemwide sales.  **We sold 43 licenses and opened 21 new studios in North America**.

- 66 -

4870-6046-8173.v5

150. Also during the call, Geisler discussed the financial condition of Xponential's franchisees and their use of the Xponential Playbook, claiming that it "ensures that our franchisees can maximize their studio performance and enhance their return on investment":

Our experienced management team and *the power of our Xponential playbook set us apart from our peers and are the keys to our successful business model*. These 2 factors have enabled us to provide robust and ongoing support to franchisees even in the midst of a global pandemic. As I just mentioned, our membership base continues to grow in the third quarter, which I believe is due in large part to the Xponential playbook and our very selective franchisee process.

From the initial phases of studio planning to leveraging technology to uncover data-driven insights across our system once a studio is open, *the Xponential playbook ensures that our franchisees can maximize their studio performance and enhance their return on investment*.

151. Defendant Meloun, for his part, denied the existence of "hesitation" from Xponential's franchisees in terms of opening studios while pointing to "AUV growth" as the evidence:

[BofA Securities Analyst:] I guess just first, it doesn't seem like you've seen any slowdown in the recovery trajectory in terms of run rate AUVs from the variant. *Can you maybe talk through the health of the franchisees and their willingness to continue the club growth in this environment? Are you seeing any hesitation from the franchisees in terms of studio openings?*

\*       \*       \*

- 67 -

4870-6046-8173.v5

[Meloun:]  ***In regards to hesitation, looking at our run rate AUVs and our LTM AUVs, they continue to recover and grow up into the right***.  So we're seeing really strong trends as far as system-wide sales, same-store studio sales, ***AUV growth***, memberships, growing.  Visitation continues to remain on trend and growing up into the right.  ***So as far as hesitation is concerned, we haven't seen anything through the second quarter, talking through where we are in Q3***.

152.  On August 25, 2021, Xponential filed with the SEC its 2Q 2021 Form 10-Q for the quarter ended June 30, 2021 signed by defendant Meloun.  In addition, defendants Geisler and Meloun provided certifications pursuant to the Sarbanes-Oxley Act of 2002 thereon ("SOX certifications") that the filing was free from fraud, accurate, and materially complete.  The 2Q 2021 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 2Q 2021 press release, including statements about AUV and studio openings.

153.  On November 11, 2021, Xponential issued a press release announcing its financial results for the third quarter of 2021 ("3Q 2021").  The 3Q 2021 release stated the Company had achieved a "[n]early 90% North American run-rate average unit volume (AUV) recovery compared to January 31, 2020."

154.  The Company held an earnings call the same day for investors.  During the call, Geisler discussed the number of franchise licenses sold, and the number of new studios opened, in the quarter:

> ***During the third quarter, we sold 248 franchise licenses***, bringing us back to pre-COVID franchise license sales levels.  ***In addition, we opened 68 new studios*** and increased our North American systemwide sales 93% year-over-year for a total of $192.4 million, our fifth consecutive quarter of increased systemwide sales.

*   *   *

- 68 -

4870-6046-8173.v5

Turning now to studio growth. *Today, we have over 1,600 licenses contractually obligated to open in North America. If we were to never sell an additional license, we'd still be able to nearly double our North American studio count over the next several years on these license obligations alone*. Our in-house real estate department is in regular contact with our franchisees across the U.S., helping them identify optimal studio locations and lease terms so that we can convert these obligated licenses into open studios as efficiently and quickly as possible. *With strong franchisee demand for new licenses and strong sales, our backlog of studios obligated to open is continuously replenished* and offers us solid visibility into our long-term growth.

155. Defendant Meloun similarly highlighted Xponential's franchise licenses sold and studio openings during the call:

As Anthony mentioned, we had a strong third quarter *with 248 licenses sold and 68 studios opened compared to 50 licenses sold and 80 studios opened during the prior year period*. The significant improvement in licenses sold during the quarter provides visibility into new studio growth.

156. On November 12, 2021, Xponential filed with the SEC its 3Q 2021 Form 10-Q for the quarter ended September 30, 2021 signed by defendant Meloun. In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete. The 3Q 2021 Form 10-Q contained substantively similar statements regarding Xponential's purported quarterly results contained in the 3Q 2021 press release, including statements about AUV and studio openings.

157. On March 3, 2022, Xponential issued a press release announcing its financial results for the fourth quarter of 2021 ("4Q 2021") and full year 2021 ("FY 2021"). The FY 2021 release stated the Company had achieved a run-rate AUV of

- 69 -

4870-6046-8173.v5

$446,000 for the quarter, compared to run-rate AUV of $287,000 in the prior-year period.

158. The Company held an earnings call the same day for investors, repeating the AUV metric announced in the press release. During the call, Geisler also discussed the number of franchise licenses sold, and the number of studios opened, in the quarter:

We are extremely proud of the operational accomplishments that drove our record financial performance in 2021, which further provides us great momentum into 2022. On a pro forma basis, including our 2 new brands, Rumble and BFT, *Xponential sold 955 franchise licenses and opened 334 new studios* across 9 countries. *Our 2021 new studio cohort of 238 North American studios added almost $50 million to the over $700 million in system-wide sales generated in 2021*.

\* \* \*

*We also experienced strong demand for our franchise licenses, selling 301 licenses in Q4 pro forma for BFT. This brought our 2021 quarterly average to almost 250 licenses sold per quarter or a run rate of almost 1,000 licenses sold, creating a solid new studio growth opportunity as we head into 2022, driven primarily by our younger brands*.

\* \* \*

Our recovery to pre-pandemic levels and beyond continues to be driven by 4 key strategic areas of growth. I'd like to discuss our progress in each of these areas, beginning with growing same-store sales and AUVs. I am pleased to note that our Q4 North American system-wide sales grew for the sixth consecutive quarter, increasing 76% year-over-year. *We ended the year with North American Q4 run rate AUVs of $446,000, up 56% compared to 2020.* The key to our

- 70 -

ongoing success is our ability to proactively manage the health of our franchise system.

\*        \*        \*

*We also experienced strong demand for our franchise licenses, selling 301 licenses in Q4 pro forma for BFT.  This brought our 2021 quarterly average to almost 250 licenses sold per quarter or a run rate of almost 1,000 licenses sold, creating a solid new studio growth opportunity as we head into 2022, driven primarily by our younger brands*.

\*        \*        \*

We entered 2022 with the largest studio count in our company's history and expect to open over 500 new studios this year.  Opening over 500 studios in a year would be a company record and is a testament to our strong pipeline and the resilience of our franchisees that we have primed to achieve such a milestone.  *Today, we have over 1,800 licenses contractually obligated to open in North America.  If we were to never sell an additional license, we'd still be able to nearly double our North American studio count over the next several years on these license obligations alone*.

159.    On March 7, 2022, Xponential filed with the SEC its Form 10-K for the quarter and year ended December 31, 2021 (the "2021 Form 10-K") signed by defendants Geisler and Meloun.  In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete.  The 2021 Form 10-K contained the statements regarding Xponential's purported quarterly results contained in the FY 2021 press release, including statements about AUV and studio openings.

- 71 -

4870-6046-8173.v5

160.   The 2021 Form 10-K also discussed studio-level economics, including that the model the Company was having franchisees use would generate AUV of $500,000 in year two of operations:

**Highly attractive and predictable studio-level economics**.

*The Xponential Playbook is designed to help franchisees achieve compelling AUVs, strong operating margins and an attractive return on their invested capital*.  Studios are generally designed to be between 1,500 and 2,500 square feet in size, depending on the brand, which contributed to a relatively low average initial franchisee investment of approximately $350,000 in 2021 and 2020*.  Our model is generally designed to generate, on average under normal conditions, an AUV of $500,000 in year two of operations and studio-level operating margins ranging between 25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%.  A studio reaches "base maturity" when it has annualized monthly revenues in the $400,000 to $600,000 AUV range*.  Using our model, we expect this to typically occur 6-12 months after studio opening.  We believe that studios typically have opportunity to continue growing and maturing beyond that point, however.

161.   On May 12, 2022, Xponential issued a press release announcing its financial results for the first quarter of 2022 ("1Q 2022").  The 1Q 2022 release stated the Company had achieved a run-rate AUV of $450,000 for the quarter.

162.   Later that day, Xponential held a conference call with analysts and investors to discuss the Company's operations and earnings release.  During the conference call, defendant Geisler stated that the Company had "reached a significant milestone in the month of March with monthly run rate North American AUV of $477,000."  He also highlighted the number of franchise licenses sold in the quarter:

- 72 -

4870-6046-8173.v5

We ended the quarter with 2,229 global studios, the largest studio count in our company's history. ***Having opened 99 net new studios in the first quarter*** as expected, we remain on track to open over 500 new studios this year. ***We also experienced strong demand for our franchise licenses, selling 260 licenses globally in Q1. In North America, we have over 1,800 licenses sold and contractually obligated to open*** and have a replenishing pipeline of organic new studio expansion offering us 4 to 5 years of visibility into our long-term growth.

163. On May 13, 2022, Xponential filed with the SEC its 1Q 2022 Form 10-Q for the quarter ended March 31, 2022 signed by defendant Meloun. In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete. The 1Q 2022 Form 10-Q contained substantively similar statements regarding Xponential's purported quarterly results contained in the 1Q 2022 press release, including statements about AUV, license sales, and studio openings.

164. On July 27, 2022, Xponential issued a press release pre-announcing the second quarter of 2022 ("2Q 2022") financial results. The press release set forth certain preliminary operating highlights, including a run-rate AUV of $480,000.

165. On August 11, 2022, Xponential issued a press release announcing its financial results for 2Q 2022. The 2Q 2022 release stated the Company had achieved a run-rate AUV of $480,000 for the quarter.

166. Later that day, Xponential held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, defendants Geisler and Meloun repeated the Company's AUV results:

[Geisler:] Finally, ***we ended the quarter with run rate North American AUVs of $480,000, up from $384,000 year-over-year.*** The

- 73 -

4870-6046-8173.v5

dynamic growth and run rate AUVs is a strong reminder that despite inflationary pressures to date, the workouts our franchisees provide across our diverse portfolio of 10 brands are an integral part of our members' lives.

\*        \*        \*

[Meloun:] Yes.  So Alex, as it relates to – you had a couple of questions in there.  I'll tackle a couple and I'll turn it over to Sarah. From an AUV perspective, yes, we have exceeded pre-COVID levels, **$480,000 on average per studio in Q2**.  We do expect AUVs continue to grow into the foreseeable future, which will drive the system-wide sales.

167.   Geisler also focused investors on studio openings, claiming that "more studios" meant more profitability and that license sales and studio openings were driving AUV growth, which reflected that "the economics are still strong":

[Geisler:] Importantly, **as we continue to open more studios and as AUVs continue to grow, our profitability increases**, driven by high-margin royalties from growing system-wide sales with an active pipeline of approximately 2,800 studios contractually obligated to open globally and only about 3/4 of our conservative North American total addressable market currently penetrated.

**Studio openings are not expected to slow anytime soon, continuing to drive profitability**.

\*        \*        \*

With that as a background, let's move to our 4 key strategic areas of growth, beginning with our first 2 growth levers; increasing our franchise studio base across all of our brands in North America, and expanding our brands and studio base internationally.  We ended the

- 74 -

4870-6046-8173.v5

quarter with 2,357 global studios, *opening 128 net new studios in the second quarter*.

We also experienced strong demand for our franchise licenses, selling 251 licenses globally in Q2, maintaining our annualized run rate of 1,000 licenses per year.  In North America, we have almost 1,900 licenses sold and contractually obligated to open and have a replenishing pipeline of organic new studio expansion, offering us 4 years to 5 years of visibility into our growth.

\*        \*        \*

[Evercore Analyst:] Nice job in a pretty tough environment.  Can you give us an update just on your franchisees' unit economics?  Because the AUV side continues to trend really nicely in the right direction.  But are your franchisees starting to see inflation show up on the cost side, especially just on the labor rent or financing side that are offsetting that AUV accretion?

