GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
mcelio@gibsondunn.com
JEFFREY D. LOMBARD, SBN 285371
jlombard@gibsondunn.com
310 University Ave
Palo Alto, CA 94301
Telephone: 650.849.5300
Facsimile: 650.849.5333

ALEXANDER K. MIRCHEFF, SBN 245074
amircheff@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendants
Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE XPONENTIAL FITNESS SECURITIES LITIGATION | CASE NO. 8:24-cv-00285-JWH-KES<br><br><u>CLASS ACTION</u><br><br>Hon. John W. Holcomb<br>Courtroom 9D, Santa Ana<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**<br><br>Date: February 14, 2025<br>Time: 9:00 a.m.<br><br>Action Filed: February 9, 2024 |

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 14, 2025, at 9:00 a.m., or as soon thereafter as the matter may be heard in the United States District Court for the Central District of California, located at 411 West 4th Street, Dept. 9D, Room 1053, Santa Ana, CA 92701-4516, Defendants Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris hereby will and hereby do move for an order dismissing the Amended Complaint for Violations of the Federal Securities Laws ("Complaint") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) (the "Motion").

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act"). This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the accompanying Declaration of Jeffrey D. Lombard and the exhibits attached thereto, and Request for Judicial Notice, all records in this action, and any additional material and arguments as may be considered in connection with the hearing on the Motion.

DATED: October 8, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Michael D. Celio*
Michael D. Celio

Attorneys for Defendants Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris

# TABLE OF CONTENTS

Page(s)


I. INTRODUCTION .......... 8

II. BACKGROUND .......... 9

III. ARGUMENT .......... 12

A. Plaintiffs' Rule 10b–5(b) and Section 11 and 12 Claims Should Be Dismissed for Failure to Plead a Materially False or Misleading Statement .......... 13

B. Plaintiffs' Scheme Liability Claim Should Be Dismissed .......... 22

C. Plaintiffs' Section 10(b) Claims Should Be Dismissed for Failure to Plead Scienter .......... 25

D. Plaintiffs' Section 10(b) Claims Should Be Dismissed for Failure to Plead Loss Causation .......... 30

E. The Section 12(a)(2) Claim Against Grabowski Should Be Dismissed .......... 32

IV. CONCLUSION .......... 32

# TABLE OF AUTHORITIES

Page(s)

**Cases**


*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010)....................28

*In re Apollo Grp., Inc. Sec. Litig.*,
2011 WL 5101787 (D. Ariz. Oct. 27, 2011)....................23, 24

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000)....................15

*In re Bally Total Fitness Sec. Litig.*,
2007 WL 551574 (N.D. Ill. Feb. 20, 2007)....................29

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010)....................32

*Barry v. Colony NorthStar, Inc.*,
2019 WL 13237719 (C.D. Cal. Aug. 1, 2019)....................22

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)....................30, 31

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)....................14

*Burnett v. Rowzee*,
561 F. Supp. 2d 1120 (C.D. Cal. 2008)....................22

*City of Pontiac Policemen & Firemen Retirement Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................16

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)....................16, 27

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)....................16, 24

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991)....................18, 19

*In re Corinthian Colleges, Inc. S'holder Derivative Litig.*,
2012 WL 8502955 (C.D. Cal. Jan. 30, 2012)....................16

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005)....................28

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009) .......... 22, 25

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .......... 17

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .......... 32

*Garcia v. J2 Glob., Inc.*,
2022 WL 22717936 (C.D. Cal. Aug. 8, 2022) .......... 28

*In re Herbalife, Ltd.*,
2015 WL 7566616 (C.D. Cal. Nov. 23, 2015) .......... 16

*Hershewe v. JOYY Inc.*,
2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) .......... 24

*Hokama v. E.F. Hutton & Co., Inc.*,
566 F. Supp. 636 (C.D. Cal. 1983) .......... 32

*Hong v. Extreme Networks, Inc.*,
2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .......... 15

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021) .......... 31

*Jiangchen v. Rentech, Inc.*,
2017 WL 10363990 (C.D. Cal. Nov. 17, 2017) .......... 14

*Karam v. Corinthian Colleges, Inc.*,
2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) .......... 25

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .......... 30

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) .......... 23

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014) .......... 31

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
2011 WL 4389689 (C.D. Cal. May 5, 2011) .......... 32

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......... 20

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... 14, 26

*In re Nat'l Golf Properties, Inc.*,
2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ........ 32

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ........ 8, 17, 33

*In re Neustar Sec.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ........ 23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ........ 30

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
98 F.3d 2 (2d Cir. 1996) ........ 21

*Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ........ 13, 31

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) ........ 14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ........ 28

*In re Read-Rite Corp.*,
335 F.3d 843 (9th Cir. 2003) ........ 14

*In re Redback Networks, Inc. Sec. Litig.*,
2007 WL 4259464 (N.D. Cal. Dec. 4, 2007) ........ 16

*Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) ........ 13

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ........ 12, 32

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........ 31

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ........ 26, 28, 29

*Rubke v. Cap. Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ........ 13

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016) ........ 25

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) ........ 24

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020) .......... 17, 20

*Shuster v. Symmetricon, Inc.*, 1997 WL 269490 (N.D. Cal. Feb. 25, 1997) .......... 20

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) .......... 22

*Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D.Va. 2003) .......... 20

*In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996) .......... 13

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998) .......... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) .......... 26

*In re Watchguard Sec. Litig.*, 2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) .......... 26

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) .......... 25, 28

**Statutes**

15 U.S.C. § 77k(a) .......... 13

15 U.S.C. § 77l(a)(2) .......... 13, 32

15 U.S.C. § 78u-4(b)(1) .......... 12

15 U.S.C. § 78u-4(b)(2) .......... 12, 25

15 U.S.C. § 78u-5(i)(1) .......... 22

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs filed this securities case seeking to capitalize on a short seller's report that was designed to tank the price of Xponential Fitness, Inc.'s stock. The anonymously sourced and self-serving allegations of that report form essentially the entire basis for this Complaint, even though the Ninth Circuit has squarely held that such reports cannot form the sole basis for a Section 10(b) claim. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022). The only other allegations that Plaintiffs purportedly "investigated" come from public complaints filed by a handful of disgruntled *franchisees* of Xponential. That some franchisees failed is simply a reality of the franchise business (and one that Xponential warned about in its SEC filings). It says nothing about whether Defendants made any materially false or misleading statements or engaged in any deceptive conduct with intent to defraud stockholders. At bottom, the Complaint fails to meet the exacting requirements for pleading falsity, a deceptive act, scienter, and loss causation required by the Private Securities Litigation Reform Act and Rule 9(b). There are at least four fatal flaws.

