ROBBINS GELLER RUDMAN
   & DOWD LLP
X. JAY ALVAREZ (134781)
DOUGLAS R. BRITTON (188769)
JEREMY W. DANIELS (351347)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re XPONENTIAL FITNESS SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 8:24-cv-00285-JWH (KESx) <br><br> <u>CLASS ACTION</u> <br><br> LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS <br><br> DATE:  February 14, 2025 <br> TIME:  9:00 a.m. <br> CTRM:  9D <br> JUDGE:  Hon. John W. Holcomb |

4898-6921-7281.v3

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION................................................................................11

II. STATEMENT OF THE FRAUDULENT SCHEME ...................................13

III. LEGAL STANDARDS.........................................................................18

IV. PLAINTIFFS ADEQUATELY ALLEGE A SCHEME CLAIM UNDER RULE 10b-5(a) AND (c)................................................................19

V. DEFENDANTS' MISSTATEMENTS AND OMISSIONS.........................23

    A. Defendants' Statements About Xponential's KPIs and the Xponential Playbook Were False and Misleading............................24

        1. Defendants' Arguments About License Sales and Studio Openings Do Not Support Dismissal ......................................25

        2. Defendants' Arguments About AUVs Do Not Support Dismissal...............................................................................27

        3. Defendants' Arguments About the Xponential Playbook Do Not Support Dismissal........................................................28

    B. Defendants' Studio Closure and SBA Loan Statements Were False and Misleading .................................................................29

VI. PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER.........31

    A. Geisler and Meloun Acted with Scienter – They Ran the Company and Knew the Franchisees....................................................31

    B. The Scheme Involved Xponential's Core Operations ........................36

    C. Geisler and Grabowski's Stock Sales Support Scienter ....................37

    D. Geisler's Termination Amidst Criminal Investigations Concludes the Scheme and Supports Scienter....................................39

    E. Defendants' Suggested Inference Is Not Compelling ........................39

VII. PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION.................40

VIII. PLAINTIFFS SUFFICIENTLY ALLEGE §12(a)(2) CLAIMS AGAINST GRABOWSKI ...................................................................44

IX. CONCLUSION ................................................................................45

- 2 -

4898-6921-7281.v3

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abdo v. Fitzsimmons*,
 2018 WL 11220494 (N.D. Cal. May 22, 2018) ...................................................38

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
 2024 WL 4647297 (S.D. Cal. Oct. 31, 2024)................................................24, 26

*Apollo Grp, Inc. Sec. Litig.*,
 2011 WL 5101787 (D. Ariz. Oct. 27, 2011) .....................................................21

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ........................................................................................18

*Azar v. Yelp, Inc.*,
 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)....................................................39

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008)...........................................................................34

*City of Sunrise Firefighter's Pension Fund v. Oracle Corp.*,
 2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) .............................................26, 35

*Cmtys. Actively Living Indep. & Free v. City of L.A.*,
 2009 WL 10676002 (C.D. Cal. June 1, 2009)....................................................13

*Desai v. Deutsche Bank Sec. Ltd.*,
 573 F.3d 931 (9th Cir. 2009)...........................................................................23

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
 81 F.4th 918 (9th Cir. 2023)...........................................................................27

*ESG Cap. Partners, LP v. Stratos*,
 828 F.3d 1023 (9th Cir. 2016)..........................................................................40

*Feyko v. Yuhe Int'l Inc.*,
 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) .......................................................25

*FindWhat Inv. Grp. v. FindWhat.com*,
 658 F.3d 1282 (11th Cir. 2011)........................................................................44

4898-6921-7281.v3

**TABLE OF AUTHORITIES**

**Page**

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016)........................................................45

*Garcia v. J2 Glob., Inc.*,
   2022 WL 22717936 (C.D. Cal. Aug. 8, 2022) ....................................................34

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023)....................................................................*passim*

*Guevoura Fund v. Sillerman*,
   2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016) ....................................................18

*Hershewe v. JOYY Inc.*,
   2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) ......................................................21

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013) ................................................................................18

*Hodges v. Akeena Solar, Inc.*,
   2010 WL 3705345 (N.D. Cal. May 20, 2010) ....................................................38

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y. 2014)............................................................20, 21, 26

*Hong v. Extreme Networks, Inc.*,
   2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ....................................................25

*In re Accuray, Inc. Sec. Litig.*,
   757 F. Supp. 2d 936 (N.D. Cal. 2010).................................................................38

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ....................................................41

*In re Autodesk, Inc. Sec. Litig.*,
   132 F. Supp. 2d 833 (N.D. Cal. 2000).................................................................23

*In re Bally Total Fitness Sec. Litig.*,
   2007 WL 551574 (N.D. Ill. Feb. 20, 2007).........................................................34

- 4 -

4898-6921-7281.v3

**TABLE OF AUTHORITIES**

**Page**

*In re Banc of Cal. Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sept. 6, 2017)....................................................21

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012).............................................................22

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020).............................................................40, 43, 44

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008)........................................................21, 26

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991)..........................................................................31

*In re Corinthian Colls., Inc. S'holder Derivative Litig.*,
2012 WL 8502955 (C.D. Cal. Jan. 30, 2012)..................................................26

*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001) ..........................................................21

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005), *abrogation recognized
in part on other grounds by Glazer Cap. Mgmt., L.P. v.
Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023),
and *In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024)...................................................................32, 37

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022)..................................................39

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015)..........................................................18, 19

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024).................................................................*passim*

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019)..................................................23

4898-6921-7281.v3

# TABLE OF AUTHORITIES

**Page**

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ......................................................23

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014)....................................................................23

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011)...................................................................42

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................................22

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023).......................................................20

*In re Nat'l Golf Props., Inc.*,
2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ....................................................45

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022)..........................................................................27, 42

*In re Portal Software, Inc. Sec. Litig.*,
2006 WL 2385250 (N.D. Cal. Aug. 17, 2006)......................................................45

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017)...............................................................................37

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022).............................................21, 28, 30, 31

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ........................................................38

*In re Redback Networks, Inc. Sec. Litig.*,
2007 WL 4259464 (N.D. Cal. 2007),
*aff'd*, 329 F. App'x 715 (9th Cir. 2009) ..............................................................26

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)...................................................................22

- 6 -

**TABLE OF AUTHORITIES**

**Page**

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................... 18

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .................................................................. 23

*In re WageWorks, Inc., Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. June 1, 2020) ......................................... 39

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021) ............................................................ 43, 44

*Jiangchen v. Rentech, Inc.*,
    2017 WL 10363990 (C.D. Cal. Nov. 17, 2017) ..................................... 23

*Karam v. Corinthian Colls., Inc.*,
    2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ....................................... 22

*Lako v. Loandepot, Inc.*,
    2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ............................... 20, 26, 35

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ................................................................ 43

*Longo v. OSI Sys., Inc.*,
    2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ....................................... 36

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .................................................................. 43

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ................................................................................. 19

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) .......................................... 45

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................ 34

4898-6921-7281.v3

**TABLE OF AUTHORITIES**

**Page**

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007)................................................................36

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018).................................................................40, 41, 42

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020)..................................................................38

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015)....................................................................28

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)........................................................................32, 37

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014)...............................................................................43

*Patel v. Parnes*,
   253 F.R.D. 531 (C.D. Cal. 2008) .......................................................................23

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ...........................................................................................45

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014), *overruled on other groundsby*
   *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*
   *Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) .........................................*passim*

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)...............................................................................38

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)........................................................................25, 31

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
   119 F. Supp. 3d 1213 (C.D. Cal. 2015)................................................................21

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) .........................................................28, 30

4898-6921-7281.v3

**TABLE OF AUTHORITIES**

**Page**

*SEC v. Leslie*,
   2012 WL 116562 (N.D. Cal. Jan. 13, 2012) ........................................................28

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................27

*Snellink v. Gulf Res., Inc.*,
   870 F. Supp. 2d 930 (C.D. Cal. 2012)..................................................................21

*Sudunagunta v. NantKwest, Inc.*,
   2017 WL 8811116 (C.D. Cal. May 16, 2017)......................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..............................................................................................31

*Universal Health Servs., Inc. v. United States*,
   579 U.S. 176 (2016) ..............................................................................................24

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   57 F. Supp. 3d 950 (D. Minn. 2014) ....................................................................18

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*,
   2024 WL 1327247 (N.D. Cal. Mar. 27, 2024)......................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009).......................................................................... 38, 39

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §77k ...............................................................................................................*passim*
   §77l..........................................................................................................................45
   §77l(a)(2) ................................................................................................................44
   §78j(b) .............................................................................................................. 18, 44
   §78t(a)......................................................................................................................44
   §78u-4 ............................................................................................................... 18, 25

- 9 -

4898-6921-7281.v3

# TABLE OF AUTHORITIES

**Page**

Federal Rules of Civil Procedure
  Rule 8(a) ........................................................................................... 18, 25
  Rule 9(b) ...................................................................................... 18, 25, 40
  Rule 15(d) ................................................................................................ 13

16 C.F.R.
  §436.2 ................................................................................................ 15, 40
  §436.5 ......................................................................................................... 15

17 C.F.R.
  §240.10b-5(a) ................................................................... 11, 18, 19, 22
  §240.10b-5(b) .................................................................................. *passim*
  §240.10b-5(c) ............................................................................... 18, 19

64 Fed. Reg. 45150-01 ................................................................................ 28

4898-6921-7281.v3

## I.      INTRODUCTION

Defendants' Motion to Dismiss (ECF 67) (the "Motion" or "Mot.") challenges whether the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 39) (the "Complaint") meets the pleading requirements for Lead Plaintiffs Fort Lauderdale Police & Firefighters' Retirement System and City of West Palm Beach Police Pension Fund's ("West Palm Beach") (collectively, "Plaintiffs") scheme claims under U.S. Securities Exchange Commission ("SEC") Rule 10b-5(a) and (c), their misrepresentation claims under Rule 10b-5(b), and their strict liability claims under the Securities Act of 1933 (the "Securities Act").  While each claim involves a different pleading standard, defendants do not distinguish between any of them.  Instead, they ask the Court to *disregard* Plaintiffs' well-pled allegations, and then argue that Plaintiffs do not meet the highest standard of all claims.  Defendants' approach requires the Court to impermissibly lump all claims into one.  But even if the highest standard did apply to every claim, defendants do not address whether the allegations, if actually considered in their entirety and collectively as the law requires, meet those standards.  The reason they do not is apparent – the Complaint's allegations present a compelling case of securities fraud.

