ROBBINS GELLER RUDMAN
  & DOWD LLP
DOUGLAS R. BRITTON (188769)
JEREMY W. DANIELS (351347)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re XPONENTIAL FITNESS SECURITIES LITIGATION | Case No. 8:24-cv-00285-JWH (KESx) |
| | CLASS ACTION |
| | LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT |
| | DATE: November 14, 2025 |
| | TIME: 9:00 a.m. |
| | CTRM: 9D |
| | JUDGE: Hon. John W. Holcomb |

4929-2587-4528.v1

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................... 14

II.     STATEMENT OF THE FRAUDULENT SCHEME ................................. 16

III.    LEGAL STANDARDS ...................................................................... 19

IV.     THE COMPLAINT AMPLY ALLEGES A SCHEME CLAIM UNDER RULE 10b-5(a) AND (c) ...................................................... 20

        A.      Defendants' Reliability Arguments Fail .................................... 22

        B.      Defendants' Particularity Arguments Fail ................................. 25

        C.      Defendants' Argument that the Scheme Was Public Fails ................ 26

V.      DEFENDANTS' MISSTATEMENTS AND OMISSIONS ......................... 27

        A.      Defendants' Statements About Xponential's KPIs and the Xponential Playbook Were False and Misleading ............................. 27

                1.      Defendants' Arguments About Xponential's Key Metrics Are Meritless ............................................ 28

                2.      Defendants' Arguments About the Xponential Playbook Are Meritless ................................................. 31

        B.      Defendants' Studio Closure and SBA Loan Statements Were False and Misleading .............................................................. 32

                1.      Defendants' Arguments About Permanent Studio Closures Are Meritless .......................................... 32

                2.      Defendants' Arguments About Xponential's AUV Definition and the Materiality of AUVs and SBA Loan Defaults Are Meritless ................................................ 34

VI.     THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER ..................................................................................... 36

        A.      Geisler and Meloun Acted with Scienter ............................................. 36

        B.      The Scheme Involved Xponential's Core Operations ...................... 40

        C.      Geisler and Grabowski's Stock Sales Support Scienter .................... 46

        D.      Geisler's Termination Amidst Criminal Investigations Concludes the Scheme and Supports Scienter ................................. 48

        E.      Defendants' Suggested Inference Is Not Compelling ...................... 49

VII.    THE COMPLAINT ALLEGES LOSS CAUSATION ............................... 50

4929-2587-4528.v1

**Page**

VIII.  THE COMPLAINT SUFFICIENTLY ALLEGES §12(a)(2) CLAIMS AGAINST GRABOWSKI ..................................................................................54

IX.  THE COMPLAINT SUFFICIENTLY ALLEGES §15 AND §20(a) CLAIMS AGAINST GRABOWSKI ........................................................55

X.   CONCLUSION .......................................................................................57

4929-2587-4528.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abdo v. Fitzsimmons*,
2018 WL 11220494 (N.D. Cal. May 22, 2018) ..................................................47

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp. 3d 852 (S.D. Cal. 2024) ..........................................................28, 54

*Arthur Child.'s Tr. v. Keim*,
994 F.2d 1390 (9th Cir. 1993) ........................................................................56

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................19

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018).................................................48

*Bajjuri v. Raytheon Techs. Corp.*,
2023 WL 3650554 (D. Ariz. May 25, 2023).....................................................23

*Bao v. Solarcity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .........................................................56

*Baron v. Hyrecar Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) ..................................................55

*Barry v. Colony Northstar, Inc.*,
2019 WL 13237719 (C.D. Cal. Aug. 1, 2019)..................................................32

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) .................................................................24

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)...........................................................................39

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014)......................................................42

*Cheng v. Can. Goose Holdings Inc.*,
2021 WL 3077469 (S.D.N.Y. July 19, 2021) ......................................34, 44, 45

- 4 -

4929-2587-4528.v1

**Page**

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013),
*aff'd*, 691 F. App'x 393 (9th Cir. 2017) .......................................................47, 50

*Cmtys. Actively Living Indep. & Free v. City of L.A.*,
2009 WL 10676002 (C.D. Cal. June 1, 2009)......................................................15

*Curry v. Yelp Inc.*,
2015 WL 7454137 (N.D. Cal. Nov. 24, 2015),
*aff'd*, 875 F.3d 1219 (9th Cir. 2017) ...................................................................26

*Defeo v. IonQ, Inc.*,
134 F.4th 153 (4th Cir. 2025)...............................................................................53

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009)................................................................................27

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023), *cert. dismissed*,
604 U.S. 20 (2024) ...............................................................................................29

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016)..............................................................................50

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024)................................................................................53

*Ferreira v. Funko Inc.*,
2021 WL 8820650 (C.D. Cal. Oct. 22, 2021) ......................................................56

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016).........................................................54

*Garcia v. J2 Glob., Inc.*,
2022 WL 22717936 (C.D. Cal. Aug. 8, 2022),
*aff'd sub nom. Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024)................................................................................43

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006).............................................................................41

4929-2587-4528.v1

**Page**

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023)....................................................................*passim*

*Guevoura Fund v. Sillerman*,
  2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016) ....................................................... 19

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ................................................................................ 19

*Hollinger v. Titan Cap. Corp.*,
  914 F.2d 1564 (9th Cir. 1990) .............................................................................. 56

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
  298 F.R.D. 116 (S.D.N.Y. 2014).......................................................................... 22

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .............................................................................. 56

*In re Am. Apparel, Inc. S'holder Litig.*,
  2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ..................................................... 56

*In re Am. Apparel, Inc. S'holder Litig.*,
  855 F. Supp. 2d 1043 (C.D. Cal. 2012)................................................................ 43

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ..................................................... 51

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)........................................................................... 50, 53

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013).............................................................................. 21

*In re Cloudera, Inc.*,
  121 F.4th 1180 (9th Cir. 2024)......................................................................... 20, 33

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004).................................................................. 47

4929-2587-4528.v1

**Page**

*In re Cornerstone Propane Partners, L.P.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................................49

*In re Daou Sys., Inc., Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005).......................................................................... 37, 46

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009) .........................................................56

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ..................................................................22

*In re Fibrogen, Inc.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022).........................................................48

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015).............................................................. 19, 20

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024)..................................................................*passim*

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sep. 27, 2019) ......................................................27

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ......................................................54

*In re Infonet Servs. Corp. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003)..................................................................55

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014)......................................................................27

*In re Lendingclub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal 2017) ...................................................................21

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011).......................................................... 52, 53

- 7 -

4929-2587-4528.v1

**Page**

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014) ................................................................. 45

*In re Mullen Auto. Sec. Litig.*,
2023 WL 8125447 (C.D. Cal. Sep. 28, 2023) ..................................................... 52

*In re Mylan N.V. Sec. Litig.*,
2023 WL 3539371 (W.D. Pa. May 18, 2023) ..................................................... 25

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019) ................................................................. 22

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ......................................................................... 29, 53

*In re Netflix, Inc. Sec. Litig.*,
2005 WL 1562858 (N.D. Cal. June 28, 2005) ................................................... 26

*In re Overstock Sec. Litig.*,
119 F.4th 787 (10th Cir. 2024) ........................................................................... 27

*In re Portal Software, Inc. Sec. Litig.*,
2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ............................................ 54, 55

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .................................................... 37

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017), *cert. dismissed
sub nom. Quality Sys., Inc. v. City of Mia.
Fire Fighters' & Police Officers' Ret. Tr.*,
586 U.S. 1031 (2018) ......................................................................................... 46

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) .................................................... 31, 33, 52

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...................................................... 47

- 8 -

4929-2587-4528.v1

**Page**

*In re Remec Inc. Sec. Litig.*,
415 F. Supp. 2d 1106 (S.D. Cal. 2006) .............................................................. 39

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................ 26

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .............................................................................. 47

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ............................................................................... 20

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................................... 46

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .............................................................................. 27

*Jui-Yang Hong v. Extreme Networks, Inc.*,
2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ................................................... 30

*Karam v. Corinthian Colls., Inc.*,
2012 WL 8499135 (C.D. Cal. Aug. 20, 2012) ................................................... 26

*Lako v. Loandepot, Inc.*,
2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ...................................................... 22

*Leacock v. IonQ, Inc.*,
2023 WL 6308045 (D. Md. Sept. 28, 2023),
*aff'd sub nom. Defeo v. IonQ, Inc.*,
134 F.4th 153 (4th Cir. 2025) ....................................................................... 24, 25

*Lilien v. Olaplex Holdings, Inc.*,
765 F. Supp. 3d 993 (C.D. Cal. 2025) ............................................................... 40

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ............................................................................ 54

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) ................................................................ 23

- 9 -

**Page**

*Longo v. OSI Sys., Inc.*,
    2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ....................................... 40, 52, 53

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ........................................................................ 54

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ........................................................................................ 35

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) ................................................ 55

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................. 41, 47

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
    2008 WL 7084629 (C.D. Cal. July 10, 2008) .............................................. 40

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................... 38

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ................................................................ 50, 51, 52

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ........................................................... 35

*No. 84 Emp.-Teamster Joint Council Pension
    Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ....................................................................... 45

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ................................................................. 37, 46

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996) ............................................................................... 31

*Osher v. JNI Corp.*,
    302 F. Supp. 2d 1145 (S.D. Cal. 2003) ........................................................ 47

- 10 -

4929-2587-4528.v1

**Page**

*Petrie v. Elec. Game Card, Inc.*,
2011 WL 13130015 (C.D. Cal. Oct. 19, 2011) ...................................................40

*Pinter v. Dahl*,
486 U.S. 622 (1988) .........................................................................................55

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014).........................................................................42

*Pujo v. EHang Holdings Ltd.*,
2025 WL 1242324 (C.D. Cal. Mar. 26, 2025) .....................................22, 23, 45

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014), *overruled*
*on other grounds by City of Dearborn Heights*
*Act 345 Police & Fire Ret. Sys. v. Align*
*Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)................................................36, 38, 44

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001).............................................................................47

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009) .......................................................42

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)............................................................................45

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016).......................................................................30, 36

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) ...........................................................33

*SEC v. Leslie*,
2012 WL 116562 (N.D. Cal. Jan. 13, 2012) .....................................................35

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...........................................................29

- 11 -

4929-2587-4528.v1

**Page**

*Shuster v. Symmetricon, Inc.*,
1997 WL 269490 (N.D. Cal. Feb. 25, 1997)......................................................35

*Smith v. Cir. City Stores, Inc.*,
286 F. Supp. 2d 707 (E.D. Va. 2003)..................................................................35

*Snellink v. Gulf Res., Inc.*,
870 F. Supp. 2d 930 (C.D. Cal. 2012)................................................................54

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998)............................................................................34

*Sudunagunta v. NantKwest, Inc.*,
2017 WL 8811116 (C.D. Cal. May 16, 2017).....................................................20

*Tchrs.' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007)..............................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ...........................................................................15, 17, 36

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
759 F. Supp. 3d 926 (D. Ariz. 2024)..................................................................55

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019)................................................................23

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
57 F. Supp. 3d 950 (D. Minn. 2014) ..................................................................19

*Wojtunik v. Kealy*,
394 F. Supp. 2d 1149 (D. Ariz. 2005).................................................................41

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*,
738 F. Supp. 3d 1182 (N.D. Cal. 2024) .............................................................20

*Zamir v. Bridgepoint Educ., Inc.*,
2018 WL 1258108 (S.D. Cal. Mar. 12, 2018).....................................................49

4929-2587-4528.v1

**Page**

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................... 48, 49

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
   §77k .......................................................................................................... 27
   §77k(a)(1) ................................................................................................. 28

Federal Rules of Civil Procedure
   Rule 8 ........................................................................................................ 54
   Rule 8(a) ............................................................................................... 20, 56
   Rule 8(a)(2) ............................................................................................... 19
   Rule 9(b) ............................................................................................... 19, 50

16 C.F.R.
   §436.2 .................................................................................................. 17, 49
   §436.5 ........................................................................................................ 17

17 C.F.R.
   §202.5(d) .................................................................................................... 49
   §240.10b-5(a) ................................................................................. 19, 20, 26
   §240.10b-5(b) ...................................................................................... *passim*
   §240.10b-5(c) ...................................................................................... 19, 20

4929-2587-4528.v1

## I.   INTRODUCTION

Xponential Fitness, Inc. ("Xponential" or the "Company") sells "boutique" fitness studio franchises under several brand names.  The Amended Consolidated Complaint for Violations of the Federal Securities Laws (ECF 104) (the "Complaint") alleges that defendants misled, lied to, and hid information from potential franchisees to get them to buy licenses and open studios.  Defendants did not tell investors that was how they pumped up metrics like licenses sold and studios opened, which several times a year they cited to investors as proof of Xponential's growth.  Defendants also misled and lied to investors (and franchisees) by portraying the franchises as uniformly robust and successful when on average most Xponential brands lost money, several franchises failed, and others defaulted on loans.

