# EXHIBIT 1

EXHIBIT 1
PAGE 3

EX-1 2 d181249dex1.htm EX-1

**Exhibit 1**

XPONENTIAL FITNESS, INC.

(a Delaware corporation)

[●] Shares of Class A Common Stock

<u>UNDERWRITING AGREEMENT</u>

Dated: [●], 2022

EXHIBIT 1
PAGE 4

XPONENTIAL FITNESS, INC.

(a Delaware corporation)

[●] Shares of Class A Common Stock

**UNDERWRITING AGREEMENT**

BofA Securities, Inc.
Jefferies LLC
as Representatives of the several Underwriters

c/o BofA Securities, Inc.
One Bryant Park
New York, New York 10036

c/o Jefferies LLC
520 Madison Avenue
New York, New York 10022

Ladies and Gentlemen:

     Xponential Fitness, Inc., a Delaware corporation (the "Company"), and the persons listed in Schedule B hereto (the "Selling Stockholders"), confirm their respective agreement with BofA Securities, Inc. ("BofA"), Jefferies LLC ("Jefferies") and each of the other Underwriters named in Schedule A hereto (collectively, the "Underwriters," which term shall also include any underwriter substituted as hereinafter provided in Section 10 hereof), for whom BofA and Jefferies are acting as representatives (in such capacity, the "Representatives"), with respect to (i) the sale by the Selling Stockholders, acting severally and not jointly, of [●] shares (the "Initial Securities") of Class A Common Stock, par value $0.0001 per share ("Class A Common Stock"), and the purchase by the Underwriters, acting severally and not jointly, of the respective numbers of Initial Securities set forth opposite such Underwriters' names on Schedule A hereto, and (ii) the grant by the Selling Stockholders to the Underwriters, acting severally and not jointly, of the option described in Section 2(b) hereof to purchase all or any part of [●] additional shares (the "Option Securities") of Class A Common Stock. The Initial Securities and the Option Securities are herein called, collectively, the "Securities."

     The Company is a holding company with its principal asset being a controlling ownership interest in Xponential Fitness LLC, a Delaware limited liability company ("XPO LLC" and, together with the Company, the "XPO Parties"), through its ownership interest in Xponential Intermediate Holdings, LLC, a Delaware limited liability company ("XPO Holdings LLC").

     The XPO Parties and the Selling Stockholders understand that the Underwriters propose to make a public offering of the Securities as soon as the Representatives deem advisable after this Agreement has been executed and delivered.

2

EXHIBIT 1
PAGE 5

The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement on Form S-1 (No. 333-[●]), including the related preliminary prospectus or prospectuses, covering the registration of the sale of the Securities under the Securities Act of 1933, as amended (the "1933 Act"). Promptly after the execution and delivery of this Agreement, the Company will prepare and file a prospectus in accordance with the provisions of Rule 430A ("Rule 430A") of the rules and regulations of the Commission under the 1933 Act (the "1933 Act Regulations") and Rule 424(b) ("Rule 424(b)") of the 1933 Act Regulations. The information included in such prospectus that was omitted from such registration statement at the time it became effective but that is deemed to be part of such registration statement at the time it became effective pursuant to Rule 430A(b) is herein called the "Rule 430A Information." Such registration statement, including the amendments thereto, the exhibits thereto, any schedules thereto and the documents incorporated or deemed to be incorporated by reference therein pursuant to Item 12 of Form S-1 under the 1933 Act, at the time it became effective, and including the Rule 430A Information, is herein called the "Registration Statement." Any registration statement filed pursuant to Rule 462(b) of the 1933 Act Regulations is herein called the "Rule 462(b) Registration Statement" and, after such filing, the term "Registration Statement" shall include the Rule 462(b) Registration Statement. Each prospectus used prior to the effectiveness of the Registration Statement, and each prospectus that omitted the Rule 430A Information that was used after such effectiveness and prior to the execution and delivery of this Agreement, including the documents incorporated by reference therein pursuant to Item 12 of Form S-1 under the 1933 Act, is herein called a "preliminary prospectus." The final prospectus, in the form first furnished to the Underwriters for use in connection with the offering of the Securities, including the documents incorporated or deemed to be incorporated by reference therein pursuant to Item 12 of Form S-1 under the 1933 Act, are herein called the "Prospectus." For purposes of this Agreement, all references to the Registration Statement, any preliminary prospectus, the Prospectus or any amendment or supplement to any of the foregoing shall be deemed to include the copy filed with the Commission pursuant to its Electronic Data Gathering, Analysis and Retrieval system or any successor system ("EDGAR").

As used in this Agreement:

"Applicable Time" means [●] [A.M./P.M.] (New York City time) on [●], 2022 or such other time as agreed by the Company and the Representatives.

"General Disclosure Package" means any Issuer General Use Free Writing Prospectuses (as defined herein) issued at or prior to the Applicable Time, the most recent preliminary prospectus (including any documents incorporated therein by reference) that is distributed to investors prior to the Applicable Time and the information included in Schedule C-1 hereto, all considered together.

"Issuer Free Writing Prospectus" means any "issuer free writing prospectus," as defined in Rule 433 of the 1933 Act Regulations ("Rule 433"), including, without limitation, any "free writing prospectus" (as defined in Rule 405 of the 1933 Act Regulations ("Rule 405")) relating to the Securities that is (i) required to be filed with the Commission by the Company, (ii) a "road show that is a written communication" within the meaning of Rule 433(d)(8)(i), whether or not required to be filed with the Commission, or (iii) exempt from filing with the Commission pursuant to Rule 433(d)(5)(i) because it contains a description of the Securities or of the offering that does not reflect the final terms, in each case in the form filed or required to be filed with the Commission or, if not required to be filed, in the form retained in the Company's records pursuant to Rule 433(g).

"Issuer General Use Free Writing Prospectus" means any Issuer Free Writing Prospectus that is intended for general distribution to prospective investors (other than a "*bona fide* electronic road show," as defined in Rule 433 (a "Bona Fide Electronic Road Show")), as evidenced by its being specified in Schedule C-2 hereto.

3

EXHIBIT 1
PAGE 6

"Issuer Limited Use Free Writing Prospectus" means any Issuer Free Writing Prospectus that is not an Issuer General Use Free Writing Prospectus.

"Testing-the-Waters Communication" means any oral or written communication with potential investors undertaken in reliance on Section 5(d) or Rule 163B of the 1933 Act.

SECTION 1. Representations and Warranties.

(a) *Representations and Warranties by the XPO Parties*. Each XPO Party severally represents and warrants to each Underwriter as of the date hereof, the Applicable Time, the Closing Time and any Date of Delivery (as defined herein), and agrees with each Underwriter, as follows:

(i) Registration Statement and Prospectuses. Each of the Registration Statement and any amendment thereto has become effective under the 1933 Act. No stop order suspending the effectiveness of the Registration Statement or any post-effective amendment thereto has been issued under the 1933 Act, no order preventing or suspending the use of any preliminary prospectus or the Prospectus has been issued and no proceedings for any of those purposes have been instituted or are pending or, to the knowledge of the XPO Parties, contemplated. The Company has complied with each request (if any) from the Commission for additional information.

Each of the Registration Statement and any post-effective amendment thereto, at the time it became effective, the Applicable Time, the Closing Time and any Date of Delivery, complied and will comply in all material respects with the requirements of the 1933 Act and the 1933 Act Regulations. Each preliminary prospectus, the Prospectus and any amendment or supplement thereto, at the time each was filed with the Commission, and, in each case, at the Applicable Time, the Closing Time and any Date of Delivery, complied and will comply in all material respects with the requirements of the 1933 Act and the 1933 Act Regulations. Each preliminary prospectus delivered to the Underwriters for use in connection with the offering and the Prospectus was or will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

The documents incorporated or deemed to be incorporated by reference in the Registration Statement, any preliminary prospectus and the Prospectus, when they became effective or at the time they were or hereafter are filed with the Commission, complied and will comply in all material respects with the requirements of the 1934 Act and the rules and regulations of the Commission under the 1934 Act (the "1934 Act Regulations").

(ii) Accurate Disclosure. Neither the Registration Statement nor any amendment thereto, at its effective time, on the date hereof, at the Closing Time or at any Date of Delivery, contained, contains or will contain an untrue statement of a material fact or omitted, omits or will omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. At the Applicable Time and any Date of Delivery, neither (A) the General Disclosure Package nor (B) any individual Issuer Limited Use Free Writing Prospectus, when considered together with the General Disclosure Package when considered together with the General Disclosure Package, included, includes or will include an untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. Neither the Prospectus nor any amendment or supplement thereto, as of its issue date, the time of any filing with the Commission pursuant to Rule 424(b), the Closing Time or any Date of Delivery, included, includes or will include an untrue statement of a material fact or omitted,

4

EXHIBIT 1
PAGE 7

omits or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The documents incorporated or deemed to be incorporated by reference in the Registration Statement, the General Disclosure Package and the Prospectus, at the time the Registration Statement became effective or when such documents incorporated by reference were filed with the Commission, as the case may be, when read together with the other information in the Registration Statement, the General Disclosure Package or the Prospectus, as the case may be, did not and will not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

The representations and warranties in this subsection shall not apply to statements in or omissions from the Registration Statement (or any amendment thereto), the General Disclosure Package or the Prospectus (or any amendment or supplement thereto) made in reliance upon and in conformity with written information furnished to the Company by any Underwriter through the Representatives expressly for use therein. For purposes of this Agreement, the only information so furnished shall be the information in the first paragraph under the heading "Underwriting–Commissions and Discounts," the information in the fourth paragraph under the heading "Underwriting–Listing," the information in the second, third and fourth paragraphs under the heading "Underwriting–Price Stabilization, Short Positions and Penalty Bids" and the information under the heading "Underwriting–Electronic Distribution," in each case contained in the Prospectus (collectively, the "Underwriter Information").

(iii) <u>Incorporation of Documents by Reference</u>. The Company meets the requirements to incorporate documents by reference in the Registration Statement pursuant to General Instruction VII to Form S-1 under the 1933 Act and the 1933 Act Regulations.

(iv) <u>Issuer Free Writing Prospectuses</u>. No Issuer Free Writing Prospectus conflicts or will conflict with the information contained in the Registration Statement or the Prospectus, including any document incorporated by reference therein, and any preliminary or other prospectus deemed to be a part thereof that has not been superseded or modified. The representations and warranties in this subsection shall not apply to statements in or omissions from any Issuer Free Writing Prospectus made in reliance upon and in conformity with the Underwriter Information.

(v) <u>Testing-the-Waters Materials</u>. The Company has not engaged in, or authorized any other person to engage in, any Testing-the-Waters Communication.

(vi) <u>Company Not Ineligible Issuer</u>. At the time of filing the Registration Statement and any post-effective amendment thereto, at the earliest time thereafter that the Company or another offering participant made a *bona fide* offer (within the meaning of Rule 164(h)(2) of the 1933 Act Regulations) of the Securities and at the date hereof, the Company was not and is not an "ineligible issuer," as defined in Rule 405, without taking account of any determination by the Commission pursuant to Rule 405 that it is not necessary that the Company be considered an ineligible issuer.

(vii) <u>Emerging Growth Company Status.</u> From the time of the initial confidential submission of the Registration Statement to the Commission through the date hereof, the Company has been and is an "emerging growth company," as defined in Section 2(a) of the 1933 Act (an "Emerging Growth Company").

5

EXHIBIT 1
PAGE 8

(viii) <u>Independent Accountants</u>. The accountants who certified the financial statements and supporting schedules included in the Registration Statement, the General Disclosure Package and the Prospectus are independent public accountants as required by the 1933 Act, the 1933 Act Regulations, the Securities Exchange Act of 1934, as amended (the "1934 Act"), the 1934 Act Regulations and the Public Company Accounting Oversight Board.

(ix) <u>Financial Statements; Non-GAAP Financial Measures</u>. The financial statements included or incorporated by reference in the Registration Statement, the General Disclosure Package and the Prospectus, together with the related schedules and notes, present fairly, in all material respects, the financial position of the Company and XPO LLC and their consolidated subsidiaries at the dates indicated and the statement of operations, stockholders' equity and cash flows of the Company and XPO LLC and their consolidated subsidiaries for the periods specified; said financial statements have been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved, except, in the case of unaudited interim financial statements, subject to normal year-end audit adjustments and the exclusion of certain footnotes as permitted by the applicable rules of the Commission; the supporting schedules, if any, present fairly in all material respects in accordance with GAAP the information required to be stated therein; the selected financial data and the summary financial information included in the Registration Statement, the General Disclosure Package and the Prospectus have been derived from the accounting records of the XPO Parties and their consolidated subsidiaries and present fairly, in all material respects, the information shown therein and have been compiled on a basis consistent with that of the audited financial statements included therein; the pro forma financial information included in the Registration Statement, the General Disclosure Package and the Prospectus present fairly, in all material respects, the information shown therein, have been prepared in all material respects in accordance with the Commission's rules and guidelines with respect to pro forma financial information and have been properly compiled on the bases described therein, and the assumptions used in the preparation thereof are reasonable and the adjustments used therein are appropriate to give effect to the transactions and circumstances referred to therein; except as included therein, no historical or pro forma financial statements or supporting schedules are required to be included or incorporated by reference in the Registration Statement, the General Disclosure Package or the Prospectus under the 1933 Act, the 1933 Act Regulations, the 1934 Act or the 1934 Act Regulations; and all disclosures contained in the Registration Statement, the General Disclosure Package or the Prospectus, or incorporated by reference therein, regarding "non-GAAP financial measures" (as such term is defined by the rules and regulations of the Commission) comply in all material respects with Regulation G of the 1934 Act and Item 10 of Regulation S-K of the 1933 Act, to the extent applicable.

