GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
  mcelio@gibsondunn.com
JEFFREY D. LOMBARD, SBN 285371
  jlombard@gibsondunn.com
310 University Ave
Palo Alto, CA 94301
Telephone:  650.849.5300
Facsimile:   650.849.5333

*Attorneys for Defendants*
*Xponential Fitness, Inc., John Meloun, Mark*
*Grabowski, Chelsea Grayson, and Brenda*
*Morris*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| IN RE XPONENTIAL FITNESS SECURITIES LITIGATION | CASE NO. 8:24-cv-00285-JWH-KES |
| | <u>CLASS ACTION</u> |
| | Hon. John W. Holcomb<br>Courtroom 9D, Santa Ana |
| | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT** |
| | Date:      November 14, 2025<br>Time:      9:00 a.m. |
| | Action Filed:  February 9, 2024 |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT..................................................................................................... 2

    A.   Plaintiffs Fail to Plead Any Deceptive Act in Violation of the Securities Laws, Much Less a "Scheme".................................................. 2

    B.   Plaintiffs' Rule 10b-5(b) and Securities Act Claims Must Be Dismissed for Failure to Plead a Materially False or Misleading Statement ................................................................................................ 6

    C.   Plaintiffs' Section 10(b) Claim Must Be Dismissed for Failure to Plead Scienter ...................................................................................... 10

    D.   Plaintiffs' Section 10(b) Claims Must Be Dismissed for Failure to Plead Loss Causation ........................................................................... 17

    E.   The Section 12(a)(2) Claim Against Grabowski Must Be Dismissed............. 18

    F.   The Section 20(a) Claim Against Grabowski Must Be Dismissed ................. 19

III. CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re AFC Enters., Inc. Sec. Litig.*,
348 F. Supp. 2d 1363 (N.D. Ga. 2004) .................................................................. 16

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................ 19

*Bao v. Solarcity Corp.*,
2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ............................................................. 19

*Bartesch v. Cook*,
941 F. Supp. 2d 501 (D. Del. 2013) ........................................................................ 3

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ................................................................................ 17

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ............................................................................. 6, 8

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*,
2017 WL 3582973 (S.D. Cal. Aug. 18, 2017) ...................................................... 16

*Cheng v. Canda Goose Holdings Inc.*,
2021 WL 2077469 (S.D.N.Y. July 19, 2021) ................................................... 10, 14

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) .......................................................................................................... 12, 15

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024) ............................................................................ 10

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .......................................................................... 12, 14

*Defeo v. IonQ, Inc.*,
2025 WL 1035292 (4th Cir. Apr. 8, 2025) ........................................................... 17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .............................................................................................. 18

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ...................................................... 16

*Ferreira v. Funko Inc.*,
2021 WL 8820650 (C.D. Cal. Oct. 22, 2021) ....................................................... 16

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .............................................................................. 19

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003)...........................................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)...........................................................................................5

*Lako v. Loandepot, Inc.*,
  2023 WL 444151 (C.D. Cal. Jan. 24, 2023).....................................................................4

*Leacock v. IonQ, Inc.*,
  2023 WL 6308045 (D. Md. Sept. 28, 2023), *aff'd sub nom. on other
  grounds Defeo v. IonQ, Inc.*, 2025 WL 1035292 (4th Cir. Apr. 8, 2025).....................3

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 WL 4389689 (C.D. Cal. May 5, 2011)...................................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).............................................................................................................7

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008)....................................................................................11, 13

*In re Nektar Therapeutics Sec. Litig.*,
  34 F.4th 828 (9th Cir. 2022)..............................................................................................6

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013).........................................................................................18

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046
  (9th Cir. 2014) .................................................................................................................12

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014).........................................................................................13

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
  2015 WL 1775221 (C.D. Cal. Apr. 14, 2015).................................................................15

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014)...........................................................................................19

*Petrie v. Elec. Game Card, Inc.*,
  2011 WL 13130015 (C.D. Cal. Oct. 19, 2011) ...............................................................14

*Pujo v. EHang Holdings Ltd.*,
  2025 WL 1242324 (C.D. Cal. Mar. 26, 2025) ..................................................................4

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017)...........................................................................................8

*QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022)...............................................................................9

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014)...........................................................................................14

iii

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ...................................................................... 9

*In re Robinhood Order Flow Litig.*,
  2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) ............................................... 5

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018)...................................................... 16

*RSN Assocs. LLC v. Ajjarapu*,
  2025 WL 2652854 (M.D. Fla. Sept. 16, 2025)............................................. 4

*Ryan v. FIGS, Inc.*,
  2025 WL 71727 (C.D. Cal. Jan. 10, 2025)................................................. 18

*Scheller v. Nutanix, Inc.*,
  450 F. Supp. 3d 1024 (N.D. Cal. 2020)...................................................... 15

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ...................................................................... 6

*Shenwick v. Twitter*,
  282 F. Supp. 1115 (N.D. Cal. 2017)............................................................ 6

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................. 11

*United States v. Dunkel*,
  927 F.2d 955 (7th Cir. 1991) ...................................................................... 5

*In Re Valence Tech. Sec. Litig.*,
  1996 WL 225010 (N.D. Cal. Apr. 30, 1996), *aff'd sub nom. Berry v.
  Valence Tech., Inc.*, 175 F.3d 699 (9th Cir. 1999) ..................................... 19

*Wade v. WellPoint, Inc.*,
  892 F. Supp. 2d 1102 (S.D. Ind. 2012)........................................................ 8