\*        \*        \*

[Geisler:]  So our employees are already paid kind of above the minimum wage.  So as minimum wage or the labor side increases, we're not really seeing any labor or wage inflation.  *And so the stores are continuing to operate profitably.  Obviously, we opened more units in Q2 than we did in Q1, continued to sell at the current 250 or more pace per quarter.  So at the top of the funnel, we're seeing franchisees want to continue to buy more franchises and we're seeing franchisees continuing to want to open as we see AUVs continue to grow.  So the economics are still strong*.

168.   On August 12, 2022, Xponential filed with the SEC its 2Q 2022 Form 10-Q for the quarter ended June 30, 2022 signed by defendant Meloun.  In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free

- 75 -

4870-6046-8173.v5

from fraud, accurate, and materially complete.  The 2Q 2022 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 2Q 2022 press release, including statements about AUV, license sales, and studio openings.

169.    On November 10, 2022, Xponential issued a press release announcing its financial results for the third quarter of 2022 ("3Q 2022").  The 3Q 2022 release stated that the Company had achieved a run-rate AUV of $489,000 for the quarter.

170.    Later that day, Xponential held a conference call with analysts and investors to discuss the Company's operations and earnings release.  During the conference call, defendant Geisler repeated the AUV figures included in the press release:

> Our Q3 North American system-wide sales also continued to grow, up 37% year-over-year to $265 million.  Finally, *we ended the third quarter with run rate North American AUVs of $489,000, up from $417,000 year-over-year.  AUVs for the month of September reached 496,000*, underscoring the continued momentum in the business.

171.    Defendant Meloun also highlighted the Company's AUV, claiming that Xponential's "younger brands" were opening above $500,000 AUV and stating that the figure could reach into the "high 600s" from its current level:

> So when you look at the brands, I mean, it's the brands that take off earlier, typically are the ones that have the highest maturity from an AUV.  So the things that we talked about on prior earnings calls, that's given us really good optimism around some of the younger brands is brands like Rumble and BFT and even our stretch lab, which I would say is kind of in the middle innings of – it's been around for a while and growing.  *They're churning out much higher AUVs than we've historically seen from Club Pilates.  Anthony mentioned early on,*

- 76 -

4870-6046-8173.v5

*Club Pilates had an AUV that was like kind of sub-300, now it's sitting 750,000-plus per studio.  Our [stretch] labs are approaching that, and it's a much younger brand.  You look at club Rumble and you look at BFT, the early -- again, small sample set, but the early units that are opening up are opening up well above like that 500 AUV.  So as these brands continue to mature, I think even the younger ones will continue to push well above that 500 AUV, which we have always defined as the design for AUV, not the MAX, like we never saw the MAX AUV prior to COVID.*

*So now that the system has gotten back to pre-Covid levels, and we're starting to see all these brands start to perform well above that 500.  I don't think you'll see that as the cap.  I think that's just kind of the ante to get to play where you get to that point of where the brand is expected to perform to, but well above that, we'll see the brands performing 500, 550 as they kind of age and get more units open*.

*       *       *

With that, obviously, AUVs will continue to climb.  What is that ceiling at which you kind of – it's kind of like a car, right, and they can only go so fast because at some point, they're pushing through air and it's hard to move faster and faster.  *But I think our AUVs, we don't know where that's at yet.  Is it possible that we do see getting to the high 600s?  I do think that's definitely a possibility having the entire system pushing close to 600,000 AUV.  We're at $500,000 roughly now, and we're definitely not slowing down from a growth perspective*.

172.   During the call, Geisler also discussed the number of franchise licenses sold in the quarter:

- 77 -

4870-6046-8173.v5

[Geisler:] Starting with increasing our franchise studio base, we ended Q3 with 2,485 global open studios opening 128 net new studios in the third quarter. **Year-to-date, we have opened 355 new studios**, putting us on track to reach our goal of 500-plus new studios for the year. Of note, with each progressive quarter, studio opening cohorts have gotten stronger, opening at higher sales and membership levels in month 1 and then ramping faster than studios in prior cohorts.

We were also pleased to see our highest number of new studio openings in the final week of September. **Our franchisees opened 36 studios in the last week of September**, a strong indicator that our franchisees remain bullish on opening new studio locations as we approach 2023. **We also experienced strong demand for our franchise licenses, selling 258 licenses globally in Q3 and 769 thus far this year**. Keep in mind that over time, as we continue to sell through prime geographic territories in each of our existing brands, in order to maintain this elevated run rate, we would eventually need to acquire another brand.

**In North America, we have over 1,900 licenses sold and contractually obligated to open** along with the replenishing pipeline of organic new studio expansion that offers us 4 to 5 years of visibility into our growth.

*        *        *

[Robert W. Baird & Co. Incorporated ("Robert W. Baird") Analyst:] Okay. That's helpful. And then, Anthony, maybe a follow-up on the appetite around unit development. I know you commented on the licenses sold that you've seen. Any broader perspective as you look out to the number of potential openings in 2023, whether you can

- 78 -

4870-6046-8173.v5

sustain and maybe how you feel about sustaining the level that you've seen this year?

[Geisler:]  Yes, a little clarification.  *So we had 120 sold, is what I said, we had actually had 139 sold in September alone.  But the franchise sales are very strong*.  We're continuing to deliver on openings this year.  We will deliver, of course, at or better openings this next year, right?  It's always our goal is we sell more, stack up more backlog to find ways to open more as we go forward.  So that's where we're sitting as of today.

173.   Also on November 10, 2022, Xponential filed with the SEC its 3Q 2022 Form 10-Q for the quarter ended September 30, 2022 signed by defendant Meloun.  In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete.  The 3Q 2022 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 3Q 2022 press release, including statements about AUV, license sales, and studio openings.

174.   On March 2, 2023, Xponential issued a press release announcing its financial results for the fourth quarter of 2022 and full year 2022 ("FY 2022").  The FY 2022 release stated that the Company had achieved a run-rate AUV of $522,000 for the fourth quarter.

175.   Later that day, Xponential held a conference call with analysts and investors to discuss the Company's operations and earnings release.  During the conference call, defendant Geisler highlighted the Company's AUV and metric and claimed that "new stores" were opening at an AUV figure north of $500,000:

[Geisler:]  We believe that our studio's quarterly run rate average unit volumes or quarterly AUVs ultimately offer the most direct measure of the health of our franchise system.  *We ended 2022 with fourth quarter run rate North American AUVs of $522,000, up from*

- 79 -

*$446,000 in Q4 of 2021*.  This represents the 10th straight quarter of AUV growth.  While we don't know maximum AUV potential, we know that our studios have plenty of capacity to add more members and classes.  The strong same-store sales exhibited by even our more mature cohorts that I discussed earlier make us confident in our studios growth prospects.

\*    \*    \*

[Raymond James Analyst:]  And maybe on AUVs, obviously, continue to make a lot of progress there, north of $500,000 here in the fourth quarter.  Could you remind us what your highest AUV studios are doing today? Is there anything unusual about those studios? Or is it just a matter of time before they sort of get to those levels?

[Geisler:]  I mean look, the AUVs vary across brands, but the ROIs and margins kind of end up being the same depending on what brands you're in.  So something like a Stretch Lab will have higher AUVs that has higher labor costs because it's one-on-one, something like a Pure Barre, we'll have lower AUVs, but it's more of an owner-operator model.  So you've got a lot of the owners that are teaching class are working in the front desk and so labor's a lot less.  And then you have something like Club Pilates called in the middle, which will have higher AUVs, but the majority of those franchisees are semi-absentee owners.  So they're hiring in the front desk and hiring for the classes as well.  But I mean there's -- when you look at sort of high-end capacity of certain things.  I mean, there are Club Pilates that are doing $1.2 million, $1.3 million out of their boxes.  And so there is the ability to do that.  We've talked about Club Pilates when we bought it, was the AUVs are about $250,000, and they're kind of triple above that now.  And so what we like that ***we're seeing is the newer brands like Rumble***

- 80 -

*and BFT, even so our YogaSix that are opening, they're kind of opening it twice where Club Pilates started, right*? And so we would love to say that those are going to triple like Club Pilates.  I don't know if that will necessarily be the case.  *But what's nice is that we're at an all-time company high AUV and our new stores that are opening in those new brands are opening at that AUV and higher* while brands like Club Pilates, or Stretch Lab their individual AUVs continue to climb as well as we comp year-over-year at double digits.

176.  During the call, Geisler also discussed the number of new studio openings and franchise licenses sold in the quarter:

Let's begin with increasing our franchise studio base.  We ended Q4 with 2,641 global open studios, *opening 156 net new studios in the fourth quarter alone.  For the full year, we opened 511 net new studios globally or a new studio opening approximately every 17 hours.  We also experienced strong demand for our franchise licenses, selling 257 licenses globally in Q4, bringing total sold licenses to 5,450*.

*In North America, we have almost 2,000 licenses sold and contractually obligated to open*, offering us multiyear visibility into our growth.  Keep in mind that over time, as we continue to sell through prime geographic territories in each of our existing brands, we would eventually need to acquire another brand to maintain this elevated run rate of license sales.

177.  Defendant Meloun similarly highlighted Xponential's franchise licenses sold and studio openings during the call:

[B. Riley Securities, Inc. Analyst:]  And let me add my congratulations.  For 2023, did you say what's baked in your guidance or what you're targeting for sales of new franchise licenses? And then

- 81 -

4870-6046-8173.v5

I guess, how is the evolving macroeconomic backdrop factored into that target?

[Meloun:]  *Yes. In regards to the license sales, I mean when you look at what we did in 2022, we did 1,000 licenses, about 250 on average a quarter*.  As we look forward into 2024, we don't -- sorry, 2023, we don't guide on license sales, but we have kind of provided some forward-looking view that we continue to sell through the available inventory that's out there or white space that's out there.

178.   On March 6, 2023, Xponential filed with the SEC its Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K") signed by defendants Geisler and Meloun, among others.  In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete.  The 2022 Form 10-K contained the statements regarding Xponential's purported quarterly results contained in the FY 2022 press release, including statements about AUV, license sales, and studio openings.

179.   The 2022 Form 10-K also discussed studio-level economics, including that the model the Company was having franchisees use would generate AUV of $500,000 in year two of operations:

**Highly attractive and predictable studio-level economics**.

*The Xponential Playbook is designed to help franchisees achieve compelling AUVs, strong operating margins and an attractive return on their invested capital*.  Studios are generally designed to be between 1,500 and 2,500 square feet in size, depending on the brand, which contributed to a relatively low weighted average initial franchisee investment of approximately $350,000 in 2022 and 2021. *Our model is generally designed to generate, on average under normal conditions, a weighted average AUV of $500,000 in year two of operations and studio-level operating margins ranging between*

- 82 -

4870-6046-8173.v5

*25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%. A studio reaches "base maturity" when it has annualized monthly revenues of approximately $400,000.* Using our model, we expect this to typically occur 6-12 months after studio opening. We believe that studios typically have opportunity to continue growing and maturing beyond that point.

180. On May 4, 2023, Xponential issued a press release announcing its financial results for 1Q 2023. The 1Q 2023 release stated that the Company had achieved a run-rate AUV of $542,000 for the quarter.

181. Later that day, Xponential held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, defendant Geisler highlighted the Company's purported robust AUV growth:

Along with growth in our membership base, North American studio visits for the 3 months ending in March increased by 38% year-over-year, reaching a total of $12.6 million. The increasing foot traffic and utilization of the studios drove record North American system-wide sales, which increased 42% year-over-year in the first quarter. Freezers on memberships are also at their lowest level since prior to the pandemic. *Q1 North American AUVs of 542,000 were up 21% from $450,000 in Q1 of 2022, our 11th straight quarter of AUV growth*. We believe that AUV growth is the most direct measure of the health of our franchise system, and I am pleased to report the momentum in AUV growth has continued to build in the second quarter. We also saw same-store sales growth of 20% in the first quarter, up from 17% in the previous 2 quarters.

182. During the call, Geisler also discussed the number of franchise licenses sold in the quarter:

- 83 -

4870-6046-8173.v5

It was another strong quarter for [X]ponential as our business has continued to perform across our key performance metrics. [X]ponential franchisees now operate over 2,750 studios globally, an increase of 24% year-over-year *with more than 5,600 licenses sold across our 10 leading fitness brands*. We now have franchise master franchise and international expansion agreements in 18 countries. Also encouraging, our mature studio cohorts are again exhibiting strong same-store sales growth with profiles similar to our younger studios. *For the quarter, North American studios over 3 years old comped at 21% same-store sales*.