*First*, the Complaint fails to plead falsity. Xponential's statements about the number of its open studios and licenses sold, as well as its AUV metric, were demonstrably true, and Defendants were not required to self-flagellate by disclosing disputed allegations made by franchisees. Nor did Defendants make false or misleading statements about the Company never having experienced a *permanent* store closure—indeed, it was Xponential's business model *not* to let franchises fail and it prominently disclosed this to investors. Xponential also clearly disclosed the key risks inherent with its operation model (*i.e.*, the Xponential Playbook). And because those optimistic statements were geared toward potential *future* performance by franchisees, they are quintessentially protected by PSLRA's safe harbor and thus inactionable.

*Second*, the Complaint fails to adequately plead any deceptive act. The allegations are derived entirely from sources with obvious motives to exaggerate and,

thus, lack indicia of reliability. But even if considered, the "scheme" allegations do not pass muster under Rule 9(b) because they are not pled with particularity and rely largely on *public* information that could not have deceived investors.

*Third*, Plaintiffs also have not pled the required strong inference of scienter, as required for their Exchange Act claims. Plaintiffs do not even attempt to allege that Defendants knew or recklessly disregarded that any of their statements (or supposedly deceptive conduct) were likely to mislead investors. Indeed, Plaintiffs' allegations regarding a purported fraud on the Company's franchisees have nothing do with issues governed by the federal securities law.

*Finally*, under black-letter Ninth Circuit law, short seller reports like the one relied on here are inadequate to plead loss causation. And the purported subsequent corrective disclosures simply parrot information that was already public, so they cannot plead loss causation as a matter of law.

Accordingly, the Complaint should be dismissed.

## II. BACKGROUND[1]

### A. Xponential and Its Business Model

Xponential is a global franchisor of boutique fitness brands. Ex. 4 at 4. At the time of the Complaint, it owned a diversified platform of ten brands, including Row House and AKT. ¶ 2 n.1; Ex. 4 at 4. Xponential's business model entails licensing boutique studio operations to, and sharing its business processes and branding with, franchisees. Ex. 4 at 4. In exchange, Xponential receives royalties and other fees. *Id.*

Xponential tracks multiple key metrics to measure the performance of its business, which provide investors with information about the number of studios operating, the number of studios that franchisees are obligated to open in the future, and the health of studios currently operating. In particular, Xponential disclosed (1) the

[1] "¶ _" refers to paragraphs of the Complaint. "Ex." refers to the exhibits to the Declaration of Jeffrey D. Lombard. Unless stated otherwise, all emphasis is added and all internal citations and quotations are omitted.

"Number of Studios Operating," which reflects the total number of studios operating "on a net basis to take account of any studios that may have closed during the reporting period"; (2) "Licenses Contractually Obligated to Open," which details the number of studio licenses Xponential has sold to franchisees "net of opened studios and terminations"; and (3) "Average Unit Volume" ("AUV"), which shows "the average sales for the trailing 12 calendar months for all studios in North America that have been open for at least 13 calendar months." Ex. 4 at 2. These metrics are disclosed on a consolidated basis across *all* brands (not at the brand level). *See, e.g.*, *id.* at 7.

**B. Xponential's Public Offerings and SEC Filings**

Xponential conducted an initial public offering ("IPO") in July 2021. ¶ 56. In connection with the IPO, Xponential explained that it offered "significant support [to franchisees] from the outset, focused on delivering a superior experience and maximizing studio-level productivity and profitability," and that this support was "a key driver of system-wide operational excellence." Ex. 1 at 9. Xponential also disclosed its operational model (aka the "Xponential Playbook"), which included "key pillars" designed to help franchisees achieve certain financial targets by the end of their second year of operation. *Id.* at 3.

Xponential disclosed to investors that the success of its then-1400+ franchisees was not guaranteed. *See* Ex. 1 at 1, 17. For example, Xponential disclosed that "[f]ranchisees may not successfully execute our suggested best practices, which include our recommended plan for operating and managing a studio . . . If a franchisee is unable to manage or operate their studio efficiently, the performance and quality of service of the studio could be adversely affected." *Id.* at 42. It also emphasized that some franchisees may not adopt Xponential's business model or "generate the revenue we expect," or that its "forecasts and projections may be inaccurate." *Id.*; *see also id.* at 41. Xponential also disclosed that "[f]ranchisees are independent third parties and their actions are outside of our control" such that it "[could not] be certain that franchisees will have the business acumen or financial resources necessary to operate successful

Gibson, Dunn & Crutcher LLP

franchises." Ex. 1 at 42. It further explained that because "[f]ranchisees own, operate and oversee the daily operations of their studios, . . . the ultimate success and quality of any studio rests with the franchisee." *Id.*

Xponential also made clear that it never allowed an individual studio within its network to fail—even if that meant operating a studio as a Company-owned studio for a period of time, which "heighten[ed] many of the other risks for [its business.]" Ex. 1 at 46. Specifically, it disclosed that Xponential would take ownership of a temporarily closed studio for a limited time to "facilitate the transfer of these studios to new or existing franchisees," *id.* at 46, 107, and it also disclosed the number of times it had done so in the past, *see id.* at 46 (Xponential owned 40 studios at the end of December 31, 2020). Xponential also disclosed that "almost all studios were temporarily closed intermittently beginning in mid-March and throughout 2020 and early 2021" due to the COVID-19 pandemic. *See* Ex. 1 at 35.

On April 6, 2022, Xponential issued a registration statement (the "Registration Statement") in connection with a secondary public offering (the "SPO"). ¶ 264; *see* Ex. 4. The Registration Statement repeated the key disclosures about Xponential's business plan, metrics, and key risks that were disclosed in the IPO. *Compare* Ex. 1 at 17 (identifying risk factors), *with* Ex. 4 at 16 (similar).

**C. Fuzzy Panda Short Seller Report**

On June 27, 2023, "Fuzzy Panda," an anonymous short seller, published a report titled "Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A House Of Cards.'" ¶ 130; Ex. 7. Fuzzy Panda admitted that it had "a short position" in Xponential's stock and "therefore [stood] to realize significant gains" if Xponential's stock price declined. Ex. 7 at 25. It also made clear that "all information contained in [its] report[] . . . has been obtained from public sources" and that it "ma[de] no representation, express or implied, as to the *accuracy, timeliness, or completeness* of any such information." *Id.* Relying largely on anonymous sources and publicly filed lawsuits by disgruntled franchisees, Fuzzy Panda alleged that: eight of Xponential's then-ten brands lost money

Gibson, Dunn & Crutcher LLP

each month; over 50% of studios never made a positive financial return; Xponential had permanently closed over 30 stores; Xponential had omitted underperforming studios from the AUV metric; and Xponential "lied in sales pitches to prospective franchisees." ¶ 132. Following the publication of the Fuzzy Panda report, Xponential's stock fell by about 37% or $9.39 per share. ¶ 133.