This case involves a classic pump and dump scheme between July 23, 2021 and May 10, 2024 (the "Class Period").  Defendants Anthony Geisler ("Geisler") and Mark Grabowski ("Grabowski"), who cobbled together a bunch of unique fitness studios to franchise under the label Xponential Fitness, Inc. ("Xponential" or the "Company"), took Xponential public through an initial public offering ("IPO") at a $12 per share price inflated by their scheme to defraud franchisees and investors, raising $120 million.  After the IPO, with the assistance of defendant John Meloun ("Meloun"), defendants told investors that Xponential was producing revenue growth based on "healthy" and "successful" franchisees as purportedly reflected in Xponential's expanding licenses sold, new studio openings, and average unit volumes ("AUVs") (collectively, "Key Performance Indicators" or "KPIs") – *all of*

- 11 -

*which depended on sales to or by franchisees*.  Their representations about "zero" studio closures and no Small Business Administration ("SBA") loan defaults added to the allure of the success and health of Xponential and its franchise base, and drove Xponential's stock price to an all-time high of over $33 per share.  Defendants Geisler and Grabowski then cashed in, selling more than $275 million at peak prices.  All in, defendants sold almost $400 million while Xponential's stock was artificially inflated.

In reality, defendants' statements about Xponential's franchise base were false and misleading when made.  Three lawsuits, two separate investigative reports, a short seller report, and two internal memoranda sent directly to Geisler shortly *before the Class Period*, all revealed the same thing – Xponential induced prospective franchisees into purchasing franchise licenses using false franchise disclosure documents ("FDDs") – which Xponential was required to deliver to *every* prospective franchisee – that contained lies about franchise profitability and omitted Geisler's long history of deception.  These separate and independent sources also revealed that Xponential's lies caused *widespread franchisee losses*, which defendants concealed using threats, intimidation, and the legal process to prevent studios from closing because, in Geisler's view, the "optics [of studio closures] would be harmful" to the brand.  Plaintiffs' own proprietary analysis of Xponential's brand-level financial performance substantiated these independent sources.

Defendants' scheme was first disclosed in a report by short seller, Fuzzy Panda Research ("Fuzzy Panda"), revealing that Xponential misled franchisees with false claims about profitability and by concealing Geisler's history of fraudulent dealings.  The report was supported by photos, videos, and links to supporting information and, with later disclosures, caused a collapse in Xponential's stock price, damaging investors.  While defendants complain about the reliability of the Fuzzy Panda report – and all of Plaintiffs' sources for that matter – they do not reconcile those reliability concerns with the civil and criminal investigations into the

- 12 -

same fraudulent scheme alleged here *or Geisler's resulting termination* amidst government investigations into "studio closures, communications with franchise owners, financial reporting, and insider trading policies."  Defendants' arguments for dismissal are not credible, especially considering that at the same time that they have asked this Court to disregard allegations as unreliable, they entered into a Consent Order with the Commissioner of Financial Protection and Innovation of the State of California on November 4, 2024 (the "Consent Order"), agreeing to pay a $450,000 fine for the same conduct alleged herein.[1]

The Complaint meets the heightened pleading standards for Plaintiffs' misrepresentations claims.  It also meets the lower standards for Plaintiffs' strict liability claims, and the standards required to plead scheme claims, which can be pled "in broad strokes."  Defendants' Motion should be denied.[2]

## II.   STATEMENT OF THE FRAUDULENT SCHEME

Geisler's pursuit of "massive" wealth through the franchise world led to his collaboration with Grabowski to buy out a private equity firm's stake in Xponential. ¶¶48, 53.[3]  With Geisler and Grabowski in complete control of Xponential, they devised a scheme to manipulate the franchise system and the investor market, enlisting Meloun to reiterate their false message.

---

[1]   Since the Consent Order was entered in November 2024, Plaintiffs could not have included its terms in the Complaint.  Plaintiffs have therefore moved to supplement the Complaint under Federal Rule of Civil Procedure 15(d) to include the terms of the Consent Order.

[2]   Plaintiffs do not oppose defendants' request for judicial notice of Exhibits 1-10. ECF 67-12. However, Plaintiffs object to the taking of the truth of the matters asserted in Exhibits 1-10. *See Cmtys. Actively Living Indep. & Free v. City of L.A.*, 2009 WL 10676002, at *8 (C.D. Cal. June 1, 2009) ("[W]hile a court may take judicial notice that a party made a statement in a document filed with the court, it should not ordinarily take notice of the truth of such statement.").

[3]   Unless otherwise noted, all "¶_" or "¶¶_" references are to the Complaint, emphasis is added, and citations are omitted.

- 13 -

***First***, Geisler and Grabowski launched Xponential with a growth at all cost strategy, collecting an array of "boutique" franchised fitness studios – ten franchise brands in all – to offer to investors in an IPO. ¶¶54-56. While the pandemic delayed the IPO, Geisler and Grabowski used it to their advantage, highlighting for investors 350 new studio openings between January 2020 and July 2021 claiming that "the power of our Xponential playbook" "enabled us to provide robust and ongoing support to franchisees even in the midst of a global pandemic." ¶55. Xponential completed its IPO in July 2021, selling ten million shares at $12 per share for proceeds of $120 million. ¶56.

***Second***, after the IPO, Geisler and Meloun created the appearance of revenue growth to drive Xponential's stock price higher, focusing investors on quarterly KPIs, including growing license sales, studio openings, and AUVs – a measure of annual studio sales. They reported expanding KPIs while telling investors that "[a]s our AUVs grow and as we increase the number of studios, we become more profitable." ¶57.

To inflate these KPIs, defendants targeted what Geisler called "'corporate refugees'" – people who "were tired of working the traditional 9-to-5." ¶¶3, 85, 224. They enticed these "'refugees'" with indulgence, flying them out to Irvine, driving them around in luxury sprinter vans, and offering them "[T]omahawk-cut steaks, fancy French wines and expensive tequilas." ¶59. Defendants then closed the deal by misrepresenting the profitability of Xponential's franchises. *Id.* Through either false FDDs or in direct sales pitches, defendants exaggerated studio revenue estimates while omitting or understating the costs to start and run a studio. ¶¶59-70, 80-84. The result was growing license sales, increasing studio openings, and expanding AUVs for Xponential, and extraordinary losses for franchisees. ¶¶84, 145-191.

Internal company documents confirm the scheme. ¶¶59-61, 65. In February 2020, Row House franchisees reported ***to Geisler*** in an internal memorandum that

- 14 -

"[t]he revenue estimates in the FDD do not appear to match the reality being experienced by many studios" and that "costs and build-out concerns being experienced by all studios . . . are not referenced in the original FDD." ¶59. And in June 2020, AKT franchisees told Geisler in a separate memorandum the same, stating that they "'were ripped off,'" "'[d]evelopment costs were $250k more for buildout then [sic] outlined in the FDD'" with "'unprofitable open studios, and deepening losses for both owners and Xponential.'" ¶¶60-61.

*Third*, Geisler concealed his long history of misleading investors and business associates despite Federal Trade Commission ("FTC") regulations *requiring* its disclosure. *See* 16 C.F.R. §§436.2, 436.5; ¶¶85-95. From his involvement as CEO of Interactive Solutions Corp., which utilized a Bangkok boiler room busted by a multi-national police effort to peddle its stock (¶¶86-88), to being held liable in multiple lawsuits alleging fraud and/or misrepresentation at L.A. Boxing (¶¶89-92), and even in his interaction with the founders of Xponential's StretchLab brand (¶¶93-94), Geisler had a history of deception that he concealed from prospective franchisees. These omissions inflated Xponential's KPIs – franchisees have stated that "[h]ad Defendants disclosed the Fraud Lawsuits, Plaintiffs would not have signed their respective Agreements." ¶95.

*Fourth*, Geisler and Meloun convinced investors that Xponential's franchisees were happy and strong financially to signal sustainable revenue growth. ¶96. They broadcasted the false message that Xponential had "never permanently closed [a] store" (¶¶97, 197), explaining that closures were "the way to really think about how healthy are our franchisees." ¶97. They added that "zero closed stores" meant that Xponential had "a great business model that actually works" (*id.*) and boasted that "[o]ur franchisees have also borrowed over $200 million from the SBA without any non-repayments under our ownership" (¶98).

These claims were untrue. ¶99. Xponential had experienced many permanent studio closures and numerous franchisees, in fact, had defaulted on SBA loans.