The scheme drove Xponential's stock to as high as $33.58 per share before the truth emerged and it plummeted to below $10.  CEO Anthony Geisler ("Geisler") and Chairman Mark Grabowski ("Grabowski") still did well for their efforts.  They personally netted $275 million from stock sales, including well over $100 million initiated after skeptical reporters started sending Xponential questions about its claims but before the truth reached the public and the stock crashed.  Xponential's Board of Directors and the Underwriter Defendants[1] signed off on an April 2022 secondary offering ("SPO") without reasonable investigation.  That SPO and one in February 2023 remarkably gained millions for Geisler and Grabowski while Xponential got nothing.

The sources for the Complaint include formal findings by the California Department of Financial Protection and Innovation ("DFPI") that Xponential made numerous "material misrepresentations and omissions" in selling licenses to franchisees.  On that basis, Xponential agreed to a $450,000 fine.  The findings largely

_____

[1]   The "Underwriter Defendants" are BofA Securities, Inc. ("BofA"), Jefferies LLC, Morgan Stanley & Co. LLC, Guggenheim Securities, LLC, Piper Sandler & Co., Robert W. Baird & Co. Incorporated, Raymond James & Associates, Inc., Roth Capital Partners, LLC, and R. Seelaus & Co., LLC.

- 14 -

4929-2587-4528.v1

echoed and confirmed: (i) what groups of Xponential franchisees from different brands had said in multiple lawsuits; (ii) what founders of two Xponential brands had said in lawsuits; (iii) what franchisees from two Xponential brands told Geisler in a memo and letter before the Company's initial public offering (the "IPO"); and (iv) what *The Capitol Forum* reported in May 2023, short seller Fuzzy Panda reported in June 2023, BofA reported in November 2023, and *Bloomberg* reported in December 2023.  The Company's revelations when reporting its fourth quarter and fiscal year 2024 financial results, including impairment charges and government investigations that forced Xponential to "pause" license sales in all states while the Company redid the franchise disclosure documents ("FDDs") that it was legally required to give to every franchisee reinforces the reliability and accuracy of these numerous sources.[2]

Considering the allegations true as required (*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)), the Complaint amply states an intentional or reckless fraud scheme and material misstatements and omissions.  The dismissal motion should be denied.[3]

---

[2]    Defendants repeatedly fault Lead Plaintiffs Fort Lauderdale Police & Firefighters' Retirement System and City of West Palm Beach Police Pension Fund ("West Palm Beach") (collectively, "Plaintiffs") for having to file "serial" motions to dismiss. *See, e.g.*, Mot. at 10-11.  But the fault is actually of defendants' own making: the events necessitating Plaintiffs' supplemented and amended complaints directly involved the Company and the fraud that is at this case's core.  Defendants had advance knowledge of these events, and easily could have alerted Plaintiffs' counsel to avoid unnecessary motion practice.

[3]    Geisler and the Underwriter Defendants have separately joined in defendants Xponential, John Meloun ("Meloun"), Grabowski, Chelsea Grayson ("Grayson"), and Brenda Morris' ("Morris") (collectively, the "Xponential Defendants") Motion to Dismiss Amended Complaint (ECF 112) (the "Motion" or "Mot.") and have presented no additional arguments.  ECF 114-115.  For the reasons discussed herein, the Motion should be denied for these defendants as well.  Plaintiffs also do not oppose the Xponential Defendants' request for judicial notice of Exhibits 1-8.  ECF 112-10.  Plaintiffs do, however, object to taking the matters asserted in Exhibits 1-8 as true. *See Cmtys. Actively Living Indep. & Free v. City of L.A.*, 2009 WL 10676002, at *8 (C.D. Cal. June 1, 2009) ("[W]hile a court may take judicial notice that a party made a statement in a document filed with the court, it should not ordinarily take notice of the truth of such statement.").

- 15 -

4929-2587-4528.v1

## II.     STATEMENT OF THE FRAUDULENT SCHEME

The core allegations of the full fraud scheme are in ¶¶57-140.[4]  To summarize, Geisler's pursuit of "massive" wealth led to collaborating with Grabowski to buy out another's stake in Xponential.  ¶¶52, 57.  Having gained complete control, Geisler and Grabowski schemed to defraud the investor market, inflate the Company's stock price, and cash out in essentially six steps.

*First*, Geisler and Grabowski pursued a growth at all cost strategy, collecting ten brands of "boutique" fitness studios to sell as franchises.  ¶58.  In short order, they took Xponential public, completing an IPO in July 2021 and selling ten million shares for $120 million.  ¶60.

*Second*, after the IPO, to drive up Xponential's stock price, Geisler and CFO Meloun repeatedly cited key metrics as proof of Xponential's revenue growth and success, including the franchise licenses sold and studios opened quarterly and annually and average unit volume ("AUV") (collectively, key performance indicators or "KPIs").  ¶¶61, 168-208.  Xponential said AUV was the total average sales generated by a subset of its North American studios over the prior 12 months.  ¶169.

Xponential artificially inflated these metrics by luring potential franchisees through indulgent displays and misleading them to buy licenses and open studios.  ¶63.  The misrepresentations occurred in FDDs and in person.  They concerned costs to start and run a studio, time to open studios, anticipated membership and revenue, and profitability.  ¶¶63-66, 69-74, 84-90.

Xponential also misled franchisees and investors with its use of AUV.  ¶¶61-62  Geisler and Meloun repeatedly championed Xponential's increasing AUVs as evidence of revenue generated by the Company's franchise base.  ¶¶61-62, 168-208.  The reality was the figure touted by Xponential as evidence of Company-wide success

---

[4]     Unless otherwise noted, all "¶_" or "¶¶_" references are to the Complaint, emphasis is added, and citations are omitted.

- 16 -

4929-2587-4528.v1

was heavily skewed by its minority of profitable brands. ¶¶67-68. Far from attaining the claimed AUVs, most Xponential brands averaged annual losses. *Id.*

**Third**, Xponential and Geisler did not tell franchisees (or Xponential's investors) about Geisler's history of fraud and deceit despite Federal Trade Commission ("FTC") regulations *requiring* disclosure. *See* 16 C.F.R. §§436.2, 436.5; ¶¶91-102. The omissions indirectly helped inflate the number of licenses sold and studios opened. ¶¶101-102. As franchisees later stated, somewhat obviously, in a lawsuit after learning of Geisler's history, "[h]ad Defendants disclosed the Fraud Lawsuits, Plaintiffs would not have signed their respective Agreements." *Id.*

**Fourth**, to sway investors (and potential franchisees), Geisler and Meloun falsely portrayed Xponential's franchisees as uniformly strong financially. ¶¶103-112, 215-226. In addition to their citations to AUV, they also repeatedly claimed that Xponential had "never permanently closed [a] store," saying closures were "the way to really think about how healthy are our franchisees" and "zero closed stores" meant that Xponential had "a great business model that actually works." ¶¶104, 224. They also repeatedly claimed "[o]ur franchisees have also borrowed over $200 million from the SBA without any non-repayments under our ownership." ¶¶105, 221-222. Both claims were false. Numerous studios had permanently closed, and numerous franchisees had defaulted on Small Business Administration ("SBA") loans. ¶¶106-111.

**Fifth**, to reinforce their false pitch that evidence of the strength of the Xponential playbook and its franchise model lay in never permanently closing a store, defendants prevented and concealed closures of failed studios. ¶¶113-137. Instead of "permanent closures," Xponential took some studios back (for pennies on the dollar), labeled them "transition" studios, and eventually resold them to new franchisees with more false promises about profitability. ¶¶114-118.

They also hid franchisee financial distress. For example, Geisler monitored Facebook for dissent and "threatened . . . fines as high as $100,000 for criticizing the

- 17 -

4929-2587-4528.v1

company." ¶¶119-132.  He resisted closing another failed studio saying "the optics would be harmful" to the AKT brand and, in a call that included Grabowski, ominously told the owner – the founder of the AKT brand – that closing it against his resistance "would be [her] 'Pearl Harbor' moment."  ¶126.

*Sixth*, Geisler and Grabowski cashed out.  ¶¶138-140.  They raised $120 million for Xponential through the IPO.  ¶138.  Geisler and Grabowski later sold another $275 million in stock – $55.6 million for Geisler and $219.8 million for Grabowski. ¶140.  Their sales were made near then-peak prices and represented large chunks of their holdings.  ¶¶139-140.  Some timing was eye-opening.  In November 2022, *The Capitol Forum* sent Xponential questions about some of its claims.  ¶¶133, 269.  At the time, Geisler had not sold any of his Xponential stock since the IPO. ¶¶139, 269.  Within weeks, he established a 10b-5 trading plan. *Id.*  There followed a February 2023 secondary offering by Xponential in which he and Grabowski unloaded five million shares for $122.5 million.  ¶¶138, 270.  Xponential received nothing.  Geisler followed that with an additional $21.8 million in sales from March 2023 to May 2023.  ¶139.

Soon after these massive sell-offs, the scheme unraveled.  On June 27, 2023, Fuzzy Panda reported the Company had misled franchisees with false FDDs and that eight of ten Xponential brands lost money monthly.  ¶¶141-143.  After Xponential immediately denied the report (¶146), BofA reported on November 1, 2023, that at least four of Xponential's brands "may not be profitable" and just two brands were "driving near-term" KPIs.  ¶149.  A month later, *Bloomberg* reported that Xponential misled franchisees into a "financial nightmare," and the U.S. Securities and Exchange Commission ("SEC") was investigating.  ¶151.  In May 2024, Xponential suspended Geisler indefinitely amid criminal and regulatory investigations.  ¶154.  And after the DFPI's findings in November 2024, the Company announced its financial results for the fourth quarter and fiscal year 2024, disclosing: (i) a sharp increase in net losses for the quarter and fiscal year; (ii) a large impairment charge because of failed studios;

- 18 -

4929-2587-4528.v1

(iii) a restatement of financial results dating back to 2022, including an admittedly material misstatement for fiscal year 2023; (iv) that the DFPI's investigation actually began in April 2023 (Xponential had never disclosed the investigation) and resulted in Xponential "paus[ing]" new license sales; and (v) that almost a third of the franchise licenses "contractually obligated to open" were inactive and over 12 months behind schedule. ¶¶155-165.

Xponential's stock collapsed in response to each of these disclosures, falling from a high of $33.58 per share to below $10. ¶¶144, 150, 152, 154, 166-167.

## III.    LEGAL STANDARDS

Dismissal is inappropriate when a complaint contains sufficient facts to "'state a claim'" that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

For the claims brought under the Securities Exchange Act of 1934 (the "Exchange Act"), Counts I and II, SEC Rule 10b-5(b) prohibits fraudulent misstatements and omissions and is subject to a heightened pleading requirement under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 10b-5(a) and (c), which prohibit schemes to defraud, are subject to a less demanding standard. Those allegations "'need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014). Instead, scheme claims can be alleged "'in broad strokes.'" *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *8 (S.D.N.Y. Sept. 12, 2016).

The claims brought under the Securities Act of 1933 ("Securities Act"), Counts III to V, are treated differently. The standard for those claims is "'relatively minimal.'" *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013); Fed. R. Civ. P. 8(a)(2). A complaint need only "contain 'a short and plain statement of the

4929-2587-4528.v1

claim showing that the pleader is entitled to relief.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023).[5]

## IV.  THE COMPLAINT AMPLY ALLEGES A SCHEME CLAIM UNDER RULE 10b-5(a) AND (c)

Defendants first argue the Complaint does not sufficiently allege a scheme to defraud investors.  Mot. at 16-22.  Rule 10b-5(a) prohibits "any device, scheme, or artifice to defraud," and Rule 10b-5(c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. §240.10b-5(a), (c).  "Because 'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient.'"  *Galena*, 117 F. Supp. 3d at 1193.  "To be individually liable, each defendant must have committed a deceptive or manipulative act in furtherance of the scheme."  *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024).