(x) <u>No Material Adverse Change in Business</u>. Except as otherwise stated therein, since the respective dates as of which information is given in the Registration Statement, the General Disclosure Package or the Prospectus, (A) there has been no material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the XPO Parties and their subsidiaries considered as one enterprise, whether or not arising in the ordinary course of business (a "Material Adverse Effect"), (B) there have been no transactions entered into by any XPO Party or any of their subsidiaries, other than those in the ordinary course of business, which are material with respect to the XPO Parties and their subsidiaries considered as one enterprise, and (C) there has been no dividend or distribution of any kind declared, paid or made by any XPO Party or XPO Holdings LLC on any class of its capital stock or other equity interests except as disclosed in the Registration Statement, the General Disclosure Package and the Prospectus.

6

EXHIBIT 1
PAGE 9

(xi) <u>Good Standing of the XPO Parties</u>. The Company has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Delaware and has corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Registration Statement, the General Disclosure Package and the Prospectus and to enter into and perform its obligations under this Agreement; each of XPO Holdings LLC and XPO LLC has been duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware and has power and authority to own, lease and operate its properties and to conduct its business as described in the Registration Statement, the General Disclosure Package and the Prospectus and to enter into and perform its obligations under this Agreement; and each XPO Party and XPO Holdings LLC is duly qualified as a foreign corporation to transact business and is in good standing in each other jurisdiction (to the extent the concept of "good standing" is applicable to each such jurisdiction) in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure so to qualify or to be in good standing would not reasonably be expected to result in a Material Adverse Effect.

(xii) <u>Good Standing of Subsidiaries</u>. Each "significant subsidiary" (as such term is defined in Rule 1-02 of Regulation S-X) of each XPO Party (each, a "Subsidiary" and, collectively, the "Subsidiaries") has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its incorporation or organization (to the extent the concept of "good standing" is applicable in each such jurisdiction), has corporate or similar power and authority to own, lease and operate its properties and to conduct its business as described in the Registration Statement, the General Disclosure Package and the Prospectus and is duly qualified to transact business and is in good standing in each jurisdiction in which such qualification is required (to the extent the concepts of "qualification to transact business" and "good standing" are applicable in each such jurisdiction), whether by reason of the ownership or leasing of property or the conduct of business, except where the failure to so qualify or to be in good standing would not reasonably be expected to result in a Material Adverse Effect. Except as otherwise disclosed in the Registration Statement, the General Disclosure Package or the Prospectus, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable (to the extent such concepts are applicable in each such jurisdiction) and is owned directly or indirectly by the applicable XPO Party or XPO Holdings LLC, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity other than those arising under the credit agreements described in the General Disclosure Package and the Prospectus and filed as exhibits to the Registration Statement. None of the outstanding shares of capital stock of any Subsidiary were issued in violation of the preemptive or similar rights of any securityholder of such Subsidiary. The only subsidiaries of the Company are (A) those listed on Exhibit 21 to the Registration Statement and (B) certain other subsidiaries which, considered in the aggregate as a single subsidiary, do not constitute a "significant subsidiary" as defined in Rule 1-02 of Regulation S-X.

(xiii) <u>Capitalization</u>. The Company has an authorized, issued and outstanding capitalization as set forth or incorporated by reference in the Registration Statement, the General Disclosure Package and the Prospectus (except for subsequent issuances, if any, pursuant to this Agreement, pursuant to reservations, agreements or employee benefit plans referred to in the Registration Statement, the General Disclosure Package and the Prospectus or pursuant to the exercise of convertible securities, options or other equity or equity-based awards referred to in the Registration Statement, the General Disclosure Package and the Prospectus); the outstanding shares of capital stock or other equity interests of the Company, XPO Holdings LLC and XPO LLC, including the Securities to be purchased by the Underwriters from the Selling Stockholders,

7

EXHIBIT 1
PAGE 10

have been duly authorized and validly issued and are fully paid and non-assessable; none of the outstanding shares of capital stock or other equity interests of the Company, XPO Holdings LLC or XPO LLC, including the Securities to be purchased by the Underwriters from the Selling Stockholders, were issued in violation of any pre-emptive or similar rights of any securityholder of the Company; and, except as described in or expressly contemplated by the Registration Statement, the General Disclosure Package and the Prospectus, there are no outstanding rights that have not been duly waived or satisfied (including, without limitation, pre-emptive rights), warrants or options to acquire, or instruments convertible into or exchangeable for, any shares of capital stock or other equity interests in any the Company, XPO Holdings LLC or XPO LLC or any of their subsidiaries, or any contract, commitment, agreement, understanding or arrangement of any kind relating to the issuance of any such capital stock or other equity interests, any such convertible or exchangeable securities or any such rights, warrants or options.

(xiv) Authorization of this Agreement. Each of the Company, XPO Holdings LLC and XPO LLC has full right, power and authority to execute and deliver, to the extent a party thereto, this Agreement.

(xv) Description of Securities. The Class A Common Stock conforms in all material respects to all statements relating thereto contained in the Registration Statement, the General Disclosure Package and the Prospectus and such descriptions conform in all material respects to the rights set forth in the instruments defining the same. No holder of Securities will be subject to personal liability solely by reason of being such a holder.

(xvi) Registration Rights. There are no persons with registration rights or other similar rights to have any securities registered for sale pursuant to the Registration Statement or otherwise registered for sale or sold by the XPO Parties under the 1933 Act pursuant to this Agreement, other than those rights that have been disclosed in the Registration Statement, the General Disclosure Package and the Prospectus and have been waived.

(xvii) Absence of Violations, Defaults and Conflicts. Neither the XPO Parties nor any of their subsidiaries is (A) in violation of its charter, by-laws or similar organizational document, (B) in default in the performance or observance of any obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, deed of trust, loan or credit agreement, note, lease or other agreement or instrument to which any XPO Party or any of their subsidiaries is a party or by which it or any of them is bound or to which any of the properties or assets of any XPO Party or any of their subsidiaries is subject (collectively, "Agreements and Instruments"), except for such defaults that (i) are described in the Registration Statement, the General Disclosure Package and the Prospectus or (ii) would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or (C) in violation of any law, statute, rule, regulation, judgment, order, writ or decree of any arbitrator, court, governmental body, regulatory body, administrative agency or other authority, body or agency having jurisdiction over any XPO Party or any of their subsidiaries or any of their respective properties, assets or operations (each, a "Governmental Entity"), except for such violations that would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein and in the Registration Statement, the General Disclosure Package and the Prospectus and compliance by each XPO Party with its obligations hereunder have been duly authorized by all necessary corporate or similar action and do not and will not, whether with or without the giving of notice or passage of time or both, conflict with or constitute a breach of, or default or Repayment Event (as defined below) under, or result in the creation or imposition of any lien, charge or encumbrance upon any properties or assets of any XPO Party or any of their

8

EXHIBIT 1
PAGE 11

subsidiaries pursuant to, the Agreements and Instruments (except for such conflicts, breaches, defaults or Repayment Events or liens, charges or encumbrances that (i) would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect or (ii) have been duly and validly waived in writing as of the date of this Agreement), nor will such action result in any violation of the provisions of the charter, by-laws or similar organizational document of any XPO Party or any of their subsidiaries or any law, statute, rule, regulation, judgment, order, writ or decree of any Governmental Entity. As used herein, a "Repayment Event" means any event or condition which gives the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by any XPO Party or any of their subsidiaries.

(xviii) <u>Absence of Labor Dispute</u>. No labor dispute with the employees of any XPO Party or any of their subsidiaries exists or, to the knowledge of the XPO Parties, is imminent; and neither the XPO Parties nor any of their subsidiaries are aware of any existing or imminent labor disturbance by the employees of any XPO Party or any of their subsidiaries' principal suppliers, manufacturers, customers or contractors, which, in either case, would reasonably be expected to result in a Material Adverse Effect.

(xix) <u>Absence of Proceedings</u>. Except as disclosed in the Registration Statement, the General Disclosure Package and the Prospectus, there is no action, suit, proceeding, inquiry or investigation before or brought by any Governmental Entity now pending or, to the knowledge of the XPO Parties, threatened, against or affecting any XPO Party or any of their subsidiaries, which would reasonably be expected to result in a Material Adverse Effect, or which would reasonably be expected to materially and adversely affect the consummation of the transactions contemplated in this Agreement or the performance by the XPO Parties of their obligations hereunder; and the aggregate of all pending legal or governmental proceedings to which any XPO Party or any of their subsidiaries is a party or of which any of their respective properties or assets is the subject which are not described in the Registration Statement, the General Disclosure Package and the Prospectus, including ordinary routine litigation incidental to the business, would not result in a Material Adverse Effect.

(xx) <u>Accuracy of Exhibits</u>. There are no contracts or documents which are required under the 1933 Act or the 1933 Act Regulations to be described in the Registration Statement, the General Disclosure Package or the Prospectus or to be filed as exhibits to the Registration Statement which have not been so described and filed as required.

(xxi) <u>Absence of Further Requirements</u>. No filing with, or authorization, approval, consent, license, order, registration, qualification or decree of, any Governmental Entity is necessary or required for the performance by the XPO Parties of their obligations hereunder, in connection with the offering, sale of the Securities hereunder or the consummation of the transactions contemplated by this Agreement, except (A) such as have been already obtained or as may be required under the 1933 Act, the 1933 Act Regulations, the rules of the New York Stock Exchange (the "Exchange"), state securities laws or the rules of the Financial Industry Regulatory Authority, Inc. ("FINRA") and (B) such as which the failure to obtain would not, singly or in the aggregate, materially impair the power of the XPO Parties to perform their obligations under this Agreement.

(xxii) <u>Possession of Licenses and Permits</u>. Each XPO Party and its subsidiaries possess such permits, licenses, approvals, consents and other authorizations (collectively, "Governmental Licenses") issued by the appropriate Governmental Entities necessary to conduct the business now operated by them, except where the failure so to possess would not, singly or in the

9

EXHIBIT 1
PAGE 12

aggregate, reasonably be expected to result in a Material Adverse Effect. Each XPO Party and its subsidiaries are in compliance with the terms and conditions of all Governmental Licenses, except where the failure so to comply would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect. All of the Governmental Licenses are valid and in full force and effect, except when the invalidity of such Governmental Licenses or the failure of such Governmental Licenses to be in full force and effect would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Neither the XPO Parties nor any of their subsidiaries have received written notice of proceedings relating to the revocation or modification of any Governmental Licenses which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would reasonably be expected to result in a Material Adverse Effect.

(xxiii) <u>Title to Property</u>. Each XPO Party and its subsidiaries have good and marketable title to all real property owned by them and good title to all other properties owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (A) are described in the Registration Statement, the General Disclosure Package and the Prospectus or (B) do not, singly or in the aggregate, materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by such XPO Party or its subsidiary; and all of the leases and subleases material to the business of the XPO Parties and their subsidiaries, considered as one enterprise, and under which any XPO Party or any of their subsidiaries holds properties described in the Registration Statement, the General Disclosure Package or the Prospectus, are in full force and effect, and neither the XPO Parties nor any of their subsidiaries have received written notice of any material claim of any sort that has been asserted by anyone adverse to the rights of any XPO Party or any of their subsidiaries under any of the leases or subleases mentioned above, or affecting or questioning the rights of such XPO Party or such subsidiary to the continued possession of the leased or subleased premises under any such lease or sublease, except to the extent that where such failure to be in effect or such claim would not reasonably be expected to result in a Material Adverse Effect.

(xxiv) <u>Possession of Intellectual Property</u>. Each XPO Party and its subsidiaries own, possess or have the right to use, or can acquire on reasonable terms, patents, patent rights, licenses, inventions, copyrights, know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), trademarks, service marks, trade names or other intellectual property (collectively, "Intellectual Property") necessary to carry on the business now operated by them, except where the failure to own, possess or acquire such Intellectual Property would not, singly or in the aggregate, reasonably be expected to have a Material Adverse Effect. Neither the XPO Parties nor any of their subsidiaries have received written notice of, and the XPO Parties are not otherwise aware of, any infringement of or conflict with asserted rights of others with respect to any Intellectual Property or of any facts or circumstances which would form a reasonable basis to render any Intellectual Property invalid, and which infringement or conflict (if the subject of any unfavorable decision, ruling or finding) or invalidity, singly or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(xxv) <u>Environmental Laws</u>. Except as described in the Registration Statement, the General Disclosure Package and the Prospectus or would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (A) neither the XPO Parties nor any of their subsidiaries is in violation of any applicable federal, state, local or, to the Company's knowledge, foreign statute, law, rule, regulation, ordinance, code or rule of common law or any legally binding judicial or administrative interpretation thereof, including any judicial or

10

EXHIBIT 1
PAGE 13

administrative order, consent, decree or judgment, relating to pollution or protection of human health (to the extent relating to exposure to Hazardous Materials (as defined below)), the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including, without limitation, laws and regulations relating to the release or threatened release of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum or petroleum products, asbestos-containing materials or toxic mold (collectively, "Hazardous Materials") or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials (collectively, "Environmental Laws"), (B) each XPO Party and its subsidiaries have all permits, authorizations and approvals required for their respective operations under any applicable Environmental Laws and are each in compliance with their requirements, (C) there are no pending or, to the XPO Parties' knowledge, threatened administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations or proceedings relating to any Environmental Law against any XPO Party or any of their subsidiaries and (D) to the XPO Parties' knowledge, there are no events or circumstances that would reasonably be expected to result in an order for clean-up or remediation, or an action, suit or proceeding by any private party or Governmental Entity, against or affecting any XPO Party or any of their subsidiaries relating to Hazardous Materials or any Environmental Laws.