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .................................................................... 11

*Welgus v. TriNet Grp., Inc.*,
  2017 WL 167708 (N.D. Cal. Jan. 17, 2017)......................................... 18, 19

*Xu v. Chinacache Int'l Holdings Ltd.*,
  2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ............................................. 9

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................ 3, 12, 17, 19

iv

## I.     INTRODUCTION

Plaintiffs' opposition strips away any doubt that their case is about alleged lies to *franchisees*.    The second sentence states plainly that the Complaint "alleges that defendants misled, lied to, and hid information from *potential franchisees* to get them to buy licenses and open studios."[1] Opp. 14.  They repeat this refrain again and again. *See, e.g.*, *id*. at 28 ("[L]icense sales and studio openings had been inflated by defrauding and deceiving *franchisees* in FDDs and elsewhere[.]").  The problem with these allegations is that they do not state a *securities fraud* claim.  Whatever the merits of the franchisee claims—and Xponential believes there are none—the alleged misconduct did not involve the purchase or sale of a security.  The opposition concedes as much but attempts a legal bank shot; even though the supposed lies to franchisees are not cognizable, they claim that Xponential had a duty to tell investors that it was defrauding its franchisees.  The defects in this formulation are legion, but the fatal flaw is obvious:  a company has no duty to disclose something it does not believe is true.  To state a claim of this sort, Plaintiffs would have to plead particularized facts indicating that Xponential believed it was defrauding its franchisees.  Plaintiffs plead no such facts.

Indeed, the types of "facts" the opposition highlights make the point clear.  The vast majority of the allegations are lifted, almost verbatim, from actions brought by a handful of unsuccessful, disgruntled franchisees.  These lawsuits were amplified by a short-seller report and then repackaged in this Complaint without any independent inquiry.  These are not multiple independent allegations; this is a single set of allegations repeated over and over again.  What the opposition calls "corroboration" is nothing more than an echo.  Legally insufficient allegations are not transformed into cognizable claims by mere repetition.  It is therefore no surprise that the SEC declined to take action against Xponential or any of the other Defendants in this action after a lengthy investigation. *See* Dkt. 117.  Indeed, Plaintiffs' repeated invocation of Xponential's settlement with the DFPI is instructive.  The DFPI is the regulator for state franchises, not for the national

---

[1] Unless otherwise stated, all emphasis is added.

securities markets—and even as to the franchise regulator there were no adjudicated findings of misconduct. The franchise regulator took (modest) action; the securities regulator took none. The implication as to the viability of Plaintiffs' securities claims ought to be obvious.

As Xponential's motion explained, this is the *fourth* complaint in this action. The case has not improved with age. Plaintiffs have repeatedly amended or "supplemented" their complaint based on some new piece of corporate news, and just as quickly those allegations fall by the wayside; the "gym socks" restatement that was trumpeted so recently is barely mentioned in the opposition. The Court should take Plaintiffs at their word; what Plaintiffs are complaining about is what Xponential allegedly said to its franchisees. And without a lot more, that is not a matter that is within the purview of the federal securities laws. Four complaints is enough. It is time to bring this matter to its end and to dismiss it with prejudice.

## II.   ARGUMENT

### A. Plaintiffs Fail to Plead Any Deceptive Act in Violation of the Securities Laws, Much Less a "Scheme"

Plaintiffs' "scheme" claim rests not on particularized facts from their own investigation but on inherently unreliable sources that Plaintiffs' counsel have no idea are true and, even if credited, do not pass muster under the PSLRA or Rule 9(b). Plaintiffs all but concede these reliability problems yet argue that the repetition of the same deficient allegations in different fora somehow transforms them into credible, particularized facts. It does not. The law requires Plaintiffs to plead reliable, corroborated facts and to link those facts to specific deceptive acts. Their opposition underscores Plaintiffs' failure to do either—much less both.

### 1.   Plaintiffs' "facts" lack indicia of reliability.

Plaintiffs' allegations rest entirely on unreliable sources: an anonymous short-seller report, four franchise lawsuits consisting of unadjudicated allegations by disgruntled franchisees, news articles that recycle those same allegations, and a Consent

2

Order containing unadjudicated "findings" under California franchise law. As Defendants explained, while such materials can *sometimes* provide foundation for securities claims, they must be sufficiently particularized, detailed, *and* corroborated by Plaintiffs' own independent investigation. Mot. 18. Plaintiffs' opposition does not even attempt to make this showing. Their only responses are that (i) the litigants in the franchisee lawsuits are identifiable; (ii) *some* franchisees quoted are identified by their first names so Xponential "could" identify them through its records; and (iii) anonymity makes no difference in assessing reliability. Opp. 23–24. Plaintiffs' arguments turn the law on its head. Courts impose heightened pleading requirements for allegations attributed to anonymous sources precisely because anonymity undermines reliability. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995–97 (9th Cir. 2009); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *12 (D. Md. Sept. 28, 2023) (court could not infer whether allegations attributed to anonymous dissatisfied IonQ customers and partners in a short seller report were reliable sources of information as they were not described with sufficient particularity), *aff'd sub nom. on other grounds Defeo v. IonQ, Inc.*, 2025 WL 1035292 (4th Cir. Apr. 8, 2025); *see also* Mot. 18 (citing additional cases). The PSLRA places the burden on Plaintiffs—not Defendants. *See Zucco*, 552 F.3d at 995. Whether Xponential has records to identify these individuals is irrelevant; Plaintiffs must supply the required details and they fail to do so here.