*     *     *

Beginning with the increase of our franchise studio base, we ended Q1 with 2,756 global open studios *opening 115 net new studios in the first quarter. We sold 188 licenses globally in Q1*, bringing the total sold licenses to 5,638. Our pipeline of over 2,000 licenses sold and contractually obligated to open on a global basis offers us multiyear visibility into our growth. Note this number does not include our master franchise agreement obligations, which I will speak to shortly.

183. Defendant Meloun also spoke on the call, attributing North American system-wide sales growth, in part, to new studio openings in the quarter:

First quarter North America system-wide sales of $317.8 million were up 42% year-over-year. *The growth in North American system-wide sales was largely driven by* the 20% same-store sales in the existing base of Open [studio] that continue to acquire new members, coupled with *82 net new North American [studios] that opened in the first quarter*.

184. Geisler also answered an analyst's question about franchisee financial health, pointing to $500,000 AUV as evidence of studio profitability:

- 84 -

4870-6046-8173.v5

[Raymond James Analyst:] I wanted to go back to the franchisee financial health sort of topic. If we look at the cash on cash returns that your franchisees are earning today, what does that look like versus when you went public? I would imagine it's actually gotten a little bit better the last couple of years.

[Geisler:] So Joe, I think when you go back to what it was kind of around IPO, it's kind of an unfair measurement given they were in kind of the color recovery period, right? ***So I think if you talk about pre-COVID when we were just under kind of the 500,000 AUV. And then now you fast forward, we've met that now exceeded it. Obviously, the cash-on-cash returns and the overall profitability and strength of the franchisee is better today than it was pre-COVID***. At IPO, it's kind of an unfair measurement given studios were still recovering as restrictions lifted and members return back to the studios. ***But overall, today, you would argue franchisees are much healthier, more profitable than they have been ever in the company's history***.

185.   On May 5, 2023, Xponential filed with the SEC its 1Q 2023 Form 10-Q for the quarter ended March 31, 2023 signed by defendant Meloun. In addition, defendants Geisler and Meloun provided SOX certifications that the filing was free from fraud, accurate, and materially complete. The 1Q 2023 Form 10-Q contained the statements regarding Xponential's purported quarterly results contained in the 1Q 2023 press release, including statements about AUV, license sales, and studio openings.

186.   Defendants' statements in ¶¶146-185 about Xponential's AUV metric and the purported growth in license sales and studio openings were false and misleading when made, concealing the underlying scheme alleged in ¶¶54-129 and numerous risks to the Class. In fact, Defendants concealed from investors that the metrics that Xponential was reporting and the purported growth that Defendants

- 85 -

Geisler and Meloun highlighted each quarter was dependent upon a scheme that procured franchisees (and thus license sales and studio openings) through unlawful means, including by misrepresenting revenue and startup costs to get those prospective franchisees to purchase licenses and open studios in a franchise concept that was experiencing widespread losses at the franchisee level.

187.   As alleged in detail in ¶¶57-84, internal documents, franchisee lawsuits, and reports by franchisees to *Bloomberg* and *The Capitol Forum* all describe the same scheme – Xponential gave franchisees baseless financial information, including "very unrealistic" projections and unrealistic cost estimates, to lure them into what franchisees have described as the "Xponential façade" and financial ruin. The misrepresentations occurred Company-wide and set franchisees up to fail.  Row House franchisees informed Geisler in February 2020 that "[t]he revenue estimates in the FDD do not appear to match the reality being experienced by many studios" while "[t]he buildout cost and timeline are higher & longer than the expectations being set during the franchisee sales process."  In June 2020, franchisees of AKT studios informed Geisler that "[d]evelopment is costly and disorganized . . . and carries significant risks.  The build-out overages are systemic, and we are in the hole financially from the beginning (50-80% above as outlined in the FDD)" and that the identified issues "translate into delayed studio openings, unprofitable open studios, and deepening losses."  Other franchisees stated:  (i) "'[w]e were ripped off . . . ***[d]evelopment costs were $250k more for buildout then outlined in the FDD*** . . . [t]his caused major delays in studio openings'"; (ii) "'[t]his seems to be the XPO game – rip you off from the build-out'"; and (iii) "'the FDD does not line up with Franchisee experiences for development and operating costs.'"    And AKT franchisees and YogaSix franchisees brought suit against Xponential, Geisler, Grabowski, and Meloun, alleging that Xponential's leadership lied to prospective franchisees about studio profitability (both revenue and costs) "to induce Plaintiffs to sign franchise agreements and area development agreements," which would

- 86 -

increase license sales and studio openings.  Reports by numerous franchisees across Xponential's brands corroborated the scheme in interviews with *Bloomberg* and *The Capitol Forum*.  *See* ¶¶62, 65-68, 81-82.

188.  Uniformly, the franchisees revealed that misrepresentations and omissions were made, in large part, in financial disclosure documents that were required to be filed by the Company to inform prospective franchisees about the profitability of the underlying franchise.  Defendants' scheme, therefore, occurred across Xponential's brands and across its franchisees.  Thus, while defendants were boasting about growing AUVs and increasing license sales and studio openings, franchisees in most of Xponential's brands were operating in the red, as the following chart confirms:[9]

| | | FY 2021 | FY 2022 | | | FY 2023 |
| | | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
|---|---|---|---|---|---|---|---|
| XPONENTIAL | Run-rate AUV (as reported) | $ 446,000 | $ 450,000 | $ 480,000 | $ 489,000 | $ 522,000 | $ 542,000 |
| | Average annualized operating profit (loss) per studio (based on reported run-rate AUV) | $ 74,000 | $ 78,000 | $ 108,000 | $ 117,000 | $ 150,000 | $ 170,000 |
| STRETCH LAB, CLUB PILATES, RUMBLE | Club Pilates, Stretch Lab, and Rumble studios included in AUV metric (estimated based on FDD data) | 723 | 741 | 784 | 840 | 856 | 925 |
| CYCLEBAR, AKT, STRIDE FITNESS, ROWHOUSE, pure barre, YOGASIX | Remaining studios included in AUV metric | 1,036 | 1,076 | 1,101 | 1,097 | 1,158 | 1,160 |
| | As a % of all studios in AUV | 59% | 59% | 58% | 57% | 57% | 56% |
| | Average annualized operating profit (loss) per remaining studio (excluding Club Pilates, Stretch Lab, and Rumble qualified studios) | $ (62,943) | $ (74,442) | $ (65,614) | $ (80,735) | $ (53,707) | $ (52,103) |

189.  Xponential's AUV calculations did not include Company-owned transition studios or, as the Company acknowledged in response to the Fuzzy Panda report, "[s]tudios with zero sales in the period" that they claimed "have always been excluded from the calculation."  Adding these studios to the calculations would have made the losses in the foregoing chart even higher.

---

[9]    An explanation of the methodology of the following chart is set forth in detail in Exhibit E, attached hereto.

- 87 -

4870-6046-8173.v5

190. While defendants were boasting about the health of their franchise system, franchisees, in truth, were facing financial ruin as follows:

- YogaSix franchisees that filed suit in November 2023 alleged that their "studios are operating at losses of $8,000 to $23,000 per month and face imminent closure . . . as a direct result of material misrepresentations made by their franchisor" and revealed that based on a survey of "nearly 100 operating YogaSix studios, the same holds true for 88% of these YogaSix franchisees, who, as of August 2022, had not reached breakeven" while "[n]ot one of the 97 surveyed franchisees indicated they would be willing to build out and open another YogaSix studio."

- AKT franchisees that filed the AKT Lawsuit allege that "Plaintiffs bought into the Xponential facade and were financially annihilated by the reality behind the facade." They, too, allege that "[t]hese problems were not unique to Plaintiffs, but existed across the brand" and that "[o]f 30 original franchisees in 2018 and 2019, it appears at best 7 remain in the AKT system."

- AKT franchisees told Geisler in a memo in June 2020 that "'[w]e thought we bought into a well-oiled corporate system. What we really bought was a startup where we're on our own and draining cash.'" The franchisees added "[t]here are issues in the operating model at every stage of the process, creating a vicious and costly cycle . . . [o]nce sold, the development processes is disastrous, putting every owner at a financial and operational disadvantage even before a studio opens." The franchisees also told Geisler, "[w]e are handicapped from the get-go because of the failures in the development process. As a result, our openings are delayed and owners run out of cash before opening." And that "[t]he issues we've identified translate into delayed studio

- 88 -

4870-6046-8173.v5

openings, unprofitable open studios, and deepening losses for both owners and Xponential."

- Row House franchisees told Geisler in a memo in February 2020 that "[t]ime is of the essence for many studios have been running negative P&Ls for over 4 – 12 months and will not be able to do so for much longer."

- Numerous franchisees interviewed by *Bloomberg* and *The Capitol Forum* also spoke of financial ruin, including bankruptcy as a direct result of defendants' scheme. *See* ¶¶65-67, 103-106, 109-110 ,120-121, 125-126.

191. When defendants spoke about Xponential's AUVs, increasing license sales, and studio openings, they were obligated to disclose that they generated those results by misrepresenting and omitting material information (required to be disclosed in Xponential's FDDs) to the prospective franchisees that ultimately purchased the licenses and opened the studios. By concealing the underlying scheme to mislead Xponential's franchisees, and the financial devastation that the scheme brought onto those franchisees, defendants misled investors about Xponential's financial condition and the many foreseeable risks that the scheme created for the Class, including (i) the likelihood that short-sellers would investigate the Company and issue damning reports; (ii) the likelihood of governmental and Wall Street investigations; (iii) the wholesale disposal (for no consideration) of brands that defendants represented were financially sound; and (iv) the termination of key executives involved in the scheme.

**B.   Defendants' Misled Investors with False Claims that Xponential Had Not Experienced Any Studio Closures and Had Not Defaulted on a Single SBA Loan**

192. A key part of the scheme was convincing franchisees and investors that Xponential's business model was successful and that existing franchisees were successful. To do this, defendants Geisler and Meloun told both franchisees and

- 89 -

investors that Xponential had never had a permanent studio closure or even a single default on an SBA loan, which existing franchisees had taken out to open their studios. The benefit of this was two-fold. It convinced prospective franchisees that they were investing in a solid franchise where they would be profitable if they followed the Company's playbook and convinced prospective investors that Xponential was a sound investment and that its reported financial results reflected a business built on "healthy, happy franchisees." Defendants Geisler and Meloun's statements alleged below in ¶¶193-203 were outright false since Xponential had experienced permanent studio closures and SBA loan defaults even before the Class Period, as alleged below in ¶¶204-214.[10]

193. Defendants began with their "no permanent closure" message on August 24, 2021, during the Company's 2Q 2021 earnings call. During his prepared remarks, defendant Geisler stated expressly that Xponential had "never had a single permanent studio closure":

> Through our franchise model that combines multiple brands, strong unit economics and extensive franchisee support, we have gained a leading market position in the United States boutique fitness industry. So how will we continue to grow this market position? Our growth initiatives center around 4 simple goals. First, we plan to grow our franchise studio base across all brands in North America. ***Throughout our company's history, including during the COVID-19 pandemic, we have never had a single permanent studio closure.*** In fact, from January of 2020 through July of 2021, we have successfully

---

[10] For ease of reference in this section of the complaint, Lead Plaintiffs list in ¶¶193-203 all of the statements concerning Xponential's studio closures and SBA loan defaults alleged to be false and misleading and then provide an explanation in ¶¶204-214 on why those statements were false and misleading when made. For each statement, Lead Plaintiffs identify the portion of each statement alleged to be false and misleading in bold and italics with the remaining portion of each statement provided for context.

opened 354 new studios across our 9 brands in North America and sold an additional 554 new licenses, including 338 licenses sold year-to-date in 2021.

194.   On September 14, 2021, defendant Geisler presented at the Raymond James Consumer Conference where he repeated his statement about "zero closed stores," attributing it to "a great business model that actually works":

> Still delivered 20 million workouts in 2020.  ***We did all of that with zero permanent closed stores prior to COVID, and we are happy to report zero permanent closed stores after COVID.  So 100% of our studios have been open since the last quarter***.