### D. The Complaint

The Complaint filed on July 26, 2024 challenges over 50 statements made between July 23, 2021 and May 9, 2023 in Xponential's SEC filings, press releases, earnings calls, and at industry conferences.[2] Although the broadbrush nature of Plaintiffs' allegations make it difficult to discern the exact nature of their claims—indeed they appear to challenge nearly every statement the Company has made for the same exact reasons—their challenges roughly fall under four topics: (1) statements about the number of studios franchisees opened and licenses Xponential sold to franchisees; (2) statements that Xponential never permanently closed a studio; (3) statements about the AUV metric; and (4) statements about the Xponential Playbook.

## III. ARGUMENT

Plaintiffs' Section 10(b) claim is subject to the "demanding pleading requirements" under Rule 9(b) and the PSLRA. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); 15 U.S.C. § 78u-4(b)(1)-(2). Specifically, Plaintiffs must allege *with particularity*: "(1) a material misrepresentation or omission; (2)

[2] The Complaint alleges that Xponential, former CEO Anthony Geisler, CFO John Meloun, and Director Mark Grabowski violated Section 10(b) of the Exchange Act. ¶¶ 30–32, 250–59. The Complaint also alleges that Xponential, the officers and directors who signed the Registration Statement for its SPO (Geisler, Meloun, Grabowski, and Directors Chelsea Grayson and Brenda Morris), and the underwriters of its SPO ("Underwriter Defendants") violated Section 11 claim of the Securities Act, ¶¶ 263–83, 294–301, and that Grabowski and the Underwriter Defendants violated Section 12 of the Securities Act, ¶¶ 302–10. Finally, the Complaint asserts control person claims under Section 20(a) of the Exchange Act against Xponential, Geisler, Meloun, and Grabowski and Section 15 of the Securities Act against Xponential and the Director Defendants. ¶¶ 266–70, 311–16.

scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603–05 (9th Cir. 2014). "These heightened pleading requirements . . . present no small hurdle," *Macomb Cty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022), which Plaintiffs have failed to clear in this case.

For its Section 11 and 12 claims, Plaintiff[3] must plead facts showing that the Registration Statement and Prospectus issued in connection with the SPO contained a misrepresentation of material fact or omitted a material fact required to be disclosed therein. 15 U.S.C. § 77k(a); *Rubke v. Cap. Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *see also* 15 U.S.C. § 77l(a)(2). Rule 9(b)'s particularity requirement applies to Section 11 and 12 claims that are "grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). Here, Plaintiff alleges in support of its Section 11 and 12 claims that Defendants "lied to prospective franchisees," ¶ 187, "misled investors about Xponential's financial condition," ¶ 191, and "conceal[ed]" a "scheme to mislead Xponential's franchisees," *id.*—allegations that indisputably sound in fraud, *see also* ¶ 287 (citing paragraphs alleged in support of Section 10(b) claim to plead Section 11 and 12 violations). Courts routinely hold that Section 11 and 12 claims are grounded in fraud where, as here, they are based on the *same* allegations as claims under Section 10(b). Because Plaintiffs' Section 11 and 12 claims are "grounded in fraud," they must be pled with particularity, *Stac Elecs.*, 89 F.3d at 1404–05, but even if analyzed under Rule 8, the Section 11 and 12 claims fail to state a claim.

### A. Plaintiffs' Rule 10b–5(b) and Section 11 and 12 Claims Should Be Dismissed for Failure to Plead a Materially False or Misleading Statement

Plaintiffs' claims under Rule 10b–5(b) and Sections 11 and 12 should be dismissed because Plaintiffs fail to plead (with particularity or otherwise) facts showing

[3] Only Plaintiff City of West Palm Beach Police Pension Fund asserts claims under Sections 11 and 12.

Gibson, Dunn & Crutcher LLP

that any of the challenged statements were false or misleading.[4] To allege falsity, Plaintiffs must plead "contemporaneous statements or conditions" that are "necessarily inconsistent" with or that "directly contradict[]" the challenged statements. *In re Read-Rite Corp.*, 335 F.3d 843, 846, 848 (9th Cir. 2003), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008). Plaintiffs are required to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Statements are misleading only if they "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

**1. Plaintiffs engage in impermissible puzzle pleading.**

It is difficult to ascertain from the Complaint exactly what any Defendant said that was allegedly false or misleading. This is because the Complaint "forces the defendants and/or court to sort out the alleged statements and match them with the corresponding alleged facts in order to solve the puzzle of interpreting Plaintiff's claims." *Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at *5 (C.D. Cal. Nov. 17, 2017). Indeed, Plaintiffs fail to specifically tie their allegations of falsity to each of the 50+ challenged statements. Plaintiffs instead provide blanket explanations as to why *all* of the challenged statements are supposedly false or misleading. *See* ¶¶ 186–91, 204–14. Courts routinely dismiss complaints with similar infirmities. *See, e.g.*, *Patel v.*

---

[4] The Section 11 claim related to the SPO cannot possibly proceed on a class-wide basis given the numerous securities offerings Xponential made during the expansive class period of July 23, 2021 to May 10, 2024. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999) (explaining that tracing shares purchased in the aftermarket to a particular registration statement "might present a problem of proof in a case in which stock was issued under more than one registration statement"); *see also, e.g.*, *In re Talis Biomedical Corp. Sec. Litig.*, 2024 WL 536303, at *9 (N.D. Cal. Feb. 9, 2024). Accordingly, even if Plaintiff can trace its shares to the SPO (which Defendants do not concede), it would be a complete waste of this Court's resources to let a one-person class claim survive (and, as set forth *infra*, Plaintiff pleads no false or misleading statements giving rise to liability under Section 11).

*Parnes*, 253 F.R.D. 531, 552 (C.D. Cal. 2008) (dismissing complaint where "allegations regarding falsity do not tie these reasons to particular statements; instead, the reasons appear to apply generally to the statements quoted in the preceding paragraphs").

Plaintiffs also allege that certain documents "contained statements" they presumably believe were false or misleading but fail to identify the *specific* statements that are false or misleading therein. *See* ¶¶ 152, 156, 159, 163, 168, 173, 178, 185. This too is impermissible. *See In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000) (dismissing complaint where "plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are").

**2. Defendants' statements about the number of studio openings and franchise licenses sold were not false or misleading.**

Plaintiffs first attempt to challenge 22 statements[5] about the number of studios opened and the number of franchise licenses sold, but Plaintiffs do not allege that any of these statements were literally false. They also fail to adequately plead that any such statement was misleading for at least four additional reasons.

*First*, the "facts" that Plaintiffs allege Xponential omitted—that "most" franchisees were "operating in the red" and Xponential's purported "scheme to mislead . . . franchisees," *see* ¶¶ 188, 190–91—are entirely unrelated to the challenged statements about accurate business metrics. The alleged omissions therefore do not render the challenged statements false or misleading because "the reasons Plaintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves." *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017).