- 15 -

4898-6921-7281.v3

¶¶100-101, 192-214. Reports from franchisees to *The Capitol Forum* and by the franchisees behind the AKT lawsuit in 2023, as well as the February 16, 2020 Row House memorandum to Geisler, revealed financially distressed franchisees, warned of imminent studio failures, and confirmed actual and permanent studio closures. ¶¶99-100. Contemporaneous SBA data confirmed many SBA loan defaults. ¶101.

*Fifth*, Xponential, Geisler, and Meloun manipulated store closures. Given their message about healthy franchisees (¶¶97, 103, 108), these defendants could ill afford to have even a single franchisee close. ¶109. But they did. And, according to franchisees, "investors [weren't] seeing studio closures because the company [wasn't] allowing them." ¶105. Defendants actually took steps to prevent or conceal studio closures, consistent with Geisler's view that closures are "harmful" optics. ¶¶105, 116. So instead of permanently closing failed studios, Xponential took them back (for pennies on the dollar), labeled them "transition" studios, and then dumped them back on franchisees with more false promises about profitability. ¶¶103-112. Franchisees have even reported that "they were deceived into believing that the businesses could be rehabilitated." ¶108.

This artifice also involved manipulation to conceal any outward sign of franchisee financial distress. Geisler himself monitored Facebook for dissent and "threaten[ed] . . . fines as high as $100,000 for criticizing the company" for "'say[ing] something that doesn't make him [Geisler] look good.'" ¶113. He even threatened a multi-brand franchisee at a mediation after taking his studios, stating "'I'm going to cut your f[***]ing head[] off and mount [it] on [a] pike[] in front of the building'" and that "'"[t]his is what happens when you [f**]k with Anthony Geisler."'" ¶¶113-116, 122. And he even disparaged the founder of Xponential's AKT brand Anna Kaiser when she refused to keep a failing studio open, telling her that "if [she] closed the NOMAD studio, it would be [her] 'Pearl Harbor' moment." ¶116. These tactics and others like them helped defendants keep the truth concealed

- 16 -

just long enough for defendants Geisler and Grabowski to sell massive amounts of stock, in the final artifice of the scheme.

*Sixth*, defendants sold a truly extraordinary amount of stock while actively concealing franchisee distress. Defendants raised $120 million for Xponential through the IPO while Geisler and Grabowski later added another $275 million to the take – $55.6 million for Geisler and $219.8 million for Grabowski. ¶¶127-129. All told, defendants sold almost $400 million of inflated Xponential stock based on their fraudulent scheme. ¶127. And Geisler and Grabowski's sales were, indeed, suspicious. Their sales were made at or near then-peak prices and represented large chunks of their holdings – Geisler sold 79% of his Class A common stock and 23.3% of all of his holdings, while Grabowski sold 59.1% of his Class A common stock and 40.9% of his Class B common stock. ¶129.

Soon after defendants' massive sell-off, the deception behind their scheme began to unravel outside of their control. On June 27, 2023, the Fuzzy Panda report revealed the truth that the Company was misleading prospective franchisees with false FDDs and that eight of ten Xponential brands were losing money monthly. ¶¶8, 131-132. After Xponential immediately denied the report (¶¶9, 135), BofA Securities, Inc. ("BofA"), based on its own investigation, confirmed on November 1, 2023, that at least four of Xponential's studios "may not be profitable" and just two brands were "driving near-term" KPIs. ¶¶12, 138. A month later, on December 7, 2023, *Bloomberg* disclosed, based on its own investigation, that Xponential franchisees were misled into signing franchise agreements that caused a "financial nightmare" and that the SEC had begun an investigation. ¶¶14, 140. Then, in May 2024, Xponential announced that Geisler had been suspended indefinitely amid probes into the Company's business by the SEC, the United States Attorney's Office, and state regulators. Xponential's stock collapsed in response to each of these disclosures, closing below $10 per share. ¶¶15, 139, 141, 143.

- 17 -

4898-6921-7281.v3

## III.   LEGAL STANDARDS

The standards governing a motion to dismiss are well established.   A complaint need only contain sufficient facts to state a claim that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Claims brought under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act are treated differently.   SEC Rule 10b-5(b) prohibits fraudulent misstatements and omissions and is subject to a heightened pleading requirement under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").   Rule 10b-5(a) and (c), which prohibit schemes to defraud, are subject to a less demanding standard.   For those claims, Plaintiffs "'need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014).   Instead, scheme claims can be alleged "'in broad strokes.'" *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016).

The standard for claims brought under the Securities Act is "'relatively minimal.'"   *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013).   A complaint need only "contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023).[4]

---

[4]   Defendants argue that the Complaint is grounded in fraud, triggering a heightened pleading standard for all claims.  Mot. at 13.  But they overlook that there is "a clear conceptual separation in the complaint between claims sounding in negligence [¶¶263-316] and those sounding in fraud." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006).  Federal Rule of Civil Procedure 8(a) applies where, like here, the §11 allegations are "sufficiently different" from §10(b) allegations. *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8811116, at *6 (C.D. Cal. May 16, 2017).

- 18 -

## IV. PLAINTIFFS ADEQUATELY ALLEGE A SCHEME CLAIM UNDER RULE 10b-5(a) AND (c)

Rule 10b-5(a) prohibits "any device, scheme, or artifice to defraud," and Rule 10b-5(c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5(a), (c). "Because 'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient . . . .'" *Galena*, 117 F. Supp. 3d at 1193. "To be individually liable, each defendant must have committed a deceptive or manipulative act in furtherance of the scheme." *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*, 2024 WL 1327247, at *13 (N.D. Cal. Mar. 27, 2024).[5]

The Complaint meets each of these standards. It pleads the **nature** of the scheme by detailing how defendants employed six "artifices" to create the false impression that Xponential's business model was creating successful franchisees who were buying franchise licenses, opening studios, and driving Xponential's revenue growth, as reflected in the Company's growing KPIs. ¶¶3, 53-129. The **purpose** of their scheme was to drive Xponential's stock price up so that the Company, along with founders Geisler and Grabowski, could cash in by selling almost $400 million of stock. ¶¶127-130. The **effect** of the scheme was that investors were deceived into driving Xponential's stock price to all-time highs. ¶¶2-3. And each defendant took active steps to further the scheme. Xponential, Geisler, and Meloun misled franchisees and misrepresented the nature of Xponential's business. ¶¶57-126. And Xponential, Geisler, and Grabowski sold

---

[5]   Defendants state generally that "[i]t is important to recognize" that their scheme did not involve "wash sales, matched orders, or rigged prices." Mot. at 22. But as explained in *Galena*, "broad language" from the Ninth Circuit "supports the conclusion that manipulative conduct includes more than only wash sales, matched orders, or rigged prices." 117 F. Supp. 3d at 1195. It is settled that "[t]hese provisions capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019).

- 19 -

large quantities of stock at inflated prices.  ¶¶2, 127-129.  These allegations are sufficient.

Defendants invite the Court to disregard allegations because of baseless attacks on the investigation of counsel, arguing that "Plaintiffs' allegations cannot proceed because they are based on an anonymous short seller report and news articles quoting anonymous franchisees."  Mot. at 23.[6]  Defendants also state that Plaintiffs rely heavily on other lawsuits that are "not sufficiently reliable to satisfy Plaintiffs' pleading burden." Mot. at 24.  Defendants are misguided for two reasons.

First, Plaintiffs' counsel here clearly conducted a reasonable factual investigation as established by the numerous cross-corroborating sources alleged in the Complaint.  *Lako v. Loandepot, Inc.*, 2023 WL 444151 at *6 (C.D. Cal. Jan. 24, 2023) (declining to strike allegations drawn from a separate complaint because additional sources of evidence cited in the instant complaint "further corroborates the allegations"); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (separate sources "report[ing] a consistent pattern of behavior [gives] the Court . . . more faith in their accuracy").  Defendants label counsel's investigation as  "secondhand accounts" of anonymous sources, but offer *zero* authority to support their criticism.  Mot. at 23-24.  Indeed, courts hold that "[c]ounsel need not conduct a *separate* investigation into . . . article[s] to corroborate [their] contents."  *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *8 n.3 (W.D. Pa. May 18, 2023) (emphasis in original).  Plaintiffs' independent sources, which rely on the Company's internal documents and corroborate each other, support the

---

[6]  Defendants are mistaken that courts refuse to credit allegations based on anonymous sources. Mot. at 23.  Courts routinely do so when those sources are in a position to know the information attributed to them.  *Glazer*, 63 F.4th at 771 ("Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made.").  Defendants' authority does not hold that anonymous sources are per se unreliable, as they suggest.  Mot. at 23.  In this case, each franchisee is cited only for their personal experiences.  They are clearly in a position to know the information attributed to them.