The Complaint does exactly what is required.  It explains (at length and with specificity) the ***nature*** of the scheme by detailing how defendants employed six "artifices" to lure investors with a false and misleading portrayal of Xponential's business.  ¶¶57-140.  The scheme's ***purpose*** was to drive up Xponential's stock price so that the Company, Geisler, and Grabowski could reap millions.  ¶¶57-58, 61, 103,

[5]     Defendants argue that the Complaint is grounded in fraud, triggering a heightened pleading standard for all claims.  Mot. at 16.  But they overlook the "clear conceptual separation in the complaint between claims sounding in negligence [¶¶301-356] and those sounding in fraud."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006).  Federal Rule of Civil Procedure 8(a) applies where, like here, the §11 allegations are "sufficiently different" from §10(b) allegations. *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8811116, at *6 (C.D. Cal. May 16, 2017) (allegation that "Defendants failed to conduct a reasonable investigation or possessed no reasonable basis for their belief" are "sufficiently different" than allegations that "Defendants intentionally or recklessly misled Class members" to apply "less rigorous Rule 8(a) pleading standard" to Securities Act claim).  *In re Cloudera, Inc.*, 121 F.4th 1180 (9th Cir. 2024), which defendants cite to argue that Plaintiffs have alleged a "'unified course of fraudulent conduct,'" is inapposite.  *Id.* at 1186.  There, the plaintiff relied "'entirely'" on a "'unified course of fraudulent conduct'" and "the same factual allegations underlying the Exchange Act claims" as a basis for its Securities Act claims.  *Id.* at 1186-87.  By treating the Securities Act claims separately and conceptually differently, Plaintiffs here do not do the same.

- 20 -

4929-2587-4528.v1

113, 138-140.  As the Company's authorized agents, Geisler, Meloun, or Grabowski's actions were Xponential's.  *See, e.g.*, *Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).  The *effect* of the scheme was that defendants deceived investors into buying Xponential stock and driving its price to all-time highs.  ¶¶138-140.  The Complaint also identifies each defendants' *role*, alleging the active steps each took to further the scheme.  Xponential, Geisler, and Meloun misled franchisees and misrepresented Xponential's business, as numerous others long alleged, the DFPI found, and the Company has now effectively admitted in part.  ¶¶61-137, 168-208, 216-226.  Xponential, Geisler, and Grabowski sold large quantities of stock at inflated prices.  ¶¶138-140.[6]

Defendants launch their attack on the scheme by wrongly characterizing the allegations then knocking their mischaracterization as deficient.  But the Complaint does not just "allege that Defendants lied to prospective franchisees."  Mot. at 16 (original emphasis omitted); *id.* at 17 (wrongly saying scheme charge rests "entirely on Xponential's purported misstatements to its prospective franchisees").  It alleges defendants misled franchisees to sell more licenses and open more studios.  ¶¶61-102.  Geisler and Meloun then used those metrics inflated through deceit as well as other misrepresentations to misleadingly portray Xponential's business to investors.  ¶¶103-112, 168-208, 216-226.

---

[6]   Defendants' tracing argument for Plaintiffs' §11 claim deserves little attention.  Mot. at 17 n.6.  West Palm Beach, and others like it, will easily be able to prove they purchased shares in the SPO, either through one of the underwriters (as West Palm Beach did), by citing the lack of a commission charged on a purchase, or by citing the offering price, which was lower than the lowest trading price when defendants offered Xponential's shares to investors.  ¶29.  Given these unique facts, the existence of other securities offerings does not support dismissal.  Defendants' authority actually supports Plaintiffs.  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013) (distinguishing between shares purchased "in the offering" and shares purchased "in the aftermarket," which require tracing); *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1180 (N.D. Cal 2017) (same).  Any tracing limitations on the class definition are appropriately resolved at class certification.

4929-2587-4528.v1

### A.     Defendants' Reliability Arguments Fail

Defendants say the allegations "lack indicia of reliability." Mot. at 17-20. Yet the sheer number of varied sources independently leveling similar accusations over an extended period, coupled with the DFPI's findings succinctly echoing the many sources' complaints and Xponential's implicit concession that at least some allegations were true – *e.g.*, "pausing" its FDDs (and license sales) to update them and changing tactic to officially "close" failed studios they previously deemed still open for "transition" after the sketchy practice was exposed – belies any real concern that the allegations are unreliable or unbelievable. *See, e.g.*, *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *6 (C.D. Cal. Jan. 24, 2023) (multiple sources "further corroborates the allegations"); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014) (allegations "from a number of different employees . . . who worked in different geographic areas and in different positions . . . report a consistent pattern of behavior," providing "more faith in their accuracy").

Defendants criticize the evidence: the news reports and Fuzzy Panda use anonymous sources, Fuzzy Panda is biased, and those who sued were disgruntled. Mot. at 18-19. But complaints may rest on such evidence. *See, e.g.*, *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *4 (C.D. Cal. Mar. 26, 2025) (complaint "'is not automatically doomed just because it relies primarily or exclusively on a short-seller report quoting anonymous sources'"); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings"); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) ("News articles, which frequently rely upon unnamed sources, constitute reliable bases for allegations.").[7]

---

[7]     Defendants also diminish the DFPI's findings with air quotes, as if not admitting the findings allows them to maintain that they consented to a sizable fine and signed a legal document on baseless grounds. Mot. at 19. In any case, findings wrapping up a matter and serving as the basis for punishment – to which Xponential agreed – obviously are different than "facts alleged" to initiate an action. *Id.*

- 22 -

4929-2587-4528.v1

Notably, the Complaint's allegations do not rest on any of these sources or types of sources alone. All courts – even decisions cited by defendants that preach caution about certain evidence – recognize reliability worries fade with corroboration. *See, e.g.*, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (courts sustain complaints when "independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports") (cited by Mot. at 18). None of the decisions cited by defendants suggests differently than this common sense principle. *Id.* at 18-20.

Defendants say one unreliable source plus another is not corroboration. *Id.* at 19-20. But that begs the question. Moving beyond generalized warnings about certain evidence, on substance, the allegations in this case have ample signs they are reliable. Much of the Complaint just recites data and defendants' statements in filings or calls. Defendants may dispute the meaning attributed to the data or statements, but the recitation's accuracy is easy to assess and point out if wrong. Same for describing the DFPI's findings, Xponential's changes and actions after the consent order, Geisler's prior litigation history, closure of stores, default history on loans, and the like. Only accounts by franchisees and others of their dealings with Xponential and Geisler – in lawsuits and to reporters or analysts – might be subject to real reliability questions. But those accounts are remarkably similar across the board and align with the DFPI's findings and Xponential's actions. The accounts also are not all from truly anonymous sources. Litigants are identifiable. "Samantha" (¶70), "Vincent" (¶71), and others probably are too; Xponential certainly has records to aid with their identification. And most if not all the information comes from franchisees' own dealings with defendants. The cases defendants cite thought sources unreliable chiefly because they did not seem like they personally knew what they reported. *Bajjuri v. Raytheon Techs. Corp.*, 2023 WL 3650554, at *31 (D. Ariz. May 25, 2023) ("all six

(suggesting DFPI's findings are like uncorroborated "facts alleged" at outset of FTC matter in *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019)).

- 23 -

accounts appear [to] be based on rumors"); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 506-08 (D. Del. 2013).[8]

Defendants say the "anonymous franchisees in the news articles and Fuzzy Panda report are not described with sufficient particularity" to assess their reliability. Mot. at 18-19. Had the Complaint replaced "a Row House franchisee" with "John Smith, owner of a 13-month-old Row House in Topeka, Kansas who said he spoke to Michelle Jones at Xponential on this date who said . . ." realistically would be no reason for a reader to think the account more or less reliable. Consistency or inconsistency with other accounts from separate sources, and others' findings and actions, is always the better barometer. Even the comments by unnamed customers and partners in the short seller report in *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *12 (D. Md. Sept. 28, 2023), *aff'd sub nom. Defeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025) (*see* Mot. at 18-19), would have gained credence if, rather than the report being the only source of such expressions in the case, it mirrored: (i) statements by franchisees and others in multiple lawsuits, memos, and letters; (ii) multiple news reports; (iii) formal findings (based on which the defendant consented to punishment); and (iv) the defendant's responsive actions.

Defendants last say Plaintiffs have not done any "investigation of their own." Mot. at 18. Investigation takes many forms. One is gathering and analyzing

[8] Defendants wonder how their March 2025 announcements corroborate or support the allegations. Mot. at 20. Even putting aside whether Xponential's restatement of past results concerned "gym socks" (*id.*), the sharp increase in net losses and large impairment charge from closing failed franchises (instead of labeling them open for "transition") tends to confirm that Xponential was not as uniformly and robustly successful as it had portrayed, and its past practices obscured its true condition. The admission that the DFPI investigation started 20 months before the consent order shows another instance when Xponential failed to tell investors about material derogatory information. Particularly considering the outcome of the investigation, it also makes Xponential's public denial of the franchisees' and Fuzzy Panda's allegations – while it was already under investigation for the same – much more damning. The remarkable Company-wide "pause" in license sales while Xponential redid its FDDs tends to confirm the FDDs were not accurate, as many alleged. And nearly a third of its studios being over a year behind schedule from opening (and inactive) tends to confirm the allegations that it took much longer and was more expensive to open studios than Xponential said.

- 24 -

information from multiple sources to form a more complete picture: SEC filings, transcripts of earnings calls, FDDs, lawsuits, news reports, etc. ¶¶44-51. The Complaint also includes Plaintiffs' own analysis of the true financial condition of several of Xponential's brands. ¶¶67-68. The Complaint is more than just a recitation of others' "characterization of their purported interviews with anonymous franchisees." Mot. at 19. Defendants seem to suggest incorrectly that Plaintiffs must have interviewed franchisees themselves or redone reporters' work. *See id.* "Counsel need not conduct a ***separate*** investigation into [an] article to corroborate its contents." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *8 n.3 (W.D. Pa. May 18, 2023) (emphasis in original). *IonQ*, cited by defendants (Mot. at 19), does not suggest differently. It just unremarkably said that anonymous sources in a short seller report must be corroborated by "independent facts." 2023 WL 6308045, at *13. And the complaint that Plaintiffs have not spoken to "the authors of the articles or the short seller report" (Mot. at 19), is especially curious. To what end? To confirm they wrote them? Or on the possibility they recant what they wrote or reveal their sources? The allegations have plenty of signs they are reliable.

### B. Defendants' Particularity Arguments Fail

Defendants incorrectly say the Complaint lacks specific facts "concerning Defendants' alleged misconduct." *Id.* at 20. The Complaint describes how defendants deceived prospective franchisees, including through false FDDs and threats of retaliation to prevent studio closures, alleges who was involved in the fraudulent sales, who interfered with studio closures, provides context, and shows how every franchisee received a false FDD. ¶¶61-102, 113-137. It quotes at length defendants' statements to investors. ¶¶168-208, 216-226. It specifies Geisler's history that he never disclosed. ¶¶91-102. "Requiring more detail" than already alleged seeks to

- 25 -

4929-2587-4528.v1

make the PSLRA's pleading requirement "an impossible one." *Glazer*, 63 F.4th at 769.[9]

Defendants say "[a]t best, Plaintiffs plead that an unidentified number of disgruntled franchisees have accused unidentified Xponential personnel of lying at undefined times and in undefined ways in sales pitches and franchise disclosure documents ('FDDs')." Mot. at 21. There are more, but one example is enough to disprove the charge. *See* ¶254 (the CycleBar and BFT franchisees allege that "Anthony Geisler represented in a video sent by Kristie Lavasile to Plaintiffs on April 1, 2021, that Xponential never had a studio close"). The many lawsuits, DFPI's findings, and government investigations around the country distinguish this from the "small number of customer complaints" in *Curry v. Yelp Inc.*, 2015 WL 7454137, at *5-*7 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017), and *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005). Mot. at 21.