(xxvi) <u>Accounting Controls and Disclosure Controls</u>. Each XPO Party and its subsidiaries, on a consolidated basis, maintain a system of internal control over financial reporting (as defined under Rules 13-a15 and 15d-15 under the rules and regulations of the Commission (the "1934 Act Regulations") under the 1934 Act and a system of internal accounting controls designed to provide reasonable assurances that (A) transactions are executed in accordance with management's general or specific authorization, (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets, (C) access to assets is permitted only in accordance with management's general or specific authorization, (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, and (E) the interactive data in eXtensible Business Reporting Language included or incorporated by reference in the Registration Statement, the General Disclosure Package and the Prospectus fairly presents the information called for in all material respects and is prepared in accordance with the Commission's rules and guidelines applicable thereto. Except as described in the Registration Statement, the General Disclosure Package and the Prospectus, since the end of the Company's most recent audited fiscal year, (1) the XPO Parties are not aware of any material weaknesses in their internal control over financial reporting (whether or not remediated) and (2) there has been no change in the XPO Parties' internal control over financial reporting that, in the case of clauses (1) and (2), has materially and adversely affected or is reasonably likely to materially and adversely affect the Company's internal control over financial reporting.

Each XPO Party and its subsidiaries, on a consolidated basis, maintain an effective system of disclosure controls and procedures (as defined in Rule 13a-15 and Rule 15d-15 under the 1934 Act Regulations) that are designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and is accumulated and communicated to the Company's management, including its principal executive officer or officers and principal financial officer or officers, as appropriate, to allow timely decisions regarding disclosure.

11

EXHIBIT 1
PAGE 14

(xxvii) <u>Compliance with the Sarbanes-Oxley Act.</u> There is and has been no failure on the part of the Company or any of the Company's directors or officers, in their capacities as such, to comply in all material respects with any provision of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith (the "Sarbanes-Oxley Act"), including Section 402 related to loans and Sections 302 and 906 related to certifications.

(xxviii) <u>Payment of Taxes</u>. All U.S. federal income tax returns of each XPO Party and its subsidiaries required by law to be filed by them (taking into account any timely requested extensions thereof) have been filed and all taxes shown by such returns or otherwise assessed, which are due and payable, have been paid, except assessments against which appeals have been or will be promptly taken and as to which adequate reserves have been provided, and except insofar as the failure to file such returns and pay such taxes would not reasonably be expected to result in a Material Adverse Effect. Each XPO Party and its subsidiaries have filed all other tax returns that are required to have been filed by them pursuant to applicable foreign, state, local or other law, except insofar as the failure to file such returns would not reasonably be expected to result in a Material Adverse Effect, and have paid all taxes due pursuant to such returns or pursuant to any assessment received by any XPO Party and any of their subsidiaries, except for such taxes, if any, as are being contested in good faith and as to which adequate reserves have been established by the applicable XPO Party or subsidiary, and except insofar as the failure to pay such taxes would not reasonably be expected to result in a Material Adverse Effect. The charges, accruals and reserves on the books of each XPO Party in respect of any income and corporation or similar tax liability for any years not finally determined are adequate to meet any assessments or re-assessments for additional income tax for any years not finally determined, except to the extent of any inadequacy that would not reasonably be expected to result in a Material Adverse Effect.

(xxix) <u>Insurance</u>. Except as described in the Registration Statement, the General Disclosure Package and the Prospectus, the XPO Parties and their subsidiaries carry or are entitled to the benefits of insurance, with financially sound and reputable insurers, or self-insurance in such amounts and covering such risks as, in the Company's reasonable judgement, is generally maintained by companies of established repute engaged in the same or similar business, and all such insurance is in full force and effect. Except as described in the Registration Statement, the General Disclosure Package and the Prospectus, the XPO Parties have no reason to believe that they or any of their subsidiaries will not be able (A) to renew their existing insurance coverage as and when such policies expire or (B) to obtain comparable coverage from similar institutions as may be necessary or appropriate to conduct their business as now conducted and at a cost that would not reasonably be expected to result in a Material Adverse Effect. Neither the XPO Parties nor any of their subsidiaries have been denied any insurance coverage which they have sought or for which they have applied.

(xxx) <u>Investment Company Act</u>. Each XPO Party is not required and, upon the sale of the Securities as herein contemplated, will not be required, to register as an "investment company" under the Investment Company Act of 1940, as amended.

(xxxi) <u>Absence of Manipulation</u>. Neither the XPO Parties nor, to the knowledge of the Company, any of their controlled affiliates have taken, nor will the XPO Parties or any of their controlled affiliates take, directly or indirectly, any action which is designed, or would reasonably be expected, to cause or result in, or which constitutes, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities or to result in a violation of Regulation M under the 1934 Act.

12

EXHIBIT 1
PAGE 15

(xxxii) <u>Foreign Corrupt Practices Act</u>. None of the Company, XPO Holdings LLC, XPO LLC or any of their subsidiaries nor, to the knowledge of the XPO Parties, any director, officer, agent, employee, affiliate or other person acting on behalf of any of the foregoing, is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA"), including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA, and the Company, XPO Holdings LLC, XPO LLC and, to the knowledge of the XPO Parties, each of their controlled affiliates have conducted their businesses in compliance with the FCPA and have instituted and maintain, or will institute and maintain, policies and procedures designed to ensure, and which are or will be reasonably expected to continue to ensure, continued compliance therewith.

(xxxiii) <u>Money Laundering Laws</u>. The operations of the Company, XPO Holdings LLC, XPO LLC and their subsidiaries are and have been conducted at all times in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Entity (collectively, the "Money Laundering Laws"); and no action, suit or proceeding by or before any Governmental Entity involving the Company, XPO Holdings LLC, XPO LLC or any of their subsidiaries with respect to any Money Laundering Laws is pending or, to the best knowledge of the XPO Parties, threatened.

(xxxiv) <u>OFAC</u>. None of the Company, XPO Holdings LLC, XPO LLC or any of their subsidiaries or, to the knowledge of the XPO Parties, any director, officer, agent, employee, affiliate or representative of the Company, XPO Holdings LLC, XPO LLC or any of their subsidiaries, is an individual or entity ("Person") currently the subject or target of any sanctions administered or enforced by the U.S. Government, including, without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union or Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), nor is the Company, XPO Holdings LLC, XPO LLC or any of their subsidiaries located, organized or resident in a country or territory that is the subject of comprehensive country-wide or territory-wide Sanctions.

(xxxv) <u>ERISA and Employment Law Compliance</u>. None of the following events has occurred or exists: (i) a failure to fulfill the obligations, if any, under the minimum funding standards of Section 302 of the Employee Retirement Income Security Act of 1974, as amended, and the regulations and published interpretations thereunder (collectively, "ERISA"), with respect to a Plan (as defined below) determined without regard to any waiver of such obligations or extension of any amortization period; (ii) an audit or investigation by the U.S. Internal Revenue Service, the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any other federal, state or foreign governmental or regulatory agency with respect to the employment or compensation of employees by any XPO Party or any of its subsidiaries that might reasonably be expected, singly or in the aggregate, to result in a Material Adverse Effect; or (iii) any breach of any contractual obligation, or any violation of law or applicable qualification standards, with respect to the employment or compensation of employees by any XPO Party or any of its subsidiaries that might reasonably be expected, singly or in the aggregate, to result in a Material

13

EXHIBIT 1
PAGE 16

Adverse Effect. Except as would not reasonably be expected, singly or in the aggregate, to result in a Material Adverse Effect, none of the following events has occurred or is reasonably likely to occur: (i) a failure to maintain and operate a Plan in compliance with its terms and the requirements of any applicable statutes, orders, rules and regulations, including ERISA and the Internal Revenue Code of 1986, as amended, and the regulations and published interpretations thereunder (collectively, the "Code"); (ii) a non-exempt prohibited transaction, within the meaning of Section 406 of ERISA or Section 4975 of the Code; (iii) a "reportable event", within the meaning of Section 4043(c) of ERISA, other than those events as to which notice is waived; (iv) a material increase in the amount of contributions required to be made to Plans, singly or in the aggregate in the current fiscal year of the Company and its subsidiaries compared to the amount of such contributions made in the Company's most recently completed fiscal year; (v) a material increase in the "accumulated post-retirement benefit obligations" (within the meaning of Statement of Financial Accounting Standards 106) of the Company and its subsidiaries compared to the amount of such obligations in the Company's most recently completed fiscal year; (vi) any event or condition giving rise to a liability under Title IV of ERISA (other than timely contributions to the Pension Benefit Guaranty Corporation in the ordinary course and without default); or (vii) the filing of a claim by one or more employees or former employees of any XPO Party or any of its subsidiaries related to its or their employment. For purposes of this paragraph, the term "Plan" means a plan (within the meaning of Section 3(3) of ERISA) with respect to which any XPO Party or any of its subsidiaries may have any liability.

(xxxvi) <u>Lending Relationship</u>. Except as disclosed in the Registration Statement, the General Disclosure Package and the Prospectus, the XPO Parties do not have any material lending or other relationship with any bank or lending affiliate of any Underwriter.

(xxxvii) <u>Related Party Transactions.</u> There are no business relationships or related party transactions involving any XPO Party or any of their subsidiaries or, to the knowledge of the XPO Parties, any other person that are required to be described in the Registration Statement, the General Disclosure Package and the Prospectus that have not been described as required.

(xxxviii) <u>Statistical and Market-Related Data</u>. Any statistical and market-related data included in the Registration Statement, the General Disclosure Package or the Prospectus are based on or derived from sources that the XPO Parties believe, after reasonable inquiry, to be reliable and accurate in all material respects and, to the extent required, the XPO Parties have obtained the written consent to the use of such data from such sources.

(xxxix) <u>Cybersecurity</u>. To the XPO Parties' knowledge, and except as disclosed in the Registration Statement, the General Disclosure Package and the Prospectus, (A) there has been no security breach or incident, unauthorized access or disclosure, or other compromise of or relating to any XPO Party's or any of their subsidiaries' information technology and computer systems, networks, hardware, software, data and databases (including the personally identifiable or confidential data and information of their respective customers, employees, suppliers, vendors and any third-party personally identifiable or confidential data maintained, processed or stored by any XPO Party and any of their subsidiaries, and any such personally identifiable or confidential data processed or stored by third parties on behalf of any XPO Party and any of their subsidiaries), equipment or technology (collectively, "IT Systems and Data"); (B) neither the XPO Parties nor their subsidiaries have been notified of, and the XPO Parties do not have knowledge of, any event or condition that would reasonably be expected to result in any security breach, incident, or unauthorized access or disclosure, or other compromise relating to their IT Systems and Data; and (C) each XPO Party and its subsidiaries have taken commercially reasonable steps to implement appropriate controls, policies, procedures, and technological

14

EXHIBIT 1
PAGE 17

safeguards to maintain and protect the integrity, continuous operation, redundancy and security of their IT Systems and Data that are reasonably consistent with industry standards and practices, or as required by applicable regulatory standards, except with respect to clauses (A) and (B), for any such security breach or unauthorized access or disclosure as would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect, or with respect to clause (C), where the failure to do so would not, singly or in the aggregate, reasonably be expected to result in a Material Adverse Effect. The XPO Parties and their subsidiaries are presently in compliance with all applicable laws or statutes and all judgments, orders, rules and regulations of any court or arbitrator or governmental or regulatory authority, internal policies and contractual obligations relating to the privacy and security of IT Systems and Data and to the protection of such IT Systems and Data from unauthorized use, access, misappropriation or modification, except where the failure to maintain such compliance would not reasonably be expected to result in a Material Adverse Effect.

(b) *Representations and Warranties by the Selling Stockholders*. Each Selling Stockholder severally represents and warrants to each Underwriter as of the date hereof, the Applicable Time, the Closing Time and any Date of Delivery, and agrees with each Underwriter, as follows:

(i) <u>Accurate Disclosure</u>. Neither the General Disclosure Package nor the Prospectus or any amendments or supplements thereto includes any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that the representations and warranties set forth in this Section 1(b)(i) apply only to statements or omissions made in reliance upon and in conformity with information relating to such Selling Stockholder furnished in writing by or on behalf of such Selling Stockholder expressly for use in the Registration Statement, the General Disclosure Package, the Prospectus or any other Issuer Free Writing Prospectus or any amendment or supplement thereto, which consists solely of the name and number of shares of such Selling Stockholder contained in the Selling Stockholders table (the "Selling Stockholder Information").