Indeed, Plaintiffs essentially concede the unreliability of their sources, acknowledging that "accounts by franchisees and others . . . might be subject to real reliability questions." Opp. 23. Their fallback is that the "sheer number" of sources cures the problem because unreliability concerns "fade" with "corroboration." *Id*. at 22–23. But Plaintiffs' sources do not "corroborate" one another—they merely echo the same allegation. The *Bloomberg* article relies on the short-seller report, which relies on *The Capitol Forum* articles, which rely on franchisee lawsuits. Repetition does not equal reliability: zero plus zero—no matter how many zeros—will always equal zero. *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013). Plaintiffs themselves admit

3

that "[c]onsistency or inconsistency with *other accounts from separate sources*, and others' findings and actions, is always the better barometer."  Opp. 24.  But "*separate sources*" are precisely what is missing here.  Indeed, if "others' findings . . . is the better barometer," the SEC's decision not to bring an enforcement action against Xponential or any of the other Defendants is the most telling barometer of all.  *See* Dkt. 117.

Plaintiffs' defensive retort that "[i]nvestigation takes many forms" only underscores their failure to do one here.  Opp. 24.  Reading others' work and pasting it into a complaint is not "investigation."  Plaintiffs' counsel chose not to interview witnesses and test the reliability of accounts before presenting them in federal court, and the result is a complaint cobbled together from unverified, secondhand grievances.  The very cases Plaintiffs cite underscore the contrast; in each, plaintiffs' counsel corroborated less reliable sources through their own independent inquiry.  *Cf. Lako v. Loandepot, Inc.*, 2023 WL 444151, at *6 (C.D. Cal. Jan. 24, 2023) (allegations corroborated by plaintiffs' interviews with ten former employees); *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *4–6 (C.D. Cal. Mar. 26, 2025) (similar).

Plaintiffs ask the Court to "move[] beyond" the reliability issues and focus instead on post-filing events as evidence of fraud.  Opp. 23.  But none of these after-the-fact events remotely suggest that Defendants intentionally lied to Xponential's franchisees to mislead the securities markets. Mot. 19–20, 36.  Rather, they show Plaintiffs grasping at hindsight straws to manufacture a "scheme" that never existed in the first place.

### 2.  Plaintiffs fail to plead any deceptive act with particularity.

Plaintiffs also fail to plead deception with the particularity required by Rule 9(b) and the PSLRA.  They allege nothing more than an *unspecified* number of disgruntled franchisees accusing *unidentified* Xponential personnel of making *vague* misrepresentations at *undefined* times in sales pitches or FDDs.  Such amorphous assertions are the very opposite of particularized facts.  *See RSN Assocs. LLC v. Ajjarapu*, 2025 WL 2652854, at *6–7 (M.D. Fla. Sept. 16, 2025) (dismissing scheme claim for failure to adequately plead "who, what, when, where, and how" of alleged

4

deceptive conduct).

Rather than specify the required "who, what, when, where, and how," Plaintiffs simply cite in their opposition to more than 130 paragraphs of their Complaint and invite the Court to search for particularity on their behalf. Opp. 25. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Although Plaintiffs insist "[t]here are more" examples of where they alleged deception with particularity, they offer only a single anecdote from one of the franchisee lawsuits. Opp. 26. Specifically, they claim that Geisler said in a video from 2021 that Xponential "never had a studio close." *Id*. But even their one example underscores the deficiency: that statement was true under the Company's then-definition, *see infra* at 8–10. That is not particularized pleading of a fraudulent scheme.

More fundamentally, Plaintiffs' "scheme" collapses entirely into their misrepresentation theory. The only alleged "deceptive act" toward the securities markets is the supposed nondisclosure of the scheme itself. *See* Opp. 20–21. Without any independent deceptive conduct aimed at the securities markets, Plaintiffs cannot repackage a misstatement theory as a "scheme" claim. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1017–18 (9th Cir. 2018) (scheme claim fails where it merely restates the alleged misrepresentations and omissions); *see also In re Robinhood Order Flow Litig.*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022) (scheme claim must "encompass conduct beyond those misrepresentations or omissions").[2] Indeed, Plaintiffs cite no case sustaining a scheme claim on comparable allegations, and they fail to distinguish in any meaningful way the numerous authorities requiring dismissal. *Compare* Mot. 20–21, *with* Opp. 25–26. Plaintiffs' inability to allege with particularity any *independent* deceptive conduct is fatal to their scheme claim.

---

[2] In response to Defendants' argument that the whole "scheme" was public (Mot. 21–22), Plaintiffs argue that "what remained undisclosed to the general public in this case was the fact that, and how, Xponential inflated the metrics it championed as demonstrating growth." Opp. 27 (cleaned up). This isn't a deceptive scheme; it is just another way of restating the claim that Xponential made false or misleading statements.

5

## B. Plaintiffs' Rule 10b-5(b) and Securities Act Claims Must Be Dismissed for Failure to Plead a Materially False or Misleading Statement

Plaintiffs' misrepresentation theory, which is the basis of their claims under Rule 10b-5(b) and the Securities Act, does not stand on its own—it hinges on the alleged scheme. In Plaintiffs' telling, if the scheme existed, then Xponential's statements must have been misleading for failure to disclose that scheme. But Plaintiffs fail to plead any underlying scheme, *supra* ___, and they still cannot identify with particularity *why* any statement was false or misleading *when made*.