*     *     *

> That was evident going into COVID that we had selected really great franchisees that were doing really well, and the model was really great.  ***Because how do you go into something like a pandemic, that you didn't plan for, with zero closed stores and come out with zero closed stores?  The only way that happens is if you have*** great franchisees that are doing a great job and ***a great business model that actually works – is the only answer for how you end up with those types of metrics***.

*     *     *

> Well, 100% of our studios closed in May – in March and April.  100% of those studios reopened.  And with zero corporate layoffs, we kept 100% of our people working, making 100% of their money.  During 2020 alone, we grand opened 241 units; about 350 have opened since the pandemic.  But just in 2020 alone, 241.  ***And of course, as I've said, we closed zero stores during that time***.

- 91 -

195. On March 7, 2022, Geisler presented at the Raymond James Institutional Investors Conference where he repeated his message that "[w]e have never permanently closed the store in the history of our business":

So affluent, engaged customers, fastest-growing segment of the $97 billion fitness industry. Through COVID, while the industry contracted by 30%, we actually grew. ***We have never permanently closed the store in the history of our business***. We actually closed about 1,500 stores temporarily for COVID, and we opened up 25% more than that when we reopened.

196. On March 8, 2022, Xponential presented at the Bank of America Consumer & Retail Technology Conference. During the conference, Geisler again represented to investors that "we've never closed a store" and tied that purported accomplishment to its business model:

A lot of people say stuff like, hey, we're going to go open 5,000 units of something. Well, that's true. You can go open 5,000 of something, but at what AUV? And if the AUV is at $200,000, then the 5,000 are going to close because it's not sustainable, right? So we want to make sure that our TAM is actually tied to an AUV target that creates a healthy franchisee and a healthy system, which we've been able to achieve that because ***pre-COVID, we've never closed a store; and post COVID, we've never closed a store***. We actually grew our store count by 25% during COVID because we select great franchisees, ***and we operate a model that allows a franchisee to have healthy economics***.

197. On March 14, 2022, Xponential presented at the ROTH Conference. During the conference, Geisler repeated the message to investors that "[w]e had never permanently closed a location prior to COVID, and we never did after COVID as well":

- 92 -

4870-6046-8173.v5

And so as much as I wouldn't wish COVID upon us or anyone else ever again, we still processed almost $500 million during COVID. *We had never permanently closed a location prior to COVID, and we never did after COVID as well*. So it really shows the resiliency of the business.

\*     \*     \*

We had to temporarily close[] where we had to, but we did not permanently lose the store. *And when you're talking about a franchisor that has a couple of 1,000 units and has never permanently closed a store*, that's massive, pre-COVID. And it sounds extremely unbelievable after COVID, which is why I'm glad we're public because then there's other third parties that audit that out and say that that's actually true, and it's not just me talking.

198. On August 11, 2022, during the Company's 2Q 2022 earnings call, Geisler repeated the message that "we had 0 studios closed permanently." He also claimed that no franchisee had defaulted on an SBA loan under Xponential's ownership:

As you may have heard me speak to previously, we take our franchisee selection process very seriously, with only 2% of our leads becoming franchisees. Our franchisees generally are corporate veterans looking for an entrepreneurial opportunity. Their resilience and business acumen is evidenced by the fact that in the company's history, including most recently during the pandemic, *we had 0 studios closed permanently*.

Our franchisees have borrowed over $200 million from the SBA *without any non-repayments under our ownership*. Between our strong franchisee base, the support we provide our franchisees and the continued strength of our underlying business, we feel confident that

- 93 -

4870-6046-8173.v5

Xponential will not only be able to successfully weather a slowdown or recession, but maintain a solid growth trajectory going forward.

199.    On November 10, 2022, during the Company's 3Q 2022 earnings call, Geisler again addressed the financial health of Xponential's franchisees, repeating that none had defaulted on an SBA loan:

With membership counts growing and churn remaining low, we are confident in the ongoing health of our membership base and demand for our boutique offerings.    The second factor contributing to Xponential's resiliency is our franchisees.    As you've heard me speak to previously, we take our franchisee selection process very seriously with only 2% of our leads becoming franchisees.    Our franchisees are typically corporate veterans looking for an entrepreneurial opportunity. These individuals have the tenacity, courage, and capital to successfully run their businesses.    ***Our franchisees have also borrowed over $200 million from the SBA without any non-repayment under our ownership***.

200.    On January 9, 2023, Meloun presented at the ICR Conference and repeated the message that "[w]e've never closed a company studio in our history," emphasizing that even its "lower end brands" were putting "25% to 30% margin to the bottom line":

What do we do at that cash? Acquisitions, stock buybacks, we could do a dividend at some point in the future.    So we have a lot of flexibility on how we can manage cash and use it over time.    Very highly attractive and predictable studio level economics.    ***We've never closed a company studio in our history, which shows you the strength of the brand, even with the lower end brands that we have putting off lower AUVs, they still put 25% to 30% margin to the bottom line based off of how they operate the business***.

- 94 -

201.   On March 15, 2023, Xponential presented at the Bank of America Consumer & Retail Conference.  During the conference, Meloun represented to investors that studio "closures" was "the way to really think about how healthy are our franchisees" and confirmed that "we don't have closures in our studios":

> So AUV is how – I think the one – *the way to really think about how healthy are our franchisees is closures, and we don't have closures in our studios.  From the time we've owned them we've never had 0 closures.  So if they weren't making money, they'd be going away.  And obviously, they're not because we haven't had any closures in the system.  So I would say the overall health of the franchisees is strong and getting stronger*.

202.   Geisler added to Meloun's explanation about studio closures at the conference, explaining that Xponential "will take . . . stores back" "if somebody isn't making margins that are not running the business properly," and stating that they "transition those studios back out into the franchise network":

> *And we'll take if somebody isn't making margins that are not running the business properly, we will take those stores back, and we will transition those back out into the franchise network or if we have to relocate a location or something like that but the franchise unit itself stays alive and open, and then we'll refranchise them back out*.  A lot of franchisors like closures because then they can turn around and sell another $60,000 franchise in that area, right?  But we are hooked on royalty.  We're not hooked on the upfront franchise fee.  And so it has to be recognized over 10 years.  Yes, we get the cash, we don't necessarily need the cash.  We want to put some franchisee in kind of in harm's way, right?

203.   On May 9, 2023, defendant Geisler appeared on Jim Kramer's ("Kramer") Mad Money show to discuss Xponential's quarterly earnings results.

- 95 -

During that discussion, Geisler repeated the misrepresentation that "[w]e've actually never had a closure" of a studio and added that franchisees, instead of closing, "typically will just transfer to somebody else" after a couple of years and sell at "three and a half to four times EBITDA":

> [Geisler:] We've actually never had a closure [of a franchisee studio].
>
> *       *       *
>
> [Kramer:] Have you ever had to terminate anybody?
>
> [Geisler:] Uh, no, we, I mean, we'll, we'll terminate people that haven't gotten open in time, right, uh, but as far as people that are open, they typically will just transfer to somebody else. They may be in the business for a couple of years and they typically sell at three and a half to four times EBITDA.

204. Defendants Geisler and Meloun's statements that Xponential had not experienced a single studio closure (¶¶193-198, 200-203) were false and misleading throughout the Class Period. Xponential, in fact, had experienced multiple studio closures even before the Class Period began and the closures were related specifically to the financial distress caused by Xponential's misrepresentations to the underlying franchisees. In fact, the internal memorandum that Row House franchisees sent directly to Geisler on February 16, 2020 stated specifically that "many studios have been running negative P&Ls for over 4 – 12 months and will not be able to do so for much longer" and that "[m]any studios [were] in danger of closing after 6 months of unprofitability." It emphasized that "*[m]any/most* open studios do not have enough revenue to cover their costs, even several months after being open." And many of those studios closed permanently not long after. As reported by *The Capitol Forum* on March 27, 2023:

> Row House had 54 franchised studios in operation at the time of the memo, according to the company's disclosure documents. By the

- 96 -

4870-6046-8173.v5

end of 2020, 17 studios – 31% of the open studio portfolio at the start of the year – had been handed over to the company." An additional five were reacquired by the company in 2021.

205.   These were permanent closures for the franchisees that operated those studios.

206.   Financial distress at the franchisee level led to permanent studio closures.  In fact, another AKT studio had closed permanently in December 2021, shortly after the IPO.  According to the 2023 AKT Litigation against the Company and its executives, including Geisler and Meloun, Xponential executives had approached one of the AKT franchisees named as a plaintiff in the lawsuit and solicited that franchisee to take over a studio that had closed in December 2021:

> On December 6, 2021, Chordock, Junk, Johnston, and Svilich approached Paul and Jodi at AKT Franchisor's annual convention (who were attending their first annual conference as franchisees in the Xponential system), soliciting Paul to take over the AKT studio in Miami that *had closed during the convention*.

> Chordock, Junk, Johnston, and Svilich (all acting individually and on behalf of AKT Franchisor) told Paul and Jodi *that the Miami studio had closed abruptly*, but that it would be successful when reopened by Paul and Jodi.

207.   According to the 2023 AKT Litigation, the AKT franchisee that ultimately took over the Miami studio that had closed in December 2021 would itself close the same studio along with three others by August 2022 and then file bankruptcy:

> The loss of funds and time ultimately caused Paul, Jodi, and East Florida Franchisee *to close not only the Miami studio after scarcely eight months, but their remaining three studios* in Southeast Florida as well, resulting in losses of more than $2 million.

- 97 -

4870-6046-8173.v5

As a result of the misrepresentations, Paul and Jodi were forced to file for bankruptcy.

208. Defendant Meloun's statements that "we don't have closures in our studios" and that studio closures were "the way to really think about how healthy are our franchisees" were false. When he made those statements in March 2023, Xponential had experienced multiple additional closures that were tied specifically to misrepresentations by defendants to those franchisees. As alleged by franchisees in the 2023 AKT Litigation, those franchisees had closed eight studios between October 16, 2022 and March 4, 2023 and would close an additional two studios within days of defendant Meloun making these statements. According to that lawsuit, Xponential filed demands for arbitration against them on March 22, 2023 and another on April 27, 2023 "[w]hen Plaintiffs closed their respective AKT studios . . . to send a message to them and make an example to other franchisees." The underlying petition to confirm the arbitration award against AKT Franchise, LLC, the subsidiary of Xponential, itself confirms that the franchisee "was forced to close her studios" after "losing well over a million dollars" based on defendants' misrepresentations:

[A]fter losing well over a million dollars and exhausting resources based on misrepresentations by Respondent [AKT Franchise, LLC] and employees of Xponential regarding the expected initial investment, expected revenues, and myriad other aspects of what was touted as a turn-key franchise, Petitioner [Amanda Davis] was forced to close her studios. [AKT Franchise, LLC] promptly filed a Demand for Arbitration, demanding $400,000 from [Amanda Davis].

209. These studios closed permanently because of the financial distress defendants' misrepresentations caused those franchisees. As the AKT franchisees alleged, they "were forced to close their franchised studios after spending between $800,000 and more than $2 million developing franchised studios as a direct result

- 98 -

4870-6046-8173.v5

of material misrepresentations made by their franchisor, AKT Franchisor, and its directors, officers, employees, and agents." In fact, those plaintiffs alleged that they "bought into the Xponential facade and were financially annihilated by the reality behind the facade." The closures revealed that many franchisees were unhealthy financially since the problems experienced by the franchisees in the 2023 AKT Litigation "were not unique to Plaintiffs, but existed across the brand" where "[o]f 30 original franchisees in 2018 and 2019, it appears at best 7 remain in the AKT system."

210. Defendant Geisler's statements at the March 15, 2023 conference that "we . . . take those stores back" and "refranchise them back out" "if somebody isn't making margins that are not running the business properly" were also false and misleading. Xponential took stores back and refranchised them out not because franchisees were running the business improperly, but instead to create the appearance that franchisees were financially sound and growing. As Meloun bragged at the same conference, "the overall health of the franchisees is strong and getting stronger" as evidenced by the false fact that "we don't have closures in our studios."