*Second*, Plaintiffs cannot support their claim of falsity by lifting wholesale

[5] Plaintiffs challenge statements made in SEC filings or by Geisler and Meloun during earnings calls. ¶¶ 146, 148–49, 152, 154–56, 158–59, 162–63, 167–68, 172–73, 176–78, 182–83, 185, 286. For example, Plaintiffs challenge a statement in the Registration Statement that "[a]s of December 31, 2021, on a cumulative basis since inception, we had 4,424 franchise licenses sold globally . . ." ¶ 286. Plaintiffs challenge this statement under Sections 11 and 12 and the remaining statements under Rule 10b–5(b).

Gibson, Dunn & Crutcher LLP

allegations from separate, unadjudicated lawsuits, *see, e.g.*, ¶¶ 69, 77–78, 83–84, 106, 115, 190, that Plaintiffs *admit* they did not verify or investigate independently. *In re Corinthian Colleges, Inc. S'holder Derivative Litig.*, 2012 WL 8502955, at *6 (C.D. Cal. Jan. 30, 2012); *see* ¶¶ 40–47 (investigation limited to reviewing allegations in lawsuits, news reports, and other documents). Because Plaintiffs purported "investigation" amounted to nothing more than *reviewing* allegations made by *other* lawyers in other lawsuits, they cannot rely on these allegations to support any of their claims. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (striking allegations from separate lawsuits where attorney did not "personally . . . validate the truth and legal reasonableness of the papers filed" or "conduct a reasonable factual investigation").

*Third*, Plaintiffs cannot allege falsity based on Defendants' supposed obligation to disclose unadjudicated wrongdoing. *See, e.g.*, ¶¶ 65–81, 186. Federal securities laws do not impose upon companies a "duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen & Firemen Retirement Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014); *cf. In re Herbalife, Ltd.*, 2015 WL 7566616, at *2 (C.D. Cal. Nov. 23, 2015) (no duty to disclose performance data when "no regulatory or criminal allegations have been made to date"). Nor was Xponential required to disclose that it allegedly relied on what Plaintiffs believe were aggressive sales techniques. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *15 (N.D. Cal. Dec. 17, 2019) (no duty to disclose alleged coercive and unsustainable sales practices when discussing "hyper-growth" of company's business); *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007) (no duty to disclose "improper" sales tactics because "[h]owever it obtained business," defendant "sold real products for real money"), *aff'd*, 329 F. App'x 715 (9th Cir. 2009).

*Finally*, Plaintiffs fail to plead the requisite particularized facts to support that "most" franchisees were "operating in the red." *See* ¶¶ 188–91. Plaintiffs rely on their supposed "proprietary" analyses, *see* ¶¶ 63–64, 188, but fail to allege sufficient

information about the underlying facts and methodology used to establish falsity. *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 930–32 (9th Cir. 2023) (allowing plaintiff to use economic analysis to plead falsity where it was "prepared by knowledgeable and competent professionals," "provided detailed information about [the] methodology," and relied on a "particularized" allegations of facts), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, 144 S. Ct. 2655 (2024). Here, Plaintiffs plead *no* facts about the data underlying their analyses and instead merely state that their analyses are based on unpled data contained in unspecified franchise disclosure documents ("FDDs"), SEC filings, and other unspecified "data points." *See* Compl., Exs. C–E. Plaintiffs also provide scant detail about the methodology employed and fail to explain how they reached certain figures, *see, e.g.*, *id.*, Ex. E (citing unspecified "data points").[6] Plaintiffs' black-box say-so is insufficient under any pleading standard, let alone the PSLRA. *In re Nektar*, 34 F.4th at 837 ("Plaintiffs cannot evade the PSLRA's exacting pleading standards by merely citing an expert who makes assertions about falsity based on questionable assumptions and unexplained reasoning.").

**3. Defendants' statements that Xponential never permanently closed a studio were not false or misleading.**

Plaintiffs also attempt to challenge statements by Geisler and Meloun that Xponential never permanently closed a studio. *See* ¶¶ 193–98, 200–03. But Plaintiffs fail to plead particularized facts contradicting those statements.

To the contrary, Xponential accurately and repeatedly stated that it never *permanently* closed a studio—meaning, the Company never allowed an individual studio within its network to fail, even if that meant transitioning it to another franchisee or

[6] The scarce details Plaintiffs *do* provide reveal that their methodology is unreliable. For example, Plaintiffs cherry-pick data, *see, e.g.*, *id.*, Ex. C (excluding data from almost half of Xponential's brands), and mix-and-match metrics across data sources, *see, e.g.*, *id.*, Ex. D (subtracting "qualified studios" as defined in FDDs—which includes North American studios open for six months or longer—from total studios reported in SEC filings), and time-periods, *see, e.g.*, *id.* (comparing average monthly revenue with annual average operating losses).

operating it as a Company-owned studio for a period of time. *Cf. SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) ("Plaintiff may not simply 'cherry-pick[] portions of Defendants' statements'" and cannot "selectively ignore[] [Defendants'] statement and the surrounding context"). This was Xponential's business model at the time and was prominently disclosed in its SEC filings and elsewhere. For example, Xponential explained in its SEC filings that it would terminate franchise agreements where a franchisee failed to meet its contractual obligations, *see, e.g.*, Ex. 5 at 14, 30, and that it had done so in the past, *see, e.g.*, *id.* at 14, 26 (disclosing that Xponential terminated 600 franchise licenses from its inception through the end of 2022). It also disclosed that, in such scenarios, Xponential would take ownership of a temporarily closed studio for a limited time to "facilitate the transfer of these studios to new or existing franchisees," Ex. 5 at 15; *see also* Ex. 1 at 46, 107, how often it did so, Ex. 5 at 15 (disclosing that Xponential had 55 "company-owned transition studios" at the end of 2022), and the financial impact of this business decision, *see id.* at 63, 104 (discussing carrying costs of corporate studios). The statements Plaintiffs challenge are fully consistent with these disclosures. *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) (alleged misstatements must "convey[ ] a false or misleading impression" when "read in light of all the information then available to the market").

Plaintiffs' claims also fail because they cannot plead that these statements are misleading when considered within their full context. For example, Plaintiffs allege that Geisler misleadingly stated on Jim Cramer's Mad Money show on May 9, 2023 that "we've actually never had a closure" of a studio. ¶ 203. But a full review of Geisler's statement makes clear that he was *not* saying a franchised-studio had never *temporarily* closed; rather, consistent with the SEC filings, Geisler explained that when a franchisee wanted to or needed to close a studio, Xponential would work to keep the studio open on a permanent basis by facilitating a sale of the studio "[t]o someone else . . . much like [when] people buy a stock . . . and they sell to someone else." Ex. 6; *see also* Ex. 2 (Meloun stating that "[w]hile we may own and operate certain studios from time to time,

our primary strategy is for all our studios to be licensed to franchisees").