- 20 -

4898-6921-7281.v3

reliability of Plaintiffs' allegations and their investigation. They also undermine defendants' attempt to discredit references in the Fuzzy Panda report based on the motivations of a short seller. *Compare* Mot. at 24, *with Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report . . . to allege falsity at the pleading stage.") (collecting cases); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *7 (C.D. Cal. Sept. 6, 2017) (same).[7]

Second, reliance on others' allegations is ***expressly permitted*** in securities cases when, like here, "they are combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations." *Homeward Residential*, 298 F.R.D. at 126; *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1080 (N.D. Cal. 2001) (plaintiff may combine own allegations with allegations from an SEC complaint). Defendants' authority is in accord. Mot. at 24 (citing *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (emphasis in original) (striking SEC complaint that "appears to be ***the only basis*** for the allegations against defendants Yaroshinsky and Zak and certain other allegations")). Here, Plaintiffs' reliance on numerous independent corroborating sources, including internal documents, resolves any question about the investigation and the reliability of Plaintiffs' allegations.[8]

---

[7] Defendants cite *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *4 (C.D. Cal. Nov. 5, 2021), to argue that Plaintiffs cannot rely on a short seller report. Mot. at 24. Not true. Courts routinely hold that plaintiffs can base allegations on short seller reports where there is indicia of reliability. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022) (crediting short seller report as reliable where "the report interview[s] nine former QuantumScape employees about QuantumScape's testing and four experts about its conclusions"). *Hershewe* holds the same. 2021 WL 6536670, at *4-*5. Unlike the short seller report in *Hershewe*, which "hardly discusse[d] its purported sources at all" (*id.* at *5), the Fuzzy Panda report here is replete with verifiable and corroborated information, providing the indicia of reliability missing in *Hershewe*. ¶¶41-42, 86-87, 130-132.

[8] Defendants cite *Apollo Grp, Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011), and *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1262 (C.D. Cal. 2015), for the broad proposition that allegations from other complaints can never be used in a complaint. Mot. at 24. But "[i]t makes little sense

- 21 -

4898-6921-7281.v3

Defendants argue that the Complaint does not contain specific facts "concerning Defendants' alleged misrepresentations to potential franchisees" as well as the Company's "alleged interference with store closures." Mot. at 25. Not true. The Complaint describes how defendants deceived prospective franchisees, including through the use of false FDDs and threats of retaliation to prevent studio closures, alleges who was involved in the fraudulent sales, who interfered with studio closures, provides context, and shows how every franchisee was deceived because they each received a false FDD. ¶¶54-126. More particularity is not required. *Glazer*, 63 F.4th at 769 ("Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one.").[9]

Defendants argue that they "could not have concealed Geisler's alleged 'fraudulent history'" because the lawsuits against Geisler "were public well before the Class Period." Mot. at 25. Defendants misconstrue Plaintiffs' allegations. FTC regulations required Geisler to affirmatively disclose the lawsuits to ***prospective***

---

to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012). Plaintiffs rely on the other complaints to corroborate the franchisees' testimonials from *The Capitol Forum* and *Bloomberg*, which is permissible. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (newspaper articles are "reasonable source[s] of information and belief allegations"). They also do not raise similar reliability concerns since the franchisees are named in the complaints.

[9] Defendants' authority is inapposite. Mot. at 25. Neither case addressed claims under Rule 10b-5(a) nor (c), which are subject to a lower pleading standard than claims under Rule 10b-5(b). And in *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016), unlike here, "Plaintiffs rel[ied] on conclusions and labels to allege that groups of contracts were fraudulent." *Id.* at 398-400. *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135 (C.D. Cal. Aug. 20, 2012), does not help defendants. There, anecdotal accounts of confidential witnesses at individual campuses were insufficient to support allegations of widespread misconduct. *Id.* at *7. Here, by contrast, Plaintiffs have alleged specifics showing that defendants' scheme was causing widespread losses in as many as eight of Xponential's ten brands and alleged that the false and misleading FDDs were provided to every prospective franchisee, as required by FTC regulations. ¶¶4, 8, 59-84.

- 22 -

4898-6921-7281.v3

*franchisees* in Xponential's FDDs. ¶¶4, 90-95. By hiding them, Geisler in turn misled investors about the foundation of Xponential's business. ¶95. For this reason, *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009), is irrelevant. Mot. at 25. What "remain[ed] undisclosed to the general public" (*id.* at 941) in this case was defendants' Company-wide scheme to mislead franchisees to inflate Xponential's license sales.[10]

## V.   DEFENDANTS' MISSTATEMENTS AND OMISSIONS

Under Rule 10b-5(b), it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the true circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). Section 11 of the Securities Act prohibits the same in the context of a registration statement. 15 U.S.C. §77k. A complaint alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).[11]

---

[10]   Defendants point to the AKT lawsuit in 2021 to argue that the scheme was public. Mot. at 25. While public, it was not a "complete source of the relevant information . . . that Plaintiffs claim was omitted." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *12 (N.D. Cal. Dec. 22, 2016). And since defendants denied the allegations, the "'truth' was not conveyed to the public in a manner to sufficiently undermine the allegedly misleading statements." *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *28 (E.D.N.Y. Sept. 27, 2019).

[11]   Defendants label the Complaint a "puzzle." Mot. at 14. It is not. The Complaint specifies each statement, emphasizes what is false in bold and italics, and discusses why those statements were false and misleading. ¶¶145-221. Since "Defendants can [and have] parse[d] out with relative ease the statements at issue and the reasons as to why they are alleged to be false and misleading," the Complaint is sufficient. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). Defendants' authority is inapposite. Mot. at 14-15 (citing *Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at *7 (C.D. Cal. Nov. 17, 2017) (multiple page block quotes, "inconsistent use of emphasis," and references to "'the above statements'" "left the Court and Defendants to decipher which statements are false and misleading"); *Patel v. Parnes*, 253 F.R.D. 531, 552 (C.D. Cal. 2008) (allegations of falsity not tied to particular statements); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000) (same)).

- 23 -

4898-6921-7281.v3

## A.   Defendants' Statements About Xponential's KPIs and the Xponential Playbook Were False and Misleading

Throughout the Class Period, defendants focused analysts and investors on a positive "AUV" metric – which they claimed is "the most direct measure of the health of our franchise system" – and on increasing license sales and studio openings.  ¶¶145-191.  They said that these expanding KPIs resulted from the Xponential playbook, which defendants claimed was "designed to help franchisees achieve compelling [AUVs], strong operating margins and an attractive return on their invested capital." *Id.*  Defendants made these statements in Xponential's SEC filings and on conference calls (*id.*) and repeated them in the registration statement for the April 6, 2022 secondary offering ("SPO") (¶¶285-292).

Defendants' statements were false and misleading when made.  Defendants concealed from investors that Xponential's reported KPIs were dependent upon a scheme that inflated license sales and studio openings through unlawful means, including by misrepresenting revenue and startup costs through FDDs that Xponential was required to provide to every franchisee in the Company.  ¶¶186-191.  Defendants, in fact, actively concealed that franchisees who had bought into defendants' claims about the promises of the Xponential playbook were thus suffering heavy losses because of defendants' misrepresentations.  *Id.*  Defendants' statements created a misleading picture of Xponential's core business.  *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 2024 WL 4647297, at *9 (S.D. Cal. Oct. 31, 2024) (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016)) ("'"representations that state the truth only so far as it goes, while omitting critical qualifying information,"' or half-truths, are actionable").

- 24 -

4898-6921-7281.v3

These allegations contradict defendants' assertion that Plaintiffs' claims do not satisfy the heightened pleading standards required by Rule 9(b) and the PSLRA. Mot. at 32.  They also clearly satisfy Rule 8 for Plaintiffs' Securities Act claims.[12]

### 1. Defendants' Arguments About License Sales and Studio Openings Do Not Support Dismissal

Defendants argue that the facts they omitted "are entirely unrelated to the challenged statements about accurate business metrics."  Mot. at 15.  They are not. Xponential depended upon sales to prospective franchisees for its false and misleading reporting of quarterly KPIs.  ¶¶145-191.  Defendants' scheme is thus directly related to their statements about the foundation of Xponential's business. "'[O]nce defendants chose to tout' positive information to the market, 'they [were] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information."  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).[13]

Defendants next argue that Plaintiffs cannot support their claims by "lifting wholesale allegations from separate, unadjudicated lawsuits."  Mot. at 15-16, 22 n.12.  But as discussed above, defendants misstate the law.  *See* §IV, *supra*.  And they misstate the Complaint.  Since Plaintiffs corroborate the allegations from other lawsuits with internal documents, franchisee interviews with both *The Capitol Forum* and *Bloomberg*, mass studio closure announcements following the Fuzzy Panda disclosure, and government investigations into the same issues presented in

---

[12]  Defendants' tracing arguments do not support dismissal of West Palm Beach's §11 claim.  Mot. at 14 n.4.  West Palm Beach purchased shares directly in the SPO and will have "no such difficulty" tracing its purchase to that offering.  *Feyko v. Yuhe Int'l Inc.*, 2013 WL 816409, at *6 (C.D. Cal. Mar. 5, 2013).  This fact distinguishes defendants' authority.  Mot. at 14 n.4.  Defendants "one person" class argument is baseless.  Every investor that bought directly in the SPO, at a minimum, is a member of the class.

[13]  Defendants' reliance on *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017), is misplaced.  Mot. at 15.  There, the confidential witnesses did not conflict with, and in instances, supported the statements plaintiffs alleged were false.  Franchisee reports here do not do the same.

- 25 -

the Complaint (¶¶54-126, 130-132, 138-143), Plaintiffs have not lifted allegations "wholesale."  Reliance on those allegations is proper.  *Lako*, 2023 WL 444151, at *6; *Homeward Residential*, 298 F.R.D. at 126.[14]

Defendants also state that Plaintiffs cannot allege falsity based on their "supposed obligation to disclose unadjudicated wrongdoing."  Mot. at 16.  They misconstrue Plaintiffs' allegations.  Plaintiffs allege that defendants schemed to mislead *franchisees* through FDDs that were required to, but did not, disclose Geisler's lawsuits and that franchisees would not have purchased franchise licenses had they known the truth.  By omitting that Xponential's reported KPIs were based on a fraudulent scheme to mislead franchisees, defendants misled investors.  ¶¶145-191; *Alger Dynamic*, 2024 WL 4647297, at *9 ("half-truths[] are actionable").[15]

Finally, Defendants argue that Plaintiffs have failed to allege the "underlying facts and methodology" for the proprietary analysis supporting their falsity allegations. Mot. at 16-17, 22 n.12.  Not true.  As the Complaint alleges, the analysis is based on data from Xponential's FDDs and SEC filings and on "breakeven" estimates from the Company and numerous analysts.  Complaint, Exs. C-E.