### C.     Defendants' Argument that the Scheme Was Public Fails

Defendants argue "investors could not . . . have been deceived" because Geisler's fraudulent history and the Company's misrepresentations to its franchisees were public. Mot. at 21-22. That misconstrues the scheme. Even if certain developments were public, by not telling investors it hid material information from and misled franchisees – information it was required by regulation to tell franchisees – Xponential misled and failed to tell investors how it inflated the number of licenses it sold and the studios it opened. That deception of investors – the crux of the scheme which, again, was not just to "misrepresent[] to . . . franchisees" (Mot. at 21) –

---

[9]     Defendants' authority is inapposite. Mot. at 20-21. Neither case addressed claims under Rule 10b-5(a) nor (c), which are subject to a lower pleading standard. And in *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016), unlike here, "Plaintiffs rel[ied] on conclusions and labels to allege that groups of contracts were fraudulent." *Id.* at 398-400. *Karam v. Corinthian Colls., Inc.*, 2012 WL 8499135 (C.D. Cal. Aug. 20, 2012), does not help defendants. There, anecdotal accounts of confidential witnesses at individual campuses were insufficient to support allegations of widespread misconduct. *Id.* at *7.

- 26 -

certainly was not public in 2021; if it had been, no one or few would have bought Xponential's stock. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009), is irrelevant. Mot. at 21. What "remain[ed] undisclosed to the general public" (*Desai*, 573 F.3d at 941) in this case was the fact that, and how, Xponential inflated the metrics it championed as demonstrating its growth. Unlike the "truthful disclosure of the terms of the upcoming dividend transaction" in *In re Overstock Sec. Litig.*, 119 F.4th 787, 803 (10th Cir. 2024), here Defendants maintained the "secrecy" of their scheme throughout the period July 23, 2021 to May 10, 2024 (the "Class Period").[10]

## V. DEFENDANTS' MISSTATEMENTS AND OMISSIONS

Under Rule 10b-5(b), it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b). Section 11 of the Securities Act prohibits the same in the context of a registration statement. 15 U.S.C. §77k. A complaint alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).[11]

### A. Defendants' Statements About Xponential's KPIs and the Xponential Playbook Were False and Misleading

Throughout the Class Period, defendants focused analysts and investors on a positive AUV metric – which they claimed is "the most direct measure of the health of

---

[10]     Denying allegations, as defendants often did, dilutes the significance (for investment purposes) of public filings, because the "'truth' was not conveyed to the public in a manner to sufficiently undermine the allegedly misleading statements." *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *28 (E.D.N.Y. Sep. 27, 2019).

[11]     Defendants say the Complaint is a "puzzle" and "fail[s] to identify the specific statements that are false or misleading." Mot. at 22 n.7. The Complaint specifies each statement, emphasizes what is false in bold and italics, and discusses why. ¶¶168-250. Since "Defendants can [and have] parse[d] out with relative ease the statements at issue and the reasons as to why they are alleged to be false and misleading," the Complaint is sufficient. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). Defendants' authority is inapposite. Mot. at 22.

- 27 -

our franchise system" – and on increasing license sales and studio openings. ¶¶168-208. They said that these steadily increasing KPIs resulted from the Xponential playbook, which was "designed to help franchisees achieve compelling [AUVs], strong operating margins and an attractive return on their invested capital." ¶¶168, 173, 183, 202. Defendants made these statements in Xponential's SEC filings and on conference calls (¶¶168-208) and repeated them in the registration statement for the SPO (¶¶322-329).

The statements were false and misleading. For example, defendants did not tell investors that license sales and studio openings had been inflated by defrauding and deceiving franchisees in FDDs and elsewhere on points like revenue and startup costs. ¶¶209-214. As Xponential has since effectively admitted by "pausing" license sales Company-wide to adjust its FDDs (¶¶156, 160-162) and by entering into the Consent Order for every brand with the DFPI (¶155), the scheme infected the entire Company. Defendants' statements misleadingly portrayed the core of Xponential's business to investors. *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 869 (S.D. Cal. 2024) (representations that omit critical qualifying information are actionable).[12]

### 1.   Defendants' Arguments About Xponential's Key Metrics Are Meritless

Defendants argue "Plaintiffs fail to sufficiently plead that the franchisees were in fact experiencing widespread losses." Mot. at 23. Yet the Complaint includes an analysis demonstrating that the majority of Xponential's brands were unprofitable and, on average, operated at a loss. ¶¶67-68. Combined with franchisee anecdotal accounts saying the same (*e.g.*, ¶¶64-90), internal memos from representatives of multiple Xponential brands saying the same (¶¶63, 69, 88, 106), SBA loan defaults

---

[12] The offering documents for the SPO contained these false and misleading KPIs. ¶¶322-329. Geisler, Meloun, Grabowski, Morris, and Grayson signed the registration statement (¶¶304, 306-307), triggering §11 liability. 15 U.S.C. §77k(a)(1). Morris and Grayson's claim that the Complaint is "limited to identifying them as Defendants" fails to address the substance of the allegations. Mot. at 23 n.8.

- 28 -

(¶¶106, 108-109, 111), store closures (¶¶106-107, 109, 113-118), the DFPI's findings that Xponential misled franchisees with false FDDs (¶155), and Xponential's implied concession as much (¶¶156, 160, 162), the Complaint more than sufficiently alleges that Xponential faced losses across at least most of its franchise base.[13]

Defendants argue that Plaintiffs have failed to provide "any detail regarding the underlying data or methodology" for their proprietary analysis.  Mot. at 23.  As the Complaint explains, however, the analysis is based on data from Xponential's FDDs and SEC filings and on "breakeven" estimates from the Company and numerous analysts.  ¶¶67-68, 211; Complaint, Exs. C-E.  This is sufficient at the pleadings stage.  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1137-38, 1141 (N.D. Cal. 2017) (defendants' "problems with Plaintiff's calculations . . . should . . . not [be resolved] at the motion to dismiss phase").

Defendants say the Complaint "do[es] not provide any detail at all on the specific data points purportedly relied upon" concerning the average monthly operating expenses of $31,000 per studio in Plaintiffs' analysis.  Mot. at 24.  But the Complaint explicitly cites three data points: the Company's own admission and two additional corroborating analyst reports.  ¶67; Complaint, Ex. C.  Defendants say "no justification whatsoever is provided" for analyzing only select Xponential brands.  Mot. at 24.  Once again, the Complaint explicitly states the justification: to "illustrate that the vast majority of Xponential's boutique studio brands were, on average, unprofitable."  ¶67; Complaint, Ex. C.  Defendants claim that including two additional studio brands would "undercut[] the[] entire 'analyses.'"  Mot. at 24.  That would be true – if the Complaint alleged *all* Xponential brands were unprofitable.  But it does

---

[13]   Defendants' reliance on *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), *cert. dismissed*, 604 U.S. 20 (2024), and *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022), is misplaced.  Mot. at 23-24.  As defendants acknowledge, *NVIDIA* supports the use of the very type of economic analysis alleged in the Complaint.  81 F.4th at 930-32.  And the expert in *Nektar*, unlike here, "provided no plausible justification for [his] assumptions."  34 F.4th at 837.

- 29 -

4929-2587-4528.v1

not.  Instead it alleges **most** Xponential brands were unprofitable and offered the analysis to prove that point. ¶67.  Adding the other two brands makes no sense for the purpose.

Defendants assert, somewhat remarkably, that they had "no duty to disclose" that most Xponential brands operated in the red, because the alleged misstatements did not relate to "the health of any individual brand or its franchisees' business." Mot. at 24.  Franchisees who bought licenses erroneously anticipating healthy Company-wide AUVs touted by defendants when the reality was the brand they bought, and most other Xponential brands, averaged a loss may think differently.  In any case, "'once defendants chose to tout' positive information to the market, 'they [were] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).  Celebrating AUV to investors as a metric showing Company-wide success when in reality the figure is heavily distorted by a few profitable brands, and most Xponential brands averaged losses, is undoubtedly what *Schueneman* had in mind.[14]

Defendants argue that they "had no duty to disclose disputed and unproven allegations that some of its franchisees believe they had been misled" or their aggressive sales tactics. Mot. at 24-25.  But the Complaint does not allege defendants committed fraud because they did not disclose franchisee complaints or were aggressive.  The Complaint alleges the defendants in fact made material misrepresentations to franchisees; the many franchisee complaints are just (some of) the proof of that.  Even if defendants never would have done it, they obviously were

---

[14]    Defendants misplace reliance on *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017), to argue that the omitted information "does not bear sufficient connection to the substance of the challenged statements."  Mot. at 24.  There, the witness accounts did not conflict with the statements alleged to be false.  The analysis here directly undermines, for most Xponential brands, the accuracy of defendants' claims about AUV and franchise profitability.

- 30 -

duty-bound to tell investors that some of the key metrics they celebrated – reasons an investor also might want to buy stock – were achieved by misleading, lying to, and hiding information from franchisees.  A truthful data picture showed that certain brands were not seeing the success that Xponential claimed.

## 2. Defendants' Arguments About the Xponential Playbook Are Meritless

Defendants argue their statements about the Xponential playbook were not misleading because Xponential warned "not all franchisees would achieve financial success."  Mot. at 25-26.  But that is not what defendants concealed with their playbook statements.  The ***facts*** concealed were defendants misled prospective franchisees into purchasing licenses and opening studios, rendering the playbook irrelevant.  ¶¶168, 209-214.  The ***risks*** concealed were those that materialized – reporters uncovering the truth, lawsuits, investigations, terminations of key executives, and suspended license sales. ¶¶141-166.  The warnings defendants cite do not discuss these risks (Mot. at 26), so they hardly dropped "'the risk of real deception . . . ***to nil***.'"  *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 734 (N.D. Cal. 2022) (emphasis in original).[15]

Defendants contend that their playbook statements are protected by the PSLRA's safe harbor because they reference "'year two of operations'" and amount to puffery because they include terms like "'compelling,'" "'strong,'" and "'attractive.'"  Mot. at 26.  "'[Y]ear two of operations'" is not what was misleading.  ¶¶168, 173, 183, 202.  It was assertions about the playbook's effect on Xponential's business and

---

[15]    *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996), which defendants cite to say that Xponential warned of the "'exact[]'" risk Plaintiffs claim was omitted, does not help defendants.  Mot. at 26.  There, the court held that statements about balancing the impact of interest rates in an investment portfolio were not actionable where investors "were told that the value of losses if rates dropped could exceed the value of profits if rates rose" which was "the very bias which plaintiffs claim was not disclosed." *Olkey*, 98 F.3d at 5, 7.  Defendants' disclosures did not do that here.  While they discussed franchisee performance, they did not disclose that franchisees had been misled with false representations regarding performance.  Those false representations created substantial risks that Xponential never mentioned.

- 31 -

on franchisee performance that misled investors. *Glazer*, 63 F.4th at 774 ("statements [that] describe past and current conditions" not protected by the safe harbor). And the presence of optimistic terms does not render an entire statement puffery. *Id.* at 770-71 (statements not puffery where they "went beyond mere optimism by 'provid[ing] a concrete description of the past and present state of the pipeline'").[16]

### B. Defendants' Studio Closure and SBA Loan Statements Were False and Misleading

To convince franchisees and investors that franchisees were successful, Geisler and Meloun repeatedly said that Xponential had never had a permanent studio closure or a single default on an SBA loan. ¶¶216-226. These facts proved "how healthy" the franchise base was. ¶¶104, 224. But these claims were false. Several studios had closed; several franchisees had defaulted at the time, and more followed. ¶¶227-243; *Glazer*, 63 F.4th at 764 ("[a] statement is false . . . if it 'directly contradict[s] what the defendant knew at the time'"). The false statements added to defendants' misleading portrayal of Xponential's growth and success.

### 1. Defendants' Arguments About Permanent Studio Closures Are Meritless

Defendants say the Complaint wrongly acts as if they said no studios had been permanently closed "'*[by] the franchisees*.'" Mot. at 26-27 (emphasis in original). But falsity depends on how "[a] diligent investor would have taken that representation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1182 (9th Cir. 2024). Defendants' implicit insistence that their closure boasts were not meant as signs of franchisee health is belied by the fact that they expressly offered the supposed

---

[16] Defendants cite *Barry v. Colony Northstar, Inc.*, 2019 WL 13237719, at *14 (C.D. Cal. Aug. 1, 2019), to argue use of terms like "'compelling,'" "'strong,'" and "'attractive'" render their statements puffery. Mot. at 26. But those are not the part that is misleading. *Id.* The misleading part was defendants' repeated refrain that the playbook played an instrumental role in franchisee performance (¶¶168, 173, 183, 202) while concealing that their false claims about profitability prevented numerous franchisees from doing so. ¶¶168, 209-214. These representations about the importance of the playbook to franchisee performance are not puffery. *Glazer*, 63 F.4th at 770-71.