(ii) <u>Organization</u>. If such Selling Stockholder is an entity, such Selling Stockholder has been duly organized and is validly existing and in good standing under the laws of its respective jurisdiction.

(iii) <u>Authorization of this Agreement</u>. This Agreement has been duly authorized, executed and delivered by or on behalf of such Selling Stockholder.

(iv) <u>Non-Contravention</u>. The execution and delivery of this Agreement and the sale and delivery of the Securities to be sold by such Selling Stockholder and the consummation of the transactions contemplated herein and compliance by such Selling Stockholder with its obligations hereunder do not and will not, whether with or without the giving of notice or passage of time or both, conflict with or constitute a breach of, or default under, or result in the creation or imposition of any tax, lien, charge or encumbrance upon the Securities to be sold by such Selling Stockholder or any property or assets of such Selling Stockholder pursuant to any contract, indenture, mortgage, deed of trust, loan or credit agreement, note, license, lease or other agreement or instrument to which such Selling Stockholder is a party or by which such Selling Stockholder may be bound, or to which any of the property or assets of such Selling Stockholder is subject, nor will such action result in any violation of the provisions of the charter or by-laws or other organizational instrument of such Selling Stockholder, if applicable, or any applicable treaty, law, statute, rule, regulation, judgment, order, writ or decree of any government, government instrumentality or court, domestic or foreign, having jurisdiction over such Selling Stockholder or any of its properties except to the extent such breach, default, tax, charge or encumbrance as would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

15

EXHIBIT 1
PAGE 18

(v) <u>Valid Title</u>. Such Selling Stockholder has, and at the Closing Time will have, valid title to the Securities to be sold by such Selling Stockholder free and clear of all security interests, claims, liens, equities or other encumbrances and the legal right and power, and all authorization and approval required by law, to enter into this Agreement and to sell, transfer and deliver the Securities to be sold by such Selling Stockholder.

(vi) <u>Delivery of Securities</u>. Upon payment of the purchase price for the Securities to be sold by such Selling Stockholder pursuant to this Agreement, delivery of such Securities, as directed by the Underwriters, to Cede & Co. ("Cede") or such other nominee as may be designated by The Depository Trust Company ("DTC"), registration of such Securities in the name of Cede or such other nominee and the crediting of such Securities on the books of DTC to securities accounts (within the meaning of Section 8-501(a) of the UCC) of the Underwriters (assuming that neither DTC nor any such Underwriter has notice of any "adverse claim," within the meaning of Section 8-105 of the Uniform Commercial Code then in effect in the State of New York ("UCC"), to such Securities), (A) under Section 8-501 of the UCC, the Underwriters will acquire a valid "security entitlement" in respect of such Securities and (B) no action (whether framed in conversion, replevin, constructive trust, equitable lien, or other theory) based on any "adverse claim," within the meaning of Section 8-102 of the UCC, to such Securities may be asserted against the Underwriters with respect to such security entitlement; for purposes of this representation, such Selling Stockholder may assume that when such payment, delivery and crediting occur, (1) such Securities will have been registered in the name of Cede or another nominee designated by DTC, in each case on the Company's share registry in accordance with its certificate of incorporation, bylaws and applicable law, (2) DTC will be registered as a "clearing corporation," within the meaning of Section 8-102 of the UCC, (3) appropriate entries to the accounts of the several Underwriters on the records of DTC will have been made pursuant to the UCC, (4) to the extent DTC, or any other securities intermediary which acts as "clearing corporation" with respect to the Securities, maintains any "financial asset" (as defined in Section 8-102(a)(9) of the UCC in a clearing corporation pursuant to Section 8-111 of the UCC, the rules of such clearing corporation may affect the rights of DTC or such securities intermediaries and the ownership interest of the Underwriters, (5) claims of creditors of DTC or any other securities intermediary or clearing corporation may be given priority to the extent set forth in Section 8-511(b) and 8-511(c) of the UCC and (6) if at any time DTC or other securities intermediary does not have sufficient Securities to satisfy claims of all of its entitlement holders with respect thereto then all holders will share pro rata in the Securities then held by DTC or such securities intermediary.

(vii) <u>Absence of Manipulation</u>. Such Selling Stockholder has not taken, and will not take, directly or indirectly, any action which is designed to or which constituted or would be expected to cause or result in stabilization or manipulation of the price of any security of any XPO Party to facilitate the sale or resale of the Securities.

(viii) <u>Absence of Further Requirements</u>. No filing with, or consent, approval, authorization, order, registration, qualification or decree of any arbitrator, court, governmental body, regulatory body, administrative agency or other authority, body or agency, domestic or foreign, is necessary or required for the performance by such Selling Stockholder of its obligations hereunder or in connection with the sale and delivery of the Securities hereunder or the consummation of the transactions contemplated by this Agreement, except (A) such as have been already obtained or as may be required under the 1933 Act, the 1933 Act Regulations, the rules of the Exchange, state securities laws or the rules of FINRA and (B) such as which the failure to obtain would not, singly or in the aggregate, materially impair the power of such Selling Stockholder to perform its obligations under this Agreement.

16

EXHIBIT 1
PAGE 19

(ix) <u>No Registration or Other Similar Rights</u>. Such Selling Stockholder does not have any registration or other similar rights to have any equity or debt securities registered for sale by the Company under the Registration Statement or included in the offering contemplated by this Agreement except as have been duly and validly waived in writing as of the date of this Agreement.

(x) <u>No Free Writing Prospectuses</u>. Such Selling Stockholder has not prepared, or had prepared on its behalf, or used or referred to any "free writing prospectus" (as defined in Rule 405), and has not distributed any written materials in connection with the offer or sale of the Securities.

(xi) <u>OFAC; FCPA; Money Laundering Laws</u>. Such Selling Stockholder will not directly or indirectly use the proceeds of the sale of the Securities, or lend, contribute or otherwise make available such proceeds to any subsidiaries, joint venture partners or other Person (i) to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions or (ii) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of any money or anything of value to any Person in contravention of the FCPA or any Money Laundering Laws.

(xii) <u>ERISA</u>. Such Selling Stockholder represents and warrants that it is not (i) an employee benefit plan subject to Title I of ERISA, (ii) a plan or account subject to Section 4975 of the Code or (iii) an entity deemed to hold "plan assets" of any such plan or account under Section 3(42) of ERISA, 29 C.F.R. 2510.3-101, or otherwise

(xiii) <u>No Association with FINRA</u>. Neither such Selling Stockholder nor any of his, her or its, as applicable, affiliates directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with any member firm of FINRA or is a person associated with a member (within the meaning of the FINRA By-Laws) of FINRA.

(c) *Officer's Certificates*. Any certificate signed by any officer of the XPO Parties or any of their subsidiaries and delivered to the Representatives or to counsel for the Underwriters shall be deemed a representation and warranty by such XPO Party or subsidiary to each Underwriter as to the matters covered thereby; and any certificate signed by or on behalf of a Selling Stockholder as such and delivered to the Representatives or to counsel for the Underwriters shall be deemed a representation and warranty by such Selling Stockholder to each Underwriter as to the matters covered thereby.

SECTION 2. <u>Sale and Delivery to Underwriters; Closing</u>.

(a) *Initial Securities*. On the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth, each Selling Stockholder, severally and not jointly, agrees to sell that number of Initial Securities set forth opposite the name of such Selling Stockholder on Schedule B hereto to each Underwriter, severally and not jointly, and each Underwriter, severally and not jointly, agrees to purchase from each Selling Stockholder, at the price per share set forth in Schedule A hereto, that number of Initial Securities opposite such Underwriter's name on Schedule A hereto, plus any additional number of Initial Securities which such Underwriter may become obligated to purchase pursuant to the provisions of Section 10 hereof, subject, in each case, to such adjustments among the Underwriters as the Representatives in their sole discretion shall make to eliminate any sales or purchases of fractional shares.

17

EXHIBIT 1
PAGE 20

(b) *Option Securities*. In addition, on the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth, the Selling Stockholders hereby grant an option to the Underwriters, severally and not jointly, to purchase up to [●] Option Securities from the Selling Stockholders, with each Selling Stockholder granting an option to purchase up to that number of Option Securities set forth opposite such Selling Stockholder's name on Schedule B hereto, at the price per share set forth in Schedule A hereto, less an amount per share equal to any dividends or distributions declared by the Company and payable on the Initial Securities but not payable on the Option Securities. The option hereby granted may be exercised for 30 days after the date hereof and may be exercised in whole or in part at any time from time to time upon notice by the Representatives to the Selling Stockholders setting forth the number of Option Securities as to which the several Underwriters are then exercising the option and the time and date of payment and delivery for such Option Securities. Any such time and date of delivery (a "Date of Delivery") shall be determined by the Representatives, but shall not, without the consent of the Company, be earlier than two full business days or later than seven full business days after the exercise of said option, nor in any event prior to the Closing Time. If the option is exercised as to all or any portion of the Option Securities, each of the Underwriters, acting severally and not jointly, will purchase that proportion of the total number of Option Securities then being purchased which the number of Initial Securities set forth in Schedule A hereto opposite the name of such Underwriter bears to the total number of Initial Securities, subject, in each case, to such adjustments as the Representatives in their sole discretion shall make to eliminate any sales or purchases of fractional shares.

(c) *Payment*. Payment of the purchase price for, and delivery of certificates or security entitlements for, the Initial Securities shall be made at the offices of Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, or at such other place as shall be agreed upon by the Representatives, the Company and the Selling Stockholders at 9:00 A.M. (New York City time) on the second (third, if the pricing occurs after 4:30 P.M. (New York City time) on any given day) business day after the date hereof (unless postponed in accordance with the provisions of Section 10 hereof), or such other time not later than ten business days after such date as shall be agreed upon by the Representatives, the Company and the Selling Stockholders (such time and date of payment and delivery being herein called the "Closing Time").

In addition, in the event that any or all of the Option Securities are purchased by the Underwriters, payment of the purchase price for, and delivery of certificates or security entitlements for, such Option Securities shall be made at the above-mentioned offices, or at such other place as shall be agreed upon by the Representatives, the Company and the Selling Stockholders, on each Date of Delivery as specified in the notice from the Representatives to the Company and the Selling Stockholders.

Payment shall be made to the Selling Stockholders by wire transfer of immediately available funds to a bank account designated by the Custodian against delivery to the Representatives for the respective accounts of the Underwriters of certificates or security entitlements for the Securities to be purchased by them. It is understood that each Underwriter has authorized the Representatives, for its account, to accept delivery of, receipt for, and make payment of the purchase price for, the Initial Securities and the Option Securities, if any, which it has agreed to purchase. BofA, individually and not as a Representative of the Underwriters, may (but shall not be obligated to) make payment of the purchase price for the Initial Securities or the Option Securities, if any, to be purchased by any Underwriter whose funds have not been received by the Closing Time or the relevant Date of Delivery, as the case may be, but such payment shall not relieve such Underwriter from its obligations hereunder.

18

EXHIBIT 1
PAGE 21

SECTION 3. <u>Covenants of the Company and the Selling Stockholders</u>. The Company and each Selling Stockholder covenant with each Underwriter as follows:

(a) *Compliance with Securities Regulations and Commission Requests*. The Company, subject to Section 3(b) hereof, will comply with the requirements of Rule 430A, and will notify the Representatives promptly, and confirm the notice in writing, (i) when any post-effective amendment to the Registration Statement shall become effective or any amendment or supplement to the Prospectus shall have been filed, (ii) of the receipt of any comments from the Commission, (iii) of any request by the Commission for any amendment to the Registration Statement or any amendment or supplement to the Prospectus, including any document incorporated by reference therein or for additional information, (iv) of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or any post-effective amendment thereto or of any order preventing or suspending the use of any preliminary prospectus or the Prospectus, or of the suspension of the qualification of the Securities for offering or sale in any jurisdiction, or of the initiation or threatening of any proceedings for any of such purposes or of any examination pursuant to Section 8(d) or 8(e) of the 1933 Act concerning the Registration Statement and (v) if the Company becomes the subject of a proceeding under Section 8A of the 1933 Act in connection with the offering of the Securities. The Company will effect all filings required under Rule 424(b) in the manner and within the time period required by Rule 424(b) (without reliance on Rule 424(b)(8)) and will take such steps as it deems necessary to ascertain promptly whether the form of prospectus transmitted for filing under Rule 424(b) was received for filing by the Commission and, in the event that it was not, it will promptly file such prospectus. The Company will make every reasonable effort to prevent the issuance of any stop order, prevention or suspension and, if any such order is issued, to obtain the lifting thereof as soon as practicable.