### 1. Defendants' statements about Xponential's key metrics were not false or misleading.

Xponential's statements about its key metrics were not false or misleading, because it had no duty to disclose the alleged "widespread losses"[3] at the brand level or an alleged "scheme" to inflate those metrics. Mot. 23. The key metrics were presented to investors as indicators of *Xponential's* company-wide health, not of each brand. Ex. 3 at 302–05. The Company never represented—nor implied—that every brand or studio was profitable. *Cf. Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707–08 (9th Cir. 2016) (statements were false where defendants touted clinical trial results while omitting contradictory data from the same trial). Because Xponential never put brand-level performance at issue, it had no duty to disclose losses at that level. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (no duty under securities laws to disclose information not put at issue). Plaintiffs' only rejoinder is that

---

[3] Plaintiffs rely on *Shenwick v. Twitter*, 282 F. Supp. 1115 (N.D. Cal. 2017), to argue that any defects in their "proprietary" calculation of brand-level "widespread losses" should not be resolved as the pleadings stage. Opp. 29. That reliance is misplaced. In *Shenwick*, the challenged figures came from an analyst report, 282 F. Supp. at 1137—not self-serving, cherry-picked data from undisclosed "FDDs, SEC filings[,] and [ ] 'breakeven' estimates[,]" Opp. 29. Courts have rejected precisely this sort of selective, assumption-driven analysis as insufficient to plead falsity. *See, e.g., In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022). Nor do Plaintiffs' 40+ paragraph cites to the Complaint demonstrate "widespread losses" across Xponential's brands. Opp. 28–29.

*franchisees* who bought licenses "anticipating healthy Company wide AUVs . . . may think differently." Opp. 30. This argument underscores the fundamental problem here: what matters under federal securities law is what investors were told and led to believe, not what individual franchisees *might* have assumed or wished to know. It is obvious that Plaintiffs are trying to litigate what is essentially a franchise dispute in the wrong forum and under the wrong law.

Moreover, Plaintiffs' theory—that Defendants misled investors by failing to confess they had supposedly lied to franchisees (Opp. 30–31) is not only circular (*infra* at 7–8) but also amounts to an impermissible demand for self-flagellation. Courts have consistently held that companies have no duty to disclose unproven allegations they do not believe are true. *See* Mot. 25 (collecting cases). Plaintiffs neither grapple with this authority nor attempt to explain how their misrepresentation claim could survive in light of it. Plaintiffs' challenge to the Company's statements about its key metrics fail.[4]

**2. Defendants' statements about the Xponential Playbook were not false or misleading.**

Plaintiffs contend Defendants' statements about the Xponential Playbook were misleading because Xponential lied to franchisees and would eventually face consequences from that deception. Opp. 31. But Plaintiffs never explain how general, forward-looking statements about the Company's operational model created any duty to

---

[4] Defendants' statements regarding AUV were not rendered misleading by their alleged failure to disclose that "failed" or "closed" studios were excluded from the calculation. Opp. 34. Xponential has always been transparent about how it calculated AUV, including that closed studios that generated zero sales plainly fall outside that definition. *See, e.g.*, Ex. 1 at 112; Ex. 3 at 305 (similar). In any event, the challenged statements about AUV (and SBA loan defaults) were not *materially* false or misleading. Investors reasonably focus on *overall* growth trends. De minimis fluctuations in AUV or a handful of SBA defaults would not "*significantly* alter the total mix." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). Put more directly, no reasonable investor would view the difference between AUV of $542,000 vs. $538,000 or SBA loan defaults of .025% vs. 0% as significantly impacting the total mix of information about the Company's overall health. Mot. 27 n.10.

disclose what Plaintiffs believe were Xponential's misleading sales practices. *Brody*, 280 F.3d at 1006 (no duty to disclose information not put at issue); *see also* Mot. 25 (collecting cases finding no duty to self-flagellate). More fundamentally, Plaintiffs ask the Court to assume the very wrong that they must prove—that Xponential lied to franchisees—and then treat that assumption as the undisclosed "truth" that rendered Playbook statements misleading. Courts routinely reject this type of bootstrapping. *See, e.g.*, *Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1134 (S.D. Ind. 2012) ("Pleading involvement in an allegedly fraudulent scheme as evidence of elements of fraud is circular and off point.").

Plaintiffs also argue that Playbook statements were not puffery, because the statements supposedly provided a "concrete description of the past and present state" of Playbook's "effect" on Xponential's business and franchisee performance. Opp. 31–32. Yet Plaintiffs identify no verifiable factual assertions, and none exist. These statements were merely aspirational and forward-looking—describing how the Playbook was designed to operate, not making guarantees about actual outcomes. *See, e.g.*, ¶ 183 ("The Xponential Playbook *is designed to help franchisees* achieve compelling AUVs, strong operating margins and an attractive return on their invested capital."). Courts consistently hold that such general statements of corporate optimism are puffery. *In re Quality Sys.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (statements actionable only if they "provide concrete description[s] of the past or present" facts, not if they merely express hopes or goals). Because Plaintiffs have not identified any specific, present-tense misstatements of fact, the Playbook statements are inactionable.