211. But the experience of the franchisees in the 2023 AKT Litigation provides a good example to the contrary. Those franchisees were not running the business improperly. According to the allegations in the 2023 AKT Litigation, they "were regularly promoted to other franchisees as the operators to emulate" and one was "named Franchisee of the Year three times." In fact, the AKT franchisees alleged that "despite following AKT Franchisor's directions precisely and trying every strategy and approach to make their AKT studios succeed, Plaintiffs continued to lose thousands and tens of thousands of dollars each month, finally requiring them to close their studios." Since "[t]hese problems were not unique to Plaintiffs, but existed across the brand," they were too pervasive to cast off as franchisees not "making margins" because they were not "running the business properly," as Geisler

- 99 -

claimed.  As the allegations in the 2023 AKT Litigation reveal, "AKT Franchisor first admitted to its franchisees that virtually every AKT studio was losing money" after it announced that it had removed its President on approximately February 27, 2023.

212.  Other sources corroborate the allegations in the 2023 AKT Litigation. The Row House memo in February 2020, for example, stated that "[t]here are plenty of owners who are following the playbook closely, and still not doing well" and that it is "[n]ot clear how to address those situations where the studio appears to be following the playbook, but still seeing negative results."  The issues facing these franchisees were clearly pervasive and not isolated to a few franchisees or even a single brand.  The numerous franchisees across many of Xponential's brands that reported similar problems to *The Capitol Forum* and to *Bloomberg* provide additional corroboration.  *See* ¶¶99, 103-106, 108-110, 112-113, 119-122.

213.  Geisler's claims on May 9, 2023 reiterating that "[w]e've actually never had a closure" of a franchisee studio and that franchisees typically sell "at three and a half to four times EBITDA" instead of closing their studios were outright false. As alleged in the 2023 AKT Litigation, those AKT franchisees had, in fact, closed ten studios across the Midwest by the time Geisler made these statements.  *See* ¶100. And, in response, Xponential had "filed arbitration demands against Plaintiffs" and "terminated Plaintiffs' Franchise Agreements at least two months prior" to Geisler's interview.  The AKT franchisees also did not sell their franchises "at three and a half to four times EBITDA."  Instead, they "bought into the Xponential facade and were financially annihilated by the reality behind the facade."

214.  Finally, Geisler's statements about SBA loan defaults as alleged in ¶¶198-199 were similarly false and misleading when made.  As alleged in ¶101, SBA loan defaults began as early as 2019, when a CycleBar franchisee in Plano, Texas, had $48,537 of a $350,000 loan charged off.  In 2020, a California Pure Barre franchisee failed to pay $117,654 on a $150,000 loan.  In 2022, a CycleBar

- 100 -

4870-6046-8173.v5

franchisee in New Jersey defaulted on a $466,000 loan, resulting in a charge off of $385,981. Each of those defaults occurred before Geisler told investors, in an earnings call on August 11, 2022, that "[o]ur franchisees have borrowed over $200 million from the SBA without any non-repayments under our ownership."

### C. Defendants Continue to Mislead Investors Through Statements in Response to the Fuzzy Panda Report

215. On or about June 27, 2023, Fuzzy Panda published the Fuzzy Panda report, which, as alleged in ¶¶130-132, represented that: (i) defendant Geisler has had a long history of misleading investors; (ii) Xponential has issued a series of misleading statements about its store closures and the overall financial health of its franchisee base; (iii) more than 50% of the Company's studios never make a positive financial return; (iv) more than 100 of Company's franchises are for sale at a price that is at least 75% less than their initial cost; (v) eight out of ten Xponential brands are losing money monthly; (vi) the Company's publicly reported AUV metric misleadingly excludes underperforming studios; (vii) Xponential had lied in sales pitches to prospective franchisees, including by using false and misleading FDDs; and (viii) at least 30 Xponential stores had been permanently closed.

216. As alleged above, the price of Xponential common stock fell more than *37%* in response to this report. However, because of defendants' denials and continued dissemination of materially false and misleading statements and omissions and failure to disclose the full truth, the price of Xponential common stock remained artificially inflated.

217. The Company issued a press release on June 28, 2023, stating that Xponential was issuing the release in response to what it called the "misleading information in a short-seller report published on" or about June 27, 2023, "denounce[d] the misleading Report," stated that it "contains inaccurate information," and "caution[ed] investors not to rely on it." The release also included a quote from Grabowski, specifically refuting the Fuzzy Panda report's allegations

- 101 -

4870-6046-8173.v5

against Geisler.  Grabowski touted Geisler's "'professionalism,'" while failing to disclose that Geisler had in fact been "held liable" in numerous lawsuits alleging fraud.  Grabowski told investors:

> "As an investor in high-performing businesses and high-integrity management teams, I've known and worked closely with Anthony Geisler, CEO of Xponential, since investing in Club Pilates at my prior firm.  ***I couldn't speak more highly of his passion, commitment to excellence and professionalism***.  I am confident in the strength of Xponential's business and the Company's continued execution and creation of long-term shareholder value."

218.   Since Grabowski decided to speak on Geisler's "'professionalism,'" he had a duty to disclose all facts necessary to make that statement not misleading.  Consequently, Grabowski's statement was false and misleading because he refuted the Fuzzy Panda report's allegations against Geisler without including necessary information about Geisler's prior fraudulent conduct.  Similarly, by denying the substance of the Fuzzy Panda report, defendants continued their scheme to mislead investors about Xponential's business, including the fact that its license sales, studio openings, and growing AUVs were based on a scheme to mislead prospective franchisees about the profitability of an Xponential franchise, as alleged in ¶¶57-95, as well as Xponential's studio closures, as alleged in ¶¶96-126, and maintained the inflation in Xponential's stock price.

219.   Geisler further refuted the Fuzzy Panda report in November 2023 through an interview published in Issue 11 of *Health Club Magazine*.  In response to a question about whether the Fuzzy Panda report had any lasting impact on Xponential, Geisler responded in part "[a]s a listed public company, we work closely with our auditing partner Deloitte and Touche and our inside and outside legal advisors every day.  ***There's no way to manipulate our numbers.  They are real and our results speak for themselves***."

- 102 -

220. Geisler's statement was demonstrably false and misleading because Xponential did in fact manipulate the numbers it reported to the market. For example, the Company removed certain underperforming studios from their reported AUV calculations and repeatedly stated that the Company had never permanently closed a studio. Geisler's statement to the contrary maintained the inflation in Xponential's common stock price.

221. Defendants' denials misrepresented the risks that materialized thereafter, including reports downgrading recommendations and lowering price targets based on an investigation into the truth, reports by news agencies about their own investigations, and the termination of key executives that were involved in the scheme, as alleged in ¶¶135-143.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

222. As alleged herein, defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Xponential, their control over, and/or receipt and/or modification of Xponential's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xponential, participated in the fraudulent scheme alleged herein.

223. The fraudulent scheme alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their executive and/or director-level positions with

- 103 -

4870-6046-8173.v5

Xponential, the Individual Defendants controlled the contents of Xponential's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants was responsible for the accuracy of Xponential's corporate statements and is, therefore, responsible and liable for the representations contained therein. Scienter of the Individual Defendants who, as executive officers of the Company, knew or recklessly ignored facts related to the core operations of Xponential, can be imputed to Xponential.

224. Geisler acted with scienter throughout the Class Period. He was intimately involved in the day to day operations of Xponential's business and had actual knowledge of the scheme alleged herein. As the IPO and SPO Prospectus described Geisler, Xponential was "highly dependent on the services of Anthony Geisler, our Chief Executive Officer and founder, who is critical to the development of our business, vision and strategic direction." And reports have shown Geisler to be a hands on manager in all aspects of Xponential's business. According to *Bloomberg*, he was specifically involved in recruiting new franchisees, "target[ing] what he calls 'corporate refugees,' people who were tired of working the traditional 9-to-5 or wanted to invest their 401(k) savings in something more lucrative." In fact, *The Capitol Forum*'s October 23, 2023 article cited a YogaSix slide presentation from late 2022 involving the "[p]articipation of 97 studios" – 58% of the entire

- 104 -

brand[11] – quoted "A.G." as stating to YogaSix franchisees that "'[w]hat we are trying to drive is where your quality of life and the money you make is in balance.'"  A franchisee involved in that recruiting process even described to *Bloomberg* Geisler's involvement in the sales pitch, while quoting Geisler as acknowledging that he was making representations during the franchisee recruiting process that "'he couldn't put in writing'":

> Xponential told the partners those studios would become profitable within three months – plus, it would waive Vincent's franchisee fee for future studios and potentially give him and his partner some stock.  He says Geisler clarified that he couldn't include it in the contract because of the quiet period ahead of the pending IPO. "Anthony was talking about promises he couldn't put in writing," Vincent says.  "He was convincing.  He's a charming guy."

225.   Geisler also regularly interacted with franchisees after the recruiting process.  In fact, Grabowski was reported in the *Bloomberg* Article as stating that "'[Geisler] was on calls every week with the franchisees'" during the pandemic.  Geisler himself highlighted his direct involvement and interactions with franchisees, thus further demonstrating his actual awareness of their financial health.  He even claimed to wire "free money to franchisees" that needed help "for the first 13-14 months of CycleBar."  During an interview with Franchise Ramp on November 15, 2019, Geisler stated:

> I asked these franchisees who they were now in this situation: are you somebody who gives up?  If you are, let's resell your store to someone who wants to fight.  Or are you somebody who wants to fight but you need help?  ***I spent about \$180,000-200,000 a month for the first 13-***

---

[11]   According to the 2023 YogaSix FDD, the studio had 167 franchised outlets at the end of 2022.

- 105 -

***14 months of CycleBar just wiring free money to franchisees***. What do you need to break even? We did this just to make sure everyone felt supported while we resold the people out who don't want to fight. Today I'm happy to say everyone is operating on their own. We closed 0 stores, 0 men and women left behind.

226. Geisler was also directly involved in threatening franchisees. In fact, when franchisees dared to close a studio, Geisler was there to intimidate the franchisee through the dispute resolution process. In one such instance, he was involved personally in a mediation with a franchisee who was on the receiving end of Geisler's threats. Both *The Capitol Forum* and *Bloomberg* reported that a multi-brand franchisee who owned two Club Pilates studios, a Row House studio, and was opening a StretchLab studio had his studios repossessed by Xponential because the franchisee had closed temporarily around the Thanksgiving holiday in 2020 to slow the spread of Covid. According to *Bloomberg*, who had interviewed the franchisee, the franchisee "couldn't share specifics about the case with *Businessweek*, citing confidentiality agreement restrictions, but he said he could relay a threat Geisler made to him via the mediator over Zoom: that his head would be cut off and mounted on a spike with a note saying, 'This is what happens when you f--- with Anthony Geisler.'" While Geisler and his counsel denied the allegation, as *Bloomberg* reported, their denial confirms Geisler's involvement in the day-to-day details of Xponential's business.

227. Geisler was so immersed in Xponential's business that he even monitored a Facebook page dedicated to Xponential franchisees and used it to threaten and intimidate. According to *Bloomberg*, "Geisler says he personally monitors Facebook groups to provide support, but some franchisees say it's to track any sign of dissent." In fact, *Bloomberg* reported that "[s]tudio owners who make negative comments on the franchisee group pages are kicked out or their comments are deleted." It also offered an example of Geisler using the Facebook page to

- 106 -

silence a franchisee after "'Xponential handed off losing studios to somebody without making sure they had financing and guaranteeing in place,'" as a *Bloomberg* interviewee with knowledge described the sale in late 2023 of 65 studios to MD Professional Holdings LLC for less than $100.   After that sale, according to *Bloomberg*'s reporting, "MD Professional ha[d] been unable to make basic payments for the studios, including rent, salaries and maintenance costs, and staffers ha[d] fled."  It was in connection with "other franchisees [catching] on to the mess" that *Bloomberg* described Geisler's personal involvement in the transaction and his use of the Facebook page to silence a franchisee who was asking questions:

> By late fall, Geisler was emailing fitness instructors at Brown's studios, pitching them to take over their boss's franchise licenses. Meanwhile, as other franchisees caught on to the mess, one posted questions about it on the Facebook franchise group's page, stating he hoped Xponential wasn't trying to manipulate things to make its numbers look better.  Geisler intervened with a response.  "I'm sure in the absence of answers your mind tends to make them up but please be careful not to be someone creating or spreading more lies," he posted. When a YogaSix owner chimed in to say she was new to the franchise and inquired if there would be a meeting about the issue, he shot back: "No we've answered all the questions in the thread below.  Can you not see the replies?"