Contrary to Plaintiffs' suggestion, Xponential's FDD disclosures, "internal" memoranda drafted by unnamed franchisees, and *The Capitol Forum*'s articles do nothing to render the challenged statements about store closures false. *See* ¶¶ 204–05, 212. Plaintiffs contend that the FDDs show that Xponential took over 17 Row House studios in 2020, which were "permanently closed *for the franchisees* that operated those studios." *Id.* But Xponential disclosed the information about studios it took over in its SEC filings: "we took ownership of a larger number of studios in 2020 than we have taken in previous years. As of December 31, 2020, we had ownership of 40 studios." *See, e.g.*, Ex. 1 at 110. And the Complaint pleads *no* facts that Xponential permanently closed any of these studios as opposed to transferring them to other franchisees or operating them as Company-owned studios for a period of time. More fundamentally, the FDDs were publicly available, so the market could not have been misled by Xponential's discussion of studio closures. *See* Ex. 10; *In re Convergent Techs.*, 948 F.2d at 513 ("an omission is materially misleading only if the information has not already entered the market").

**4. Defendants' statements about the AUV metric were not materially false or misleading.**

Plaintiffs attempt to challenge statements about Xponential's AUV metric, but this theory is similarly deficient because Xponential disclosed the *very* information that Plaintiffs allege was omitted.[7] Indeed, Xponential's SEC filings specifically disclosed that the AUV metric[8] included *only* studios that had been open for the past 13 months:

---

[7] Plaintiffs challenge 27 such statements made in SEC filings, press releases, and earnings calls. *See* ¶¶ 147, 151–53, 156–59, 161–70, 172–74, 178, 180–81, 184–85, 285. For example, Plaintiffs challenge a statement in a press release Xponential issued on August 11, 2022 that "the Company had achieved a run-rate AUV of $480,000" for the second quarter of 2022. ¶ 165. Plaintiffs challenge only the statements alleged in ¶ 285 under Sections 11 and 12 and the remaining statements under Rule 10b–5(b).

[8] Plaintiffs' allegations that Defendants' statements about AUV were misleading because Xponential purportedly failed to disclose that most franchisees were "operating in the red," and the "underlying scheme to mislead Xponential's franchisees," *see* ¶¶

AUV "consists of the average sales . . . for all studios in North America *that have been open for at least 13 calendar months as of the measurement*." *See, e.g.*, Ex. 5 at 68; Ex. 3 at 32. In other words, "[s]tudios with zero sales in the [relevant measurement] period have always been excluded from the [AUV] calculation." ¶ 135. Plaintiffs cannot "selectively ignore[] [Defendants'] statement and the surrounding context" to manufacture a claim. *See SEB Inv. Mgmt. AB*, *Inc*., 485 F. Supp. 3d at 1126.

Plaintiffs also fail to plead that any alleged misstatement about the AUV metric was material. Xponential's calculation of the AUV metric was consistent with industry standard definitions, and Plaintiffs concede that if the allegedly omitted studios were added to the AUV calculation, it would result in only a "0.9% change to the AUV figure ($542,000 vs. $538,000)." ¶ 135. Accordingly, the disclosure of the allegedly omitted studios would not have "significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); *see, e.g.*, *Shuster v. Symmetricon, Inc.*, 1997 WL 269490, at *8 (N.D. Cal. Feb. 25, 1997) (transactions accounting for 2% of all revenue immaterial as a matter of law); *Smith v. Circuit City Stores, Inc*., 286 F. Supp. 2d 707, 720–21 (E.D. Va. 2003) (omission of increased costs totaling 3.25% of company's net annual earnings not material).[9]

**5. Defendants' statements about the Xponential Playbook were not false or misleading.**

Plaintiffs' claims regarding Defendants' statements about the Xponential

---

188–91, fare no better. As discussed above, Plaintiffs' allegations of unadjudicated fraud on franchisees cannot form the basis of a securities claim. *See supra* at 16–17. Nor can Plaintiffs rely on "proprietary analysis" to establish that "most" franchisees were "operating in the red." *See supra* at 17–18.

[9] Plaintiffs also challenge two statements made by Geisler during the August 11 and November 10, 2022 earnings calls, that franchisees had "borrowed over $200 million from the SBA without any non-repayments," ¶¶ 198–99, because the SBA allegedly charged off about $550,000 in loans taken out by *three* franchisees, ¶ 214. These alleged misstatements are not *material*. No reasonable investor could find it material that *three* out of almost *two thousand* franchisees defaulted on about *a quarter of one percent* of all money Xponential franchisees borrowed from the SBA. *See Shuster*, 1997 WL 269490, at *8; *Smith*, 286 F. Supp. 2d at 720–21; Ex. 5 at 8.

Gibson, Dunn & Crutcher LLP

Playbook fail because Xponential disclosed the risks that Plaintiffs baselessly allege were omitted—*i.e.*, that not all franchisees would achieve financial success—and these statements are otherwise protected by the PSLRA safe harbor.[10]

Plaintiffs allege these statements were misleading because some franchisees "follow[ed] the [P]laybook closely" and "still [were] not doing well," ¶ 212, but Xponential specifically disclosed that it "cannot be certain that franchisees will have the business acumen or financial resources necessary to operate successful franchises." *See, e.g.*, Ex. 1 at 42. The Company likewise warned that "[f]ranchisees may not successfully execute our suggested best practices, which include our recommended plan for operating and managing a studio." *See, e.g.*, Ex. 1 at 42. Xponential also warned that the Xponential Playbook was not one-size-fits-all: "[f]ranchisees' studios require significant upfront and ongoing investment . . . If franchisees' costs are greater than expected, franchisees may need to outperform their operational plans to achieve their targeted returns." *See, e.g.*, Ex. 1 at 41. Thus, the Registration Statement "warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).[11]

The challenged statements are also protected by the PSLRA safe harbor because

---

[10] Plaintiffs challenge four statements about the Xponential Playbook, made in Form 10-Ks for 2022 and 2023 and the April 2022 SPO Registration Statement, and by Geisler during an August 24, 2021 earnings call. ¶¶ 150, 160, 179, 285. In particular, Plaintiffs challenge statements that the Xponential Playbook is designed to (1) "help franchisees achieve compelling AUVs, strong operating margins[,] an attractive return on their invested capital," and "maximize their studio performance" and (2) generate an AUV of $500,000 in year two of operations and studio-level operating margins ranging between 25% and 30%. *See id.* Plaintiffs challenge only the statements alleged in ¶ 285 under Sections 11 and 12 and the remaining statements under Rule 10b–5(b).