---

[14] Defendants' authority is inapposite.  In *In re Corinthian Colls., Inc. S'holder Derivative Litig.*, 2012 WL 8502955 (C.D. Cal. Jan. 30, 2012), the Court held that plaintiffs could not rely solely on allegations made in a separate lawsuit "[i]n an effort to save the FAC."  *Id.* at *6.  And as discussed in §IV, *Connetics* similarly granted a motion to strike an SEC complaint where it "appear[ed] to be *the only basis* for the allegations."  542 F. Supp. 2d at 1005 (emphasis in original).  Here, by contrast, the lawsuits are among numerous cross-corroborating sources that support Plaintiffs' claims.

[15] Defendants' "unadjudicated wrongdoing" authority is thus irrelevant.  Mot. at 16. Plaintiffs here allege that defendants misled *franchisees* by concealing Geisler's deceptive past, which in turn misled investors.  Defendants' use of false FDDs refutes their assertion that they simply used "aggressive sales techniques."  *Id.* Defendants' authority does not support their argument.  In *City of Sunrise Firefighter's Pension Fund v. Oracle Corp.*, 2019 WL 6877195 (N.D. Cal. Dec. 17, 2019), the court held that "investors *would have been* interested to know that 'a material driver' of Cloud Sales was Oracle's Sales Practices."  *Id.* at *15.  And in *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 4259464 (N.D. Cal. 2007), *aff'd*, 329 F. App'x 715 (9th Cir. 2009), the sales practices resulted in real sales and were irrelevant to a claim challenging the "'accurate reporting of revenues.'"  *Id.* at *3. Plaintiffs here are not challenging the accuracy of Xponential's revenue.

- 26 -

Plaintiffs do not impermissibly "cherry-pick data" nor "mix-and-match metrics across data sources," as defendants contend.  Mot. at 17 n.6.  This is sufficient at the pleadings stage.  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1137-38, 1141 (N.D. Cal. 2017) (defendants' "problems with Plaintiff's calculations" "should . . . not [be resolved] at the motion to dismiss phase").[16]

### 2.    Defendants' Arguments About AUVs Do Not Support Dismissal

Having admitted publicly that Xponential removed failed studios from its reported AUV metric (¶135), defendants contend that Xponential's AUV definition "disclosed the *very* information that Plaintiffs allege were omitted." Mot. at 19-20 (emphasis in original).  It did not.  While the Company's definition "included studios that had been open for the past 13 months," it did not reveal that the calculation excluded failed studios.   ¶¶135, 189.   A reasonable investor would interpret Xponential's AUV definition to mean that new studios were not included in the calculation, not that failed studios were removed.  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1182 (9th Cir. 2024) ("whether a statement is misleading is considered from the vantage of a reasonably diligent investor").

Defendants argue that the AUV metric and Geisler's statements about SBA loan defaults were immaterial.  Mot. at 20 (original emphasis omitted) (citing "'0.9% change to the AUV figure'" and "a quarter of one percent" of money borrowed).  But they ignore their representations to investors that these metrics reflected the Company's and its franchisees' financial health.  ¶¶145-191.  Combined with their scheme to mislead franchisees, including through interfering with studio closures, the omissions were *qualitatively* material and would have significantly altered the

---

[16]  Defendants' reliance on *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), and *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022), is misplaced.  Mot. at 17.  As defendants acknowledge, *NVIDIA* supports the use of the very type of economic analysis alleged in the Complaint.  81 F.4th at 930-32.  And the expert in *Nektar*, unlike here, "provided no plausible justification for [his] assumptions."  34 F.4th at 837.

- 27 -

total mix of information available to investors. *SEC v. Leslie*, 2012 WL 116562, at *7 (N.D. Cal. Jan. 13, 2012) (even "relatively small" numbers can be material where they are "significant indicators of the company's health"); *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 974 (N.D. Cal. 2015) (CEOs theft of "quantitatively immaterial" amounts are material where a reasonable investor would consider them as having "'significantly altered the "total mix" of information'"). As the SEC explains, an assessment of materiality must consider "all relevant . . . qualitative factors" and there is "no basis" for relying "exclusive[ly] . . . on [a] percentage or numerical threshold." SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150-01 (Aug. 19, 1999).[17]

### 3. Defendants' Arguments About the Xponential Playbook Do Not Support Dismissal

Defendants argue that their statements about the Xponential playbook were not misleading because Xponential disclosed the risk that "not all franchisees would achieve financial success." Mot. at 20-21. But that is not what the Complaint alleges defendants concealed. The ***facts*** concealed were that defendants misled prospective franchisees into purchasing licenses and opening studios, rendering the playbook irrelevant. And the ***risks*** concealed were those that materialized – investigative reporters uncovering the truth, franchisee lawsuits, governmental enforcement actions, criminal investigations, and terminations of key executives. ¶¶130-143. Xponential's warnings about success not being guaranteed (Mot. at 21) did not drop "'the risk of real deception . . . ***to nil***.'" *QuantumScape*, 580 F. Supp. 3d at 734 (emphasis in original). Since defendants misstate the concealed risks, their

---

[17] Defendants cite *SEB Inv. Mgmt. AB v. Align Tech., Inc.* 485 F. Supp. 3d 1113 (N.D. Cal. 2020), to argue that Plaintiffs have "omitt[ed] the entire context of the statement" by not addressing the definition of AUV. *Id.* at 1125-26; Mot. at 20. Not true. Plaintiffs have identified a qualitatively material omission since defendants told investors to use the AUV metric to gauge Xponential's financial performance. ¶¶57, 145, 175, 181. Defendants' authority did not address qualitative materiality and, unlike here, involved accounting fraud claims. Mot. at 20.

- 28 -

"disclosure" authority is inapposite.  Mot. at 21 & n.11.  Disclosures about generic risks do not undermine Plaintiffs' Exchange Act or Securities Act claims.  *Id.*

Defendants contend that their Xponential playbook statements are protected by the PSLRA's safe harbor because they reference "year two of operations" and amount to puffery because they include terms like "compelling," "strong," and "attractive."  Mot. 22.  Neither argument works.  "Year two of operations" is not what Plaintiffs allege was misleading.  ¶¶145, 150, 160.  It was assertions about the playbook's effect on Xponential's business and on franchisee performance that misled investors.  *Glazer*, 63 F.4th at 774 ("statements [that] describe past and current conditions" not protected by the safe harbor).  Contrary to defendants' authority (Mot. at 22), the presence of optimistic terms does not render an entire statement puffery.  *Glazer*, 63 F.4th at 770-71 (statements not puffery where they "went beyond mere optimism by 'provid[ing] a concrete description of the past and present state of the pipeline'").

**B.      Defendants' Studio Closure and SBA Loan Statements Were False and Misleading**

A key part of defendants' scheme was convincing franchisees and investors that Xponential's existing franchisees were successful as a result of its business model.  To do this, Geisler and Meloun told both franchisees and investors that Xponential had never had a permanent studio closure or even a single default on an SBA loan.  ¶¶192-203.  They also told investors studio closures were "the way to really think about how healthy are our franchisees."  ¶¶97, 201.  But these claims were outright false.  Xponential's franchisees had experienced numerous permanent studio closures and SBA loan defaults specifically because of defendants' scheme (¶¶204-214).  *Glazer*, 63 F.4th at 764 ("[a] statement is false . . . if it 'directly contradict[s] what the defendant knew at the time'").  The Complaint's specifics refute defendants' contention that the allegations are not particular.  Mot. at 17.

- 29 -

4898-6921-7281.v3

Defendants concede that Xponential had closed studios, but argue that it never did so ***permanently*** and instead transferred them to other franchisees or operated them as Company-owned studios. *Id.* They also argue that Plaintiffs ignore the full context, citing discussions on Jim Cramer's Mad Money show to deny that Geisler stated that "'[w]e've actually never had a closure' of a [franchisee] studio." *Id.* at 18. But it is defendants that ignore context. Geisler's comment about "transfer[ring] to somebody else" was in the context of terminating a franchisee, not a revelation that franchisees were failing financially. ¶203. He even stated that franchisees in this process "typically sell at three and a half to four times EBITDA," which was simply untrue. *Id.* Defendants' distinction between permanent closures ***at Xponential*** instead of ***at the franchisee level*** is meaningless since they told investors to use closures to gauge ***franchisee*** financial health. Mot. at 19; *see Genius Brands*, 97 F.4th at 1182 (falsity pled based on how "[a] diligent investor would have taken that representation").[18]

Defendants cite disclosures explaining that the Company "would terminate franchise agreements where a franchisee failed to meet contractual obligations," and "take ownership . . . for a limited time to 'facilitate the transfer of these studios to new or existing franchisees,'" stating that they "never allowed an individual studio within its network to fail." Mot. at 17-18. But disclosures are only sufficient if they "discredit the [allegedly misleading statement] so obviously that the risk of real deception ***drops to nil***." *QuantumScape*, 580 F. Supp. 3d at 734 (emphasis in

---

[18] Defendants' reliance on *Align* to argue that Plaintiffs have "cherry-picked" their false statements is misplaced. Mot. at 18. There, the court held that plaintiff offered an "implausible interpretation" where it had "omit[ted] the entire context of the statement." *Align*, 485 F. Supp. 3d at 1125-26. Plaintiffs have not done that here. While defendants cite to disclosures or quibble with what Geisler actually said, they do not provide any context that would make Plaintiffs' interpretation implausible. Mot. 18.