- 32 -

lack of closures as a sign of franchisee health.  ¶224 ("[T]he way to really think about how healthy are our franchisees is closures, and we don't have closures in our studios."); *id.* ("So if [the franchisees] weren't making money, they'd be going away. And obviously, they're not because we haven't had any closures in the system."). That was the only reason to say it.  The boast loses all steam and sense if defendants really meant, and thought everyone would understand it as, "a number of franchisees lost money, and we bought back their franchises and held onto them as transition studios to hopefully resell to others, but we've never permanently closed anything."[17]

Defendants say their "public disclosures ma[de] clear that Xponential's definition of 'permanent studio closures' did not include company-owned transition studios."  Mot. at 27-28 (original emphasis omitted).  Yet they cite nothing in the disclosures saying transition studios are excepted from their "zero closure" message. Certainly nothing in the disclosures "'discredit[s] the [allegedly misleading statement] so obviously that the risk of real deception ***drops to nil***.'"  *QuantumScape*, 580 F. Supp. 3d at 734 (emphasis in original).[18]

Defendants also dispute that their "increase in studio closures in 2024" proves transition studios really were closed failed studios all along, saying the change to close them just reflected a "transparent shift in corporate strategy."  Mot. at 28-29.  The short answer is, regardless of label, Xponential already acknowledged that in reality these were failed studios.  ¶241 ("pretty high" new closure rate represented "a lagging

---

[17]    This is not *Cloudera*, which involved the ambiguous phrase "cloud-native." *See* 121 F.4th at 1187-88; Mot. at 26.  "Zero," "0," and "never" (¶¶216-226) are plain and absolute, and even putting aside there is ample evidence in the Complaint that the "transition" studio gambit was part of a larger charade to avoid "closed" studios – context makes clear defendants meant the boast as no franchisee had permanently closed a studio.

[18]    Defendants' reliance on *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020), to argue that Plaintiffs have "cherry-picked" their false statements is misplaced.  Mot. at 28.  There, plaintiff offered an "implausible interpretation" where it had "omit[ted] the entire context of the statement." *Align*, 485 F. Supp. 3d at 1125-26.  Defendants do not provide any context that would make Plaintiffs' interpretation implausible.

- 33 -

4929-2587-4528.v1

catch up related to studios that . . . should have ramped down or closed over time"); ¶242 (new CEO: closures reflected "struggling underperforming studios [that] probably need to close"). Xponential's change of direction also is just one of the bases in the Complaint for the allegation that Xponential had permanently closed studios contrary to its claims. *E.g.*, ¶¶106-107.[19]

### 2. Defendants' Arguments About Xponential's AUV Definition and the Materiality of AUVs and SBA Loan Defaults Are Meritless

Defendants contend that their statements about AUVs were not misleading because "Xponential was transparent about how it calculated its AUV metric." Mot. at 26-27 n.11. But while the Company's definition included studios "'***that have been open for at least 13 calendar months as of the measurement***,'" it did not reveal that the calculation excluded failed studios until after the Fuzzy Panda report. *Id.* (emphasis in original); ¶¶146, 212. A reasonable investor would interpret Xponential's original AUV definition to mean that new studios were not included, not that failed studios were removed. *Genius Brands*, 97 F.4th at 1182.[20]

Defendants say their statements about Xponential's AUVs and SBA loan defaults were not material. Mot. at 26-28 nn.10-11. But defendants expressly told investors that these metrics reflected Xponential's financial health. ¶¶169-208. The materiality of the statements lies in the messaging it would have changed, not statistical differences it could have made. As a sales pitch (which these were), there is a significant difference to any potential franchisee or investor between "our AUV for

---

[19]    The multiple bases for the allegation are why nothing is really gained in this case from the observation in *Cheng v. Can. Goose Holdings Inc.*, 2021 WL 3077469, at *8 (S.D.N.Y. July 19, 2021), that a company changing strategy in light of market conditions is not unusual. Mot. at 29.

[20]    Defendants argue summarily that Plaintiffs' §11 claims that defendants violated Items 105 and 303 of Regulation S-K "fail for the same reasons discussed above." Mot. at 29 n.12. Since their arguments above fail, so too must this summary. *See* §V. And since "the risks were [not] completely disclosed," as discussed at §V.A.2., herein, *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998), does not help defendants.

4929-2587-4528.v1

the quarter was $600,000" and "our AUV for the quarter was $600,000 but for these two brands it was $900,000 and for the remaining brands it was $32,000"; or "no franchisee has ever defaulted on a loan," versus "our franchisees have taken out $200 million in loans and defaulted on $6 million."  And contrary to defendants' claim (Mot. at 26-27 n.10), the spike in SBA loan defaults in 2023 and 2024 (¶¶110-111, 238) demonstrates that franchisees were already struggling to keep up with their SBA loan payments, adding to the material nature of the omission. ¶110 (the time between loan approval and default is "an indication of the lagging nature of SBA loan defaults as a barometer for franchise system health").

In short, the omissions would have qualitatively and significantly altered the total mix of information available to investors. *SEC v. Leslie*, 2012 WL 116562, at *7 (N.D. Cal. Jan. 13, 2012) (even "relatively small" numbers can be material where they are "significant indicators of the company's health"); *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 974 (N.D. Cal. 2015) (CEOs theft of "quantitatively immaterial" amounts are material where "a reasonable investor would consider [them] as having 'significantly altered the "total mix" of information'").  As the SEC explains, an assessment of materiality must consider "all relevant" "qualitative factors" and there is "no basis" for relying "exclusive[ly] . . . on . . . [a] percentage or numerical threshold." *SEC Staff Accounting Bulletin No. 99 – Materiality*, 64 Fed. Reg. 45151 (Aug. 19, 1999).[21]

---

[21]    Defendants' authority on materiality is inapposite.  Mot. at 26-28 nn.10-11.  In *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), the Supreme Court actually rejected the very type of "bright-line rule" that defendants advance here because materiality "is a 'fact-specific' inquiry." *Id.* at 39, 43-45.  And *Shuster v. Symmetricon, Inc.*, 1997 WL 269490 (N.D. Cal. Feb. 25, 1997), and *Smith v. Cir. City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D. Va. 2003), did not involve the type of indicators of the Company's and its franchisees' financial health involved here. *Shuster*, 1997 WL 269490, at *8; *Smith*, 286 F. Supp. 2d at 710, 720-21.

- 35 -

## VI.   THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER

Defendants say the Complaint does not sufficiently allege scienter.  Mot. at 29-40.   Scienter is "'intent to deceive, manipulate, or defraud' or 'deliberate recklessness.'"  *Schueneman*, 840 F.3d at 705.  A defendant is deliberately "'reckless if he [or she] had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he [or she] could have done so without extraordinary effort.'"  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).  "The inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322-23 (emphasis in original).

### A.   Geisler and Meloun Acted with Scienter

The Complaint fully alleges Geisler's scienter.  He was the founder and top executive at Xponential who, being "critical to the development of [Xponential's] business," interacted closely with franchisees.  ¶¶253-260, 262.  He was directly involved in the false and misleading sales pitches to franchisees, recorded videos distributed to franchisees during the sales process, lured them in with indulgence, and closed the deals with false claims about profitability (¶¶63, 71, 253-254).  *Glazer*, 63 F.4th at 772 (strong inference of scienter because defendants "participated in the . . . pressure campaign").

Grabowski placed Geisler "'on calls every week with the franchisees'" during the pandemic and Geisler admitted wiring "free money to franchisees" that needed help "for the first 13-14 months of CycleBar," establishing he knew their financial condition.  ¶255.  Geisler threatened franchisees who sought to close studios because that would "harm[]" the brand.  ¶¶123-126, 132, 256.  He admitted monitoring the Company's Facebook page; he said to "provide support," but *Bloomberg* reported

- 36 -

4929-2587-4528.v1

indications he did so to track dissent.  ¶¶123, 257.  [A]dmissions from top executives that they are involved in every detail of the company . . . favor . . . inferring scienter." *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1022 (9th Cir. 2005), *abrogation recognized in part on other grounds by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023), *and In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171 (9th Cir. 2024).

Geisler also was warned by franchisees from two brands in a memo and letter before the Company went public that Xponential's representations and FDDs were grossly inaccurate and caused widespread financial ruin.  ¶¶63-65, 69, 88, 106, 259. Similar complaints persisted later (¶¶61-90), indicating Geisler had done nothing to correct and was indifferent to (and probably endorsed) the misrepresentations.  And the Company has now admitted the DFPI's investigation began in April 2023, a month before Geisler highlighted the Company's KPIs and hyped franchisee health in an earnings call, and falsely said again on Mad Money that no studio had permanently closed.  ¶¶156, 204, 226.  His lack of caution and indifference to accuracy in the face of an investigation was at least reckless but more likely betrays his determination to manipulate and deceive.  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("[t]he most direct way to show" the party making the statement knew it was false is through "contemporaneous reports or data, available to the party, which contradict the statement"); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *10 (S.D. Cal. Mar. 18, 2019) (allegation that "Defendants made their statements at a time when regulators were investigating whether Qualcomm engaged in the very licensing practices at issue, making it particularly implausible that Defendants did not know that Qualcomm, in fact, engaged in these practices" sufficient for scienter).[22]

---

[22]    Defendants wrongly claim the "only allegations of purported actual knowledge are that Geisler received two franchisee memos."  Mot. at 30.  For example, Geisler acknowledged wiring "free money to franchisees" that needed help, threatened franchisees who contemplated closing studios, and monitored Facebook to track

- 37 -

CFO Meloun also knew or recklessly disregarded that his statements were false and misleading. ¶¶258-267. Like Geisler, Meloun had franchise industry experience and knew about the required FDDs and their purpose. ¶258. He was CFO on the FDDs used to help mislead franchisees about profitability metrics, initial investment costs, franchise fees, and financing arrangements. ¶261. This direct involvement in the sales process raises a strong inference of Meloun's scienter. *Glazer*, 63 F.4th at 772. As CFO, Meloun also would know about the DFPI's investigation, which hit less than a month before he again misleadingly attributed sales growth to new studio openings during the Company's first quarter of 2023 earnings call. ¶¶156, 206; *Reese*, 747 F.3d at 570-72 (position gave executive "every reason to review" corrosion monitoring and left "little room for misunderstanding" data).

Meloun effectively admitted later in the Class Period that he knew the real financial condition of many of Xponential's franchisees. In June 2023 – three months after telling investors that "we don't have closures in our studios," "if [franchisees] weren't making money, they'd be going away[,] [a]nd obviously, they're not because we haven't had any closures in the system," and that the "health of franchisees is strong and getting stronger" (¶224) – Meloun did an abrupt about face and admitted the Company had sold transition studios that were "'already in trouble'" and claimed they decided to switch strategies to closing failed studios because reselling them was "'not a wise strategy.'" ¶¶145, 264-265, 267. Meloun made these admissions immediately before Xponential disposed of unprofitable studios in mass numbers. ¶¶145, 266. The timing and abrupt change – and blaming a strategic change instead of new information – indicates he knew all along his earlier claims of uniform franchisee health were untrue. *Reese*, 747 F.3d at 575 ("three to six months" between "the

dissent. ¶¶123-126, 132, 255-257. And contrary to defendants' contention (Mot. at 30 n.13), defendants' certifications under §302 of the Sarbanes-Oxley Act of 2002 ("SOX") add to the inference of scienter. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1190 (C.D. Cal. 2007) ("[F]inancial disclosures, proxy statements, and SOX Certifications are clearly 'statements' for the purposes of establishing contemporaneous knowledge.").

- 38 -

4929-2587-4528.v1

statements and the contradictory disclosures" supports scienter); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) ("'temporal proximity'" indicates "that defendants knew about the [problem] when they made the statement").