(b) *Continued Compliance with Securities Laws*. The Company will comply with the 1933 Act and the 1933 Act Regulations so as to permit the completion of the distribution of the Securities as contemplated in this Agreement and in the Registration Statement, the General Disclosure Package and the Prospectus. If at any time when a prospectus relating to the Securities is (or, but for the exception afforded by Rule 172 of the 1933 Act Regulations ("Rule 172"), would be) required by the 1933 Act to be delivered in connection with sales of the Securities, any event shall occur or condition shall exist as a result of which it is necessary, in the opinion of counsel for the Underwriters or for the Company, to (i) amend the Registration Statement in order that the Registration Statement will not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) amend or supplement the General Disclosure Package or the Prospectus in order that the General Disclosure Package or the Prospectus, as the case may be, will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances existing at the time it is delivered to a purchaser or (iii) amend the Registration Statement or amend or supplement the General Disclosure Package or the Prospectus, as the case may be, in order to comply with the requirements of the 1933 Act or the 1933 Act Regulations, the Company will promptly (A) give the Representatives notice of such event, (B) prepare any amendment or supplement as may be necessary to correct such statement or omission or to make the Registration Statement, the General Disclosure Package or the Prospectus comply with such requirements and, a reasonable amount of time prior to any proposed filing or use, furnish the Representatives with copies of any such amendment or supplement and (C) file with the Commission any such amendment or supplement; provided that the Company shall not file or use any such amendment or supplement to which the Representatives or counsel for the Underwriters shall reasonably object in a timely manner. The Company will furnish to the Underwriters such number of copies of such amendment or supplement as the Underwriters may reasonably request.

19

https://www.sec.gov/Archives/edgar/data/1802156/000119312522095064/d181249dex1.htm 19/45

EXHIBIT 1
PAGE 22

(c) *Delivery of Registration Statements*. The Company has furnished or will deliver to the Representatives and counsel for the Underwriters, if requested, without charge, conformed copies of the Registration Statement as originally filed and each amendment thereto (including exhibits filed therewith or incorporated by reference therein and documents incorporated or deemed to be incorporated by reference therein) and conformed copies of all consents and certificates of experts, and will also deliver to the Representatives, without charge, a conformed copy of the Registration Statement as originally filed and each amendment thereto (without exhibits) for each of the Underwriters. The copies of the Registration Statement and each amendment thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(d) *Delivery of Prospectuses*. The Company has delivered to each Underwriter, without charge, as many copies of each preliminary prospectus as such Underwriter reasonably requested, and the Company hereby consents to the use of such copies for purposes permitted by the 1933 Act. The Company will furnish to each Underwriter, without charge, during the period when a prospectus relating to the Securities is (or, but for the exception afforded by Rule 172, would be) required to be delivered under the 1933 Act, the Company shall deliver to each Underwriter, without charge, such number of copies of the Prospectus (as amended or supplemented) as such Underwriter may reasonably request. The Prospectus and any amendments or supplements thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(e) *Blue Sky Qualifications*. The Company will use its reasonable best efforts, in cooperation with the Underwriters, to qualify the Securities for offering and sale under the applicable securities laws of such states and other jurisdictions (domestic or foreign) as the Representatives may reasonably designate and to maintain such qualifications in effect so long as required to complete the distribution of the Securities; provided, however, that the Company shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or as a dealer in securities in any jurisdiction in which it is not so qualified or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

(f) *Rule 158*. The Company will timely file such reports pursuant to the 1934 Act as are necessary in order to make generally available (which may be satisfied by filing with the Commission pursuant to EDGAR) to its securityholders as soon as practicable an earnings statement for the purposes of, and to provide to the Underwriters the benefits contemplated by, the last paragraph of Section 11(a) of the 1933 Act.

(g) *Listing*. The Company will use its reasonable best efforts to maintain the listing of the Class A Common Stock (including the Securities) on the Exchange.

(h) *Restriction on Sale of Securities*. During a period of 90 days from the date of the Prospectus, the Company will not, without the prior written consent of BofA and Jefferies, (i) directly or indirectly, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of any shares of Class A Common Stock or any securities convertible into or exercisable or exchangeable for Class A Common Stock (including the Company's Class B common stock, par value $0.0001 per share ("Class B Common Stock" and, together with the Class A Common Stock, the "Common Stock"), and the limited liability company interests in XPO LLC) or file or confidentially submit any registration statement under the 1933 Act with respect to any of the foregoing or (ii) enter into any swap or any other agreement or any transaction that transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of the Class A Common Stock, whether any such swap or transaction

20

EXHIBIT 1
PAGE 23

described in clause (i) or (ii) above is to be settled by delivery of Class A Common Stock or other securities, in cash or otherwise. The foregoing sentence shall not apply to (A) any shares of Class A Common Stock issued by the Company upon the exercise of an option or warrant or the conversion of a security outstanding on the date hereof and referred to in the Registration Statement, the General Disclosure Package and the Prospectus, (B) any shares of Class A Common Stock issued and options to purchase Class A Common Stock or other equity incentive awards granted in the ordinary course of business pursuant to employee benefit, equity incentive or employee stock purchase plans of the Company (i) referred to in the Registration Statement, the General Disclosure Package and the Prospectus or (ii) created as successor plans to any such plans or similar plans of XPO LLC referred to in the Registration Statement, the General Disclosure Package and the Prospectus, (C) the filing of any registration statement on Form S-8 or any successor form thereto with respect to the registration of securities to be offered under any plan referred to in clause (B) of this Section 3(h), (D) any shares of Class A Common Stock issued pursuant to any non-employee director stock plan or dividend reinvestment plan referred to in the Registration Statement, the General Disclosure Package and the Prospectus, (E) any shares of Class A Common Stock issued in exchange for an equivalent number of shares of Class B common stock, (F) the issuance of shares of Class A Common Stock in connection with the acquisition by the Company or any of its subsidiaries of the securities, business, property or other assets of another person or business entity or pursuant to any employee benefit plan assumed by the Company in connection with any such acquisition, or (G) the issuance of shares of Class A Common Stock, of restricted stock awards or of options to purchase shares of Class A Common Stock, in each case, in connection with joint ventures, commercial relationships or other strategic transactions, provided, however, that in the case of any issuance described in (F) or (G) above, (i) the aggregate number of shares of Class A Common Stock issued in connection with, or issuable pursuant to the exercise of any options or equity incentive awards issued in connection with, all such acquisitions and other transactions does not exceed 5% of the aggregate number of shares of Common Stock outstanding immediately following the consummation of the offering of the Securities and (ii) it shall be a condition to such issuance that the Representatives shall have received an agreement substantially in the form of Exhibit A hereto signed by each recipient.

(i) *Reporting Requirements*. The Company, during the period when a Prospectus relating to the Securities is (or, but for the exception afforded by Rule 172, would be) required to be delivered under the 1933 Act, will file all documents required to be filed with the Commission pursuant to the 1934 Act within the time periods required by the 1934 Act and 1934 Act Regulations.

(j) *Issuer Free Writing Prospectuses*. Each of the Company and each Selling Stockholder agrees that, unless it obtains the prior written consent of the Representatives, it will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus or that would otherwise constitute a "free writing prospectus," or a portion thereof, required to be filed by the Company with the Commission or retained by the Company under Rule 433; provided that the Representatives will be deemed to have consented to the Issuer Free Writing Prospectuses listed in Schedule C-2 hereto and any "road show that is a written communication" within the meaning of Rule 433(d)(8)(i) that has been reviewed by the Representatives. Each of the Company and each Selling Stockholder represents that it has treated or agrees that it will treat each such free writing prospectus consented to, or deemed consented to, by the Representatives as an "issuer free writing prospectus," as defined in Rule 433, and that it has complied and will comply with the applicable requirements of Rule 433 with respect thereto, including timely filing with the Commission where required, legending and record keeping. If at any time following issuance of an Issuer Free Writing Prospectus there occurred or occurs an event or development as a result of which such Issuer Free Writing Prospectus conflicted or would conflict with the information contained in the Registration Statement, any preliminary prospectus or the Prospectus or included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at that subsequent time, not misleading, the Company will promptly notify the Representatives and will promptly amend or supplement, at its own expense, such Issuer Free Writing Prospectus to eliminate or correct such conflict, untrue statement or omission.

21

EXHIBIT 1
PAGE 24

(k) *Certification Regarding Beneficial Owners*. Each Selling Stockholder will deliver to the Representatives, on or before the date of execution of this Agreement, a properly completed and executed Certification Regarding Beneficial Owners of Legal Entity Customers, together with copies of identifying documentation, and each Selling Stockholder undertake to provide such additional supporting documentation as the Representatives may reasonably request in connection with the verification of the foregoing certification.

SECTION 4. <u>Payment of Expenses</u>.

(a) *Expenses*. The XPO Parties will pay or cause to be paid all expenses incident to the performance of their obligations under this Agreement (excluding taxes, other than taxes described in clause (iii) below), including (i) the preparation, printing and filing of the Registration Statement (including financial statements and exhibits) as originally filed and each amendment thereto, (ii) the preparation, printing and delivery to the Underwriters of copies of each preliminary prospectus, each Issuer Free Writing Prospectus and the Prospectus and any amendments or supplements thereto and reasonable costs associated with electronic delivery of any of the foregoing by the Underwriters to investors, (iii) the preparation and delivery of the certificates or security entitlements for the Securities to the Underwriters, including any stock or other transfer taxes and any stamp or other duties payable upon the sale or delivery of the Securities to the Underwriters, (iv) the fees and disbursements of the Company's counsel, accountants and other advisors, (v) the qualification of the Securities under securities laws in accordance with the provisions of Section 3(e) hereof, including filing fees and the reasonable fees and disbursements of counsel for the Underwriters in connection therewith and in connection with the preparation of the Blue Sky Survey and any supplement thereto in an amount not to exceed $5,000, (vi) the fees and expenses of any transfer agent or registrar for the Securities, (vii) the costs and expenses of the Company relating to investor presentations on any "road show" undertaken in connection with the marketing of the Securities, including without limitation, expenses associated with the production of road show slides and graphics, fees and expenses of any consultants engaged by the Company or with the Company's prior written consent in connection with the road show presentations, travel and lodging expenses of the representatives and officers of the Company and any such consultants (provided that the Underwriters shall pay for the travel and lodging expenses of the Underwriters) and 50% of the cost of any aircraft and other transportation chartered in connection with the roadshow (with the Underwriters paying for the other 50% of such chartered aircraft and other transportation), (viii) the filing fees incident to, and the reasonable fees and disbursements of counsel to the Underwriters in an amount not to exceed $35,000 in connection with the review by FINRA of the terms of the sale of the Securities, (ix) the fees and expenses incurred in connection with the listing of the Securities on the Exchange and (x) the reasonable and documented costs and expenses (including, without limitation, any damages or other amounts payable in connection with legal or contractual liability) associated with the reforming of any contracts for sale of the Securities made by the Underwriters caused by a breach of the representation contained in the third sentence of Section 1(a)(ii) hereof. The XPO Parties will pay or cause to be paid all expenses incident to the performance of the Selling Stockholders' obligations under this Agreement for which provision is not otherwise made in this Section 4, including the fees and disbursements of counsel for the Selling Stockholders.

(b) *Termination of Agreement*. If this Agreement is terminated by the Representatives in accordance with the provisions of Section 5, 9(a)(i), 9(a)(iii) or 10 hereof, the Company and the Selling Stockholders shall reimburse the non-defaulting Underwriters for all of their reasonable and documented out-of-pocket expenses that were actually incurred, including the reasonable and documented fees and disbursements of counsel for the Underwriters. For the avoidance of doubt, in the case of termination by the Underwriters in accordance with the provisions of Section 10 hereof, the Company shall have no obligation to reimburse any defaulting Underwriter pursuant to this Section 4(b).

22

EXHIBIT 1
PAGE 25

(c) *Allocation of Expenses*. The provisions of this Section 4 shall not affect any agreement that the Company and the Selling Stockholders may make for the sharing of such costs and expenses.

SECTION 5. Conditions of Underwriters' Obligations. The obligations of the several Underwriters hereunder are subject to the accuracy, as of the Applicable Time, the Closing Time and each Date of Delivery, of the representations and warranties of the XPO Parties and the Selling Stockholders contained herein or in certificates of any officer of the XPO Parties or any of their subsidiaries or on behalf of any Selling Stockholders delivered pursuant to the provisions hereof, to the performance by the XPO Parties and each Selling Stockholder of their respective covenants and other obligations hereunder, and to the following further conditions:

(a) *Effectiveness of Registration Statement; Rule 430A Information*. The Registration Statement, including any Rule 462(b) Registration Statement, has become effective and, at the Closing Time, no stop order suspending the effectiveness of the Registration Statement or any post-effective amendment thereto has been issued under the 1933 Act, no order preventing or suspending the use of any preliminary prospectus or the Prospectus has been issued and no proceedings for any of those purposes have been instituted or are pending or, to the knowledge of the XPO Parties, contemplated; and the XPO Parties have complied with each request (if any) from the Commission for additional information. A prospectus containing the Rule 430A Information shall have been filed with the Commission in the manner and within the time frame required by Rule 424(b) without reliance on Rule 424(b)(8) or a post-effective amendment providing such information shall have been filed with, and declared effective by, the Commission in accordance with the requirements of Rule 430A.

(b) *Opinion of Counsels for Company*. At the Closing Time, the Representatives shall have received the opinions, dated the Closing Time, of each of Davis Polk & Wardwell LLP and Buchalter, PC, counsels for the Company, in form and substance reasonably satisfactory to counsel for the Underwriters, together with reproduced copies of such letters for each of the other Underwriters.