### 3. Defendants' statements about no permanent studio closures were not false or misleading.

Defendants' statement about "no permanent studio disclosures" were not false or misleading. The Company's contemporaneous disclosures made clear that "permanent closures" did not include company-owned transition studios. Mot. 27–28. Plaintiffs now argue that investors would have understood "no permanent closures" to mean no

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 8:24-cv-00285-JWH-KES

*franchisee* failures. Opp. 32–33. Plaintiffs point specifically to Meloun's March 2023 statement that "the way to really think about how healthy are our franchisees is closures[.]" Opp. 33. But Plaintiffs yank the statement from its context; even a cursory review of the full quote makes clear that there was no misstatement. *Xu v. Chinacache Int'l Holdings Ltd.*, 2016 WL 4370030, at *5 (C.D. Cal. Aug. 15, 2016) ("A court evaluates defendants' alleged false statements in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying language."). Meloun *also* stated that "*[f]rom the time we've owned them* we've never had [ ] closures." ¶ 224. And immediately following Meloun's remark, Geisler added further that "if somebody isn't making margins [or] not running the business properly, we will take those stores back, and we will transition those back out into the franchise network . . . but the franchise unit itself stays alive and open[.]" ¶ 225. These disclosures preclude any reasonable inference that "no closures" meant "no franchisee failures." The Company plainly told investors it took back failed studios and that Xponential had no studio closures from the time *it* owned them.

Unable to plead any facts to show that Xponential defined "permanent closures" in their preferred way, Plaintiffs argue that the Company was required to qualify its "no studio closure" statements with an express carve-out for transition studios. Opp. 33. That is not the law. "[S]ection 10(b) and Rule 10b–5 prohibit only misleading and untrue statements, not statements that are incomplete." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012). Here, the supposed omission did not render the statements misleading in light of Xponential's repeated disclosures about its practice of reacquiring failed studios and operating them as transition studios.[5]

_____

[5] Citing *QuantumScape Securities Class Action Litigation*, 580 F. Supp. 3d 714 (N.D. Cal. 2022), Plaintiffs suggest that Xponential was obligated to disclose all information that would "'discredit the [allegedly misleading statement] so obviously that the risk of real deception drops to nil.'" Opp. 33. That also misstates the law. The "drop to nil" standard arises in evaluating whether cautionary language is sufficiently robust to trigger the PSLRA safe-harbor—not in defining a company's general duty of disclosure. *See QuantumScape*, 580 F. Supp. at 737.

Nor do Plaintiffs salvage their claim by citing later CEO Mark King's post-Class Period statement that "closures reflected 'struggling underperforming studios [that] probably need to close.'" Opp. 34. That comment merely reflected a strategic shift in how the Company chose to address underperforming studios—closing rather than refranchising them—under new leadership. *See* ¶ 242 (King: "[W]e're really being more, I would say conservative how we're dealing with [the underperforming studios] . . . ."). Courts consistently reject attempts to plead falsity based on later changes to a company's business strategy. *See Cheng v. Canda Goose Holdings Inc.*, 2021 WL 2077469, at *8 (S.D.N.Y. July 19, 2021). Xponential never represented that every corporate-owned studio was financially successful, only that such studios were not deemed "permanently closed." Plaintiffs have failed to plead any materially false or misleading statements and, as such, their claims must fail.[6]

## C. Plaintiffs' Section 10(b) Claim Must Be Dismissed for Failure to Plead Scienter

Plaintiffs' opposition underscores the absence of any evidence of scienter. They do not allege that any defendant received contemporaneous reports or data contradicting the Company's public statements. Instead, they fall back on two stale franchisee memos, generalized complaints from unidentified franchisees, and a short seller's report issued *after* most of the alleged misstatements. They try to inflate these deficient allegations

---

[6] Plaintiffs' Securities Act claims against Geisler, Meloun, Grabowski, Morris, and Grayson fail for the same reasons as discussed above. *See also* Mot. 29 n.12. Plaintiffs argue that their Securities Act claims are "conceptually different" than claims sounding in fraud and, as such, heightened pleading standard under Rule 9(b) should not apply. Opp. 20 n.5. But Plaintiffs never explain how; nor could they. The Complaint makes clear that the gravamen of their Section 11 and 12 claims is precisely the same alleged "scheme" and supposed misrepresentations that underpin their Section 10(b) claim— namely, that Defendants failed to disclose that Xponential procured franchise license sales and AUV growth through alleged misrepresentations to franchisees. ¶¶ 322–29. Plaintiffs' bare assertion that their claims are "conceptually different[]" does not change the substance of their allegations. *See In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024).

by relying on "core operations" and pointing to stock sales and Geisler's later departure, but none of these theories—taken individually or together—suggest fraudulent intent. The allegations against Graboswki and Meloun are particularly thin, and Plaintiffs' focus on Geisler rests on speculation and hindsight. In the end, Plaintiffs' grab bag pleading is the hallmark of weak scienter and falls far short of creating the strong inference the law requires.

### 1. The competing, non-fraudulent inference is far more compelling.

The scienter inquiry begins and ends with plausibility. Under *Tellabs*, Plaintiffs must plead facts giving rise to a strong inference of fraudulent intent that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs' allegations fall well short of that high bar. Again and again, they take what is really a dispute between franchisees and the Company and then point to ordinary course stock sales and routine corporate disclosures to support scienter. But as above, the alleged "scheme" makes no sense. Plaintiffs allege a sweeping cover-up premised on the notion that no studios ever closed, even though the Company's own filings told investors otherwise. *See supra* at 8–10. Plaintiffs also claim insiders were motivated to cash out, yet Meloun sold nothing and Geisler, the purported mastermind, sold less than a quarter of his stake while keeping hundreds of millions of dollars in stock exposed to the very decline he supposedly knew was coming. They further contend Defendants fraudulently concealed litigation that was already a matter of public record. And they point to the SEC's investigation but concede the SEC—the regulator in charge of policing securities fraud—reviewed these same allegations and declined to bring charges against any of the Defendants here. Opp. 48 n.30. Courts consistently reject such illogical theories. *See, e.g., Webb v. SolarCity Corp.*, 884 F.3d 844, 855–58 (9th Cir. 2018); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 8:24-cv-00285-JWH-KES

## 2. The two franchisee memos sent to Geisler are not indicative of scienter.

The only allegations that go to anyone's purported actual knowledge—two memos purportedly sent to Geisler by franchisees—do not establish scienter.[7] Mot. 30–31. The opposition proves this point.