228.   Geisler and Meloun, as Xponential's CEO and CFO, respectively, also had actual knowledge of Xponential's scheme to mislead franchisees to fuel its license sales and studio openings.  As Xponential's top executives, they knew about the franchise process and about the limitations imposed on franchisors in the sales process, including specific disclosures that were required in the FDD for Xponential's operating brands.  In fact, Xponential's IPO Prospectus highlighted Geisler's experience as evidence of Xponential's "[p]roven and experienced

- 107 -

management team with an entrepreneurial culture," stating that "Geisler has direct experience scaling franchised fitness brands, having previously served as the Chief Executive Officer of LA Boxing, and has worked with many members of our leadership team for several years."  The IPO Prospectus also highlighted Meloun's expertise, stating that he "served in executive roles at The Joint Corp, a national operator, manager and franchisor of chiropractic clinics, including as Chief Financial Officer from November 2016 to July 2018."

229.    Geisler and Meloun also had actual knowledge that Xponential was selling franchise licenses using misleading FDDs.  Geisler, in fact, was first alerted of a problem with Xponential's FDDs through the Row House memo in February 2020 – a full year before the IPO.  That memo stated specifically that "[t]he FDD painted a rosy picture of being profitable in a few months, which few/no studios have achieved" and that the "FDD [was] missing many costs incurred by franchisees such as Legal fees, SBA loan/finance cost, architect fees, flooring cost, sound engineering cost etc."  The franchisees of AKT studios similarly alerted Geisler of problems with Xponential's FDDs in a June 2020 memo, specifically stating that the "build-out overages are systemic, and we are in the hole financially from the beginning (50-80% what is outlined in the FDD)."   Other franchisees stated: (i) "'[w]e were ripped off . . . *[d]evelopment costs were $250k more for buildout then outlined in the FDD* . . . [t]his caused major delays in studio openings'"; (ii) "'[t]his seems to be the XPO game – rip you off from the build-out'"; and (iii) "'the FDD does not line up with Franchisee experiences for development and operating costs.'"  As alleged above in ¶60, Geisler acknowledged that he received the AKT memo.  The YogaSix slideshow presentation also reported the same, stating that "[f]ranchisees were not lead to believe it would be years before we could reach breakeven."  And reports of numerous franchisees in the AKT lawsuits, the YogaSix litigation, and in interviews with Bloomberg and *The Capitol Forum* describe those FDDs as misleading and "grossly" inaccurate.  *See* ¶¶59-95.  These documents and

- 108 -

the reported franchisee experiences were fundamental to the core of Xponential's business, which would have been a primary focus for both Geisler and Meloun. The degree to which those FDDs were misstated adds to the strength of the inference of fraudulent intent from these defendants. Indeed, the degree of inaccuracy reveals that Xponential and its executives used the FDDs to lure unsuspecting prospective franchisees into purchasing a franchise license and opening a studio.

230. Defendant Meloun was listed as the CFO in FDDs provided to franchisees during the Class Period. The FDDs indicated they were provided to prospective franchisees to help them "make up [their] mind[s]" about buying a franchise and included financial information such as initial investment costs, franchise fees, and financing arrangements. Meloun's inclusion in these materials adds to the inference that he possessed actual knowledge of the false and misleading financial information used to induce franchisees to invest in Xponential's franchises.

231. Defendants Geisler and Meloun, given their experience and positions at Xponential, were also aware of the specific disclosure requirements in the FDDs for Xponential's brands. And given that knowledge, the wholesale disclosure failures in those FDDs, as alleged in ¶¶59-61, 65, 70, 86-95, raise a strong inference that these defendants intended to mislead franchisees and investors.

232. Not only did Xponential omit material information from the FDDs, it took active steps to hide the true performance of Xponential's franchisees, which itself raises a strong inference of scienter for Geisler, Grabowski, and Meloun who were all in a position to be involved in the Company's restructuring in 1Q 2023. In fact, when *The Capitol Forum* began inquiring of the Company about the financial health of its franchisees, Xponential restructured to eliminate brand level financial disclosures. As *The Capitol Forum* reported on April 21, 2023, Xponential "underwent a quiet 'internal reorganization' that allows it to avoid disclosing the financial statements of its 10 fitness franchise brands," that the Company's previous FDDs "would ordinarily provide prospective franchisees with a franchise system's

- 109 -

4870-6046-8173.v5

audited financials from the preceding years," but now "made use of a loophole in franchise disclosure laws, providing a balance sheet for [a] newly created company rather than audited financials for the individual franchise systems."  According to *The Capitol Forum*, and confirmed by the 2023 CycleBar, Club Pilates, and Pure Barre FDDs, the Company created XPOF Assetco, LLC, on March 6, 2023 as a guarantor of its various operating brands, which enabled Xponential to replace audited financial statements in the FDDs with a balance sheet listing the assets of XPOF Assetco, LLC, which were contributed by Xponential Fitness, LLC, and consisted of "$8 million in cash, $8.9 million in property and equipment and $90.8 million in intangible assets, the majority of which 'consist of trademarks related to Club Pilates, CycleBar and Pure Barre brands.'"  *The Capitol Forum* article explained that "Xponential made no mention of the 'internal reorganization' in its most recent SEC filings, or in calls and presentations to investors, which occurred around the same time that the reorganization took place."  According to franchise lawyers and accounting experts interviewed by *The Capitol Form*, "[t]he purpose of the many layers of complexity was not immediately clear" but "raised questions about the health of the company's brands."  Geisler and Meloun (as the highest-level executives) and Grabowski (as Chairman of the Board), would have been acutely aware of this restructuring and the purpose of it, contributing to the facts raising a strong inference of scienter.

233.   Defendants Geisler and Meloun also had actual knowledge that their statements about studio closures were false and misleading.  In fact, they both admitted publicly to having knowledge of the Company's practice of taking back studios when franchisees had closed.  They just concealed the reason that Xponential was taking those studios back.  Initially, the Company's press release responding to the Fuzzy Panda report stated that "[i]n certain circumstances, Xponential relocates and/or transitions underperforming studios to other franchisees in the Xponential franchise network, during which period the stores may be temporarily closed."

- 110 -

4870-6046-8173.v5

Reports of franchisees for many of those stores report that they permanently closed those studios.  ¶¶99-100.

234.   Geisler knew of the process himself, but explained it a bit differently at the Bank of America Consumer & Retail Conference on March 15, 2023, before Fuzzy Panda issued its report, stating that the Company took stores back "if somebody isn't making margins that are not running the business properly" but that when it did "the franchise unit itself stays alive and open." And Meloun admitted on the same day the Fuzzy Panda report was published in a video call hosted by Raymond James that "refranchised studios had been 'handed a studio that was already in trouble,'" according to *The Capitol Forum*'s article published on July 7, 2023.  The article reported that he also admitted knowing that those refranchised studios were failing studios, stating that "the company had in 2023 'made a conscious decision not to refranchise those out until they get back close to break even or profitable."  And as *The Capitol Forum* relayed his comments:  "Meloun also indicated that the company might consider closing failing studios rather than reselling them.  'We're going to start looking at that differently than we have because as we get bigger it's not a wise strategy.'"  Both Geisler and Meloun knew that their "no studio closures" was a false talking point to create the appearance that Xponential was financially sound at the franchisee level.  Geisler even acknowledged in connection with his dispute with Kaiser, "the harm" that studio closures would cause to the brand.

235.   The massive wave of studio closures after the Fuzzy Panda report not only confirms that studios had in fact failed and closed during the Class Period, but that defendants knew about the condition of those franchisees and disposed of them after their scheme was outed.  *The Capitol Forum*, in fact, issued several reports addressing Xponential's studio closures:

- October 24, 2023: "Dozens of studios within two boutique fitness brands franchised by Xponential Fitness (XPOF) have suddenly and

- 111 -

permanently closed, *The Capitol Forum* has learned from sources familiar with the brands' operations and confirmed through social media accounts and company webpage data. Many of the studios appear to have been what Xponential calls 'transition studios' – studios that were built and owned by franchisees but ultimately handed over to Xponential when franchisees could no longer afford to operate them."

- November 28, 2023: Xponential has disposed of additional studios, this time through the sale of 66 AKT, CycleBar, Pure Barre, Row House, Stride, and YogaSix studios in September 2023 to a franchisee named Mitch Brown, via a company called MD Pro Fitness LLC, who was later sued for failing to pay its employees. The report quoted Geisler as stating ""did Mitch get some duds? Yeah, he did.""

- December 5, 2023: "Mass closures of boutique fitness studios franchised by Xponential Fitness (XPOF) appear to be ongoing, with as many as 70 studios – more than 2% of Xponential's total U.S. studio base – no longer offering classes since the end of October, according to studio schedule data collected and analyzed by *The Capitol Forum*. Data for eight of the company's 10 brands also indicate that the brands collectively lost 24 studios since the beginning of October, bringing the total potential closures to more than 3% of U.S. studios over the two-month period."

236. The closures alleged in ¶234, came after defendant Meloun spoke of the Company's decision to recommend closures to failing studios, a strategy in stark contrast to their previous practice of hiding failed studios and studio closures: "'We'll take one last attempt to transfer the studio to a new franchisee,' Meloun said. 'If a transfer is impossible, a studio closure will be recommended.'" The sudden change in policy shortly after Fuzzy Panda revealed the truth about the health of Xponential's franchisees and the existence of studio closures, contributes to the

- 112 -

4870-6046-8173.v5

inference that both Geisler and Meloun knew the truth about Xponential's strategy to conceal studio closures and misrepresent the health of Xponential's franchisees.

237.   Defendants were also motivated to engage in the fraudulent course of conduct alleged herein to allow corporate insiders, including defendants Geisler and Grabowski, to collectively sell more than 11.7 million shares of Xponential common stock for gross proceeds of more than $269 million during the Class Period. Defendant Geisler alone sold over $46 million worth of his Xponential shares at prices as high as $33.49 in an approximately three-and-a-half month period, from February 10, 2023 to May 25, 2023.   Grabowski, for his part, sold 9.925 million shares in the Company's two secondary offerings for proceeds of $219.875 million.

238.   These sales were suspicious in both timing and amount and out of line with prior trading patterns.  After pocketing $9 million in a side transaction with the Company executed during Xponential's IPO, Geisler had not sold a single share prior to his first sale in February 2023.  Those that he sold in the secondary market were pursuant to a Rule 10b5-1 trading plan that Geisler implemented on December 14, 2022.   Geisler, however, was aware of material non-public information when he implemented the plan.  Not only did Geisler have actual knowledge of the scheme to sell licenses and open studios by misleading franchisees, as alleged herein, he was specifically aware of an investigation that would uncover the scheme when he entered the plan.  In particular, reporters at *The Capitol Forum* began sending written questions to Xponential regarding their investigation into the Company in November 2022.  Just weeks later, Geisler entered into the plan, which enabled Geisler to sell his personal shares at or near record highs.  In fact, most of Geisler's sales were at prices very near the Company's Class Period high trading price of $33.58 per share on May 1, 2023.

239.   Both Geisler and Grabowski also sold shares to investors through the Company's secondary offering on or around February 7, 2023.  The timing was, again, suspicious.  Geisler and Grabowski sold their shares to investors for the

- 113 -

4870-6046-8173.v5

offering price of $24.50 per share, which was just below the then-highest trading price for Xponential shares at that time. And the trading amounts were also suspicious. As discussed in ¶129, combined with his IPO and SPO proceeds, Geisler sold 79% of his Class A common stock holdings and 23.3% of all of his holdings for proceeds of $55.6 million, with all but one transaction occurring in just a six-month period in 2023. And through the SPOs, Grabowski sold off 59.1% of his Class A common stock and 40.9% of his Class B common stock for massive proceeds of $219.8 million.

240. Defendants were also motivated to complete the Company's IPO. In the IPO, Xponential sold over ten million Xponential shares (including a partial exercise of the underwriter's over-allotment option) at $12 per share for total proceeds of $120 million. Without the IPO, defendants Geisler and Grabowski would not have been able to sell their shares to investors for the proceeds that they received.

241. Finally, the scienter of defendants is underscored by the SOX certifications of defendants Geisler and Meloun, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Xponential was made known to them and that the Company's disclosure-related controls were operating effectively.