[11] Unable to identify any misstatement in the Registration Statement, Plaintiff asserts Section 11 claims that Defendants violated Items 105 and 303 of Regulation S-K by failing to disclose that Xponential allegedly sold franchise licenses using inaccurate FDDs and the adverse economic circumstances some franchisees allegedly faced as a result. ¶¶ 289–92. These claims fail for the same reasons discussed above. *See supra* at 16–22; *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (affirming dismissal of Item 303 claim where "the risks were completely disclosed").

they are forward-looking statements about franchisee's *future* performance. 15 U.S.C. § 78u-5(i)(1)(A)–(D); *see, e.g.*, ¶ 145 (the Xponential Playbook is designed to "help franchisees achieve compelling AUVs" "in year two of operations"). And the portions of these statements discussing "compelling," "strong," and "attractive" results are also nonactionable puffery. *See Barry v. Colony NorthStar, Inc.*, 2019 WL 13237719, at *14 (C.D. Cal. Aug. 1, 2019) ("[s]tatements about 'strong progress,' and 'highly attractive' products are exactly the type of remarks that investors have learned to ignore").[12]

### B. Plaintiffs' Scheme Liability Claim Should Be Dismissed

Plaintiffs also fail to plead that Defendants engaged in any scheme to defraud investors. To plead a scheme claim under Rules 10b–5(a) or (c), Plaintiffs must allege deceptive or manipulative conduct. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009). Such conduct involves "deception . . . to defraud" investors and must have "the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047–48 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008). Scheme liability claims are subject to heightened pleading requirements under Rule 9(b). *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1126 (C.D. Cal. 2008).

It is important to recognize that Plaintiffs do not allege that Defendants engaged in any manipulative or deceptive conduct that typically gives rise to liability under Rules 10b–5(a) or (c), *i.e.*, wash sales, matched orders, or rigged prices. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). Rather, Plaintiffs allege that Defendants schemed by lying to prospective franchisees about the financial prospects of operating a franchised studio, hiding Geisler's history, and interfering with studio closures, which Plaintiffs claim they used to sell stock at artificially inflated prices. ¶¶ 53–144. These

[12] Finally, Plaintiffs cannot rely on their "proprietary analysis" to establish that "most" franchisees were "operating in the red." *See supra* at 17–18. Nor can they rely on allegations from separate lawsuits they did not independently investigate or allegations of unadjudicated wrongdoing. *See supra* at 16–17.

Gibson, Dunn & Crutcher LLP

allegations fail because (1) the facts in the Complaint are entirely attributed to sources that lack indicia of reliability and, therefore, are not well-pled; (2) notwithstanding, Plaintiffs do not plead any deceptive conduct with particularity; and (3) even if the so-called "scheme" that Plaintiffs allege occurred (it did not), all the information was public and thus could not have deceived investors.

**1. All of Plaintiffs' "facts" are attributed to sources that lack indicia of reliability.**

Plaintiffs' allegations cannot proceed because they are based on an anonymous short seller report and news articles quoting anonymous franchisees. Although news articles and short seller reports can provide foundation for securities fraud allegations, courts refuse to credit such allegations because of reliability concerns where, as here, they are based on anonymous sources. *See In re Apollo Grp., Inc. Sec. Litig.*, 2011 WL 5101787, at *11 n.7 (D. Ariz. Oct. 27, 2011) ("anonymous internet postings are less reliable than confidential witness statements"); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (noting a "particular need for close scrutiny" when assessing the reliability of facts attributed to a short seller report given "the risk of motivated reporting by the author . . . twinned with the reliability concerns presented by anonymous sourcing"). As such, courts will only deem such sources reliable where they (1) are sufficiently particular and detailed *and* (2) tend to corroborate a plaintiff's own investigation. *See In re Neustar Sec.*, 83 F. Supp. 3d 671, 685 (E.D. Va. 2015).

The Court should not credit anonymous secondhand accounts taken from *The Capitol Forum*, *Bloomberg*, and Fuzzy Panda, *see, e.g.*, ¶¶ 59, 65–68, 104–07, 109–10, 112–13, 119, 132, which contend Xponential's employees lied about the financial prospects of operating a studio to potential franchisees. Plaintiffs have neither shown that these sources are sufficiently particular and detailed nor conducted *any* independent investigation of their own. In fact, Plaintiffs purported "investigation" consists of nothing more than repeating these sources' characterization of their purported interviews with anonymous franchisees. Plaintiffs do not claim to have interviewed any current or

former franchisees themselves. Indeed, Plaintiffs do not even claim to have attempted to contact any franchisees—much less confirmed the identities of the interviewees cited. Nor do Plaintiffs allege that they spoke directly with the authors of the articles or report who allegedly conducted the interviews.

Moreover, these sources do not sufficiently explain how their confidential sources possess the information alleged. The Fuzzy Panda report is especially concerning because its author was admittedly short on Xponential's stock and had an "obvious motive to exaggerate the infirmities of the securities in which they speculate." *See Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *4 (C.D. Cal. Nov. 5, 2021). The anonymously sourced information in *The Capitol Forum* and *Bloomberg* articles and Fuzzy Panda report lack indicia of reliability, and Plaintiffs cannot rely on allegations taken from these sources to satisfy their pleading burden under Rule 9(b).

The reliability of other sources cited in the Complaint is even more suspect. Indeed, Plaintiffs rely heavily on allegations made in lawsuits by disgruntled franchisees. *See, e.g.*, ¶¶ 60–61, 69–70, 72–80, 83, 111, 115. These allegations are unproven and contested, and thus are not sufficiently reliable to satisfy Plaintiffs' pleading burden. *See In re Apollo*, 2011 WL 5101787, at *10 n.5 (allegations from other complaints "do not amount to 'facts' sufficient to establish a strong inference of scienter"); *ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213 (C.D. Cal. 2015) (same); *see also supra* at 16–17. Again, there is no indication that Plaintiffs did anything to confirm the veracity of these allegations. As such, the Court should ignore them. *See In re Connetics*, 542 F. Supp. 2d at 1004–06 (granting motion to strike facts incorporated from SEC complaint where plaintiff's counsel did no independent investigation to personally validate the truth of the allegations therein).

**2. Plaintiffs fail to plead a manipulative or deceptive act with particularity.**

Even if the Court credits Plaintiffs' allegations taken from these unreliable sources, they fail to allege deception with particularity. The Complaint does not contain

any specific facts concerning Defendants' alleged misrepresentations to potential franchisees or alleged interference with store closures. Instead, Plaintiffs merely adopt the conclusory secondhand accounts from the sources described above. ¶¶ 59–62, 65–84, 103–26. None of Plaintiffs' allegations specify who from Xponential made the allegedly false statements to franchisees or interfered with studio closures, when such interactions occurred, in what context they occurred, or the number of franchisees who were purportedly deceived. *See Karam v. Corinthian Colleges, Inc.*, 2012 WL 8499135 (C.D. Cal. Aug. 20, 2012). The absence of such allegations is fatal. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 398–400 (S.D.N.Y. 2016) (dismissing scheme claim for failure to plead underlying deceptive conduct with particularity under Rule 9(b)).