- 30 -

original).  Here, the disclosures were insufficient.  Franchisees closed failing studios because of false FDDs, not because they "failed to meet contractual obligations."[19]

## VI.  PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

Scienter is "a mental state that . . . covers 'intent to deceive, manipulate, or defraud' [and] 'deliberate recklessness.'"  *Schueneman*, 840 F.3d at 705.  A defendant is deliberately "'reckless if he [or she] had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he [or she] could have done so without extraordinary effort.'"  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).  "The inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original).

### A.   Geisler and Meloun Acted with Scienter – They Ran the Company and Knew the Franchisees

Geisler clearly acted with scienter.  He was the founder and top executive at Xponential who, being "critical to the development of [Xponential's] business" interacted closely and regularly with both prospective and existing franchisees.  ¶¶224-229, 231.  He was also directly involved in the very false and misleading sales

---

[19]  Defendants cite *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), to argue that their disclosures in SEC filings and FDDs about "tak[ing] ownership" of a large number of studios means that their statements were not false.  Mot. at 18-19.  *Convergent* is inapposite.  It merely holds that an omission is misleading if the information has not entered the market.  *Convergent*, 948 F.2d at 512.  And here, it had not.  Since the Company's message was that it was terminating franchise agreements because of "contractual obligations," these disclosures could not "discredit the [allegedly misleading statement] so obviously that the risk of real deception ***drops to nil***."  *QuantumScape*, 580 F. Supp. 3d at 734 (emphasis in original).  They said nothing about franchisees closing permanently because of defendants' false and misleading FDDs.

4898-6921-7281.v3

pitches to prospective franchisees, lured them in with indulgence, and then closed the deals with false claims about profitability (¶¶59, 67, 224). *Glazer*, 63 F.4th at 772 (strong inference of scienter where plaintiff alleged that defendants "themselves participated in the . . . pressure campaign").

Further, Grabowski placed Geisler "'on calls every week with the franchisees'" during the pandemic and Geisler himself acknowledged having wired "free money to franchisees" that needed help "for the first 13-14 months of CycleBar," a direct admission to knowledge of franchisee financial condition. ¶225. Geisler was also involved in threatening franchisees, including those who sought to close their studios because closing a studio would "harm[]" the brand. ¶¶113-116, 122, 226. He even admitted to personally monitoring the Company's Facebook page to "provide support," although *Bloomberg* reported that he did so to track any sign of dissent. ¶¶113, 227. This level of involvement directly with franchisees raises a strong inference of scienter. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("[S]pecific admissions from top executives that they are involved in every detail of the company . . . are factors in favor of inferring scienter in light of improper accounting reports."), *abrogation recognized in part on other grounds by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023), *and In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171 (9th Cir. 2024).

Geisler also had actual knowledge that Xponential's FDDs were false. Franchisees in two different Xponential brands sent internal memoranda **directly to Geisler before the IPO** explaining that Xponential's FDDs made false profitability claims and were causing widespread financial ruin. ¶¶5, 59-61, 65, 84, 99, 229. These memoranda, alone raise a strong inference of Geisler's scienter, and through him, Xponential's. *Glazer*, 63 F.4th at 773 ("inference of scienter is bolstered by Plaintiffs' allegations that [CEO] had access to information about the sales pipeline . . . through internal reports"); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("[t]he most direct way to show" the

- 32 -

4898-6921-7281.v3

party making the statement knew it was false is through "contemporaneous reports or data, available to the party, which contradict the statement").

CFO Meloun also knew or recklessly disregarded that his statements about Xponential's KPIs and studio closures were false and misleading. ¶¶228-231. Like Geisler, Meloun was one of the two top executives at Xponential that had direct experience in the franchise industry and would thus have known about the limitations on FDD disclosures, including their use in the sales process (¶228). *Reese*, 747 F.3d at 570-72 (scienter adequately alleged where position and qualifications gave executive "every reason to review" corrosion monitoring and left "little room for misunderstanding" data). Meloun was also listed as CFO in the false and misleading FDDs that Xponential used to sell franchise licenses, which stated expressly that they were provided to help prospective franchisees "make up [their] mind[s]" about buying a franchise. ¶230. They also included the very information that defendants used to mislead franchisees – profitability metrics, initial investment costs, franchise fees, and financing arrangements. *Id.* This direct involvement in the sales process raises a strong inference of Meloun's scienter. *Glazer*, 63 F.4th at 772 (scienter alleged where defendant "participated in the alleged pressure campaign").

Meloun has also admitted knowing about the financial condition of Xponential's franchisees. He stated publicly that the Company had sold transition studios that were "'already in trouble'" and represented that they had decided to switch strategies and allow studios to fail because reselling them was "'not a wise strategy.'" ¶¶134, 233-234, 236; *Glazer*, 63 F.4th at 779-80 (executive's admission of a phone call about not closing merger "sufficient to raise a strong inference that Defendants knew of the possibility of misleading shareholders by stating . . . '[w]e look forward to completing our pending transaction'"). And the timing strengthens the inference. Meloun made these admissions immediately before the Company disposed of unprofitable studios in mass numbers (¶¶134, 235) and just three months

- 33 -

after he told investors that "we don't have closures in our studios" and that "if [franchisees] weren't making money, they'd be going away . . . [a]nd obviously, they're not because we haven't had any closures in the system." ¶201. Meloun's admissions and the timing demonstrate a strong inference of his scienter. *Reese*, 747 F.3d at 575 ("three to six months" between "the statements and the contradictory disclosures" supports scienter); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) ("'temporal proximity'" indicates "that defendants knew about the [problem] when they made the statement").[20]

Defendants rely on *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008), and *Garcia v. J2 Glob., Inc.*, 2022 WL 22717936 (C.D. Cal. Aug. 8, 2022), to characterize these detailed allegations as merely "general awareness of the day-to-day working of the company's business" and that Geisler was merely "generally involved with franchisees." Mot. at 26, 28. Neither *Metzler* nor *Garcia* help defendants. In *Metzler*, the court held that "general awareness" does not establish scienter "at least absent some additional allegation of specific information conveyed to management and related to the fraud." 540 F.3d at 1068. And in *Garcia*, "the SAC [was] vague regarding the precise information to which Defendants allegedly had access." 2022 WL 22717936, at *6. The direct involvement of both defendants in the misleading sales process and in the manipulation of store closures, including the two internal memoranda sent directly to Geisler, distinguishes this case from *Metzler* and *Garcia*.

---

[20] Defendants cite *In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, at *5 (N.D. Ill. Feb. 20, 2007), to argue that the massive number of studio closures following the Fuzzy Panda report "is pure fraud-by-hindsight." Mot. at 29. It is not. As the Ninth Circuit recognized, "significant evidence of scienter . . . can be gleaned from . . . later disclosures." *Reese*, 747 F.3d at 574. *Bally* does not hold otherwise. There, the court refused to draw an inference of scienter from the later termination of severance pay from an agreement that was "'null and void and of no further force and effect'" and where the inference plaintiffs alleged did "not necessarily follow from the fact of the severance discontinuation." *Bally*, 2007 WL 551574, at *5.

4898-6921-7281.v3

Defendants also ask the Court to disregard the internal memoranda sent directly to Geisler, arguing that "they lack indicia of reliability" because Plaintiffs' counsel did not dig them up themselves or provide particulars about "when" and "how" they were sent to Geisler or whether he "actually read the memo." Mot. at 27 (original emphasis omitted). Defendants are wrong on both fronts. First, they cite nothing requiring Plaintiffs to locate evidence themselves before pleading it in the Complaint. *Id.* Plaintiffs' investigation included reviewing both memoranda and accurately citing their particulars, including the dates, the recipients, and their contents. Second, the Complaint actually alleges that "Geisler acknowledged receiving" the AKT memorandum and both memoranda were sent directly to him to raise issues that were critical to the Company and in which Geisler was personally involved. ¶¶5, 60, 229. Defendants do not even address Geisler's acknowledgment, or the fact that he participated in a Zoom call with AKT franchisees just days later to explain that Anna Kaiser had closed her NOMAD studio to damage the AKT franchise. ¶¶116, 229.[21]

Since both memoranda specifically identified that Xponential's FDDs were false, defendants' assertion that "nothing in the Row House memo contradicts anything Xponential said to investors" is not credible. Mot. at 27 (original emphasis omitted). What "the memo would have alerted Geisler" (*id.*) presents an "intensely fact-specific inquiry" that cannot be resolved on a motion to dismiss. *Lako*, 2023 WL 444151, at *12.

---

[21] These facts distinguish this case from *Oracle*, where the court refused to credit allegations about reports from confidential witnesses who "lacked personal knowledge." Mot. at 27. Oracle did not disregard internal reports based on an unlikely assumption that the defendant read those reports. *Oracle*, 2019 WL 6877195, at *19. The Ninth Circuit has held that similar demands for "more detail" would improperly "transform the PSLRA's formidable pleading requirement into an impossible one" and held that "Individual Defendants' access to internal reports and [database] support the inference of scienter." *Glazer*, 63 F.4th at 769, 773.