Defendants wrongly argue the memos sent to Geisler "lack detail and credibility" because the Complaint does not say "when" and "how" they were sent or whether he read them. Mot. at 31 (original emphasis omitted). The Complaint alleges that Geisler acknowledged receiving the AKT memo, both memos were sent to him, and identifies who sent them. ¶¶63-64, 259. It also quotes statements in each that contradicted defendants' claims to investors about Xponential's KPIs and franchisee performance (¶¶63-64, 69, 88, 106, 213, 227, 235, 259), distinguishing this case from the confidential witness descriptions of internal reports or generalized allegations of internal reports in defendants' authority. Mot. at 31.

Defendants also say that "nothing in either memo contradicts anything Geisler said to investors." *Id.* (original emphasis omitted). The import of the memos, however, is they demonstrate Geisler knew (or had enough knowledge to know) before the IPO about a key step in the scheme to defraud investors, *i.e.*, driving up licenses sold and studios opened through misrepresentations to franchisees. ¶¶63-65, 259. The persistence of similar complaints after the memos, after the IPO, indicate he endorsed the misrepresentations and knew what they served.[23]

---

[23]    No one claims the memos informed Geisler of "comprehensive data representative of the average" franchise. Mot. at 32. So defendants' citation to decisions minimizing records for not providing a complete data picture are irrelevant. *Id.* He was the CEO; he obviously could get that data from Company records. The memos instead indicate that, at best, Geisler had reason to be concerned that some franchisees had been misled (which a responsible CEO would seek to address, and he did not, making him reckless) and, at worst, he already knew. And that combined with the subsequent government investigations, Geisler's termination, the "pretty high" closure rate of Xponential studios, SBA loan defaults, offloading of brands for free, the DFPI's findings, and Xponential's "pause" in license sales demonstrates that the difference here was related to fraud, as opposed to the "assum[ption]" of fraudulent conduct in *In re Remec Inc. Sec. Litig.*, 415 F. Supp. 2d 1106, 1115 (S.D. Cal. 2006).

4929-2587-4528.v1

Finally, Defendants argue that even if the memos indicated Geisler knew that Xponential's FDDs were false, that does not mean Geisler knew his "'failure to disclose those facts presented a danger of misleading [investors].'"  Mot. at 32 (quoting *Petrie v. Elec. Game Card, Inc.*, 2011 WL 13130015, at *7 (C.D. Cal. Oct. 19, 2011)).  This cannot be serious.  Geisler was not naïve or unsophisticated.  He was the CEO of an international company.  He constantly tried to sell investors on licenses sold and studios opened, but he did not think they might pause if those metrics were achieved through deceit?  At any rate, his threats to franchisees and others to "protect Xponential's brand" show he fully sensed that investors would pass or be less enthusiastic if they knew Xponential's franchises were not as roundly successful as he claimed.  That pushes this well past *Petrie*.  *Id.*[24]

### B.  The Scheme Involved Xponential's Core Operations

Franchisees were the lifeblood of Xponential's business.  The Company's existence – and revenue growth – depended on managing them. ¶¶58-137.  The effect of the governmental investigations, which forced the Company to pause license sales *for every brand in every state* as its revenue growth collapsed, reinforced their importance to Xponential.  ¶162.  For that reason, defendants would have (*and did*) closely monitor the franchisees' financial condition.  ¶259.  In fact, that Geisler and Meloun repeatedly discussed the health of franchisees throughout the Class Period signals their obsessive monitoring.  ¶¶103-112, 168-207, 216-226; *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) ("'absurd'" to think "'not

---

[24]  Defendants argue they disclosed "'the Company's practice of taking back studios when franchisees had closed,'" and claim that Geisler and Meloun's knowledge of studio closures "says nothing about either Defendants['] intent to deceive."  Mot. at 32 n.14.  But defendants did not say they took back "closed" studios; they called them "underperforming." ¶¶146, 216-226.  And "repeated" false claims obviously suggest intent to deceive. *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at *6 (C.D. Cal. July 10, 2008).  Defendants' truth-on-the-market claim fails given the allegations, which, in any case, is "'fact-specific'" and "'inappropriate' for resolution at the pleading stage." *Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993, 1010 (C.D. Cal. 2025).

- 40 -

aware of issues'" when "defendants regularly made statements touting OSI's turnkey business . . . as 'driving . . . growth'").[25]

Defendants, relying on a handful of cases, mischaracterize the allegations as merely "'general awareness of the day-to-day workings of the company's business.'" Mot. at 33. But the cases they cite underscore the allegations in this case are more than sufficient. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008), holds that "general awareness" coupled with "additional allegation[s] of specific information conveyed to management and related to the fraud" allege scienter. *Id.* at 1068. *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149 (D. Ariz. 2005), indicates that while "broad allegations concerning the 'obviousness' of the corporate financial problems do not meet the PSLRA's particularity requirement," specific allegations of the sort here do. *Id.* at 1167. Defendants' receipt and disregard of memos complaining of fraudulent conduct (¶¶63-64, 259) along with their direct involvement in the fraudulent sales process (¶¶71, 253), the manipulation of store closures (¶¶113-137), and their interaction with franchisees (¶¶71, 255, 257) refutes their assertion that the allegations in *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264-66 (11th Cir. 2006) "created a much stronger inference of scienter." Mot. at 33. There, the plaintiffs "failed to allege what was said at the meeting, to whom it was said, or in what context." *Garfield*, 466 F.3d at 1265.[26]

---

[25] Defendants incorrectly argue the DFPI's findings "say nothing about scienter." Mot. at 34 n.16. For one, the findings all but confirm that defendants schemed to mislead franchisees. ¶273. For another, their failure to tell investors about the investigation while still making claims that the DFPI later found were false or misleading suggests (i) defendants always intended to deceive, and (ii) their misrepresentations to franchisees were not innocent or negligent or, being notified of the investigation, would have caused them to pause and verify their claims.

[26] Defendants say Grabowski "was an outside director, not an executive." Mot. at 33 n.15 (original emphasis omitted). Yet Grabowski is also a founder of Xponential, has been the Chairman of Xponential's Board of Directors since 2017, and was directly involved in Xponential's business, including interacting with franchisees. ¶¶33, 125-126, 299.

4929-2587-4528.v1

Defendants say the Complaint "must allege 'specific information conveyed to management and related to the fraud' that gives rise to an inference of fraudulent intent." Mot. at 34 (original emphasis omitted). Yet the Complaint does that. For example, unlike *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (*see* Mot. at 34), the Complaint quotes specific information in the memo and letter that Geisler received; it also quotes the Fuzzy Panda report that Xponential obviously read because it denied the contents. ¶¶64, 141-143, 259. It further alleges that the defective FDDs infected every brand in every state, undermining Xponential's reported KPIs and defendants' repeated representations about franchisee financial health. ¶¶90, 155, 160, 273.

Defendants erroneously say their false claims that no franchisee had defaulted on a loan "adds nothing" because there is no allegation that Geisler "knew of, or even had access to, such figures at the time of his challenged statements." Mot. at 34 (original emphasis omitted). Geisler volunteered and repeated this claim unprompted. Either he looked into the data then just lied, or he made the claim without knowing the true facts which was remarkably reckless, especially when he knew from the memo, letter, and lawsuits that numerous franchisees struggled financially, and they had a stock of "transition" studios which was code for studios that failed or were failing. *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("If he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.").[27]

_____

[27] Defendants argue that the restructuring allegations fail to support an inference of scienter because "Plaintiffs do not allege any specific information known to Defendants that would have made a statement to investors false when made" and "Xponential never disclosed brand-level financials in its SEC filings." Mot. at 34 n.17. Defendants ignore the allegations. Xponential restructured to hide the truth about its franchisees shortly after *The Capitol Forum* began investigating. ¶¶134, 263. Disclosure would have hindered license sales and undermined the Company's KPIs. ¶¶61-90, 169-208. The timing of the restructuring, which would have to be approved at the highest level in the Company (¶263), reveals defendants' intent to hide the truth and distinguishes *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *8 (C.D. Cal. Feb. 6, 2014). Here, Plaintiffs do not allege the restructuring was a "post-hoc claim that [Xponential's] method was flawed from the beginning." *Id.*

- 42 -

4929-2587-4528.v1

Defendants argue that Geisler "being generally involved with franchisees does not suggest that [he] intended to defraud investors." Mot. at 35 (original emphasis omitted) (citing *Garcia v. J2 Glob., Inc.*, 2022 WL 22717936, at *6 (C.D. Cal. Aug. 8, 2022), *aff'd sub nom. Espy v. J2 Glob., Inc.*, 99 F.4th 527 (9th Cir. 2024)). He was much more than "generally involved." Geisler not only received the memos revealing that Xponential's FDDs were false and that franchisees were facing financial ruin, but he was directly involved in the franchise sales process and even threatened franchisees to manipulate studio closures. ¶¶5, 64, 71, 123-126, 132, 256-257. This type of intentional conduct is very different than the reference to "executives [being] informed about their businesses" from *Garcia*, where "the SAC [was] vague regarding the precise information to which Defendants allegedly had access." 2022 WL 22717936, at *6. It also distinguishes this from *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043 (C.D. Cal. 2012), which said the defendant's presence at the factory at issue, office location in the same building as the company's manufacturing plant, and statement that terminated employees were "'part of [the] family for nearly 10 years'" were not enough to infer the defendant knew many American Apparel workers were undocumented. *Id.* at 1079. While defendants attack the lawsuit filed against Xponential in Orange County Superior Court by former CycleBar and BFT franchisees as "irrelevant to Geisler's state of mind" (Mot. at 35 n.19), it "corroborates" the reports that Geisler was directly involved in recruiting franchisees during the Class Period. ¶¶253-254. It is relevant to his knowledge and involvement in the fraudulent scheme, which distinguishes this case from those defendants cite.[28]

---

[28] Defendants' complaint that Plaintiffs do not adequately describe their sources could not be more off base. Mot. at 35 n.18. Plaintiffs provide specific details about the threatened franchisees, including the studios they owned, the timing of Geisler's threats, and even provide direct quotes from Geisler as examples of his intimidation tactics. ¶¶256-257. Their personal involvement put them in a position to know the information attributed to them, meeting the requirements in the authority defendants cite. Mot. at 35 n.18. And even though a threat by Geisler was at a confidential

4929-2587-4528.v1

Defendants say pointing to Xponential's closures of Company-owned studios following the Fuzzy Panda report "is pure fraud-by-hindsight." Mot. at 36. First, that was just one of multiple bases supporting the allegation that studios had been closed or functionally closed contrary to defendants' claims. ¶¶71, 106-107, 114, 116, 121. Second, "significant evidence of scienter . . . can be gleaned from . . . later disclosures." *Reese*, 747 F.3d at 574. Xponential's switch from "transition" to "closure" buttresses the allegations that Geisler and Meloun knew their statements about studio closures were false and misleading when made. Meloun acknowledged on March 15, 2023, that buyers of some "refranchised studios had been 'handed a studio that was already in trouble.'" ¶265. And Geisler stated in connection with the disposal of 66 studios after Fuzzy Panda revealed the truth that ""Mitch [got] some duds."" ¶266. These admissions, combined with Geisler's claim that studio closures would be "harmful" to the brand (¶126), indicate defendants always knew their "no closures proves the franchises are healthy" narrative was grossly misleading at best. The spike in closures after the Fuzzy Panda report just effectively confirmed what many had alleged long before: many studios failed, and Xponential covered that up (¶¶106-107, 227-236, 239, 266), which is why defendants' fraud-by-hindsight authority does not apply. Mot. at 36.

Defendants' argument that Xponential simply changed its definition of "'permanent'" closures to include studios that were "'no longer operating'" fails for the same reasons. *Id.* Franchisee reports of permanent closures (¶¶106-107, 116, 121), the spike in closures (¶¶239-243, 266), and defendants' acknowledgment that refranchised studios were "already in trouble" (¶¶145, 264-267) distinguishes this case from *Cheng.* Mot. at 36. Unlike this case, the plaintiffs in *Cheng* lacked additional evidence indicating that defendants did not simply adjust their business model in the

---

mediation, it was referenced from public sources and is a particular allegation that the Court can accept as true. ¶256.

- 44 -

intervening months between the statements at issue. *Cheng*, 2021 WL 3077469, at *11.