(c) *Opinion of Counsel for Selling Stockholders*. At the Closing Time, the Representatives shall have received the opinion, dated the Closing Time, of Buchalter, PC, counsel for the Selling Stockholders, in form and substance reasonably satisfactory to counsel for the Underwriters, together with reproduced copies of such letter for each of the other Underwriters.

(d) *Opinion of Counsel for Underwriters*. At the Closing Time, the Representatives shall have received the opinion, dated the Closing Time, of Latham & Watkins LLP, counsel for the Underwriters, in the form and substance reasonably satisfactory to the Representatives, together with reproduced copies of such letter for each of the other Underwriters.

(e) *Officers' Certificate*. At the Closing Time, there shall not have been, since the date hereof or since the respective dates as of which information is given in the Registration Statement, the General Disclosure Package or the Prospectus, any material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the XPO Parties and its subsidiaries considered as one enterprise, whether or not arising in the ordinary course of business, and the Representatives shall have received a certificate of the Chief Executive Officer or the President of each XPO Party and of the Chief Financial Officer of each XPO Party, dated the Closing Time, to the effect that (i) there has been no such material adverse change, (ii) the representations and warranties of each XPO Party in this Agreement are true and correct with the same force and effect as though expressly

23

EXHIBIT 1
PAGE 26

made at and as of the Closing Time, (iii) each XPO Party has complied in all material respects with all agreements and satisfied all conditions on its part to be performed or satisfied at or prior to the Closing Time, and (iv) no stop order suspending the effectiveness of the Registration Statement under the 1933 Act has been issued, no order preventing or suspending the use of any preliminary prospectus or the Prospectus has been issued and no proceedings for any of those purposes have been instituted or are pending or, to their knowledge, contemplated by the Commission.

(f) *Certificate of Selling Stockholders*. At the Closing Time, the Representatives shall have received a certificate on behalf of each Selling Stockholder, dated the Closing Time, to the effect that (i) the representations and warranties of such Selling Stockholder in this Agreement are true and correct with the same force and effect as though expressly made at and as of the Closing Time and (ii) such Selling Stockholder has complied with all agreements and all conditions on its part to be performed under this Agreement at or prior to the Closing Time.

(g) *Chief Financial Officer's Certificate.* At the time of the execution of this Agreement, the Representatives shall have received from the Chief Financial Officer of the Company, dated such date, in form and substance reasonably satisfactory to the Representatives, giving "management comfort" with respect to certain financial data contained in the Registration Statement, the General Disclosure Package and the Prospectus.

(h) *Bring-down Chief Financial Officer's Certificate.* At the Closing Time, the Representatives shall have received from the Chief Financial Officer of the Company, dated the Closing Time, reaffirming the statements made in the certificate furnished pursuant to Section 5(g) hereof.

(i) *Accountant's Comfort Letter*. At the time of the execution of this Agreement, the Representatives shall have received from Deloitte & Touche LLP a letter, dated such date, in form and substance satisfactory to the Representatives, together with reproduced copies of such letter for each of the other Underwriters containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the General Disclosure Package and the Prospectus.

(j) *Bring-down Comfort Letter*. At the Closing Time, the Representatives shall have received from Deloitte & Touche LLP a letter, dated the Closing Time, to the effect that they reaffirm the statements made in the letter furnished pursuant to Section 5(i) hereof, except that the specified date referred to shall be a date not more than three business days prior to the Closing Time.

(k) *Approval of Listing*. At the Closing Time, the Securities shall have been approved for listing on the Exchange.

(l) *No Objection*. FINRA has confirmed that it has not raised any objection with respect to the fairness and reasonableness of the underwriting terms and arrangements relating to the offering of the Securities.

(m) *Lock-up Agreements*. At the date of this Agreement, the Representatives shall have received an agreement substantially in the form of Exhibit A hereto signed by each of the Selling Stockholders and the other persons listed in Schedule D hereto.

(n) *Maintenance of Rating*. Neither the Company nor its subsidiaries have any debt securities or preferred stock that are rated by any "nationally recognized statistical rating agency" (as defined in Section 3(a)(62) of the 1934 Act).

24

EXHIBIT 1
PAGE 27

(o) *Conditions to Purchase of Option Securities*. In the event that the Underwriters exercise their option provided in Section 2(b) hereof to purchase all or any portion of the Option Securities, the representations and warranties of the XPO Parties and the Selling Stockholders contained herein and the statements in any certificates furnished by XPO Parties and any of their subsidiaries and the Selling Stockholders hereunder shall be true and correct as of each Date of Delivery and, at the relevant Date of Delivery, the Representatives shall have received:

(i) Officers' Certificate. A certificate, dated such Date of Delivery, of the Chief Executive Officer or the President of each XPO Party and of the Chief Financial Officer of each XPO Party confirming that the certificate delivered at the Closing Time pursuant to Section 5(d) hereof remains true and correct as of such Date of Delivery.

(ii) Certificate of Selling Stockholders. A certificate, dated such Date of Delivery, on behalf of each Selling Stockholder confirming that the certificate delivered at the Closing Time pursuant to Section 5(f) hereof remains true and correct as of such Date of Delivery.

(iii) Opinion of Counsels for Company. If requested by the Representatives, the opinions of each of Davis Polk & Wardwell LLP and Buchalter, PC, counsels for the Company, in form and substance reasonably satisfactory to counsel for the Underwriters, dated such Date of Delivery, relating to the Option Securities to be purchased on such Date of Delivery and otherwise to the same effect as the opinion required by Section 5(b) hereof.

(iv) Opinion of Counsel for the Selling Stockholders. If requested by the Representatives, the favorable opinion of Buchalter, PC, counsel for the Selling Stockholders, in form and substance satisfactory to counsel for the Underwriters, dated such Date of Delivery, relating to the Option Securities to be purchased on such Date of Delivery and otherwise to the same effect as the opinion required by Section 5(c) hereof.

(v) Opinion of Counsel for Underwriters. If requested by the Representatives, the favorable opinion of Latham & Watkins LLP, counsel for the Underwriters, dated such Date of Delivery, relating to the Option Securities to be purchased on such Date of Delivery and otherwise to the same effect as the opinion required by Section 5(d) hereof.

(vi) Bring-down Comfort Letter. If requested by the Representatives, a letter from Deloitte & Touche LLP, in form and substance satisfactory to the Representatives and dated such Date of Delivery, substantially in the same form and substance as the letter furnished to the Representatives pursuant to Section 5(i) hereof, except that the "specified date" in the letter furnished pursuant to this paragraph shall be a date not more than three business days prior to such Date of Delivery.

(p) *Additional Documents*. At the Closing Time and at each Date of Delivery (if any), counsel for the Underwriters shall have been furnished with such documents and opinions as they may reasonably require for the purpose of enabling them to pass upon the issuance and sale of the Securities as herein contemplated, or in order to evidence the accuracy of any of the representations or warranties, or the fulfillment of any of the conditions, herein contained; and all proceedings taken by the Company and the Selling Stockholders in connection with the sale of the Securities as herein contemplated shall be reasonably satisfactory in form and substance to the Representatives and counsel for the Underwriters.

25

EXHIBIT 1
PAGE 28

(q) *Termination of Agreement*. If any condition specified in this Section 5 shall not have been fulfilled or waived when and as required to be fulfilled, this Agreement, or, in the case of any condition to the purchase of Option Securities on a Date of Delivery which is after the Closing Time, the obligations of the several Underwriters to purchase the relevant Option Securities, may be terminated by the Representatives by notice to the Company and the Selling Stockholders at any time at or prior to Closing Time or such Date of Delivery, as the case may be, and such termination shall be without liability of any party to any other party except as provided in Section 4 hereof and except that Sections 1, 6, 7, 8, 14, 15, 16 and 17 hereof shall survive any such termination and remain in full force and effect.

SECTION 6. Indemnification.

(a) *Indemnification of Underwriters by the XPO Parties*. The XPO Parties, jointly and severally, agree to indemnify and hold harmless each Underwriter, its affiliates (as such term is defined in Rule 501(b) under the 1933 Act (each, an "Affiliate")), its selling agents and each person, if any, who controls any Underwriter within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act as follows:

(i) against any and all loss, liability, claim, damage and expense whatsoever, as incurred, arising out of any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement (or any amendment thereto), including the Rule 430A Information, or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statements therein not misleading or arising out of any untrue statement or alleged untrue statement of a material fact included (A) in any preliminary prospectus, any Issuer Free Writing Prospectus, the General Disclosure Package or the Prospectus (or any amendment or supplement thereto), or (B) in any materials or information provided to investors by, or with the approval of, the Company in connection with the marketing of the offering of the Securities ("Marketing Materials"), including any roadshow or investor presentations made to investors by the Company (whether in person or electronically), or the omission or alleged omission in any preliminary prospectus, any Issuer Free Writing Prospectus, the Prospectus or in any Marketing Materials of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(ii) against any and all loss, liability, claim, damage and expense whatsoever, as incurred, to the extent of the aggregate amount paid in settlement of any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or of any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission; provided that (subject to Section 6(e) hereof) any such settlement is effected with the written consent of the Company and the Selling Stockholders;

(iii) against any and all expense whatsoever, as incurred (including the fees and disbursements of counsel chosen by the Representatives), reasonably incurred in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission, to the extent that any such expense is not paid under (i) or (ii) above;

provided, however, that this indemnity agreement shall not apply to any loss, liability, claim, damage or expense to the extent arising out of any untrue statement or omission or alleged untrue statement or omission made in the Registration Statement (or any amendment thereto), including the Rule 430A Information, the General Disclosure Package, any preliminary prospectus, any Issuer Free Writing Prospectus, any Marketing Materials or the Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with the Underwriter Information.

26

EXHIBIT 1
PAGE 29

(b) *Indemnification of Underwriters by the Selling Stockholders.* Each Selling Stockholder, severally and not jointly, agrees to indemnify and hold harmless each Underwriter, its Affiliates and selling agents and each person, if any, who controls any Underwriter within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act to the extent and in the manner set forth in Sections 6(a)(i), 6(a)(ii), 6(a)(iii) and 6(f) hereof; *provided* that each Selling Stockholder shall be liable only to the extent that such untrue statement or alleged untrue statement or omission or alleged omission has been made in the Registration Statement, any preliminary prospectus, the General Disclosure Package, the Prospectus (or any amendment or supplement thereto) or any Issuer Free Writing Prospectus in reliance upon and in conformity with the Selling Stockholder Information; *provided, further*, that the liability under this subsection of each Selling Stockholder shall be limited to an amount equal to the aggregate gross proceeds after underwriting commissions and discounts, but before expenses, to such Selling Stockholder from the sale of Securities sold by such Selling Stockholder hereunder.

(c) *Indemnification of the XPO Parties, Directors and Officers, and Selling Stockholders*. Each Underwriter severally agrees to indemnify and hold harmless each XPO Party, each director of the Company, each officer of the Company who signed the Registration Statement and each person, if any, who controls the Company within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act, and each Selling Stockholder and each person, if any, who controls any Selling Stockholder within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act, against any and all loss, liability, claim, damage and expense described in the indemnity contained in Section 6(a) hereof, as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Registration Statement (or any amendment thereto), including the Rule 430A Information, the General Disclosure Package, any preliminary prospectus, any Issuer Free Writing Prospectus, any Marketing Materials or the Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with the Underwriter Information.

(d) *Actions against Parties; Notification*. Each indemnified party shall give notice as promptly as reasonably practicable to each indemnifying party of any action commenced against it in respect of which indemnity may be sought hereunder, but failure to so notify an indemnifying party shall not relieve such indemnifying party from any liability hereunder to the extent it is not materially prejudiced as a result thereof and in any event shall not relieve it from any liability which it may have otherwise than on account of this indemnity agreement. In the case of parties indemnified pursuant to Sections 6(a) and 6(b) hereof, counsel to the indemnified parties shall be selected by the Representatives, and, in the case of parties indemnified pursuant to Section 6(c) hereof, counsel to the indemnified parties shall be selected by the Company. An indemnifying party may participate at its own expense in the defense of any such action; provided, however, that counsel to the indemnifying party shall not (except with the consent of the indemnified party) also be counsel to the indemnified party. In no event shall the indemnifying parties be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from their own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances. No indemnifying party shall, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification or contribution could be sought under this Section 6 or Section 7 hereof (whether or not the indemnified parties are actual or potential parties thereto), unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such litigation, investigation, proceeding or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

27

EXHIBIT 1
PAGE 30

(e) *Settlement without Consent if Failure to Reimburse*. If at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel as contemplated by this Section 6, such indemnifying party agrees that it shall be liable for any settlement of the nature contemplated by Section 6(a)(ii) hereof effected without its written consent if (i) such settlement is entered into more than 45 days after receipt by such indemnifying party of the aforesaid request, (ii) such indemnifying party shall have received notice of the terms of such settlement at least 30 days prior to such settlement being entered into and (iii) such indemnifying party shall not have reimbursed such indemnified party in accordance with such request prior to the date of such settlement.

(f) *Other Agreements with Respect to Indemnification*. The provisions of this Section 6 shall not affect any agreement among the Company and the Selling Stockholders with respect to indemnification.