Plaintiffs do not dispute that the memos, which both predate the Class Period by more than a year, are not tied to any challenged statement. Nor do they dispute that the memos reflect complaints about individual franchisee operations, not evidence that investor disclosures about Company-wide performance were false. Opp. 39 n.23; *see, e.g.*, *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013) (generic "red flags" or anecdotal complaints without a connection to the alleged misstatements cannot establish scienter), *aff'd*, 691 F. App'x 393 (9th Cir. 2017). Instead, Plaintiffs simply repeat the conclusory assertion that the memos "demonstrate Geisler knew . . . before the IPO" of the purported scheme to defraud investors. Opp. 39. But therein lies the weakness.

Plaintiffs never bridge the gap from a few dated franchisee complaints about pre-COVID FDDs, build-out costs, and profitability and Geisler's purported knowledge that later investor-facing statements were false when made. *See In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. Oct. 12, 2011) ("Knowledge of the problem, however, is insufficient to infer that [defendant] acted with the intent to defraud or with deliberate recklessness in not reporting the issue publicly."), *aff'd*, 768 F.3d 1046 (9th Cir. 2014). Plaintiffs' own cases show they must bridge that gap. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("General allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient."); *see also Zucco*, 552 F.3d at 1000–01 ("Allegations that [company's] management had access to the purportedly manipulated quarterly accounting numbers,

---

[7] Plaintiffs do not even try to argue their relevance to Meloun or Grabowski. Mot. 30.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 8:24-cv-00285-JWH-KES

or that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated."). The memos show, at best, that some franchisees were unhappy with their costs or performance and wrote to the Company to complain. They say nothing about Geisler's state of mind regarding statements made to the Company's investors.

### 3. The circumstantial allegations of purported knowledge also do not support an inference of scienter.

Plaintiffs' circumstantial "knowledge" allegations—executives' positions at the Company, core operations, anecdotal franchisee interactions, and regulatory developments—are precisely the types of generic allegations courts routinely reject. Mot. 33–37. Plaintiffs' opposition underscores both the weakness of their circumstantial allegations and the lack of a single contemporaneous, particularized fact showing anyone knew a challenged statement was false when made.

*First*, titles alone—here, CEO, CFO, or director—are insufficient to support an inference of scienter. Mot. 33–34. Plaintiffs effectively concede the point. For Geisler, Meloun, and Grabowski, they essentially offer only boilerplate assertions that they were "directly involved" in the business and had industry experience. Opp. 36–38, 41 n.26. But neither allegation ties any Defendant to contemporaneous contradictory information, which is required. *Metzler*, 540 F.3d at 1068.

*Second*, "core operations" does not relieve Plaintiffs of their burden to plead contemporaneous facts showing that someone at the Company actually knew information contradicting the challenged statements. Mot. 34. Plaintiffs try to use "core operations" to bootstrap deficient allegations of actual knowledge. But Plaintiffs must allege that contradictory facts were known before they can be imputed to Defendants. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014). Plaintiffs never identify those "facts." Their reliance, again, on unverified franchisee memos sent years earlier and the Fuzzy Panda report—which post-dates the majority of alleged misstatements—adds nothing. Opp. 42. Plaintiffs simply ask the Court to assume that

13

because franchisees complained, Defendants must have known the Company's disclosures were false.  That is not the law.  *See Petrie v. Elec. Game Card, Inc.*, 2011 WL 13130015, at *7 (C.D. Cal. Oct. 19, 2011) ("The important issue is not whether defendants had knowledge of certain undisclosed facts but rather whether defendants knew or should have known that their failure to disclose those facts presented a danger of misleading [investors]." (cleaned up)).

*Third*, even if allegations about Geisler's day-to-day involvement with franchisees were true (they are not), they do not establish scienter.  Mot. 34–36.  Plaintiffs' examples do not suggest otherwise.  "[M]onitoring the Company's Facebook page" is routine, and "wiring free money to franchisees that needed help" reflects support, not fraud.  Opp. 36.  As Plaintiffs' own authority recognizes, "general allegations of defendants' hands-on management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient."  *Daou*, 411 F.3d at 1022 (cleaned up).

*Fourth*, Plaintiffs' reliance on the Company's handling of "transition" studios does not support scienter; indeed, their reliance on studio closures *after* the Fuzzy Panda report is classic fraud-by-hindsight.  Mot. 36.  Plaintiffs invoke *Reese*, where the plaintiffs alleged a senior executive "indisputably had access" to contradictory information when she made a challenged statement and later information "directly contradicted [earlier] statements."  *Reese v. Malone*, 747 F.3d 557, 574–75 (9th Cir. 2014).  But here, Plaintiffs identify no reports or data—either contemporaneous or subsequent, contradicting Defendants' statements—only post hoc allegations that some refranchised studios were "already in trouble" or "duds," and argue that Xponential "switched" from "transition" to "closure" terminology.  Opp. 44.  These later business developments cannot retroactively establish scienter.  *See Cheng*, 2021 WL 3077469, at *11 ("Changing one's mind or methodology without more cannot be the basis for finding scienter.").