## XI. SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

242. Neither the statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 nor the bespeaks caution doctrine apply to any of the allegedly false statements pled in this complaint. The statements alleged to be false and misleading herein all relate to then existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were

- 114 -

4870-6046-8173.v5

no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent that either the statutory safe harbor or bespeaks caution doctrine is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Xponential who knew that the statement was false when made.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

243.   At all relevant times, the market for Xponential common stock was an efficient market for the following reasons, among others:

(a)   Xponential common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient stock market;

(b)   as a regulated issuer, Xponential filed periodic public reports with the SEC and the NYSE;

(c)   Xponential regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Xponential was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

244.   As a result of the foregoing, the market for Xponential common stock promptly digested current information regarding Xponential from all publicly

4870-6046-8173.v5

available sources and reflected such information in the price of the common stock. Under these circumstances, all purchasers of Xponential common stock during the Class Period suffered similar injury through their purchase of Xponential common stock at artificially inflated prices and a presumption of reliance applies.

245. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated, in significant part, upon omissions of material fact for which there was a duty to disclose. Since this action involves defendants' failure to disclose material adverse information regarding Xponential's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. LOSS CAUSATION

246. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiffs' and Class members' economic loss. Lead Plaintiffs' claims for securities fraud are asserted under the fraud-on-the-market and *Affiliated Ute* theories of reliance. The market for Xponential's stock was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, defendants engaged in a scheme and made materially false and misleading statements and omissions. Defendants' conduct artificially inflated the price of Xponential stock and operated as a fraud or deceit on the Class.

247. The Class Period inflation in Xponential's stock price was removed when information concealed by defendants' scheme and misleading statements and omissions was revealed to the market through corrective disclosures and/or when risks created by defendants' alleged misconduct materialized in the form of public

- 116 -

4870-6046-8173.v5

revelations.  Each of the risks that materialized, as alleged in ¶¶135-143, were within the zone of risks created by defendants' alleged misconduct.  And as a result of their purchases of Xponential common stock during the Class Period, Lead Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

248.  The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by defendants' continued scheme and misleading statements and omissions that continued to conceal the true nature of defendants' alleged misconduct.  Each partial disclosure did not on its own fully remove the inflation from Xponential's stock price, because it only partially revealed the ramification of defendants' previously misrepresented and concealed conduct.  Defendants' continued scheme and misrepresentations and omissions maintained the price of Xponential common stock at artificial levels and induced members of the Class to continue purchasing shares in Xponential even after the partial disclosures.

249.  The disclosures that corrected the market price and that revealed the risks created by defendants' alleged misconduct to reduce the inflation maintained by defendants' fraud are detailed in ¶¶135-143 herein.  These stock price declines were due to firm-specific, fraud-related disclosures and were not the result of market, industry, or firm specific, non-fraud factors.

## COUNT I

**Violation of §10(b) of the Exchange Act and Rule 10b-5(a)-(c) Promulgated Thereunder**
**(Against Defendants Xponential, Geisler, Meloun, and Grabowski)**

250.  Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

251.  This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

252.  During the Class Period, defendants: (i) engaged in a scheme and wrongful course of conduct pursuant to which they knowingly or recklessly engaged

- 117 -

in acts, transactions, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and other members of the Class; (ii) made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) employed a scheme to defraud in connection with the purchase and sale of Xponential common stock.  The scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Xponential common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Xponential common stock at artificially inflated prices.  In furtherance of this unlawful scheme and course of conduct, defendants took the actions set forth herein.

253.    Pursuant to the above wrongful course of conduct, each of the defendants participated directly or indirectly in: (a) the scheme; and/or (b) statements or omissions, including those in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other documents described above, such as statements made to securities analysts and the media that were designed to influence the market for Xponential common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Xponential's finances and business prospects.

254.    As alleged in ¶¶222-235, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available

- 118 -

4870-6046-8173.v5

to defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth.

255. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As senior managers and/or directors of Xponential, the Individual Defendants had knowledge of the details of Xponential's internal affairs.

256. The Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, defendants were able to and did, directly or indirectly, control the content of the statements of Xponential. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Xponential's businesses, operations, future financial condition, and future prospects. As a result of defendants' misconduct, the market price of Xponential's common stock was artificially inflated throughout the Class Period. Unaware of the adverse facts concerning Xponential's business and financial condition which were concealed by defendants, Lead Plaintiffs and other members of the Class purchased or otherwise acquired Xponential common stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by defendants, and were damaged thereby.

257. During the Class Period, Xponential common stock was traded on an active and efficient market. Lead Plaintiffs and other members of the Class, relying on the materially false and misleading statements described herein, which defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Xponential common stock at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiffs and other members of the Class known the truth, they would not have purchased or otherwise acquired said Xponential common stock, or would not have purchased or otherwise

- 119 -

4870-6046-8173.v5

acquired it at the inflated prices paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Xponential common stock was substantially lower than the prices paid by members of the Class. The market price of Xponential common stock declined upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

258.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

259.   As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of Xponential common stock during the Class Period, as the truth about Xponential's operations and prospects began to be disclosed to the investing public.

## COUNT II

### Violation of §20(a) of the Exchange Act
**(Against Defendants Xponential, Geisler, Meloun, and Grabowski)**

260.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

261.   The Individual Defendants acted as controlling persons of Xponential within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Xponential, and their ownership of Xponential stock, the Individual Defendants had the power and authority to cause Xponential to engage in the wrongful conduct complained of herein.  Xponential controlled the Individual Defendants and each of its employees.

262.   By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

- 120 -

4870-6046-8173.v5

## XIV. LEAD PLAINTIFFS' NON-FRAUD CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

263. The claims set forth below in Counts III, IV, and V allege violations of §§11, 12(a)(2), and 15 of the Securities Act ("Securities Act Claims"). These Securities Act Claims are based solely on strict liability and negligence – *i.e.*, not intentional or reckless conduct. This section expressly disclaims any allegations of fraud, scienter, or recklessness pled herein in connection with the Exchange Act claims. As such, these Securities Act Claims are presented separate and apart from Counts I and II.

264. Xponential issued a Registration Statement and Prospectus (the "Offering Documents") in connection with the Company's April 6, 2022 SPO. The Offering Documents for the SPO were negligently prepared and, as a result, contained materially false and misleading statements of fact and failed to disclose material facts as required under the rules and regulations governing the preparation of such documents.

265. The Securities Act Claims seek to recover such losses suffered by members of the Class who purchased shares of Xponential common stock pursuant or traceable to the false and misleading Offering Documents.

### A. Securities Act Defendants

#### 1. Defendants Xponential, Geisler, Meloun, and Grabowski

266. Xponential, Geisler, Meloun, and Grabowski (*see* ¶¶30-32, *supra*), are realleged as defendants for the Securities Act Claims. Xponential is the registrant of the securities sold in the SPO. Geisler, Meloun, and Grabowski signed the Offering Documents. In addition, Geisler, Meloun, and Grabowski were controlling persons of Xponential throughout the Class Period, including in connection with the SPO, as alleged above, ¶¶34-38.

4870-6046-8173.v5

**2.    Director Defendants**

267.   The Securities Act Claims are also brought against Board members identified below, who each signed the Offering Documents at issue and/or were named as directors in the registration statements for the SPO.

268.   Defendant Brenda Morris has been a member of Xponential's Board since 2019. Morris reviewed and authorized her signature on the negligently prepared, false, and misleading Offering Documents.

269.   Defendant Chelsea Grayson has been a member of Xponential's Board since 2021.  Grayson reviewed and authorized her signature on the negligently prepared, false, and misleading Offering Documents.

270.   Geisler, Meloun, Grabowski, Morris, and Grayson are collectively referred to herein as the "Registration Statement Defendants."

**3.    Underwriter Defendants**

271.   Defendant BofA Securities, Inc. served as a Lead Underwriter and underwriter representative for the SPO.   Under the terms and subject to the conditions in the underwriting agreement, BofA Securities was allotted 1,657,582 shares in the SPO.

272.   Defendant Jefferies LLC served as an underwriter and underwriter representative for the SPO.  Under the terms and subject to the conditions in the underwriting agreement, Jefferies was allotted 1,243,187 shares in the SPO.

273.   Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the SPO.  Under the terms and subject to the conditions in the underwriting agreement, Morgan Stanley was allotted 508,846 shares in the SPO.

274.   Defendant Guggenheim Securities, LLC served as an underwriter for the SPO. Under the terms and subject to the conditions in the underwriting agreement, Guggenheim was allotted 254,423 shares in the SPO.

4870-6046-8173.v5

275. Defendant Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the SPO. Under the terms and subject to the conditions in the underwriting agreement, Piper Sandler was allotted 254,423 shares in the SPO.

276. Defendant Robert W. Baird & Co. Incorporated served as an underwriter for the SPO. Under the terms and subject to the conditions in the underwriting agreement, Robert W. Baird was allotted 218,077 shares in the SPO.

277. Defendant Raymond James & Associates, Inc. served as an underwriter for the SPO. Under the terms and subject to the conditions in the underwriting agreement, Raymond James was allotted 218,077 shares in the SPO.

278. Defendant Roth Capital Partners, LLC served as an underwriter for the SPO. Under the terms and subject to the conditions in the underwriting agreement, Roth Capital was allotted 127,212 shares in the SPO.

279. Defendant R. Seelaus & Co., LLC ("R. Seelaus") served as an underwriter for the SPO. Under the terms and subject to the conditions in the underwriting agreement, R. Seelaus was allotted 18,173 shares in the SPO.

280. All of the underwriters listed in ¶¶271-279 are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase Xponential stock in the SPO.

281. The Underwriter Defendants are responsible for the false and misleading statements in the Offering Documents. The Underwriter Defendants assisted Xponential and the Individual Defendants in planning the SPO and were required to conduct an adequate and reasonable investigation into the business and operations of the Company in order to participate in the SPO – a process known as a "due diligence" investigation. During the course of their investigation, the Underwriter Defendants had continual access to confidential corporate information concerning Xponential's operations and commercial prospects.

- 123 -

4870-6046-8173.v5

282.   In addition to access to internal corporate documents, agents of the Underwriter Defendants met with Xponential's counsel, management, and top executives and made joint decisions with them regarding: (i) the terms of the SPO, including the price at which Xponential shares would be sold to the public; (ii) the strategy to best accomplish the SPO; (iii) the information to be included in the Offering Documents; and (iv) the responses to be made to the SEC in connection with its review of the Offering Documents.

283.   Xponential, the Registration Statement Defendants, and the Underwriter Defendants are referred to collectively as the "Securities Act Defendants."

**B.      Materially False and Misleading Statements and Omissions in the Offering Documents**

284.   The Offering Documents for the SPO contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with SEC rules and regulations governing the preparation of such documents.

285.   The Offering Documents for the SPO made a number of representations regarding certain key performance indicators, including AUV.   The Offering Documents specifically attributed AUV to the use of the Xponential Playbook and claimed that franchisees would generate AUV of approximately $500,000 in year two of operations.   It also represented that the Company had generated a run-rate AUV of $287,000 in fourth quarter 2020 and $446,000 in 4Q 2021:

> The Xponential Playbook is designed to help franchisees achieve compelling Average Unit Volumes ("AUVs"), strong operating margins and an attractive return on their invested capital.  Studios are generally designed to be between 1,500 and 2,500 square feet in size, depending on the brand.  The smaller box format contributed to a relatively low average initial franchisee investment of approximately

- 124 -

4870-6046-8173.v5

$350,000 in 2021 and 2020. ***By utilizing the Xponential Playbook, our model is designed to generate, on average, an AUV of approximately $500,000 in year two of operations and studio-level operating margins ranging between 25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%***.

\* \* \*

Highlights of our platform's recent financial results and growth include:

\* \* \*

- ***grew run-rate AUV from $287,000 in the fourth quarter of 2020 to $446,000 in the fourth quarter of 2021***, representing an increase of 55% . . . .

286. The Offering Documents for the SPO also emphasized the number of licenses Xponential had sold and the studios that it had opened, including, but not limited to, the following:

As a franchisor, we benefit from multiple highly predictable and recurring revenue streams that enable us to scale our franchised studio base in a capital efficient manner. ***Our system has significant embedded growth based on already-sold licenses for studios that have not yet opened. As of December 31, 2021, franchisees were contractually obligated to open an additional 1,806 studios in North America***. Converting our current pipeline of licenses sold to open studios in North America would nearly double our existing franchised studio base. Based on our internal and third-party analyses by Buxton Company, we estimate that franchisees could have a total of approximately 7,900 studios in the United States alone.