**3. The alleged "scheme" was public so there was no deception.**

Plaintiffs' claim fails for yet another reason: Even if there was a "scheme" as Plaintiffs allege (there was not), the supposedly concealed information was public. *See Desai*, 573 F.3d at 941 (noting a successful scheme usually "remain[s] undisclosed to the general public."). Various lawsuits against Geisler, including one dating back to 2009, were public well before the Class Period, so Defendants could not have concealed Geisler's alleged "fraudulent history." *See* Compl. § VII.C. And by the end of 2021, franchisees had already filed lawsuits against Geisler (among others) with allegations about alleged misrepresentations to franchisees regarding their financial prospects and studio build-out costs. *See, e.g.*, ¶ 83. The scheme liability claim, thus, cannot survive.

**C. Plaintiffs' Section 10(b) Claims Should Be Dismissed for Failure to Plead Scienter**

All of the Section 10(b) claims independently fail for failure to plead scienter. Under the PSLRA, the Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). To do so, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless

false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). The Court must engage in a "comparative evaluation," and consider "competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). An inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

Plaintiffs attempt to plead scienter through (1) Geisler's and Meloun's alleged knowledge of the supposed "scheme," misstated FDDs, and studio closures; (2) Geisler's and Grabowski's stock sales; and (3) changes made to Xponential's operations.[13] For the reasons discussed below, these allegations fail to support any inference, much less a strong and compelling one, that Defendants acted with the requisite state of mind.

**1. The allegations concerning Geisler and Meloun's knowledge lack reliability and, even if considered, are not indicative of scienter.**

Plaintiffs attempt to plead that Geisler and Meloun knew of Xponential's alleged scheme to mislead franchisees and that Defendants' statements to investors were false and misleading by virtue of their positions at Xponential. ¶¶ 34–35, 223, 228, 231. Plaintiffs allege that Geiser, in particular, was involved in the day-to-day operations of Xponential's business and was a "hands-on-manager" in all aspects of Xponential's business. ¶ 224. But "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information," which is absent here, "conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068.

Plaintiffs also claim that Geisler received two "internal documents"—namely, a

[13] Plaintiffs also argue that Defendants' scienter is "underscored" by the fact that Geisler and Meloun signed certifications under Section 302 of the Sarbanes-Oxley Act of 2022. ¶ 241. This allegation—that by certifying Xponential's financial statements, Geisler and Meloun must have known they were false and misleading—is "circular" and plainly inadequate. *In re Watchguard Sec. Litig.*, 2006 WL 2038656, at *10 (W.D. Wash. Apr. 21, 2006) (finding reliance on SOX certification to support scienter "circular").

February 2020 memo from Row House franchisees and a June 2020 memo from AKT franchisees—that allegedly informed him that "Xponential license sales were based on fabricated revenue projections and cost estimates."[14] ¶¶ 5, 187, 190, 204, 229. These memos cannot support an inference of scienter. *First*, they lack indicia of reliability. Plaintiffs do not claim to have spoken to the franchisees who allegedly sent the memos to Geisler. Instead, Plaintiffs purportedly reviewed the memos after they were referenced in *The Capitol Forum* articles or filed in other lawsuits—sources that also lack indicia of reliability as discussed *supra* at 24–25. ¶ 47. Indeed, Plaintiffs do not even allege which or how many of the franchisees contributed or signed onto the memos. *Second*, these memos do not raise an inference of scienter. Plaintiffs does not allege *when* the memo was sent to Geisler, *how* it was sent, and, most critically, that Geisler *actually read* the memo. *See, e.g.*, *Oracle Corp*., 2019 WL 6877195, at *19 (discrediting CW allegations because the CWs lacked personal knowledge as to whether the defendant actually read the presentations sent to his direct report or otherwise heard the information therein). More importantly, *nothing* in the Row House memo contradicts anything Xponential said to investors. At most, the memo would have alerted Geisler that (1) an *unknown* number of franchisees for *one* of its ten brands was not meeting revenue estimates, experiencing higher and longer buildout costs and timeline, and thus were concerned about unprofitability; and (2) the 2018 (*i.e.*, pre-COVID) FDDs, which Row House franchisee claim to have relied on in deciding to open up a studio, *see* ¶ 84, may no longer accurately reflect the post-COVID state of business. Such knowledge does not indicate Geisler's intent to defraud *investors*.[15]

Plaintiffs also attempt to plead scienter by pointing to Geisler's direct involvement with the franchisees. Specifically, Plaintiffs allege that Geisler was involved in recruiting new franchisees, including being on calls with them every week during the

[14] Neither Meloun nor Grabowski is alleged to have received either memo so they are irrelevant to their mental state.
[15] For the same reasons, the AKT memo does not support scienter.

pandemic, and even "threatening" franchisees. ¶¶ 67, 224–27. However, being generally involved with franchisees does not suggest that Geisler intended to defraud investors about the health of Company franchisees. "Were the court to hold otherwise, companies could be exposed to liability simply because executives are informed about their businesses." *Garcia v. J2 Glob., Inc.*, 2022 WL 22717936, at *6 (C.D. Cal. Aug. 8, 2022), *aff'd sub nom. Espy v. J2 Glob., Inc.*, 99 F.4th 527 (9th Cir. 2024).

**2. Geisler and Grabowski's stock sales do not support an inference of scienter.**

The Complaint also points to stock sales by Geisler and Grabowski to try to establish motive. ¶¶ 237–40. However, motive alone is insufficient to plead scienter. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005). And stock sales may serve as circumstantial evidence of scienter only if they are "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063–64 (9th Cir. 2014). No such allegations are pled here.

*First*, the sales here are not "suspicious or unusual" because all of Grabowski's sales and most of Geisler's sales were made in connection with the Company's IPO or SPO. *See, e.g.*, *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 950 (N.D. Cal. 2010). Indeed, these sales are entirely consistent with an intent to diversify Defendants' investment portfolios. *See, e.g.*, *Ronconi*, 253 F.3d at 435 ("[N]ot every sale of stock by a corporate insider shows that the share price is about to decline. A corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan."). Moreover, because Company insiders could not sell shares prior to the IPO, Plaintiffs cannot plead that their stock sales were "inconsistent with . . . usual trading patterns" as required in the Ninth Circuit to raise inference of scienter. *Zucco*, 552 F.3d at 1006.

*Second*, all other sales by Geisler were made pursuant to his Rule 10b5-1 trading plan. Plaintiffs make conclusory allegations that Geisler "had actual knowledge of the

scheme to sell licenses and open studios by misleading franchisees" and that he was aware of "an investigation that would uncover the scheme" when he entered the plan in December 2022, ¶ 238, but plead no *particularized* facts to support these assertions.

*Third*, Plaintiffs do not allege any stock sales by Meloun and, notwithstanding Geisler's and Grabowski's alleged sales, each retained a *majority* of their total holdings of the Company. *See* ¶ 239; *see also* Exs. 8 & 9. As such, Plaintiffs' stock allegations do not raise a strong inference of scienter. *See, e.g.*, *Ronconi*, 253 F.3d at 436 ("One insider's well timed sales [of 75.3% of his holdings] do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the factorable characterization of the company's affairs were known to be false when made.").