4898-6921-7281.v3

**B.    The Scheme Involved Xponential's Core Operations**

As alleged, franchisees were the lifeblood of Xponential's business. The Company's entire existence – and its revenue growth – depended on Geisler and Meloun successfully managing them. ¶¶54-126. Given the importance of Xponential's franchise base, these defendants would have (*and did*) closely monitor the franchisees' financial condition and the health of their studios. ¶229. In fact, that they repeatedly discussed the health of the franchisees throughout the Class Period demonstrates the importance of franchisee performance to Xponential's business. ¶¶96-102, 145-184; *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) ("'[i]t is thus "absurd" to suggest that the individual Defendants were not aware of issues'" when "defendants regularly made statements touting OSI's turnkey business . . . as 'driving . . . growth'").[22]

The critical nature of this information is further buttressed by the steps that defendants took to conceal franchisee financial condition. Not only did Geisler and Meloun actively misrepresent the existence of studio closures, but Xponential also engaged in a restructuring that replaced its brand-level disclosures with that of a guarantor shortly after *The Capitol Forum* began investigating the condition of Xponential's franchisees. ¶¶124, 192-203, 232. Xponential, thus, went from filing detailed financial statements for certain individual brands to a single balance sheet for a newly-created "guarantor," a move that *The Capitol Forum's* investigation revealed "appeared designed to obfuscate the financials of the company and its individual brands." *Id.* This type of restructuring would have been elevated to the highest levels at Xponential, including to Geisler, Meloun, and Grabowski. *Reese*,

---

[22]  Contrary to defendants' contention (Mot. at 26), defendants' certifications under §302 of the Sarbanes-Oxley Act of 2002 ("SOX") add to the inference that defendants closely monitored important aspects of Xponential's business. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1190 (C.D. Cal. 2007) ("financial disclosures, proxy statements, and SOX Certifications are clearly 'statements' for the purposes of establishing contemporaneous knowledge").

- 36 -

4898-6921-7281.v3

747 F.3d at 572 ("reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies").

Defendants argue that the restructuring is "a red herring" and "irrelevant" because "Xponential never disclosed brand-level financials in its SEC filings." Mot. at 29. To the contrary, the restructuring came shortly after *The Capitol Forum* began investigating Xponential's manipulation of its franchisees, the disclosure of which would have hindered additional license sales and undermined the Company's KPIs. Defendants' argument assumes a disconnect between Xponential and its franchisees when the opposite is true – Xponential's financial condition depended on healthy franchisees, as defendants reminded investors each quarter.

**C.    Geisler and Grabowski's Stock Sales Support Scienter**

"'Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.'" *Daou*, 411 F.3d at 1022. "To evaluate suspiciousness of stock sales, [the Ninth Circuit] consider[s], *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Oracle*, 380 F.3d at 1232.

All three are satisfied here. ¶¶127-129, 237-240. Both Geisler and Grabowski sold large percentages of their holdings for proceeds totaling $275 million. ¶239 (Geisler – 79% of Class A common stock and 23.3% of all holdings for $55.6 million; Grabowski – 59.1% of Class A common stock and 40.9% of Class B common stock for $219.8 million). They both sold at near then-peak prices. ¶¶237-238 (Geisler – most sales near peak trading price of $33.58, including sales as high as $33.49); ¶239 (Geisler and Grabowski's SPO sales at $24.50, just below then-highest trading price). And neither had sold shares on the open market when they first began trading. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) ("massive and uncharacteristic sale in February, made near the apogee of QSI's stock price . . . and shortly before the stock went into a steep decline . . . is, to

- 37 -

say the least, 'suspicious'"); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1030 (N.D. Cal. 2020) ("[T]he significant uptick compared with . . . prior sales history [is] supportive of scienter."). These suspicious stock sales, combined with Xponential's $120 million IPO strengthen the inference of scienter. *Abdo v. Fitzsimmons*, 2018 WL 11220494, at *18 (N.D. Cal. May 22, 2018) ("misrepresentations while soliciting funds from investors adds to the strength of the allegations").

Defendants' description of these sales as innocent is simply not credible. Mot. at 28. They state all of Grabowski's sales and "most" of Geisler's sales were in the IPO or SPO and were not suspicious "because Company insiders could not sell shares prior to the IPO." *Id.* But they overlook that the SPO took place nearly a year after the IPO, leaving plenty of time to establish a pattern. And since the SPO was designed exclusively for ***insiders*** to sell their shares, it does not render defendants' trading innocent. Whether the trades were to diversify holdings is a "factual question . . . appropriately resolved on summary judgment." *Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at *6 (N.D. Cal. May 20, 2010).[23]

Defendants point to Geisler's 10b5-1 trading plan to negate scienter. Mot. at 28-29. It does not. *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) ("[T]he fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales."). "'[A] 10b5-1 trading plan does not provide an absolute defense to a claim of insider trading. Rather, it requires an

---

[23]  Nothing in the case law defendants cite converts these extremely suspicious sales into innocent ones. Mot. at 28-29. *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 950 (N.D. Cal. 2010), holds that selling in an IPO is not suspicious or unusual. With the exception of Geisler's $9 million side deal, Geisler and Grabowski began selling their shares months after the IPO. ¶238. This gap provides the "'meaningful trading history'" referenced in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009). And the language defendants cite from *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001), was simply in the context of discussing the reasons behind the "'unusual' or 'suspicious'" standard. *Id.* at 435. The unified sales by Geisler and Grabowski, the architects of the scheme, distinguish this case from *Ronconi* where the two insiders who made most of the representations sold only 10% and 17% of their shares and where the insiders "miss[ed] the boat . . . dramatically" in terms of timing. *Id.* The opposite is true here.

4898-6921-7281.v3

additional factual finding of good faith,' which a court cannot make [on] a motion to dismiss." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018). And here, the Complaint quotes *The Capitol Forum* report, which states that it sent investigatory questions to the Company **in November 2022**, less than a month before Geisler established his plan and just a few months before both the SPO and Geisler's open-market trades. ¶238. As alleged, Geisler's trading plan actually contributes to a strong inference of scienter against him.

### D. Geisler's Termination Amidst Criminal Investigations Concludes the Scheme and Supports Scienter

Executive departures support scienter when they are "accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002. Here, Xponential terminated Geisler when it announced civil and criminal investigations into what the Company later admitted involved "studio closures, communications with franchise owners, financial reporting, and insider trading policies." ¶¶15, 143. Geisler's termination under these circumstances adds credibility to the numerous sources alleged in the Complaint and strengthens the inference of scienter as to all defendants. *See In re Fibrogen, Inc.*, 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022) ("abrupt resignation tends to support scienter"); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020) (resignations in "close temporal proximity to the initial revelations" supported scienter). It also strengthens the inference of scienter against Grabowski since he publicly defended Geisler's "'professionalism'" after the Fuzzy Panda report and was admittedly a close associate of Geisler. ¶¶9-10, 217-218.

### E. Defendants' Suggested Inference Is Not Compelling

Defendants suggest that a more compelling inference is that "[a] small number of franchisees, in the midst and wake of the global pandemic, experienced financial hardships" and that defendants had to step in "to transition these studios to other franchisees and temporarily operated some as Company-owned studios." Mot. at

- 39 -

29-30. But to reach this inference, defendants have ignored well-pled allegations, including: (i) internal documents describing the scheme and financial hardship before the pandemic; (ii) false and misleading FDDs that were used to sell licenses to every franchisee, Company-wide (16 C.F.R. §436.2); (iii) numerous corroborating claims by separate sources that Xponential misrepresented the profitability of its studios; (iv) misrepresentations regarding studio closures; (v) Geisler's view that studio closures created harmful optics for the brand; and (vi) Geisler's termination amidst civil and criminal government investigations. Defendants' suggested inference is not even plausible under the facts alleged. Plaintiffs' allegations raise a strong inference of scienter. *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) ("[I]f two possible inferences . . . are equally compelling, a plaintiff has demonstrated a strong inference of scienter.").

## VII.   PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

"To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). "'Because loss causation is simply a variant of proximate cause,  the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.'" *Id.* Pleading loss causation "'should not prove burdensome,' for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

Here, the Complaint alleges the required "causal connection" by tracing the loss back to the facts about which defendants lied when reporting expanding KPIs and discussing studio closures – Xponential's deceptive license sales and the resulting franchisee financial condition.  ¶¶130-144, 246-249.  The Fuzzy Panda report, in fact, directly contradicted defendants' claims that these metrics reflected

- 40 -

4898-6921-7281.v3

the "health" of Xponential's franchise base, revealing the truth that Xponential had lied in sales pitches to prospective franchisees, including by using false and misleading FDDs and stating that it had "[d]ebunked" Xponential's assertions about studio closures, citing ">30 permanently closed stores."  ¶¶130-133.  Since the Fuzzy Panda report, in turn, caused a same-day stock decline of 37%, it qualifies as a corrective disclosure sufficient for loss causation.  *First Solar*, 881 F.3d at 754 ("That a stock price drop comes immediately ***after*** the revelation of fraud can help to rule out alternative causes.") (emphasis in original).  It also satisfies loss causation as a materialization of an undisclosed risk since discovery by investigative reporters was within the zone of risk created by defendants' misstatements and omissions.  *Genius Brands*, 97 F.4th at 1184 ("A corrective disclosure . . . is not the only way a plaintiff can show 'the truth became known.'"); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *21 (C.D. Cal. Aug. 4, 2014) (increased restrictions on off-label use within "'zone of risk'" created by false statements about marketing compliance with U.S. Food and Drug Administration ("FDA") regulations).  Defendants do not identify any other fact that caused Plaintiffs' loss.

The November 1, 2023 BofA report and the December 7, 2023 *Bloomberg* article also revealed the truth that, in turn, caused fraud-induced inflation to dissipate.  ¶¶138-141.  The day after the Fuzzy Panda report, Xponential issued a press release "denounc[ing] the misleading Report" and reiterating "the strength of the business and health of its franchisees" while defending Geisler's "'professionalism.'" ¶135.  The BofA report and the *Bloomberg* article revealed that these denials were false.  The BofA report affirmed widespread franchisee financial distress – downgrading the stock because of "franchisee profitability headwinds" where four of Xponential's brands "may not be profitable" (¶13, 138-139) – while the *Bloomberg* article revealed the manipulative nature of the scheme, including misleading franchisees with inflated profit projections and underestimated costs, and concealing the existence of closed studios with threats and reprisals.  ¶¶14, 140-141.

- 41 -

4898-6921-7281.v3

It also revealed that the SEC was starting to investigate claims against the Company. *Id.* Since each disclosure was immediately followed by a drop in Xponential's stock price – 8% and a three day 33.8% decline, respectively (¶¶139, 141) – the Complaint adequately alleges loss causation. *First Solar*, 881 F.3d at 754.

These disclosures, along with the announcement of Geisler's termination and governmental investigations, also satisfy loss causation as a materialization of undisclosed risks since discovery by investigative reporters, governmental investigations, and terminations of those involved were within the zone of risk created by defendants' misstatements and omissions. *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011) (FDA denial of drug application was a materialization of an undisclosed risk that adequately alleged loss causation).

Defendants argue that "under black-letter Ninth Circuit law, short seller reports . . . are inadequate to plead loss causation." Mot. at 9, 30. They are not. In *Genius Brands*, the Ninth Circuit recently held that "'[a] corrective disclosure can . . . come from **any source**, including . . . **investigative reporters**'" and upheld loss causation allegations that were based on an "[a]ctivist short seller[]." 97 F.4th at 1178, 1184. Defendants' reliance on *Nektar* to argue otherwise is misplaced. Mot. at 30. There, the court held that the "musings" of a short seller report followed by a 7% drop in Nektar's stock price could not serve as a corrective disclosure where it disclaimed accuracy and completeness, finding that "the nature of the report means that investors would have taken its 'contents with a healthy grain of salt.'" *Nektar*, 34 F.4th at 839-40. But unlike *Nektar*, where the short seller merely "compared statements made by Nektar at different conferences and . . . cross-checked sources provided by Nektar" (*id.* at 840), Fuzzy Panda analyzed "16,000+ pages of Franchise Disclosure Doc[ument]s," had "conversations with franchisees," sat through sales pitches from Xponential "sales reps," received and reviewed an internal company "memo to XPOF CEO Geisler," and included photographic and video evidence to support the assertions in the report. *See* ECF 67-8 at 3, 8-9, 11, 14, 16-18, 25. While

- 42 -

4898-6921-7281.v3

it did include a warranty disclaimer, it also offered facts that indicated reliability, including: (i) a representation that "[t]o the best of their ability and belief, all information contained in their reports is accurate and reliable"; (ii) a contact email; and (iii) a representation that "[w]e have reported and will continue to report all the information . . . to the SEC, FTC, and have reached out to state attorney generals." *Id.* at 20, 26. These facts and the resulting 37% stock decline, make it plausible that investors did not take the report with a grain of salt. *BofI*, 977 F.3d at 795 ("The ultimate question is again one of plausibility.").[24]

Defendants complain that Plaintiffs have failed to "'specify which of the Defendants' statements were [revealed to be] untrue' by any of the alleged corrective disclosures." Mot. at 31. Not true. The Complaint places defendants' statements into three categories (¶¶146-185, 193-203, 217-219) and explains how these statements were revealed to be false and misleading when the Fuzzy Panda report revealed that defendants had deceived franchisees and caused widespread franchisee losses. ¶¶8, 130-133, 246-249. Defendants count "50+ challenged statements" (Mot. at 31) but overlook that defendants repeated substantially similar statements each quarter and that each of those statements concealed the same truth and undisclosed risks. ¶¶145-185, 192-203.[25]

---

[24] Citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), defendants argue that "Plaintiffs cannot rely on . . . governmental investigations to plead loss causation." Mot. at 31. Not so. After *Loos*, the Ninth Circuit held in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016), that "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation." *Id.* at 1203. Defendants fail to mention *Lloyd* for good reason. The SEC investigation here was first disclosed in the *Bloomberg* article affirming that defendants' denials were false while subsequent disclosures tied the SEC investigation to the very facts about which defendants lied, including "studio closures, communications with franchise owners, financial reporting, and insider trading policies." ¶¶140-141, 143.

[25] Defendants' reliance on *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598 (9th Cir. 2014), and *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397 (9th Cir. 2021), is misplaced. Mot. at 31. Both cases stand for the unremarkable proposition that corrective disclosures must call into question specific statements. *Apollo*, 774 F.3d at 608 ("unclear what claims made by the Defendants

- 43 -

4898-6921-7281.v3

Citing *BofI*, 977 F.3d at 794, and *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011), defendants attempt to invalidate the BofA report and the *Bloomberg* article as corrective disclosures because they purportedly did not "introduce[] any new information to the market," arguing that they "both addressed the same already-public information discussed in Fuzzy Panda's report." Mot. at 31-32 (original emphasis omitted). But defendants ignore allegations that they continued to mislead investors by publicly refuting the Fuzzy Panda report and that the BofA report and the *Bloomberg* article revealed the truth about those denials. ¶¶135-141. *BofI* offers defendants no support as it did not discuss a similar denial. 977 F.3d 794-97. And *FindWhat* actually supports Plaintiffs as the 11th Circuit recognized that "[f]raudulent statements that ***prevent*** a stock price from falling can cause harm by ***prolonging*** the period during which the stock is traded at inflated prices," which is precisely what defendants' denial accomplished in this case. 658 F.3d at 1310, 1314 (emphasis in original). Defendants simply do not address these allegations or that Geisler's termination independently satisfies loss causation as a materialization of an undisclosed risk. ¶143. Defendants' challenge to loss causation should be denied on this basis alone.[26]

## VIII. PLAINTIFFS SUFFICIENTLY ALLEGE §12(a)(2) CLAIMS AGAINST GRABOWSKI

Defendants argue that Grabowski is not a statutory seller under §12(a)(2) because "there are no allegations suggesting Grabowski actively solicited any sales in the SPO." Mot. at 32. They are mistaken. The Complaint alleges that Grabowski

---

were invalidated by [disclosure]"); *Uber*, 998 F.3d at 407 (plaintiff failed to link reduced valuation to any particular scandal or misstatement, instead lumping together 60 dissimilar misstatements and the revelation of eight dissimilar corporate scandals). Plaintiffs here have linked four specific disclosures to the alleged misstatements. ¶¶8-15, 130-144.

[26] Because Plaintiffs sufficiently allege a primary violation of §10(b), and defendants do not dispute each defendant's control, the Complaint properly pleads §20(a) control person liability.

- 44 -

4898-6921-7281.v3

himself signed the defective registration statement for the SPO and funded Xponential's roadshows (through his H&W Investco entities) to sell stock for himself. ¶¶129, 305-306. These allegations suffice at the pleadings stage. *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. Aug. 17, 2006) ("solicitation activity [that] 'included participating in, and signing, the preparation of the false and misleading Prospectus'" held sufficient); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *18 (C.D. Cal. June 9, 2016) (same).[27]

## IX. CONCLUSION

In this case, defendants used false FDDs to mislead franchisees, which allowed them to mislead investors and inflate Xponential stock to sell $400 million at peak prices, many of which occurred just before the truth was revealed and the stock price collapsed. Geisler was then terminated amidst governmental investigations into Xponential misleading franchisees. The Complaint satisfies its pleading obligations. Defendants' Motion should be denied.

DATED: December 6, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
X. JAY ALVAREZ
DOUGLAS R. BRITTON
JEREMY W. DANIELS

s/ Douglas R. Britton
DOUGLAS R. BRITTON

---

[27] Defendants' authority does not help Grabowski. Mot. at 32. In *In re Nat'l Golf Props., Inc.*, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003), the Court held that "sign[ing] a registration statement *is* sufficient to allege active solicitation." *Id.* at *3. And in *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689 (C.D. Cal. May 5, 2011), the defendant did not draft or disseminate the prospectus or sell shares in the offering. *Id.* at *9-*10. Since Grabowski was involved in active solicitation, "he is a person from whom the buyer purchases within the meaning of §12." *Pinter v. Dahl*, 486 U.S. 622, 642, 646 (1988) (statutory seller broader than traditional contractual privity). And since West Palm Beach bought in the offering, it falls within the statutory definition. ¶28; *Pinter*, 486 U.S. at 647.

4898-6921-7281.v3

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jaya@rgrdlaw.com
dougb@rgrdlaw.com
idaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
BONNI S. JENSEN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
bonni@robertdklausner.com

Additional Counsel

4898-6921-7281.v3

## **L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 35 pages, exclusive of caption, table of contents, table of authorities, and signature block, which complies with the page limit set by Court Order dated November 26, 2024.

DATED:  December 6. 2024

s/ Douglas R. Britton
DOUGLAS R. BRITTON