Defendants also argue the government investigations, their sales "pause," and their financial restatement do not suggest scienter, and the pause was consistent with "a desire to improve compliance." Mot. at 36-37. Defendants ignore that all the allegations combined are what demonstrate (and must be assessed for) scienter, not any fact or category of facts on their own. Regardless, the main significance of these developments was they tend to prove the circumstances alleged by others and in the Complaint are true: FDDs were inaccurate, franchisees were misled, and so on. But because they concerned matters so critical to Xponential's functioning, they also tend to indicate defendants knew and (even if they improbably did not do so earlier) must have looked into the true state of Xponential's business at least by the point they learned of the DFPI's April 2023 investigation. *See EHang*, 2025 WL 1242324, at *9 (quoting *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003)) ("The company's maintenance problems, and the related government investigation, were so paramount to the company that 'it [was] absurd to suggest that the Board of Directors would not discuss' them.") The PSLRA does not require the Court to "close their eyes to circumstances that are probative of scienter" and leave common sense at the courthouse door. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Defendants cite *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1042 (S.D. Cal. 2014) (Mot. at 37), but the investigations in that case did not lead to findings of wrongdoing during the class period or a halt in the company's operations.

Defendants similarly view the Complaint too narrowly in asserting that "[t]here are no allegations that Geisler or Meloun knew – or even should have known – nearly two years prior that an impairment charge related to certain brands would ultimately be required." Mot. at 37. The Complaint alleges evidence defendants knew or had reason to know their "no closures" claims were false, they covered up closures and

- 45 -

4929-2587-4528.v1

failed franchises, and the "transitional" labeling was a charade. Added to that, the belated concession marked by the impairment charges tends to confirm the entire effort to obscure closed studios was meant to create a false impression of uniformly healthy franchises and deceive investors. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (finding that impairment charges and financial restatements contributed to the totality of allegations that demonstrated a strong inference of scienter).

### C.    Geisler and Grabowski's Stock Sales Support Scienter

"'Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.'" *Daou*, 411 F.3d at 1022. "To evaluate suspiciousness of stock sales, [the Ninth Circuit] consider[s], *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Oracle*, 380 F.3d at 1232.

All three are satisfied here. ¶¶138-140, 268-271. Both Geisler and Grabowski sold large percentages of their holdings for proceeds totaling $275 million. ¶270 (Geisler – 79.3% of Class A common stock and 23.7% of all holdings for $55.6 million; Grabowski – 59.1% of Class A common stock and 40.9% of total holdings for $219.8 million). They both sold at near then-peak prices. ¶¶268-269 (Geisler – most sales near peak trading price of $33.58, including sales as high as $33.49); ¶270 (Geisler and Grabowski's SPO sales at $24.50, just below then-highest trading price). And neither had sold shares on the open market when they first began trading (¶269). *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) ("massive and uncharacteristic sale in February, made near the apogee of QSI's stock price . . . and shortly before the stock went into a steep decline . . . is, to say the least, 'suspicious'"), *cert. dismissed sub nom. Quality Sys., Inc. v. City of Mia. Fire Fighters' & Police Officers' Ret. Tr.*, 586 U.S. 1031 (2018). These suspicious stock sales, combined with Xponential's $120 million IPO strengthen the inference of

- 46 -

scienter. *Abdo v. Fitzsimmons*, 2018 WL 11220494, at *18 (N.D. Cal. May 22, 2018) ("misrepresentations while soliciting funds from investors adds to the strength of the allegations").[29]

Defendants argue the timing of the sales was not suspicious "because all of Grabowski's sales and most of Geisler's sales" were in the "IPO or SPO" and "Company insiders could not sell shares prior to the July 2021 IPO." Mot. at 38. First, the Motion ignores that defendants' sales were timed for at near then-peak prices. Second, the SPO took place nearly a year after the IPO, leaving plenty of time to establish a pattern. Geisler and Grabowski are unlike the new officer in *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999). Mot. at 39. Neither Geisler nor Grabowski argue that they were restricted from engaging in trades earlier. *Id.* Since the SPO was designed exclusively for **insiders** to sell their shares, it does not render defendants' trading innocent. *Osher* does not hold otherwise. 302 F. Supp. 2d at 1166; Mot. at 38.

Defendants point to Geisler's 10b5-1 trading plan to negate scienter. Mot. at 39. But "the fact of the 10b5-1 trading plan, without more, is insufficient to negate the effect of otherwise suspicious sales." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013). "'[A] 10b5-1 trading plan'" instead "'requires an additional factual finding of good faith,' which a court cannot make [on]

---

[29] These sales are far more suspicious than those in defendants' authority. Mot. at 37-38; *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) ("[o]ne insider's well timed sales" not suspicious where the others acted **inconsistent** with a fraudulent inference since they "sold too soon to be taking advantage of their allegedly fraudulent statements"); *Metzler*, 540 F.3d at 1067 (lack of sales by one defendant weighed against scienter where the other two insiders sold most of their shares "before the DOE investigation" at issue and "in a manner consistent with their pre-Class Period sales"); *Osher v. JNI Corp.*, 302 F. Supp. 2d 1145, 1165-66 (S.D. Cal. 2003) (sales were "consistent with prior trading" pattern); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 873 (N.D. Cal. 2004) (stock sales consistent with past trading patterns and sold at 43% to 72% of the stock's peak value). And nearly all of the open market purchases that defendants mention (without identifying) occurred **after** Fuzzy Panda disclosed the truth to investors (ECF 112-6 at 44, 46; ECF 112-7 at 19). *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1141 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017), thus, does not help defendants. Meloun's lack of sales do not negate scienter under these circumstances.

- 47 -

a motion to dismiss." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *4 (N.D. Cal. Nov. 27, 2018).  And here, *The Capitol Forum* sent investigatory questions to the Company less than a month before Geisler established his plan and just a few months before both the SPO and Geisler's open-market trades.  ¶269.  The convenient timing after a prolonged period of no sales suggests Geisler feared Xponential's practices were in danger of exposure and sought to sell before the stock lost value.  In this case, implementing the trading plan adds to the inference of scienter.  Defendants' authority, reciting general rules, does not hold otherwise.  *See* Mot. at 39.

### D. Geisler's Termination Amidst Criminal Investigations Concludes the Scheme and Supports Scienter

Executive departures support scienter when they are "accompanied by suspicious circumstances." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).  Xponential effectively terminated Geisler when it announced civil and criminal investigations into what the Company later admitted involved "studio closures, communications with franchise owners, financial reporting, and insider trading policies."  ¶¶15, 154.  Geisler's termination adds credibility to the numerous sources alleged in the Complaint and strengthens the inference of scienter as to all defendants.  *See In re Fibrogen, Inc.*, 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022) ("abrupt resignation tends to support scienter").  Contrary to defendants' assertion (Mot. at 39-40), Geisler's termination strengthens the inference of scienter against Meloun and Grabowski since the investigations involved the same scheme and especially against Grabowski since, as an admittedly close associate of Geisler, he publicly defended Geisler's "'professionalism'" after the Fuzzy Panda report.  ¶¶9-10, 246-247.[30]

_____

[30]    Shortly before filing their Motion, defendant Xponential filed a Notice of Subsequent Event to inform the Court that "'[o]n July 1, 2025, the SEC informed the Company that it had concluded its investigation without action.'" ECF 117.  But they failed to also inform the Court of deep staffing cuts at the SEC, including in its enforcement division.  Douglas Gillison & Chris Prentice, *Wall Street watchdog staff shrinks 16% in last year, includes key units, sources say*, Reuters (Apr. 24, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/wall-street-watchdog-

4929-2587-4528.v1

Defendants argue that Geisler's termination was not suspicious because it occurred "a full year after the Fuzzy Panda report" and the "'press release did not specifically attribute Geisler's dismissal to the wrongdoing.'"  Mot. at 39.  But they fail to address the allegations tying the investigations and Geisler's termination to the fraudulent conduct alleged in the Complaint.  ¶¶15, 154.  These allegations provide the "suspicious circumstances" referenced in *Zucco*, 552 F.3d at 1002, and distinguish this case from *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069 (N.D. Cal. 2005), where the terminated executives "would assist in the 'management transition'" and where "there [was] no evidence that defendants' termination was based on fraud."  *Id.* at 1092-93.

### E.     Defendants' Suggested Inference Is Not Compelling

Defendants suggest that a more compelling inference is that "[a]n unidentified number of franchisees, in the midst and wake of the global pandemic, experienced financial hardships" and that defendants had to step in "to transition these studios to other franchisees or operated some as company-owned studios" because "the Company had some unhappy and underperforming franchisees[,] . . . some of whom apparently believed the Company was misleading them about operating a studio." Mot. at 40.  This inference is not even plausible.  It ignores, among other allegations: (i) the DFPI's findings that the Company's FDDs for *every* brand "included material misrepresentations and omissions" regarding studio profitability; (ii) federal regulations requiring that FDDs be provided to each prospective franchisee (16 C.F.R. §436.2) meant that the Company used these false and misleading FDDs for *every* franchise license sale, Company-wide; (iii) the Company's admission that the DFPI's findings and other investigations required it to "pause" license sales in ***all states for every brand***; (iv) the internal memos sent to Geisler ***before the Covid outbreak*** stating

staff-shrinks-16-last-year-includes-key-units-sources-say-2025-04-24/.  The SEC's decision to not "take enforcement action cannot be construed as indicating that a party has been exonerated."  *Zamir v. Bridgepoint Educ., Inc.*, 2018 WL 1258108, at *17 (S.D. Cal. Mar. 12, 2018); *see also* 17 C.F.R. §202.5(d).

- 49 -

that Xponential's FDDs were false and that franchisees were operating at significant losses; (v) the numerous corroborating claims by separate sources revealing that Xponential misrepresented the profitability of its studios and the health of the Company's franchisees by manipulating studio closures, as confirmed by the jump in studio closures and SBA loan defaults after the truth was revealed; and (vi) Geisler's termination amidst civil and criminal government investigations.  Plaintiffs' allegations raise a compelling inference of scienter.  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016) ("[I]f two possible inferences . . . are equally compelling, a plaintiff has demonstrated a strong inference of scienter.").[31]

## VII.   THE COMPLAINT ALLEGES LOSS CAUSATION

"To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  "'Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.'" *Id.*  Pleading loss causation "'should not prove burdensome,' for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

The Complaint alleges the connection.  Among other things, it specifies defendants misled and lied to investors about how they achieved the number of

---

[31]   Defendants rely on *City of Roseville*, to argue that "Plaintiffs' allegations address only alleged 'red flags' that 'were matters of public knowledge.'" Mot. at 40.  The internal memos and governmental investigations across the country distinguish this case from the "red flags" ignored in *City of Roseville*, which consisted "entirely of own financial data that Defendants publicly and contemporaneously reported." 963 F. Supp. 2d at 1132.  Additionally, the public was unaware that: (i) Xponential utilized false and misleading FDDs to inflate their KPIs; (ii) numerous Company-owned studios were permanently closed; (iii) numerous franchisees had defaulted on SBA loans; and (iv) a vast majority of Xponential's brands were losing money monthly.  Defendants' authority is thus inapposite.  Mot. at 40.

4929-2587-4528.v1

licenses they sold and studios they opened, and by their claim that no studios had permanently closed.  ¶¶141-167, 282-286.  The Fuzzy Panda report exposed defendants' misrepresentations to franchisees and squarely contradicted defendants' "no closure" claims.  ¶¶141-143.  Xponential's stock declined 37% the same day the report came out (¶144), making it a corrective disclosure for loss causation purposes. *First Solar*, 881 F.3d at 754 ("That a stock price drop comes immediately ***after*** the revelation of fraud can help to rule out alternative causes.") (emphasis in original). The Complaint also satisfies loss causation as a materialization of undisclosed risk since discovery by investigative reporters was within the zone of risk created by defendants' misstatements and omissions.  *Genius Brands*, 97 F.4th at 1184 ("A corrective disclosure . . . is not the only way a plaintiff can show that 'the truth became known.'"); *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *21 (C.D. Cal. Aug. 4, 2014) (increased restrictions on off-label use within "'zone of risk'" created by false statements about marketing compliance with U.S. Food and Drug Administration ("FDA") regulations).  Defendants do not identify any other fact that caused Plaintiffs' loss.

The November 1, 2023 BofA report, the December 7, 2023 *Bloomberg* article, the May 10, 2024 announcement that Geisler was suspended indefinitely as CEO, and the Company's report of its fourth quarter and fiscal year 2024 financial results also revealed the truth that, in turn, caused fraud-induced inflation to dissipate.  ¶¶149-166. The day after the Fuzzy Panda report, Xponential issued a press release "denounc[ing] the misleading Report" and reiterating "the strength of the business and health of its franchisees" while defending Geisler's "'professionalism.'"  ¶146.  The BofA report, the *Bloomberg* article, Geisler's termination, and the Company's report of its fourth quarter and fiscal year 2024 financial results showed the denials were false.  The BofA report confirmed widespread franchisee financial distress (¶¶12, 149-150) while the *Bloomberg* article and the Company's financial reporting revealed the manipulative nature of the scheme (¶¶14, 151-152).  The *Bloomberg* article and the

- 51 -

announcement of Geisler's termination also revealed that the Company was under criminal and regulatory investigation. *Id.* Since each disclosure was immediately followed by a drop in Xponential's stock price – 8%, a three day 33.8% decline, 31%, and 38% respectively (¶¶150, 152, 154, 166) – the Complaint easily alleges loss causation. *First Solar*, 881 F.3d at 754. The disclosures also satisfy loss causation as a materialization of undisclosed risks. Discovery by investigative reporters, governmental investigations, terminations of those involved, and restrictions on selling franchise licenses were within the zone of risk created by defendants' misrepresentations. *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 815 (C.D. Cal. 2011) (FDA denial of drug application was a materialization of an undisclosed risk that adequately alleged loss causation).

Defendants say the Fuzzy Panda report was not a corrective disclosure because it "merely aggregated already public information," which they argue means that "everything underlying the purported 'scheme' was already public – and, by definition, incorporated into Xponential's stock price." Mot. at 41 (original emphasis omitted). But Fuzzy Panda analyzed "16,000+ pages of Franchise Disclosure Doc[ument]s," had "conversations with franchisees," sat through sales pitches from Xponential "sales reps," and received and reviewed an internal Company memo to Geisler. *See* ECF 67-8 at 3, 8-9, 11, 14, 16-18, 25. This is not the type of "reasonably available" public information that would be automatically incorporated into a stock price. *QuantumScape*, 580 F. Supp. 3d at 732, 742 ("the [short] report interviewed nine former QuantumScape employees about QuantumScape's testing"); *Longo*, 2021 WL 1232678, at *10 (corrective disclosure because short seller report "'disclosed verifiable facts and documents . . . that were not reasonably available to investors'"); *In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *11 (C.D. Cal. Sep. 28, 2023) (short report includes information that "would not have been readily available to investors and was not already known by the market"). The Ninth Circuit expressly

- 52 -

permits loss causation from "'any source,'" including short sellers. *Genius Brands*, 97 F.4th at 1178, 1184.[32]

Defendants argue that "the Company's March 2025 restatement and related disclosures . . . are untethered to any challenged statement." Mot. at 43. Even if that was true, the Complaint alleges loss causation elsewhere, so dismissal would be inappropriate. In any case, the disclosures further revealed the existence and breadth of the scheme, as well as the expanding government investigations, that defendants misled Xponential's franchisees in every brand and had to "pause" license sales in all states to "update[] and renew[]" its FDDs, and the backlog of studios over a year behind schedule from opening, undermining the claims about franchisee health and the denial of the Fuzzy Panda report. ¶¶156-165, 283. These announcements were also all within the zone of risk created by defendants' misrepresentations, satisfying loss causation as a materialization of undisclosed risks since they diminished Xponential's stock by 38%. ¶¶166, 283; *MannKind*, 835 F. Supp. 2d at 815.[33]

---

[32]    The breadth of the analysis and the type of sources used for the Fuzzy Panda report, including undercover interaction with Xponential's sales representatives, distinguish this case from *Nektar*, 34 F.4th at 839-40, and *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 541-42 (9th Cir. 2024), on which defendants rely to argue that the Fuzzy Panda report did not reveal new information. Mot. at 41-42. The short seller in *Nektar* merely "compared statements made by Nektar at different conferences" and "cross-checked sources provided by Nektar." 34 F.4th at 840. The short seller in *Espy* based its report "only on a careful reading of public documents." 99 F.4th at 542. And while the Fourth Circuit in *Defeo v. IonQ, Inc.*, 134 F.4th 153, 163-64 (4th Cir. 2025), criticized a short-seller's use of disclaimers, the Fuzzy Panda report here offered facts that provided assurances of reliability, including: (i) a representation that "[t]o the best of their ability and belief, all information contained in their reports is accurate and reliable"; (ii) a contact email; and (iii) a representation that "[w]e have reported and will continue to report all the information . . . to the SEC, FTC, and have reached out to state attorney generals." *See* ECF 67-8 at 3, 20, 26. Those factors add to the report's reliability. *Espy*, 99 F.4th at 541 (distinguishing the "report in *Nektar*, which had no associated contact information that would allow investors to verify the report's reliability"). Fuzzy Panda's representations, cited sources, and the resulting 37% stock decline, make it plausible that investors did not take the report with a grain of salt. *BofI*, 977 F.3d at 795 ("The ultimate question is again one of plausibility. . . ."); *Longo*, 2021 WL 1232678, at *10 (30% stock decline "the same day that details" were revealed by short seller sufficient for loss causation).

[33]    Defendants incorrectly argue that including Class Period purchasers who held through March 2025 violates the PSLRA's bounce-back provision. Mot. at 43 n.22. The March 2025 disclosures and resulting 38% decline damaged those investors.

- 53 -

4929-2587-4528.v1

Finally, defendants argue that the BofA report and the *Bloomberg* article "did not reveal any new risk that had not already been communicated to the market by Fuzzy Panda." Mot. at 43 (original emphasis omitted). But defendants continued to mislead investors by denying the Fuzzy Panda report. The BofA report and *Bloomberg* article indicated the denial was itself false. ¶¶146-152. The denials make this unlike the full materialization in *Acadia*. 756 F. Supp. 3d at 878-79; Mot. at 43. Defendants' failure to address these allegations and Geisler's termination independently satisfying loss causation by materializing an undisclosed risk dooms their loss causation arguments.[34]

## VIII. THE COMPLAINT SUFFICIENTLY ALLEGES §12(a)(2) CLAIMS AGAINST GRABOWSKI

The Complaint "strips" the Securities Act allegations of fraud, so Rule 8 governs those allegations. *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *17 (C.D. Cal. June 9, 2016). "[S]ection 12(a)(2) . . . 'imposes civil liability on a person who offers or sells securities by means of a prospectus or oral communication containing material misrepresentations or omissions.'" *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. Aug. 17, 2006). "Plaintiffs must allege facts indicating that defendants actually sold or otherwise solicited the purchase of the securities at issue . . . and . . . were 'sellers' within the meaning of section 12." *Id.*

Defendant Grabowski is a quintessential statutory seller under §12(a)(2). Contrary to defendants' claim that "there are no allegations suggesting Grabowski

*Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) (rejecting the notion that "Plaintiffs cannot suffer any loss as a result of fraud that was not disclosed until after the close of the class period"). Defendants' argument that the disclosures did not reveal any "truth" is not credible.

[34] Citing *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), and *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *3 (C.D. Cal. Mar. 16, 2015), defendants argue that "Plaintiffs cannot use the announcement of governmental investigations to plead loss causation." Mot. at 43. But after *Loos* and *Herbalife*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016), held that "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation." *Id.* at 1203.

- 54 -

4929-2587-4528.v1

actively solicited any sales in the SPO" (Mot. at 44), the Complaint alleges that Grabowski signed the defective registration statement for the SPO and funded Xponential's roadshows (through his H&W entities) to sell "[a]ll shares" in the SPO for himself. ¶¶138, 140, 344-345. Defendants bald assertion that he did not "'fund[] Xponential's roadshows'" ignores the allegations. Mot. at 44 n.25. And their argument that the §12(a)(2) "claim also fails because Plaintiffs fail to allege a material misstatement in the Offering Documents" (*id.* at 44 n.24) similarly ignores the allegations that the offering documents for the SPO included statements about Xponential's KPIs but omitted that defendants procured license sales, studio openings, and growing AUVs with inaccurate and misleading sales information. ¶¶322-326. These allegations suffice at the pleadings stage. *Pinter v. Dahl*, 486 U.S. 622, 647 (1988) (liability "extends . . . to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests"); *Portal*, 2006 WL 2385250, at *4 ("solicitation activity [that] 'included participating in, and signing, the preparation of the false and misleading Prospectus'" held sufficient).[35]

## IX. THE COMPLAINT SUFFICIENTLY ALLEGES §15 AND §20(a) CLAIMS AGAINST GRABOWSKI

A §20(a) claim is alleged by "'(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.'" *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *17 (C.D. Cal. Dec. 5, 2022). A defendant need not be "a culpable participant in the violation" and "actual participation or the exercise of actual power" in the violation is "not necessary."

---

[35] Grabowski's signature on the defective registration statement, his act of committing Xponential to roadshow expenses, and his receipt of all the proceeds from the SPO distinguish this case from the cases defendants cite. Mot. at 44-45; *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *9-*10 (C.D. Cal. May 5, 2011) ("mere preparation of prospectus supplements insufficient to plead solicitation"); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1101-02 (C.D. Cal. 2003) ("only alleged acts were serving on the Board of Directors and signing the Prospectus and Registration Statement"); *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 990 (D. Ariz. 2024) ("the Court is not persuaded that signing a registration statement *alone* is sufficient").

- 55 -

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  "[B]ecause fraud is not a necessary element of a control person claim, the pleading of such a claim need only meet the requirements of Rule 8(a)."  *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *33 n.249 (C.D. Cal. Aug. 8, 2013).  "[T]he controlling person analysis [for §15] is the same."  *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1578 (9th Cir. 1990)).  "'[T]he determination of who is a controlling person . . . is an intensely factual question'" that is not typically subject to resolution on a motion to dismiss.  *Ferreira v. Funko Inc.*, 2021 WL 8820650, at *37 (C.D. Cal. Oct. 22, 2021) (quoting *Arthur Child.'s Tr. v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993)).

The Complaint easily alleges Grabowski exercised control over Xponential.  He is a co-founder, a co-conspirator in the scheme (¶¶33, 57-140), has been the Chairman of Xponential's Board of Directors since 2017 (¶¶263, 299), was a *de facto* controlling shareholder of Xponential throughout the Class Period (¶¶36, 299), was involved in Xponential's operations (¶¶81, 125-126, 210), and even made alleged false statements (¶¶246-247).  Grabowski exercised actual control over Xponential in connection with the SPO.  He signed the defective registration statement and committed Xponential to "road show" expenses so he could sell shares entirely for himself.  *See* §VIII, *supra*.  Defendants' argument that "Plaintiffs allege only that Grabowski was a founder and a director of Xponential" or did not exercise control over the false statements, again, ignores the allegations.  Mot. at 45.  The allegations here also distinguish this case from the cases defendants cite.  *In re Downey Sec. Litig.*, 2009 WL 736802, at *15 (C.D. Cal. Mar. 18, 2009) ("position in Downey and their ownership of Downey stock" insufficient); *Bao v. Solarcity Corp.*, 2016 WL 54133, at *9-*10 (N.D. Cal. Jan. 5, 2016) (same).[36]

---

[36] Defendants argue that Plaintiffs' §15 claims against defendants Morris and Grayson fail because the Complaint "pleads no facts about anything they did to purportedly exercise control over Xponential."  Mot. at 45 n.27.  But the Complaint includes allegations that each were "critical to effecting the SPO, based on their involvement in preparing and signing the registration statement, and by having taken actions to ensure that the SPO was successfully completed."  ¶354.

4929-2587-4528.v1

## X.  CONCLUSION

For the reasons above, the Xponential Defendants' Motion should be denied.

DATED:  August 29, 2025

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DOUGLAS R. BRITTON
JEREMY W. DANIELS


                    s/ Douglas R. Britton
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
jdaniels@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON
ROBERT D. KLAUSNER
BONNI S. JENSEN
7080 NW 4th Street
Plantation, FL  33317
Telephone:  954/916-1202
954/916-1232 (fax)
bob@robertdklausner.com
bonni@robertdklausner.com

Additional Counsel

- 57 -

4929-2587-4528.v1

**L.R. 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 44 pages, exclusive of caption, table of contents, table of authorities, and signature block, which complies with the page limit set by Court Order dated August 26, 2025.

DATED:  August 29. 2025                         s/ Douglas R. Britton
                                        DOUGLAS R. BRITTON