SECTION 7. <u>Contribution</u>. If the indemnification provided for in Section 6 hereof is for any reason unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, liabilities, claims, damages or expenses referred to therein, then each indemnifying party shall contribute to the aggregate amount of such losses, liabilities, claims, damages and expenses incurred by such indemnified party, as incurred, (i) in such proportion as is appropriate to reflect the relative benefits received by the XPO Parties and the Selling Stockholders, on the one hand, and the Underwriters, on the other hand, from the offering of the Securities pursuant to this Agreement or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the XPO Parties and the Selling Stockholders, on the one hand, and of the Underwriters, on the other hand, in connection with the statements or omissions which resulted in such losses, liabilities, claims, damages or expenses, as well as any other relevant equitable considerations.

The relative benefits received by the XPO Parties and the Selling Stockholders, on the one hand, and the Underwriters, on the other hand, in connection with the offering of the Securities pursuant to this Agreement shall be deemed to be in the same respective proportions as the total net proceeds from the offering of the Securities pursuant to this Agreement (after deducting underwriting discounts and commissions but before deducting expenses) received by the XPO Parties and the Selling Stockholders, on the one hand, and the total underwriting discount received by the Underwriters, on the other hand, in each case as set forth on the cover of the Prospectus, bear to the aggregate initial public offering price of the Securities as set forth on the cover of the Prospectus.

The relative fault of the XPO Parties and the Selling Stockholders, on the one hand, and the Underwriters, on the other hand, shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the XPO Parties and the Selling Stockholders or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The XPO Parties, the Selling Stockholders and the Underwriters agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 7. The aggregate amount of losses, liabilities, claims, damages and expenses incurred by an indemnified party and referred to above in this Section 7 shall be deemed to include any documented legal or other expenses reasonably incurred by such indemnified party in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue or alleged untrue statement or omission or alleged omission.

28

EXHIBIT 1
PAGE 31

Notwithstanding the provisions of this Section 7, no Underwriter shall be required to contribute any amount in excess of the underwriting commissions received by such Underwriter in connection with the Securities underwritten by it and distributed to the public.

No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

For purposes of this Section 7, each person, if any, who controls an Underwriter within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act and each Underwriter's Affiliates and selling agents shall have the same rights to contribution as such Underwriter, and each director of the Company, each officer of the Company who signed the Registration Statement and each person, if any, who controls any XPO Party or any Selling Stockholder within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act shall have the same rights to contribution as the Company or such Selling Stockholder, as the case may be. The Underwriters' respective obligations to contribute pursuant to this Section 7 are several in proportion to the number of Initial Securities set forth opposite their respective names in Schedule A hereto and not joint.

The provisions of this Section 7 shall not affect any agreement among the Company and the Selling Stockholders with respect to contribution.

SECTION 8. Representations, Warranties and Agreements to Survive. All representations, warranties and agreements contained in this Agreement or in certificates of officers of the XPO Parties or any of their subsidiaries or the Selling Stockholders submitted pursuant hereto, shall remain operative and in full force and effect regardless of (i) any investigation made by or on behalf of any Underwriter or its Affiliates or selling agents, any person controlling any Underwriter, its officers or directors or any person controlling any XPO Party or any Selling Stockholder and (ii) delivery of and payment for the Securities.

SECTION 9. Termination of Agreement.

(a) *Termination*. The Representatives may terminate this Agreement, by notice to the Company and the Selling Stockholders, at any time at or prior to the Closing Time (i) if there has been, in the judgment of the Representatives, since the time of execution of this Agreement or since the respective dates as of which information is given in the Registration Statement, the General Disclosure Package or the Prospectus, any material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the Company and its subsidiaries considered as one enterprise, whether or not arising in the ordinary course of business, such as to make, in the judgment of the Representatives, it impractical or inadvisable to proceed with the completion of the offering contemplated hereby or to enforce contracts for sales of the Securities, or (ii) if there has occurred any material adverse change in the financial markets in the United States or the international financial markets, any outbreak of hostilities or escalation thereof or other calamity or crisis or any change or development involving a prospective change in national or international political, financial or economic conditions, in each case the effect of which is such as to make it, in the judgment of the Representatives, impracticable or inadvisable to proceed with the completion of the offering or to enforce contracts for the sale of the Securities, or (iii) if trading in any securities of the Company has been suspended or materially limited by the Commission or the Exchange, or (iv) if trading generally on the NYSE MKT or the New York Stock Exchange or in the Nasdaq Global Select Market has been suspended or materially limited, or minimum or maximum prices for trading have been fixed, or maximum ranges for prices have been required, by any of said exchanges or by order of the Commission, FINRA or any other governmental authority, or (v) a material disruption has occurred in commercial banking or securities settlement or clearance services in the United States or with respect to Clearstream or Euroclear systems in Europe, or (vi) if a banking moratorium has been declared by either Federal or New York authorities.

29

EXHIBIT 1
PAGE 32

(b) *Liabilities*. If this Agreement is terminated pursuant to this Section 9, such termination shall be without liability of any party to any other party except as provided in Section 4 hereof, and provided further that Sections 1, 6, 7, 8, 14, 15, 16 and 17 hereof shall survive such termination and remain in full force and effect.

SECTION 10. Default by One or More of the Underwriters. If one or more of the Underwriters shall fail at the Closing Time or a Date of Delivery to purchase the Securities which it or they are obligated to purchase under this Agreement (the "Defaulted Securities"), the Representatives shall have the right, within 24 hours thereafter, to make arrangements for one or more of the non-defaulting Underwriters, or any other underwriters, to purchase all, but not less than all, of the Defaulted Securities in such amounts as may be agreed upon and upon the terms herein set forth; if, however, the Representatives shall not have completed such arrangements within such 24-hour period, then:

(i) if the number of Defaulted Securities does not exceed 10% of the number of Securities to be purchased on such date, each of the non-defaulting Underwriters shall be obligated, severally and not jointly, to purchase the full amount thereof in the proportions that their respective underwriting obligations hereunder bear to the underwriting obligations of all non-defaulting Underwriters, or

(ii) if the number of Defaulted Securities exceeds 10% of the number of Securities to be purchased on such date, this Agreement or, with respect to any Date of Delivery which occurs after the Closing Time, the obligation of the Underwriters to purchase, and the Selling Stockholders to sell, the Option Securities to be purchased and sold on such Date of Delivery shall terminate without liability on the part of any non-defaulting Underwriter.

No action taken pursuant to this Section 10 shall relieve any defaulting Underwriter from liability in respect of its default.

In the event of any such default which does not result in a termination of this Agreement or, in the case of a Date of Delivery which is after the Closing Time, which does not result in a termination of the obligation of the Underwriters to purchase and the Selling Stockholders to sell the relevant Option Securities, as the case may be, either (i) the Representatives or (ii) the Company and any Selling Stockholder shall have the right to postpone Closing Time or the relevant Date of Delivery, as the case may be, for a period not exceeding seven days in order to effect any required changes in the Registration Statement, the General Disclosure Package or the Prospectus or in any other documents or arrangements. As used herein, the term "Underwriter" includes any person substituted for an Underwriter under this Section 10.

SECTION 11. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication. Notices to the Underwriters shall be directed to the Representatives at BofA Securities, Inc., One Bryant Park, New York, New York 10036, Attention: Syndicate Department (email: dg.ecm_execution_services@bofa.com), with a copy to ECM Legal (email: dg.ecm_legal@bofa.com), and Jefferies LLC, 520 Madison Avenue, New York, New York 10022, Attention: General Counsel (facsimile: (646) 619-4437); notices to the Company shall be directed to it at Xponential Fitness, Inc., 17877 Von Karman Ave., Irvine, California 92614, Attention: Chief Financial Officer; notices to the Selling Stockholders shall be directed to Buchalter, PC, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA 90017, Attention: Jeremy Weitz (email: jweitz@buchalter.com).

30

EXHIBIT 1
PAGE 33

SECTION 12. <u>No Advisory or Fiduciary Relationship</u>. Each of the Company and each Selling Stockholder acknowledges and agrees that (a) the purchase and sale of the Securities pursuant to this Agreement, including the determination of the initial public offering price of the Securities and any related discounts and commissions, is an arm's-length commercial transaction between the Company and the Selling Stockholder, on the one hand, and the several Underwriters, on the other hand, and does not constitute a recommendation, investment advice or solicitation of any action by the Underwriters, (b) in connection with the offering of the Securities and the process leading thereto, each Underwriter is and has been acting solely as a principal and is not the agent or fiduciary of the Company, any of its subsidiaries or any Selling Stockholder, or its respective stockholders, creditors, employees or any other party, (c) no Underwriter has assumed or will assume an advisory or fiduciary responsibility in favor of the Company or any Selling Stockholder with respect to the offering of the Securities or the process leading thereto (irrespective of whether such Underwriter has advised or is currently advising the Company, any of its subsidiaries or any Selling Stockholder on other matters) and no Underwriter has any obligation to the Company or any Selling Stockholder with respect to the offering of the Securities except the obligations expressly set forth in this Agreement, (d) the Underwriters and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of each of the Company and each Selling Stockholder, (e) the Underwriters have not provided any legal, accounting, regulatory, investment or tax advice with respect to the offering of the Securities, and the Company and each of the Selling Stockholders has consulted its own respective legal, accounting, financial, regulatory and tax advisors to the extent it deemed appropriate, and (f) none of the activities of the Underwriters in connection with the transactions contemplated herein constitutes a recommendation, investment advice or solicitation of any action by the Underwriters with respect to any entity or natural person.

SECTION 13. <u>Recognition of the U.S. Special Resolution Regimes</u>.

(a) In the event that any Underwriter that is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Underwriter of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Agreement, and any such interest and obligation, were governed by the laws of the United States or a state of the United States.

(b) In the event that any Underwriter that is a Covered Entity or a BHC Act Affiliate of such Underwriter becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against such Underwriter are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if this Agreement were governed by the laws of the United States or a state of the United States.

For purposes of this Section 13, a "BHC Act Affiliate" has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k). "Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b). "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable. "U.S. Special Resolution Regime" means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

31

EXHIBIT 1
PAGE 34

SECTION 14. <u>Parties</u>. This Agreement shall each inure to the benefit of and be binding upon the Underwriters, the Company, the Selling Stockholders and each of their respective successors. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person, firm or corporation, other than the Underwriters, the Company, the Selling Stockholders and their respective successors and the controlling persons and officers and directors referred to in Sections 6 and 7 hereof and their heirs and legal representatives, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained. This Agreement and all conditions and provisions hereof are intended to be for the sole and exclusive benefit of the Underwriters, the Company, the Selling Stockholders and their respective successors, and said controlling persons and officers and directors and their heirs and legal representatives, and for the benefit of no other person, firm or corporation. No purchaser of Securities from any Underwriter shall be deemed to be a successor by reason merely of such purchase.

SECTION 15. <u>Trial by Jury</u>. Each XPO Party (on its behalf and, to the extent permitted by applicable law, on behalf of its stockholders and affiliates), each of the Selling Stockholders and each of the Underwriters hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

SECTION 16. <u>GOVERNING LAW</u>. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF, THE STATE OF NEW YORK WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS.

SECTION 17. <u>Consent to Jurisdiction; Waiver of Immunity</u>. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby ("Related Proceedings") shall be instituted in (i) the federal courts of the United States of America located in the City and County of New York, Borough of Manhattan or (ii) the courts of the State of New York located in the City and County of New York, Borough of Manhattan (collectively, the "Specified Courts"), and each party irrevocably submits to the exclusive jurisdiction (except for proceedings instituted in regard to the enforcement of a judgment of any such court (a "Related Judgment"), as to which such jurisdiction is non-exclusive) of such courts in any such suit, action or proceeding. Service of any process, summons, notice or document by mail to such party's address set forth above shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or other proceeding in the Specified Courts and irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such suit, action or other proceeding brought in any such court has been brought in an inconvenient forum.

SECTION 18. <u>TIME</u>. TIME SHALL BE OF THE ESSENCE OF THIS AGREEMENT. EXCEPT AS OTHERWISE SET FORTH HEREIN, SPECIFIED TIMES OF DAY REFER TO NEW YORK CITY TIME.

SECTION 19. <u>Counterparts and Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. Electronic signatures complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law will be deemed original signatures for purposes of this Agreement. Transmission by telecopy, electronic mail or other transmission method of an executed counterpart of this Agreement will constitute due and sufficient delivery of such counterpart.

SECTION 20. <u>Effect of Headings</u>. The Section headings herein are for convenience only and shall not affect the construction hereof.

*[Signature page follows]*

32

EXHIBIT 1
PAGE 35

If the foregoing is in accordance with your understanding of our agreement, please sign and return to the XPO Parties and the Selling Stockholders a counterpart hereof, whereupon this instrument, along with all counterparts, will become a binding agreement among the Underwriters, the XPO Parties and the Selling Stockholders in accordance with its terms.

Very truly yours,

XPONENTIAL FITNESS, INC.

By _____

Title:

XPONENTIAL INTERMEDIATE HOLDINGS, LLC

By _____

Title:

H&W INVESTCO, LP

By _____

Title:

H&W INVESTCO II, LP

By _____

Title:

[*Signature Page to Underwriting Agreement*]

EXHIBIT 1
PAGE 36

CONFIRMED AND ACCEPTED,
     as of the date first above written:

BOFA SECURITIES, INC.
JEFFERIES LLC

By: BOFA SECURITIES, INC.

By   _____
           Authorized Signatory

For themselves and as a Representatives of the other Underwriters named in Schedule A hereto.

[*Signature Page to Underwriting Agreement*]

EXHIBIT 1
PAGE 37

CONFIRMED AND ACCEPTED,
     as of the date first above written:

BOFA SECURITIES, INC.
JEFFERIES LLC

By: JEFFERIES LLC

By    _____
           Authorized Signatory

For themselves and as a Representatives of the other Underwriters named in Schedule A hereto.

[<em>Signature Page to Underwriting Agreement</em>]

EXHIBIT 1
PAGE 38

SCHEDULE A

The initial public offering price per share for the Securities shall be $[●].

The purchase price per share for the Securities to be paid by the several Underwriters shall be $[●], being an amount equal to the initial public offering price set forth above less $[●] per share, subject to adjustment in accordance with Section 2(b) for dividends or distributions declared by the Company and payable on the Initial Securities but not payable on the Option Securities.

| Name of Underwriter | Number of Initial Securities |
|---|---|
| BofA Securities, Inc. | [●] |
| Jefferies LLC | [●] |
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| Total | [●] |

Sch A

https://www.sec.gov/Archives/edgar/data/1802156/000119312522095064/d181249dex1.htm

EXHIBIT 1
PAGE 39

**SCHEDULE B**

| | Number of Initial Securities to be Sold | Maximum Number of Option Securities to Be Sold |
|---|---|---|
| H&W Investco, LP | [•] | [•] |
| H&W Investco II, LP | [•] | [•] |
| Total | [•] | [•] |

Sch B

EXHIBIT 1
PAGE 40

SCHEDULE C-1

Pricing Terms

1. The Selling Stockholders are selling [●] shares of Class A Common Stock.

2. The Selling Stockholders have granted an option to the Underwriters, severally and not jointly, to purchase up to an additional [●] shares of Class A Common Stock.

3. The initial public offering price per share for the Securities shall be $[●].

Sch C-1

EXHIBIT 1
PAGE 41

SCHEDULE C-2

<u>Free Writing Prospectuses</u>

Sch C-2

EXHIBIT 1
PAGE 42

SCHEDULE D

<u>List of Persons and Entities Subject to Lock-up</u>

<u>Directors</u>

Mark Grabowski
Anthony Geisler
Brenda Morris
Chelsea Grayson

<u>Officers</u>

Anthony Geisler
Ryan Junk
Sarah Luna
John Meloun
Megan Moen

<u>Selling Stockholders and Stakeholders</u>

H&W Investco, LP
H&W Investco II, LP

Sch D

EXHIBIT 1
PAGE 43

Exhibit A

FORM LOCK-UP AGREEMENT
PURSUANT TO SECTION 5(m)

[•], 2022

BofA Securities, Inc.
Jefferies LLC
  as a Representatives of the several
  Underwriters to be named in the
  within-mentioned Underwriting Agreement

c/o BofA Securities, Inc.
One Bryant Park
New York, New York 10036

c/o Jefferies LLC
520 Madison Avenue
New York, New York 10022

  Re:  Proposed Public Offering by Xponential Fitness, Inc.

Ladies and Gentlemen:

  The undersigned, a stockholder, officer and/or director of Xponential Fitness, Inc., a Delaware corporation (the "**Company**"), understands that BofA Securities, Inc. ("**BofA**") and Jefferies LLC ("**Jefferies**") propose to enter into an Underwriting Agreement (the "**Underwriting Agreement**"), on behalf of the several underwriters to be named in Schedule A thereto (the "**Underwriters**"), with the Company and the Selling Stockholders to be listed in Schedule B thereto providing for the public offering (the "**Public Offering**") of shares of the Company's Class A common stock, par value $0.0001 per share (the "**Class A Common Stock**"), pursuant to a Registration Statement on Form S-1 (the "**Registration Statement**") to be filed with the Securities and Exchange Commission (the "**Commission**"). In recognition of the benefit that the Public Offering will confer upon the undersigned as a stockholder, officer and/or director of the Company, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned agrees with each Underwriter that, during the period beginning on the date hereof and ending on the date that is 90 days from the date of the Underwriting Agreement (the "**Lock-Up Period**"), the undersigned will not, without the prior written consent of BofA and Jefferies, (i) directly or indirectly, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of any shares of Class A Common Stock or the Company's Class B common stock, par value $0.0001 per share (the "**Class B Common Stock**" and, together with the Class A Common Stock, the "**Common Stock**"), or any securities convertible into or exercisable or exchangeable for Common Stock (including, without limitation, the limited liability company interests in Xponential Fitness LLC (the "**LLC Units**")), whether now owned or hereafter acquired by the undersigned or with respect to which the undersigned has or hereafter acquires the power of disposition (collectively, the "**Lock-Up Securities**"), or exercise any right with respect to the registration of any of the Lock-up Securities, or file, cause to be filed or cause to be confidentially submitted any registration

Exh A-1

EXHIBIT 1
PAGE 44

statement in connection therewith, under the Securities Act of 1933, as amended (the "***Securities Act***"), or (ii) enter into any swap or any other agreement or any transaction that transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of the Lock-Up Securities, whether any such swap or transaction is to be settled by delivery of Common Stock or other securities, in cash or otherwise.

Notwithstanding the foregoing, and subject to the conditions below, the undersigned may transfer the Lock-Up Securities without the prior written consent of BofA and Jefferies, *provided* that: (1) in the case of clauses (i) through (v), BofA and Jefferies have received a signed lock-up agreement for the balance of the Lock-Up Period from each donee, trustee, distributee or transferee, as the case may be, and in the case of clause (ix), the undersigned shall use reasonable best efforts to cause the transferee to deliver to BofA and Jefferies a signed lock-up agreement for the balance of the Lock-Up Period; (2) in the case of clauses (i) through (vi), such transfer shall not involve a disposition for value; (3) in the case of clauses (i) through (v) and clause (x), such transfer is not required to be reported with the Commission on Form 4 in accordance with Section 16 of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"); (4) in the case of clauses (vi) through (ix) and clause (xi), any such required Form 4 shall state the reason for such transfer; and (5) the undersigned shall not otherwise voluntarily effect any public filing or report regarding such transfer (other than a report on Form 5 or a filing on Schedule 13D, 13F or 13G that is required to be filed during the Lock-Up Period, *provided* that any such required Form 5 shall state the reason for such transfer):

(i) as a *bona fide* gift or gifts, including, without limitation, gifts to a charity or charitable trust;

(ii) to a trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned;

(iii) by will, other testamentary document or intestate succession to a legal representative, heir, beneficiary or member of the immediate family of the undersigned;

(iv) if the undersigned is a corporation, partnership, limited liability company, trust or other business entity, as part of a distribution to the stockholders, partners, members, beneficiaries or other equityholders of the undersigned;

(v) to another corporation, partnership, limited liability company, trust or other business entity that is an affiliate (as defined in Rule 405 promulgated under the Securities Act of 1933, as amended) of the undersigned, or to the undersigned's affiliates or to an investment fund or other entity controlling, controlled by, managing or managed by or under common control with the undersigned or its affiliates (including, for the avoidance of doubt, where the undersigned is a partnership, to its general partner, a successor partnership or fund, or other fund managed by such partnership), or to a trust [of which the undersigned and/or the immediate family of the undersigned][1] are the legal and beneficial owner of all of the outstanding equity securities or similar interests;

(vi) pursuant to the conversion or exchange of (a) outstanding LLC Units and a corresponding number of outstanding shares of Class B Common Stock into or for shares of Common Stock (or securities convertible into or exercisable or exchangeable for Common Stock) and (b) outstanding shares of Class B Common Stock into shares of Class A Common Stock, in each case as described in the Registration Statement and the prospectus for the Public Offering (the "***Prospectus***"), *provided* that any shares of Common Stock (or securities convertible into or exercisable or exchange for Common Stock) received upon such conversion or exchange shall be subject to the restrictions set forth in this lock-up agreement;

---

[1] For CEO lock-up agreement, bracketed language to be replaced with: "of which the undersigned, the family or friends of the undersigned and/or a charitable organization".

Exh A-2

EXHIBIT 1
PAGE 45

(vii)  to the Company in connection with the exercise, vesting or settlement of options, warrants or other rights to purchase shares of Common Stock, or any securities convertible into or exchangeable for Common Stock, in accordance with their terms (including, in each case, on a "cashless" or "net exercise" basis and/or to cover withholding tax obligations in connection with such exercise, vesting or settlement) pursuant to a stock incentive plan or stock purchase plan of the Company described in the Registration Statement and the Prospectus, *provided* that any shares of Common Stock received upon such exercise, vesting or settlement shall be subject to the restrictions set forth in this lock-up agreement;

(viii)  to the Company pursuant to arrangements in effect on the date hereof and described in the Registration Statement and the Prospectus pursuant to which the Company has (a) an option to repurchase such Lock-Up Securities or (b) a right of first refusal with respect to transfers of such Lock-Up Securities, *provided*, in the case of clause (b), that the transfer triggering such right of first refusal is otherwise permitted under this lock-up agreement;

(ix)  by operation of law pursuant to a qualified domestic order or in connection with a divorce settlement, divorce decree, separation agreement or other related court order;

(x)  in connection with the establishment of a written trading plan pursuant to Rule 10b5-1 under the Exchange Act, *provided* that the securities subject to such plan may not be transferred during the Lock-Up Period;

(xi)  to the Company in connection with the termination of the undersigned's service for the Company pursuant to an arrangement in effect on the date hereof that provides the Company with an option to repurchase such Lock-Up Securities;

(xii)  pursuant to a *bona fide* third-party tender offer, merger, consolidation or similar transaction made to all holders of the Company's capital stock involving a change of control of the Company, *provided* that in the event that such tender offer, merger, consolidation or similar transaction is not completed, such Lock-Up Securities shall remain subject to the restrictions set forth in this lock-up agreement;

(xiii)  to the Underwriters pursuant to the Underwriting Agreement;

(xiv)  pursuant to transactions described, and as contemplated, under the caption "Organizational Structure" in the Registration Statement and the Prospectus, *provided* that any shares of Common Stock or LLC Units, or any securities convertible into or exercisable or exchangeable for Common Stock or LLC Units, received in such transactions shall be subject to the restrictions set forth in this lock-up agreement; or

(xv)  [pursuant to a pledge, hypothecation or other granting of a security interest in shares of Common Stock to one or more lending institutions as collateral or security for or in connection with a margin loan or other loans, advances or extensions of credit entered by the undersigned or its affiliates, or a refinancing thereof, and any subsequent transfers of such shares of Common Stock pursuant to any foreclosures in connection therewith, *provided* that the amount of the undersigned's Common Stock subject to such pledges, hypothecations or other grants of security interests shall be limited, in the aggregate, to 25% of the undersigned's Common Stock measured as of completion of the Public Offering].[2]

---

[2]  To be included in lock-up agreement of certain entities.

Exh A-3

EXHIBIT 1
PAGE 46

For purposes of this lock-up agreement: "*immediate family*" means any relationship by blood, marriage or adoption, not more remote than first cousin; and "*change of control*" means the transfer (whether by tender offer, merger, consolidation or similar transaction), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an Underwriter pursuant to the Public Offering), of the Company's voting securities if, after such transfer, such person or group of affiliated persons would hold more than 50% of the outstanding voting securities of the Company (or the surviving entity).

Furthermore, the undersigned may sell shares of Common Stock purchased by the undersigned on the open market following the Public Offering if and only if (i) such sales are not required to be reported in any public report or filing with the Commission or otherwise and (ii) the undersigned does not otherwise voluntarily effect any public filing or report regarding such sales.

The undersigned also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the Lock-Up Securities except in compliance with the foregoing restrictions.

The undersigned understands that the Company and the Underwriters are relying upon this lock-up agreement in proceeding toward consummation of the Public Offering. The undersigned further understands that this lock-up agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors and assigns. The undersigned acknowledges and agrees that the Underwriters have not provided any recommendation or investment advice, nor have the Underwriters solicited any action from the undersigned with respect to the Public Offering, and the undersigned has consulted his, her or its own legal, accounting, financial, regulatory and tax advisors to the extent deemed appropriate.

Upon the earliest to occur, if any, of (i) BofA and Jefferies, on the one hand, or the Company, on the other hand, informs the other, prior to the execution of the Underwriting Agreement, that it has determined not to proceed with the Public Offering, (ii) the Registration Statement is withdrawn, (iii) the Underwriting Agreement is not executed by [May 23], 2022 or (iv) the Underwriting Agreement (other than the provisions thereof that survive termination) is terminated prior to payment for and delivery of the Class A Common Stock to be sold thereunder, this lock-up agreement shall be terminated and the undersigned shall be released from his, her or its obligations hereunder.

This agreement may be delivered via facsimile, e-mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com or www.echosign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

This lock-up agreement and any claim, controversy or dispute arising under or related to this lock-up agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflict of laws principles that would result in the application of the laws of any other jurisdiction.

[*Signature page follows.*]

Exh A-4

EXHIBIT 1
PAGE 47

Very truly yours,

Signature: _____

Print Name: _____

Exh A-5

EXHIBIT 1

PAGE 48