*Fifth*, later regulatory inquiries, the DFPI consent order, the FDD "pause," and

14

the restatement do not support scienter. Companies have no duty to disclose uncharged investigations, and the later developments do not establish that earlier statements were false when made. Mot. 36–37. Plaintiffs offer nothing to the contrary. Instead, they resort to the circular assertion that these later events "must" mean Defendants knew the "truth" all along. Opp. 45–46. But the Complaint pleads no contemporaneous facts showing that Geisler, Meloun, or anyone else knew information that rendered a statement false when made. Plaintiffs' vague refrain about the "true state of Xponential's business" underscores the weakness of their theory: they identify no particularized facts about what that "true state" was, who knew it, or how it contradicted any statement when made. Opp. 45. Speculation of that sort cannot substitute for particularized allegations under the PSLRA.

### 4. Geisler's and Grabowski's stock sales do not support an inference of scienter.

Plaintiffs' stock sale allegations fail for multiple independent reasons. *First*, while Plaintiffs cast this case as a sweeping fraud for personal gain, the trading allegations do not fit that narrative. Plaintiffs concede that Meloun—one of the two primary speakers—sold nothing, and Geisler, the other speaker and purported mastermind, sold less than a quarter of his stake. Opp. 46, 47 n.29; *see, e.g.*, *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1043 (N.D. Cal. 2020) (stock sales not suspicious where "both defendants lost more money in their retained shares throughout the Class Period than they made in their stock sales"); *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *38 (C.D. Cal. Apr. 14, 2015) (CEO's retention of "more stock than [he] sold during the class period . . . strongly rebuts an inference of scienter"). Plaintiffs also acknowledge that both Geisler and Grabowski *purchased* Xponential shares on the open market, which undercuts scienter. Opp. 47 n.29; *City of Roseville*, 963 F. Supp. 2d at 1141.

*Second*, all of Grabowski's sales and most of Geisler's sales occurred through the

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 8:24-cv-00285-JWH-KES

IPO or SPO so are not suspicious.[8]  Mot. 38.  By definition, public offerings are mechanisms for insiders to sell.  Thus, it is entirely unsurprising that courts routinely reject attempts to infer scienter from such routine transactions.  *See, e.g.*, *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *15 (N.D. Cal. Nov. 14, 2016) (no scienter inference where "Defendants sold their FireEye stock only during the secondary public offering, had no prior trading history, and retained a majority of their shares."); *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) ("It is not uncommon or otherwise suspicious to sell stock in association with a public offering; indeed, the sale of stock is often the point of the offering.").

Indeed, as to Grabowski, private equity sponsors routinely reduce or exit positions through registered offerings as part of ordinary exit strategies or portfolio diversification, so courts recognize that such sales are neither suspicious nor probative of scienter.  *See, e.g.*, *Charter Twp. of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*, 2017 WL 3582973, at *7 (S.D. Cal. Aug. 18, 2017) ("Plaintiff's allegations point more strongly to innocent inferences, such as that [a private equity sponsor's] decision to exit [the company's] stock was based on anticipated headwinds applicable across the financial services industry[.]"); *Ferreira v. Funko Inc.*, 2021 WL 8820650, at *35 (C.D. Cal. Oct. 22, 2021) (finding that a private equity sponsor's sale in a secondary offering was not "suspicious enough to establish a strong inference of scienter" even when sold near peak price).  The same analysis—and result—applies here.

### 5. Geisler's departure does not support an inference of scienter.

Finally, Geisler's departure does not establish scienter.  Mot. 39–40.  Personnel changes—even after negative events—do not create a strong inference of scienter

---

[8]    Plaintiffs concede Geisler's only other sales were through a Rule 10b5-1 trading plan, further weakening any scienter inference.  Opp. 47–48; *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1056 (N.D. Cal. 2018).  Plaintiffs try to sidestep that point by invoking the timing of *The Capitol Forum*'s questions, but they are inconsistent on when those questions were received and do not allege Geisler actually reviewed or knew of them.  Mot. 39 n.20.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 8:24-cv-00285-JWH-KES

without more.  *Zucco*, 552 F.3d at 1002.  Here, Geisler's departure occurred nearly a year after the publication of Fuzzy Panda's report.  And Plaintiffs still do not identify any "suspicious circumstances" surrounding his departure, as they acknowledge is required.  Opp. 48.  Instead, they claim only that his departure "adds credibility" to other allegations.  *Id*.  But the Complaint itself admits "the press release did not specifically attribute Geisler's dismissal to the wrongdoing."  Mot. 39.  Plaintiffs do not—and cannot—explain why his departure was probative of scienter in light of that concession.

### D. Plaintiffs' Section 10(b) Claims Must Be Dismissed for Failure to Plead Loss Causation

Plaintiffs also fail to plead loss causation.  As Defendants explained, the Fuzzy Panda report cannot serve as a corrective disclosure.  Mot. 41–42.  Plaintiffs concede the report (1) was issued by a short seller with a financial motive to depress Xponential's stock and (2) expressly disclaimed its own accuracy.  Opp. 52–53.  Now, they try to reframe the report as relying on nonpublic information, but the report itself states that "all information contained in the[] report[] . . . has been obtained from *public sources*."  ECF 112-5 at 352.  A short seller's advocacy piece drawing inferences from public information is not a corrective disclosure, even if the report "required extensive and tedious research involving the analysis of far-flung bits and pieces of data."  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020); *see also Defeo v. IonQ, Inc.*, 2025 WL 1035292, at *163–64 (4th Cir. Apr. 8, 2025).

Plaintiffs effectively concede that post-Fuzzy Panda events did not correct any earlier statements, arguing that such disclosures "showed the denials [of the Fuzzy Panda report] were false."  Opp. 51.  But Plaintiffs sidestep Defendants' central argument that none of these later events revealed any *new* information beyond what Fuzzy Panda had already alleged.  Mot. 43; *In re BofI Holding*, 977 F.3d at 794.  Likewise, Geisler's 2024 suspension and the DFPI Consent Order did not reveal any fraud:  Terminations do not "reveal" falsity, and the DFPI order was franchise-law focused and made clear that it contained only unadjudicated allegations.  Mot. 43.  And Plaintiffs concede the March

17

2025 restatement and related disclosures are insufficient.  Opp. 53.

Finally, Plaintiffs' "materialization of risk" theory does not save the day.  Mot. 42–43.  Securities laws require disclosure of concrete facts, not speculation about how risks might unfold.  And courts consistently hold that a stock drop triggered by the later materialization of *disclosed* risks cannot establish loss causation.  *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120–21 (9th Cir. 2013); *see supra* at 8–10.  Business setbacks, regulatory scrutiny, and uneven franchisee performance are not revelations of prior fraud.  As the Supreme Court has made clear, Plaintiffs must link the stock drop to the revelation of earlier fraud, not to ordinary business risks that merely came to fruition.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–46 (2005).  Plaintiffs do not plead the required connection.

## E. The Section 12(a)(2) Claim Against Grabowski Must Be Dismissed

Plaintiffs' Section 12(a)(2) claim against Grabowski fails because he is not a "statutory seller."  Mot. 44–45.  Across four complaints, Plaintiffs can muster only that Grabowski signed the SPO Registration Statement.  ¶ 344.  But that is not solicitation. *See, e.g.*, *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003); *Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *19 (N.D. Cal. Jan. 17, 2017); *Ryan v. FIGS, Inc.*, 2025 WL 71727, at *12 (C.D. Cal. Jan. 10, 2025).  Plaintiffs now try to stretch further by arguing Grabowski "funded Xponential's roadshows."  Opp. 55. But the Complaint pleads only that entities allegedly controlled by Grabowski were, like Grabowski, "signatories to the Underwriting Agreement and caused the Company to agree" to cover its own expenses for investor presentations.  ¶ 345.  Those allegations do not support the conclusion that Grabowski (i) sold Plaintiffs any Xponential stock in the offering, or (ii) solicited Plaintiffs' purchase of Xponential stock, whether in roadshows or otherwise.  They do not even support Plaintiffs' argument that Grabowski funded the roadshows (which Plaintiffs unsurprisingly do not attempt to tie to statutory seller status).  In any event, "[e]ven participation in road shows to promote the sale of stock does not constitute active solicitation under *Pinter*."  *Maine State Ret. Sys. v.*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT
CASE NO. 8:24-cv-00285-JWH-KES

*Countrywide Fin. Corp.*, 2011 WL 4389689, at *9 (C.D. Cal. May 5, 2011).

### F. The Section 20(a) Claim Must Be Dismissed

Plaintiffs' Section 20(a) claim fails as to all Defendants because there is no primary violation.[9]  *See Zucco*, 552 F.3d at 990.  The Section 20(a) claim additionally fails as to Grabowski because Plaintiffs allege no facts showing he exercised day-to-day control over Xponential.  *See, e.g.*, *Bao v. Solarcity Corp.*, 2016 WL 54133, at *9–10 (N.D. Cal. Jan. 5, 2016); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008).  Plaintiffs repeat that Grabowski was a founder and Chairman and recycle their defective argument that he "funded" roadshow expenses.[10]  Opp. 56.  But "merely signing a group published document does not make an outside director liable for the contents of that document."  *In Re Valence Tech. Sec. Litig.*, 1996 WL 225010, at *3 (N.D. Cal. Apr. 30, 1996), *aff'd sub nom. Berry v. Valence Tech., Inc.*, 175 F.3d 699 (9th Cir. 1999).  Indeed, courts have rejected Section 20(a) claims where a plaintiff alleged that a controlling shareholder held board seats, reviewed filings, and approved offerings but pled no facts showing "day-to-day involvement in the operation of the Company."  *Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *13 (N.D. Cal. Jan. 17, 2017); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 n.13 (9th Cir. 2000).  And Plaintiffs' only alleged "statement" by Grabowski—a press release quote praising Geisler—is irrelevant to whether he controlled Xponential.[11]  Absent particularized facts showing that Grabowski directed the Company's statements or operations, Plaintiffs' Section 20(a) claim cannot stand.

### III.   CONCLUSION

The Court should dismiss the Complaint in its entirety and with prejudice.

---

[9] For the same reason, Plaintiffs' Section 15 claim also fails against Defendants.  *See* Opp. 56 n.36.

[10]  Plaintiffs cite to approximately 100 paragraphs in the Complaint, Opp. 56, the vast majority of which do not even mention or have anything to do with Grabowski, much less his supposed ability to control the Company.

[11] The statement also is mere puffery and inactionable opinion.  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

DATED:  October 14, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Michael D. Celio*
      Michael D. Celio

*Attorneys for Defendants Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris*

20