\* \* \*

- 125 -

4870-6046-8173.v5

Highlights of our platform's recent financial results and growth include:

- *grew the number of global open studios from 1,796 as of December 31, 2020 to 2,130 as of December 31, 2021*, representing an increase of 19%;

- *grew global franchise licenses sold from 3,469 as of December 31, 2020 to 4,424 as of December 31, 2021*, representing an increase of 28% . . . .

\*      \*      \*

**Large and expanding franchisee base with visible organic growth**.

Our large number of existing licenses sold represents an embedded pipeline to support the continued growth of our business. *As of December 31, 2021, on a cumulative basis since inception, we had 4,424 franchise licenses sold globally, compared to 1,508 franchise licenses sold as of December 31, 2017*, on an adjusted basis to reflect historical information of the brands we have acquired.  Franchisees are contractually obligated to open studios in their territories after purchasing a franchise license.  In the event that franchisees are unable to meet their contractual obligations, we have the ability to resell or reassign their territory license(s) to another franchisee in the system or our franchisee pipeline.  Based on our experience as a franchisor, we believe that a significant majority of our licenses sold will convert into operating studios.  Accordingly, we have the potential to substantially increase our studio base through our existing licenses sold, providing us high visibility into our unit growth and further increasing our already significant scale within the boutique fitness industry.

\*      \*      \*

- 126 -

4870-6046-8173.v5

*We have grown our franchised studio footprint in North America from 813 open studios across 47 U.S. states, the District of Columbia and Canada as of December 31, 2017 to 1,954 open studios across 48 U.S. states, the District of Columbia and Canada as of December 31, 2021*, on an adjusted basis to reflect historical information of the brands we have acquired, representing a CAGR of 25%. *As of December 31, 2021, we had 1,556 franchisees and licenses for 1,806 studios contractually obligated to be opened under existing franchise agreements in North America. We sold 787 licenses in 2021 compared to 265 licenses in 2020 and 923 licenses in 2019 in North America*.

287. The Offering Documents were defective and inaccurate, contained untrue statements of material fact, and omitted to state facts required to be disclosed, including that defendants were procuring license sales, studio openings, and growing AUVs through inaccurate and misleading sales information given to prospective franchisees, as alleged in ¶¶187-191.

288. In addition to the materially false and misleading statements in the Offering Documents identified above, the Securities Act Defendants also violated their affirmative obligations to provide certain material information in the Offering Documents as required by applicable SEC rules and regulations.

289. Item 303 of SEC Regulation S-K, 17 C.F.R §229.303 ("Item 303"), required the Offering Documents to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

290. The failure of the Offering Documents to disclose that Xponential was selling franchise licenses using inaccurate FDDs, and the adverse economic circumstances various franchisees were facing as a result, violated Item 303 because these undisclosed facts, trends, and uncertainties were known and because these

- 127 -

4870-6046-8173.v5

undisclosed facts, trends, and uncertainties would and did have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.

291.   In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the Offering Documents, a discussion of the most significant factors that made the SPO risky or speculative and that each risk factor adequately describe the risk.   Because the Securities Act Defendants omitted material facts alleged in ¶¶187-191, as well as the consequent material adverse effects on the Company's results and prospects, the Securities Act Defendants violated Item 105.

292.   In negligent violation of Item 105 and Item 303, the SPO Offering Documents failed to disclose that Xponential was selling franchise licenses using inaccurate FDDs, and the adverse economic circumstances various franchisees were facing as a result, specifically, that: (i) Xponential was misrepresenting its AUV metric; and (ii) a significant number of Xponential franchisees were losing money every month as a result of misrepresentations and omissions in Xponential's FDDs, as alleged at ¶¶187-191.

293.   Neither Xponential, the Registration Statement Defendants, nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.   Had they exercised reasonable care, these defendants could have known of the material misstatements and omissions alleged herein.

## COUNT III

**For Violation of §11 of the Securities Act Against the Securities Act Defendants**

294.   Lead Plaintiff City of West Palm Beach Police Pension Fund repeats and realleges ¶¶263-293 above as if fully set forth herein.

- 128 -

4870-6046-8173.v5

295. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.

296. The Securities Act Defendants are liable under theories of strict liability for their violations of §11 of the Securities Act. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. Lead Plaintiffs do not allege that the Securities Act Defendants acted with scienter or fraudulent intent.

297. The Offering Documents used to complete the offering contained untrue statements of material fact, omitted to state material facts required to be stated therein, and/or omitted to state other facts necessary to make the statements made therein not misleading.

298. By reason of the conduct herein alleged, each defendant named herein violated §11 of the Securities Act.

299. Lead Plaintiff City of West Palm Beach Police Pension Fund acquired Xponential stock in and traceable to the SPO.

300. Lead Plaintiff City of West Palm Beach Police Pension Fund and Class members that purchased pursuant to the Offering Documents have sustained damages as the value of the stock issued in the SPO has declined due to the Securities Act Defendants' violations.

301. At the time of their purchases of Xponential stock issued in the SPO, Lead Plaintiff City of West Palm Beach Police Pension Fund and other members of the Class that purchased pursuant to the Offering Documents were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiff City of West Palm Beach Police Pension Fund discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff City of West Palm Beach

- 129 -

4870-6046-8173.v5

Police Pension Fund commenced this action. Less than three years have elapsed between the time that the stock upon which this Count is brought was offered to the public and the time Lead Plaintiff City of West Palm Beach Police Pension Fund commenced this action.

**COUNT IV**

**For Violations of §12(a)(2) of the Securities Act Against Defendant Grabowski and the Underwriter Defendants**

302. Lead Plaintiff City of West Palm Beach Police Pension Fund repeats and realleges ¶¶263-301 above as if fully set forth herein.

303. This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against defendant Grabowski and the Underwriter Defendants.

304. Defendant Grabowski and the Underwriter Defendants are liable under theories of strict liability for their violations of §12(a)(2) of the Securities Act. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. With respect to this Count, Lead Plaintiff City of West Palm Beach Police Pension Fund does not allege that defendant Grabowski or the Underwriter Defendants had scienter or fraudulent intent.

305. By means of the defective Offering Documents, defendant Grabowski and the Underwriter Defendants issued, promoted, and sold Xponential stock to Lead Plaintiff City of West Palm Beach Police Pension Fund and other members of the Class for their own benefit and the benefit of those associated with them. The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase Xponential stock in the SPO. Defendant Grabowski signed the defective Registration Statement for the SPO and through H&W Investco, LP and H&W

- 130 -

Investco II, LP (collectively, the "Selling Stockholders"), which he controlled, collected the proceeds from the SPO. As the Prospectus described it, "[a]ll shares being sold in this offering are being sold by the selling stockholders," which were listed in the Underwriting Agreement as H&W Investco, LP and H&W Investco II, LP. The Offering Documents for the SPO described defendant Grabowski's control over these entities. It identified defendant Grabowski as the "Managing Partner" of the Selling Stockholders and stated that "Mr. Grabowski has reported sole investment and dispositive power over these shares" held by the Selling Stockholders.

306. In connection with the Selling Stockholders, which Grabowski controlled, also made certain representations and warranties concerning information that would be used in documents designed to solicit investors to purchase shares in the SPO, including "information relating to such Selling Stockholder furnished in writing by or on behalf of such Selling Stockholder expressly for use in the Registration Statement, the General Disclosure Package, the Prospectus or any other Issuer Free Writing Prospectus or any amendment or supplement thereto." The Selling Stockholders, which Grabowski controlled, were also signatories to the Underwriting Agreement, in which the Company agreed to pay "the costs and expenses of the Company relating to investor presentations on any 'road show' undertaken in connection with the marketing" of the SPO:

> The XPO Parties will pay or cause to be paid all expenses incident to the performance of their obligations under this Agreement . . . including . . . (vii) the costs and expenses of the Company relating to investor presentations on any "road show" undertaken in connection with the marketing of the Securities, including without limitation, expenses associated with the production of road show slides and graphics, fees and expenses of any consultants engaged by the Company or with the Company's prior written consent in connection with the road show

- 131 -

4870-6046-8173.v5

presentations, travel and lodging expenses of the representatives and officers of the Company and any such consultants (provided that the Underwriters shall pay for the travel and lodging expenses of the Underwriters) and 50% of the cost of any aircraft and other transportation chartered in connection with the roadshow (with the Underwriters paying for the other 50% of such chartered aircraft and other transportation) . . . .

307.   The Offering Documents used to complete the SPO contained untrue statements of material fact, omitted to state material facts required to be stated therein, and/or omitted to state other facts necessary to make the statements made therein not misleading.

308.   Defendant Grabowski and the Underwriter Defendants owed Lead Plaintiff City of West Palm Beach Police Pension Fund and other members of the Class who purchased Xponential stock pursuant to the Offering Documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   Defendant Grabowski and the Underwriter Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents as set forth above.

309.   By reason of the conduct alleged herein, defendant Grabowski and the Underwriter Defendants violated §12(a)(2) of the Securities Act.   As a direct and proximate result of such violations, Lead Plaintiff City of West Palm Beach Police Pension Fund and other members of the Class who purchased Xponential stock pursuant to the Offering Documents sustained substantial damages in connection with their purchases.   Lead Plaintiff City of West Palm Beach Police Pension Fund and other members of the Class who purchased Xponential stock pursuant to the

- 132 -

Offering Documents seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for the Xponential stock purchased, and hereby tender such Xponential stock to defendant Grabowski and the Underwriter Defendants.

310. At the time of their purchases of the Xponential stock issued in the SPO, Lead Plaintiff City of West Palm Beach Police Pension Fund and other members of the Class that purchased pursuant to the Offering Documents were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiff City of West Palm Beach Police Pension Fund discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff City of West Palm Beach Police Pension Fund commenced this action. Less than three years have elapsed between the time that the stock upon which this Count is brought was offered to the public and the time Lead Plaintiff City of West Palm Beach Police Pension Fund commenced this action.

## COUNT V

### For Violation of §15 of the Securities Act Against Xponential and the Registration Statement Defendants

311. Lead Plaintiffs repeat and reallege ¶¶263-310 above as if fully set forth herein.

312. This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of Class members that purchased pursuant to the Offering Documents, against Xponential and the Registration Statement Defendants.

313. Each of the Registration Statement Defendants were control persons of Xponential within the meaning of §15 of the Securities Act by virtue of their positions as directors, senior executives, and/or major stockholders of the Company and exercised actual control over the Company at the time of the SPO and possessed

- 133 -

4870-6046-8173.v5

the power to control Xponential in connection with the SPO. The Registration Statement Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Xponential. The Registration Statement Defendants were also each critical to effecting the SPO, based on their involvement in preparing and signing the Registration Statement, and by having taken actions to ensure that the SPO was successfully completed.

314. Xponential was a control person of the Registration Statement Defendants and all of its employees within the meaning of §15 of the Securities Act. Xponential exercised actual control over the Registration Statement Defendants at the time of the SPO and possessed the power to control the Registration Statement Defendants in connection with the SPO.

315. This Count does not sound in fraud. With respect to this Count, Lead Plaintiff City of West Palm Beach Police Pension Fund does not claim that any of the defendants committed intentional acts or reckless misconduct or that any of the Registration Statement Defendants acted with scienter or fraudulent intent. This claim is based on strict liability and negligence.

316. By reason of such wrongful conduct, for which the Company and the Registration Statement Defendants are primarily liable, as set forth above, the Registration Statement Defendants and Xponential are jointly and severally liable with and to the same extent as these primary violators pursuant to §15 of the Securities Act.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action, certifying Lead Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Class Counsel;

- 134 -

4870-6046-8173.v5

B.     Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

**XVI.  JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

DATED:  July 26, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
X. JAY ALVAREZ
DOUGLAS R. BRITTON
JEREMY W. DANIELS


s/ Douglas R. Britton
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
BONNI S. JENSEN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
bonni@robertdklausner.com

Additional Counsel

- 135 -

4870-6046-8173.v5