**3. Xponential's operational changes do not support an inference of scienter.**

Plaintiffs assert that Defendants' closures of certain company-owned studios after the Fuzzy Panda report suggests scienter. ¶¶ 235–36. Not so. Defendants' action *months after* the alleged misstatements do not shed light on their state of mind *at the time* the alleged misstatements were made. *In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, at *5 (N.D. Ill. Feb. 20, 2007). This is pure fraud-by-hindsight.

Plaintiffs also argue that the Company's decision to undergo an internal reorganization supports an inference of scienter. ¶ 232. This is a red herring. Xponential never disclosed brand-level financials in its SEC filings, *see, e.g.*, Ex. 1, so the fact that Xponential made such a change in FDDs is irrelevant.

**4. The competing, non-fraudulent inference is far more compelling.**

Plaintiffs' allegations, even when considered holistically, do not establish scienter. Instead, they suggest a far simpler and more compelling inference: A small number of franchisees, in the midst and wake of the global pandemic, experienced financial hardships and had to close their operations. Xponential, as it always had, stepped in to transition these studios to other franchisees and temporarily operated some

Gibson, Dunn & Crutcher LLP

as Company-owned studios, consistent with its prominently disclosed business model. That Defendants knew some of its franchisees were experiencing hardships does not mean that they intended to defraud its investors. At bottom, the mere fact that the Company allegedly had a small number of unhappy franchisees does not give rise to the requisite intent required to plead a securities fraud claim under the PSLRA.

**D. Plaintiffs' Section 10(b) Claims Should Be Dismissed for Failure to Plead Loss Causation**

The Section 10(b) claim fails for a third, independent reason: Plaintiffs fail to adequately allege loss causation. Loss causation is typically satisfied by pleading that the defendant or some other source "revealed the truth [about the defendant's alleged misstatements] through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (corrective disclosure must "reveal new information to the market that has not yet been incorporated into the [stock] price."). In other words, Plaintiffs must trace their alleged loss back to "the very facts about which the defendant lied." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). Plaintiffs fail to meet this standard.

*First*, a short seller report like Fuzzy Panda's—which explicitly disclaims its own accuracy—cannot serve as a corrective disclosure. *In re Nektar*, 34 F.4th at 839–40. In *Nektar*, the Ninth Circuit held that even if a short seller report "pulled together disparate [public] sources and connected data in ways that were not plainly obvious," it nonetheless did not plausibly reveal the "truth" about allegedly false statements because the short seller had a "financial incentive to convince others to sell" so "investors would have taken [the report] with a healthy grain of salt"—particularly where the short seller disclaimed the accuracy and completeness of the published information. *In re Nektar*, 34 F.4th at 840. This reasoning applies aptly here. As in *Nektar*, Fuzzy Panda's report (1) was issued by a short seller with a financial motive to tank Xponential's stock, (2)

relies solely on public information, and (3) disclaims the accuracy and completeness of the information in the report. Ex. 7 at 25. Plaintiffs' reliance on Fuzzy Panda to plead loss causation, ¶¶ 130–33, fails as a matter of law.

*Second*, Plaintiffs fail to "specify which of the Defendants' statements were [revealed to be] untrue" by any of the alleged corrective disclosures. *Apollo*, 774 F.3d at 608. Instead, Plaintiffs ask the Court to assume all 50+ challenged statements somehow "proximately caused" the decline in Xponential's stock. ¶ 246. This is not plausible, let alone the requisite pleading with particularity, and a similar attempt by plaintiffs was recently rejected by the Ninth Circuit. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021).

*Third*, Plaintiffs cannot rely on the announcement of governmental investigations to plead loss causation. *See* ¶¶ 140, 143. This is because "[t]he announcement of an investigation does not 'reveal' fraudulent practices to the market"; rather, the stock price decline "following the announcement of an investigation can only be attributed to market speculation," which "cannot form the basis of a viable loss causation theory." *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014).

*Finally*, the remaining alleged corrective disclosures post-dating Fuzzy Panda cannot plead loss causation, ¶¶ 138, 140, because Plaintiffs fail to allege that these subsequent disclosures introduced any *new* information to the market. *In re BofI*, 977 F.3d at 794. Plaintiffs allege they suffered further losses when (1) BofA issued an analyst report on November 1, 2023, ¶ 138, and (2) *Bloomberg* published an article on December 7, 2023, ¶ 140. But both addressed *the same already-public information* discussed in Fuzzy Panda's report. *See, e.g.*, ¶ 138 (the BofA report "corroborated portions of Fuzzy Panda's analysis"); ¶ 140 (*Bloomberg* article reported that some franchisees had closed studios, and that Mr. Giesler was a "combative" manager). *See Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) ("[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time."); *see also FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310

(11th Cir. 2011) ("disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price").

**E. The Section 12(a)(2) Claim Against Grabowski Should Be Dismissed**

To plead a claim under Section 12(a)(2) against Grabowski, Plaintiff must allege, among other things, that he "is a statutory seller." *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *8 (C.D. Cal. May 5, 2011) (citing 15 U.S.C. 77l(a)(2)). Plaintiff fails to do so.[16] A person or entity "is a statutory seller . . . if [it] either passes title of the security to the purchaser, or solicits the sale of the security." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1073 (N.D. Cal. 2010). In other words, "[i]f the defendant is not in literal privity with the plaintiff, his conduct must proximately cause the sale, or he must be a 'motivating force' behind the sale." *Hokama v. E.F. Hutton & Co., Inc.*, 566 F. Supp. 636, 641 (C.D. Cal. 1983). Plaintiff does not allege that Grabowski passed title directly to it, so it must allege "active solicitation coupled with a motivation, at least in part, to benefit one's own financial interests or those of the securities owner." *See In re Nat'l Golf Properties, Inc.*, 2003 WL 23018761, at *3 (C.D. Cal. Mar. 19, 2003). But there are no allegations suggesting Grabowski actively solicited any sales in the SPO, let alone to Plaintiff. *See, e.g.*, *Maine State Ret. Sys.*, 2011 WL 4389689, at *10 ("Plaintiffs must include very specific allegations of solicitation, including direct communication with Plaintiffs."); ¶ 28 ("Lead Plaintiff purchased 3,380 shares . . . *through Merrill Lynch Pierce Fenner & Smith*").[17]

## IV. CONCLUSION

For the foregoing reasons, the Motion should be granted with prejudice.

---

[16] This claim also fails because Plaintiffs fail to allege a material misstatement in the Registration Statement or Prospectus. *Maine State Ret. Sys.*, 2011 WL 4389689, at *8; *see supra* at 13–22.

[17] Because Plaintiffs fail to plead a primary violation, their control person claims necessarily fail as well. *See In re Rigel*, 697 F.3d at 886.

DATED: October 8, 2024

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Michael D. Celio*
Michael D. Celio

Attorneys for Defendants Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris