# EXHIBIT A

Case 8:24-cv-00285-JWH-KES   Document 133-1   Filed 12/02/25   Page 2 of 28   Page
ID #:3438
State Teachers Retirement System of Ohio v. Zoominfo..., Slip Copy (2025)

2025 WL 3013683
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Tacoma.

STATE TEACHERS RETIREMENT SYSTEM OF OHIO et al., Plaintiffs,

v.

ZOOMINFO TECHNOLOGIES INC. et al., Defendants.

Case No. 3:24-cv-05739-TMC

|

Signed October 28, 2025

**Attorneys and Law Firms**

Eric J. Belfi, Pro Hac Vice, Francis P. McConville, Pro Hac Vice, Jacqueline Meyers, Pro Hac Vice, James T. Christie, Pro Hac Vice, Michael P. Canty, Pro Hac Vice, Michael H. Rogers, Pro Hac Vice, Nicholas Manningham, Pro Hac Vice, Labaton Keller Sucharow LLP, New York, NY, Bradley S. Keller, Joshua Bacon Selig, Byrnes Keller Cromwell LLP, Seattle, WA, for Plaintiffs State Teachers Retirement System of Ohio, Ohio Public Employees Retirement System.

Danny C. Kelly-Stallings, Seattle, WA, for Plaintiff Hampton Roads Shipping Association, International Longshoreman's Association.

Duncan Calvert Turner, Badgley Mullins Turner PLLC, Lynnwood, WA, for Plaintiff Francisco Javier Martin Escanciano.

Ramzi Abadou, Pro Hac Vice, Kahn Swick & Foti LLP, San Francisco, CA, Roger Mulford Townsend, Townsend Legal PLLC, Bainbridge Island, WA, for Plaintiff Teachers Retirement System of Louisiana.

DeKalb County Pension Fund, Pro Se.

Alexander K. Talarides, Pro Hac Vice, James N. Kramer, Pro Hac Vice, Orrick Herrington & Sutcliffe, San Francisco, CA, Molly McCafferty, Pro Hac Vice, Orrick Herrington & Sutcliffe, Menlo Park, CA, Paul Francis Rugani, Orrick Herrington & Sutcliffe, Seattle, WA, for Defendants ZoomInfo Technologies Inc, Henry Schuck, Cameron Hyzer.

Alexander K. Talarides, James N. Kramer, Orrick Herrington & Sutcliffe, San Francisco, CA, Paul Francis Rugani, Orrick Herrington & Sutcliffe, Seattle, WA, for Defendant Joseph Christopher Hays.

ORDER ON MOTIONS TO DISMISS

Tiffany M. Cartwright, United States District Judge

**\*1** Before the Court is a motion to dismiss filed by Defendants ZoomInfo Technologies Inc., Henry Schuck, Cameron Hyzer, Joseph Christopher Hays, and DO Holdings (WA), LLC (Dkt. 91) and a separate motion to dismiss filed by Defendants TA Associates Management, L.P. and the Carlyle Group, Inc (Dkt. 87). For the reasons set forth below, this Court GRANTS the motion to dismiss all claims against TA Associates and Carlyle and GRANTS IN PART the motion with respect to the remaining Defendants. The Court DISMISSES all claims against TA Associates, Carlyle, and DO Holdings.

## I. BACKGROUND

Exhibit A
Page 2

Plaintiffs represent a putative class of investors who purchased securities from defendant ZoomInfo Technologies Inc. ("ZoomInfo") during a class period beginning November 10, 2020, and ending August 5, 2024 (the "Class Period"). Dkt. 81 at 1. Plaintiffs assert three Exchange Act claims based on Defendants' allegedly false and misleading statements that ignored ZoomInfo's high risk of customer non-payment and looming financial downturn. *Id*. ¶¶ 20–23.

## A. The Parties

Defendant ZoomInfo "is a technology company that offers digital sales and marketing tools to businesses." *Id*. ¶ 5. ZoomInfo's flagship product, SalesOS, is "in essence a digital lead list—a commercial database that provides sales and marketing professionals with organizational and contact information to help them identify, connect, and engage with prospective customers." *Id*. ZoomInfo is incorporated under the laws of Delaware with its principal executive offices located in Vancouver, Washington. The Company's common stock is listed on Nasdaq Global Select Market under the trading symbol "ZI." *Id*. ¶ 88.

ZoomInfo's customers fall into three broad categories: (1) Enterprise; (2) Mid-Market; and (3) small-to-medium businesses ("SMB"). *Id*. ¶ 109. ZoomInfo offers subscriptions at various price points based on customer usage, and those subscriptions account for nearly 100% of the Company's revenue. *Id*. ¶ 110. Different subscription tiers allow customers to purchase licenses or "seats" to access various products, as well as units or "credits" to access specific information within ZoomInfo's databases. *Id*.

Defendant Henry Schuck was Chief Executive Officer ("CEO") of ZoomInfo, Chairman of the company's Board of Directors, and a Director on the Board. *Id*. ¶ 89. Plaintiffs allege that, as CEO, Schuck "participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact, among other things, relating to the retention of customers." *Id*. He also signed ZoomInfo's annual and quarterly SEC filings, which allegedly "contained false and misleading statements and financial figures." *Id*. Schuck sold more than 21.3 million shares of ZoomInfo stock in open market transactions during the Class Period. *Id*.

Defendant Cameron Hyzer was the Chief Financial Officer ("CFO") of ZoomInfo from November 2018 to October 2024. *Id*. ¶ 90. In his role as CFO, Hyzer "led multiple teams including, accounting, finance, internal audit, SEC reporting, and tax treasury, and also participated in various media interviews, earnings calls, and conferences with securities analysts," during which Plaintiffs allege Hyzer made misleading statements regarding ZoomInfo's retention of customers. *Id*. Hyzer also signed ZoomInfo's SEC filings, which Plaintiffs allege contained misleading statements and financial figures. *Id*. Hyzer sold more than 600,000 shares of ZoomInfo stock in open market transactions during the Class Period. *Id*.

**\*2** Defendant Joseph Christopher Hays was ZoomInfo's President and Chief Operating Officer ("COO"). *Id*. ¶ 107. Responsible for sales development, Hays allegedly suppressed information that ZoomInfo was falling behind its competitors and losing market share. *Id*. ¶¶ 91, 436–37. Hays sold more than 1 million shares of ZoomInfo stock in open market transactions during the Class Period. *Id*. ¶ 91.[1]

Defendants DO Holdings, TA Associates, and Carlyle Group (together, the "Sponsor Defendants") were entities holding shares in ZoomInfo during the Class Period. *Id*. ¶¶ 92–94. Plaintiffs allege that the Sponsor Defendants were "controlling shareholders of ZoomInfo" required to "disseminate prompt, accurate, and truthful information" with respect to ZoomInfo's business and financial condition and that each failed to do so. *Id*. ¶ 465. DO Holdings was owned and controlled by Schuck and Kirk Brown and allegedly acted at Schuck's direction. *Id*. at 126, n. 32. TA Associates and Carlyle Group were outside investment firms that "together held a significant percentage of the combined voting power" during the Class Period and allegedly exercised control over ZoomInfo, its officers, and directors. *Id*. ¶¶ 92–93.

In the complaint, Plaintiffs rely on statements from thirteen Former Employees ("FE") who are not party to this action. *Id*. ¶¶ 95–107. Plaintiffs identify each employee's work title and period of employment, along with key ZoomInfo managers and executives whom the FEs worked closely with. *Id*.

Exhibit A
Page 3

**B. ZoomInfo's IPO**

Schuck co-founded ZoomInfo's predecessor, DiscoverOrg, in 2007 as a marketing and sales startup that provided clients with a database of business information and contacts. *Id*. ¶ 7. Schuck managed DiscoverOrg with Hyzer and Hays. *Id*. DiscoverOrg acquired its competitor, Zoom Information, Inc., on February 4, 2019, and rebranded as ZoomInfo. *Id*. ZoomInfo held an initial public offering ("IPO") on June 4, 2020. *Id*. ¶ 8. Shares were priced at $21.00 per share and closed at $34.00 per share after the first day of trading. *Id*. ¶ 17.

Plaintiffs allege that "leading up to the IPO, Defendant Schuck personally directed employees to sell to as many customers as possible for the express purpose of increasing the Company's pre-IPO stock price. FEs confirmed that Defendant Schuck coupled this directive with ZoomInfo not performing due diligence into its customers' ability to pay." *Id*. ¶ 113. Schuck "told employees that the Company needs 'all-hands-on-deck' to sign up as many customers as possible" and ZoomInfo distributed equity to employees to incentivize more new customer sign-ups. *Id*. ¶ 114.

**C. ZoomInfo's Sales Strategy**

Plaintiffs allege that, "as part of ZoomInfo's aggressive push to increase sales and inflate the price of ZoomInfo stock, the Company did not perform due diligence into new customers' ability to pay when closing their contracts." *Id*. ¶ 119. "FEs confirmed that ZoomInfo's decision not to vet customers led to large numbers of customer subscriptions—disproportionately within ZoomInfo's SMB and Mid-Market segments—carrying a high likelihood of nonpayment. FEs further specified frequent instances of ZoomInfo allowing customers that posed a high collectability risk to begin using ZoomInfo immediately, without tendering payment. This forced FEs in ZoomInfo's accounting department to recognize revenue that ZoomInfo knew it was unlikely to collect." *Id*. ¶ 119. According to FE-1, a former Sales Manager, "there were no discussions around due diligence and vetting prospective customers." *Id*. ¶ 120. Unlike similar companies she previously worked for, ZoomInfo did not have credit checks for new customers; "the mentality was 'get it done, we'll deal with [any problems] later.' " *Id*. (quotation modified).

**\*3** Plaintiffs allege that this aggressive sales practice and lack of due diligence led to customers defaulting on payment obligations. According to FE-3, there were "no barriers" and "no constraints" placed on the Sales Team regarding potential customers, including "not requiring upfront payment from customers, and not requiring more than a business name and a business address to get a deal signed." *Id*. ¶ 122. "The entire length of the company, a decade, the entire thing is just sell—just sell, get that deal signed. Does it mean we're going to collect the money? No. That's what was happening at a large scale here. But it got out of control." *Id*. Despite this, ZoomInfo's accountants "technically recognize[d] the deal as revenue because it's on paper and there was a 'contract.' " *Id*. ¶ 125.

As the COVID-19 pandemic accelerated, many small and midsize businesses obtained temporary funding, including federal Paycheck Protection Program ("PPP") loans, to accommodate a shift to virtual work and volatile market conditions. *Id*. ¶ 128. Plaintiffs allege this led to "skyrocketing demand for digital sales and marketing tools" resulting in more unverified customer sign-ups that Defendants knew "were both driven by temporary demand and saturated with financial risk" and "would not continue to generate the stable revenue growth that ZoomInfo portrayed to the investors." *Id*. ¶¶ 129–30. Over time, many employees returned to the office around the country and many ZoomInfo customers lost funding or went out of business. *Id*. ¶ 130.

**D. ZoomInfo's Accounting Practices**

The SEC relies on the Financial Accounting Standards Board ("FASB") to adopt principles that govern accounting standards for SEC filings, including the Generally Accepted Accounting Principles ("GAAP"). *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015); Accounting Standards, 2 Law Sec. Reg. § 9:90. "Far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions," there are nineteen different GAAP sources which "tolerate a range of reasonable treatments, leaving the choice among alternatives to management." *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1203 (D. Ariz. 2009) (citation modified).

Financial analysts covering ZoomInfo's stock focused on Remaining Performance Obligations ("RPO"), a GAAP metric representing the aggregate value of all outstanding contracts ZoomInfo had not recognized revenue for yet. Dkt. 81 ¶ 134. Analysts believed ZoomInfo's RPO to be a "proxy" for annual contract value, or ACV, and Morgan Stanley found it "indicative that existing customers are sticking around." *Id*. ¶¶ 136, 144.

Although ZoomInfo was required to comply with GAAP when reporting RPO, Plaintiffs allege the company failed to "perform a robust assessment of its likelihood of collecting on its contracts." *Id*. ¶ 135. "Specifically, according to ASC 606, ZoomInfo was required to, as part of an initial contract review prior to day one of the contract's inception, evaluate the total consideration (*i.e.*, dollars) that was probable to be received." *Id*. ZoomInfo "did not even have a variable constraint model in place to assess collectability" and thus overestimated the total consideration of its contracts, reporting inflated RPO and revenue figures. *Id*. ¶¶ 138–39. Defendants "further inflated RPO by not writing down bad debt for accounts that Defendants knew to be uncollectable or delinquent," instead counting *revenue* from accounts "hundreds of days in delinquency" in ZoomInfo's RPO figures. *Id*. ¶ 141.

### E. ZoomInfo's Financial Health and Defendants' Stock Sales

*1. 2020 Q3 Earnings Call on November 9, 2020*

The day before the start of the Class Period, ZoomInfo released its earnings for the third quarter of 2020 and held an associated earnings call. During the call, Defendant Hyzer stated that unearned revenue at the end of the quarter was $176 million and RPO was $458 million, $349 million of which was "expected to be delivered in the next 12 months." *Id*. ¶ 145. Plaintiffs allege this statement was misleading because it touted an inflated RPO which lacked due diligence controls and robust collectability measures. *Id*. ¶ 146.

 **\*4**  During the same call, Schuck stated that "because of the strength that we're seeing across all areas of the business, including record quarterly new sales, record engagement levels and a new high watermark for our customers spending over $100,000 a year with us, we are raising our financial guidance for the full year." *Id*. ¶ 147. Unbeknownst to investors, however, these sales were achieved "through a systemic directive to close deals quickly without vetting customers" and carried a high risk of nonpayment. *Id*. ¶ 148. Analysts reacted positively, with Canaccord Genuity reporting that ZoomInfo's "unparalleled combo of growth and profits carries on" and that investors could expect "growth rates well north of 30% for at least the next couple of years." *Id*. ¶ 149.

*2. Lock-Up Period Ending on December 2, 2020*

Plaintiffs allege that Defendants began selling their shares shortly after the lock-up period ended on December 2, 2020.[2] *Id*. ¶ 153. Plaintiffs also allege that Defendants entered into Rule 10b5-1 trading plans allowing them to sell their stock at a predetermined time, but only after "they were already in possession of material, nonpublic information about the unsustainability of ZoomInfo's growth and customer demand." *Id*. ¶ 154. Defendant Schuck adopted his 10b5-1 trading plan "prior to November 30, 2020." *Id*. ¶ 26. TA Associates adopted a plan on December 6, 2020, Carlyle Group adopted a plan on June 22, 2021, and DO Holdings adopted a plan on September 15, 2021. *Id.* at 50 n.19.

Plaintiffs list the following stock sales in December 2020:

• December 4, 2020: Before adopting a Rule 10b5-1 plan, TA Associates sold 6,859,327 shares for over $300 million in proceeds, and Carlyle Group sold 11,817,596 shares for approximately $518 million.

• December 7, 2020: Outside of his 10b5-1 trading plan, Hays sold 23,687 shares for $1,023,472.40.

• December 11, 2020: Hays sold another 30,000 shares, totaling $1,242,606.60 in proceeds.

• December 14, 2020: Hays sold another 17,241 shares, totaling $726,708.15 in proceeds.

Exhibit A
Page 5

• December 15, 2020: On December 15, Schuck sold 400,000 shares totaling over $16 million in proceeds. He would continue to sell blocks of shares each month— eventually selling 21,345,375 shares for proceeds of approximately $1.1 billion.

• December 22, 2020: Hyzer sold 90,950 shares for more than $4 million in proceeds.

*Id*. ¶¶ 153, 157. Plaintiffs allege that all Defendants would continue to offload stock while making materially false and misleading statements that inflated ZoomInfo's stock price, ultimately totaling more than $8.6 billion in sales. *Id*. ¶ 156.

*3. ZoomInfo's Financial Decline*

By 2021, it became apparent to those inside ZoomInfo that the company's financial condition and market position were worsening. *Id*. ¶ 158. FE-11 attended weekly meetings with Hays and others to "discuss the status updates on demand generation" and commissioned a marketing survey "to compare features of ZoomInfo and their competitors, including data quality and ease of use." *Id*. ¶ 159. The survey showed ZoomInfo's competitors were performing better than previously believed and, in some areas, had even surpassed ZoomInfo. *Id*. ¶ 160. For example, "ZoomInfo no longer [had] the best data when previously, as DiscoverOrg, their data quality was what set them apart." *Id*. FE-11 expressed that the market survey showed ZoomInfo's "gravy train of growth" was slowing down, but Hays and the other executives "buried" the news "because it did not tell the story they wanted to tell." *Id*. ¶¶ 159–60.

 **\*5** Meanwhile, ZoomInfo's internal tracking systems confirmed that fewer customers were actually using ZoomInfo's platform. *Id*. ¶¶ 171–72. According to multiple FEs, senior leadership reviewed figures from platforms like Gainsight and Salesforce that "sent an unmistakable signal to Defendants that declining usage rates and collectability challenges were occurring in droves." *Id*. ¶ 172. Specifically, "every account had their own Health Score that was color-coded and designated as red, yellow, or green," based on the number of active licenses and "customer sentiment," a field manually input by representatives based on conversations with customers. *Id*. ¶¶ 173–74. Schuck and Hyzer presented the color-coded scores in internal meetings, where FE-4 saw the data and believed it was "not where [ZoomInfo] wanted to be." *Id*. ¶ 175. FE-4 estimated that 30 to 45 percent of customers were inactive and not logging into their ZoomInfo account. *Id*.

Thus, Plaintiffs claim, Defendants knew that ZoomInfo had two major problems: (1) the danger of non-payment from risky contracts, and (2) declining demand. *Id*. ¶ 161. Still, Defendants touted illusory successes and inflated RPO figures. *Id*.

On a February 22, 2021 earnings call, Hyzer reported "record new customer additions and strong retention in upsell activity in the fourth quarter" and "more than 20,000 customers representing greater than 35% growth relative to 2019." *Id*. ¶ 162. On May 3, 2021, ZoomInfo reported that its RPO was $592 million, of which $461 million was expected to be delivered in the next 12 months. *Id*. ¶ 164. ZoomInfo's stock price climbed, reaching $66.58 per share at close of trading on August 5, 2021. *Id*. ¶ 165. On August 6, 2021, ZoomInfo conducted a secondary offering for the sale of 27 million Class A shares. *Id*. ¶ 166. The August 6 secondary offering was non-dilutive, allowing Defendants to sell existing shares directly to investors without issuing any additional shares. *Id*. Defendants made the following sales:

• DO Holdings sold 5,920,821 shares, with 3,286,639 of these shares being indirectly held by Schuck, who traded outside of his Rule 10b5-1 trading plan for $179.9 million in proceeds.

• Outside of its 10b5-1 trading plan,[3] TA Associates sold 9,625,934 shares totaling $527 million in proceeds.

• Outside of its 10b5-1 trading plan, Carlyle Group sold 9,236,692 shares totaling $505 million in proceeds.

*Id*. The Company made another non-dilutive secondary offering on August 11, 2021, and Defendants made the following sales:

• Schuck sold 2,545,328 shares outside of his 10b5-1 trading plan totaling $157.8 million in proceeds. On September 2, 2021, Schuck sold an additional 386,020 shares via an over-allotment option for $23.9 million more in proceeds.

Exhibit A
Page 6

- TA Associates sold 6,953,598 shares outside of its 10b5-1 trading plan totaling $431 million in proceeds. On September 2, 2021, TA Associates sold an additional 1,043,039 shares via an over-allotment option for $64.6 million in proceeds. That same day, TA Associates also sold 991,362 shares pursuant to its 10b5-1 plan for over $65 million in proceeds.

- Carlyle Group sold 7,401,220 shares outside of its 10b5-1 trading plan totaling $458 million in proceeds. On September 2, 2021, Carlyle Group sold an additional 1,035,891 shares via an over-allotment option for $64.2 million in proceeds.

- On September 1, 2021, Hays sold 1,702 shares outside of his 10b5-1 trading plan totaling $108,883.72 in proceeds. On September 10 and 14, 2021, Hays sold 226,000 shares outside of his trading plan totaling approximately $14.5 million in proceeds.

- On September 15, 2021, Hyzer sold 300,000 shares outside of his 10b5-1 trading plan totaling over $20 million in proceeds.

*Id*. ¶¶ 166–67. ZoomInfo's stock price reached its Class Period high at $77.35 per share on November 17, 2021. *Id*. Defendants continued to sell stock:

- On November 17, 2021, Hyzer sold 15,000 shares totaling $1,150,779.50 in proceeds. On December 17, 2021, he sold 15,000 shares totaling $905,250 in proceeds.

 **\*6**  - Throughout November 2021, Schuck sold 3,727,028 shares totaling $258 million in proceeds.

- Throughout November 2021, Hays sold 195,728 shares totaling $14 million in proceeds. Throughout December 2021, Hays sold 244,659 totaling $15 million in proceeds.

*Id*. ¶¶ 176–77.


*4. ZoomInfo's Changing Strategy*

As ZoomInfo's business was declining, the company "pivoted from trying to boost sales to trying to force existing customers to renew." *Id*. ¶ 178. ZoomInfo planned to "entrap customers in an autorenewal, and then threaten them with litigation or turning them over to collection agencies." *Id*. ¶ 180. For example, FE-5 was instructed by account managers to avoid contacting customers until their contract was 59 days away from ending. *Id*. ¶ 180. Since the renewal opt-out deadline was 60 days from termination, this "ensured the customer was locked into their renewal, which assisted Account Managers in meeting their quotas." *Id*. According to FE-10, ZoomInfo purposely structured its renewal opt-out emails to be caught by customers' spam filters. *Id*. FE-10 recalled discussing with colleagues that they "felt like they were a collections agency" for customers locked into a renewal, and FE-9 explained that autorenewals were a common reason that SMB customers were prone to "ghosting" ZoomInfo, ignoring the company and not paying their subscription fees. *Id*. ¶ 181. In coercing these subscriptions, Plaintiffs allege ZoomInfo "further forestalled the inevitable consequences of its failure to perform due diligence into customers' ability to pay." *Id*. ¶ 182.

ZoomInfo continued to boast of record profitability. On February 15, 2022, ZoomInfo reported unearned revenue of $364 million at the end of the quarter and an RPO of $864 million, with $672 million expected to be delivered in the next 12 months. *Id*. ¶ 184. Defendants continued to sell stock:

- From March 18, 2022, to June 6, 2022, Schuck sold 1,092,025 shares totaling over $57 million in proceeds.

- From March 18, 2022, to October 10, 2022, Hyzer sold 60,000 shares totaling over $3.3 million in proceeds.

- From February 17, 2022, to October 3, 2022, Hays sold 197,415 shares totaling $8.6 million in proceeds.

*Id*. ¶ 186.

Exhibit A
Page 7

*5. ZoomInfo's Corrective Disclosures*

Although Plaintiffs allege that ZoomInfo continually misrepresented its growth throughout the class period, they identify a series of five "partial disclosures" from late 2022 through mid-2024 that revealed risks to investors. *Id*. ¶¶ 187–89.

First, on November 1, 2022, ZoomInfo disclosed that at the end of Q3 2022, the company "saw a greater level of financial scrutiny from buyers, which further elongated sales cycles." *Id*. ¶ 191. During the November 1, 2022 earnings call, Defendants cited a "challenging macroeconomic environment" and cautioned investors to "expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021." *Id*.

 **\*7**  ZoomInfo's stock price fell $12.69 per share, or approximately 29%, to $30.81 on November 2, 2022. *Id*. ¶ 192. The market reacted with surprise, with Canaccord Genuity writing, "this wasn't the update that we were expecting [...] After all, management was pretty bullish at our conference in mid-august, and as late as mid-September at the Goldman event, the suggestion was that Q3 was not looking any worse than Q2." *Id*. ¶ 193. Hyzer continued to reassure investors, however, blaming financial troubles on "a worsening macro environment." *Id*. ¶ 194. Hyzer also stated that "gross retention continues to be really strong, over 90%" while Schuck claimed Zoominfo was "continuing to see really strong demand" but that "those deals are just taking longer to close." *Id*. ¶ 195.

Second, on November 16, 2022, Hyzer disclosed at a conference that the increased customer scrutiny had continued into the fourth quarter and would negatively impact ZoomInfo's revenue growth in FY 2023. *Id*. ¶ 198. Hyzer stated ZoomInfo would see "something that's more like a high-teens growth rate" which, according to Wolfe Research, "shocked" investors because it was far lower than "the mid-20%+ many on the Street were modeling." *Id*. ¶¶ 199–200. ZoomInfo's stock fell another 17%, from $31.69 to $26.17 per share, in the two days following Hyzer's statement. *Id*. ¶ 201. Again, Hyzer blamed the slower growth on "macro headwinds" and did not disclose the full extent of the company's financial troubles. *Id*. ¶ 202. Analysts maintained a positive outlook, finding it "hard to believe that the business has broken in this short of a time period" and "expect[ing] the company to maintain its strong unit economics, which underscore ZoomInfo's strong free cash flow generation." *Id*. ¶ 203.

- On February 24, 2023, Schuck enacted a new Rule 10b5-1 trading plan allowing him to sell up to 6 million common stock shares between May and November 2023. In June 2023, Schuck sold 2,083,334 shares totaling $55 million in proceeds.

- From May 3 to July 5, 2023, Hyzer sold 30,000 shares totaling $740,075.84 in proceeds.

- On May 22 and June 20, 2023, Hays sold 60,000 shares totaling $1.5 million in proceeds.

*Id*. ¶¶ 205–07.

Third, on June 31, 2023, ZoomInfo released the company's financial results for Q2 2023, announcing a decline in customers with high-value ACVs. *Id*. ¶ 208. Schuck cited "substantial" cuts for ZoomInfo's high-growth customers "in the context of a lower growth environment." *Id*. ¶ 208. ZoomInfo's stock fell about 28%, from $25.57 to $18.40 per share, over the next two days. *Id*. ¶ 209. Analysts at UBS research found the drop "well below investor expectations" and "even short of the bear case for a modest guide down." *Id*. ¶ 210.

ZoomInfo peppered its announcements with reassurances of continued growth. The company blamed increased cancellations on customers' "budgetary pressures" while Schuck pointed to "strong performance, with more pipeline created, higher win rates, faster close times, and higher ASPs [average selling prices]." *Id*. ¶ 211. Schuck assured investors that ZoomInfo was retaining customers but seeing elongated renewal cycles, while "omitting that a large segment of its customer base—particularly SMBs— had been locked into previous renewals for subscriptions that ZoomInfo knew they could not pay but were nevertheless counting as a way to inflate its RPO figures." *Id*. ¶ 212. Analysts at Barclays seemed to accept these assurances, stating, "[w]e see this more as a reflection of the market rather than a ZI specific issue." *Id*. ¶ 213. Morgan Stanley remained "encouraged by relative stability in gross retention and competitive win rates particularly in the SMB customer segment with greater competition." *Id*.

Exhibit A
Page 8

Fourth, on May 7, 2024, Schuck revealed that SMB renewals *decreased* in Q1 2024, causing net revenue retention—a measure of how much revenue the company kept from its existing customers—to slide to 85% from 87% in Q4 2023. *Id*. ¶ 215. Hyzer stated that the effects in Q1 were especially severe due to the "higher or larger pool of renewals coming in" during that time of year. *Id*. ZoomInfo reduced its annual revenue guidance from a range of $1.26–1.28 billion to $1.255–1.27 billion. *Id*. ZoomInfo's stock fell from $16.02 per share to $12.14 per share, a 24% drop, and analysts reported that their "patience has worn thin in waiting for a fundamental recovery at ZI" in the SMB and mid-market customer sectors. *Id*. ¶¶ 216–17.

**\*8**  When an analyst asked for more detail on SMBs' "weakness," Schuck stated "[i]t is fundamentally down-market. We're seeing much more of a macro effect than a competitive effect [...] we've not seen a material change in the competitive landscape or an increased impact to our business from competitors." *Id*. ¶ 218. Tempering the bad news, Hyzer stated that "SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend. It does feel like the SMB cohort is more sensitive to the higher rates for longer discussion that we've seen over the last few months." *Id*. ¶ 219. Hyzer also stated that ZoomInfo was requiring "a majority of smaller and more risky clients" to pay at checkout, which Plaintiffs allege "conceal[ed] the true extent" of elevated write-offs at the company. *Id.* ¶ 220.

Fifth, on the last day of the Class Period, August 5, 2024, ZoomInfo revealed it was incurring a $33 million charge because "the company made a change in estimates related to the collectability of receivables from customers and changed operational procedures to require upfront pre-payment for services from certain smaller customers." *Id*. ¶ 224. ZoomInfo decreased its revenue guidance by approximately $65 million following the disclosure, and Schuck explained in the August 5 earnings call that "in 2022 and 2023, [the company] extended credit to a higher mix of SMB customers, and the rate of non-payment by these customers increased throughout the past 24 months." *Id*. ¶¶ 224–25. ZoomInfo also announced the departure of Hyzer, who had been with the company for six years, and appointed Michael O'Brien as interim CFO in Hyzer's place. *Id*. ¶ 226. ZoomInfo's stock fell from $9.80 per share to $8.01 per share in one day, an 18% drop. *Id*. ¶ 228. On August 7, 2024, Schuck purchased 1.5 million shares of ZoomInfo "while ZoomInfo shares were trading at a rock-bottom price of $8.49 per share." *Id*. ¶ 229.

### F. Post-Class Period Events

On August 13, 2024, interim CFO O'Brien acknowledged ZoomInfo's debt stemmed from "a higher risk of non-payment than we had previously estimated." *Id*. ¶¶ 230–31. Schuck admitted the root cause of the charge was that ZoomInfo "extended credit historically to customers who weren't creditworthy." *Id*. ¶ 231. On November 12, 2024, Schuck explained that ZoomInfo would still have "an elevated level of processing write-offs in Q3" and that the SMB segment continued "to be challenged, particularly from a net retention perspective." *Id*. ¶ 232. That same day, ZoomInfo announced a 3% decrease in the full year guidance for revenue. *Id*.

### G. Defendants' Allegedly Misleading Statements

Plaintiffs identify 28 separate occurrences where Defendants allegedly made false or misleading statements. *Id*. ¶¶ 235–355. These include press releases, earnings calls, interviews, and SEC form disclosures, many of which have already been discussed above. *See supra*, Section I.E. They can largely be sorted into one or more of the following categories:

• Statements overplaying the sustainability of demand increases caused by the COVID-19 pandemic. *See, e.g., id*. ¶¶ 235–62 (statement A).

• Statements reporting ZoomInfo's RPO, which was inconsistent with GAAP and inflated by a lack of due diligence and variable constraint analysis, an increased risk of nonpayment, and large amounts of uncollectable debts remaining in accounts receivable. *See, e.g., id*. ¶¶ 263–64 (statement B).

• Statements reporting new customers or other financial indicators, such as revenue or ACV, which were inflated by a lack of due diligence, coercive auto-renewal policies, and inactive customers who were not using ZoomInfo's products. *See, e.g., id*. ¶¶ 272–75 (statement D).

Exhibit A
Page 9

State Teachers Retirement System of Ohio v. ZoomInfo..., Slip Copy (2025)

- Statements downplaying ZoomInfo's financial decline or blaming economic conditions for problems caused by the company's own practices. *See, e.g., id*. ¶¶ 335– 37 (statement V).

## II. PROCEDURAL HISTORY

**\*9**  Plaintiff City of Pontiac Police and Fire Retirement System first filed a complaint against Defendants on September 4, 2024. Dkt. 1. Subsequently, several other Plaintiffs moved to be appointed as class counsel and lead plaintiff. Dkt. 30; Dkt. 33; Dkt. 35; Dkt. 38; Dkt. 40. On December 12, 2024, the Court granted the Ohio Funds' motion to be appointed as class counsel and lead plaintiff. Dkt. 59.

On April 1, 2025, Plaintiffs filed an amended corrected complaint, now the operative complaint. Dkt. 81. TA Associates and the Carlyle Group moved to dismiss the complaint. Dkt. 87. DO Holdings, Hays, Hyzer, Schuck, and ZoomInfo moved to dismiss in a separate motion. Dkt. 91. They also filed a request for judicial notice. Dkt. 92. The Court heard oral argument regarding the motions to dismiss on October 27, 2025. Dkt. 104.

## III. LEGAL STANDARD

"In an ordinary civil action, the Federal Rules of Civil Procedure" under Rule 8(a)(2), "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting Fed. Rule Civ. Proc. 8(a)(2)). Until the passage of the Private Securities Litigation Reform Act ("PSLRA"), a complaint for securities fraud was governed by the heightened pleading standard set forth in Rule 9(b). *Id.* (citation omitted). Rule 9(b) demands that "the circumstances constituting fraud [...] be stated with particularity."

In 1995, however, Congress enacted the PSLRA, a law "[d]esigned to curb perceived abuses of the § 10(b) private action— nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." *Tellabs*, 551 U.S. at 320 (citation modified). In Section 21D(b) of the PSLRA, Congress "impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5." *Id.* at 321 (citation omitted). Under the PSLRA's heightened pleading standard, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citation modified).

The rest of the standard 12(b)(6) motion to dismiss rules remain in place. First, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 323 (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)). And second, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id.* (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993)).

## IV. REQUESTS FOR JUDICIAL NOTICE

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). When "matters outside the pleading are presented to and not excluded by the court," a motion to dismiss "converts into a motion for summary judgment under Rule 56." *Id.* (citing Fed. R. Civ. P. 12(d)). Then, "both parties must have the opportunity 'to present all the material that is pertinent to the motion.' " *Id.* (citing Fed. R. Civ. P. 12(d)).

**\*10**  There are two exceptions to this rule. *Id.* First, a court may take judicial notice of facts "not subject to reasonable dispute" because they are either: "(1) [ ] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

Exhibit A
Page 10

readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The second exception is "incorporation-by-reference." *Khoja*, 899 F.3d at 998. This rule allows courts to consider a document that is not attached to the complaint if the complaint "necessarily relies" on it and "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

But the Ninth Circuit has warned of a "a concerning pattern in securities cases like this one: exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 998. Certainly, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on [...] motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (quoting *Tellabs*, 551 U.S. at 322). "Yet the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id.* And "[t]his risk is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access." *Id.* (citations omitted).

Defendants ask the Court to notice eighteen exhibits. Dkt. 92. Plaintiffs do not oppose judicial notice of Exhibits 3, 5, 10–12, and 17–18. *See* Dkt. 94. The Court GRANTS Defendants' request for judicial notice for the unopposed exhibits. The Court GRANTS IN PART the remaining requests. The Court will judicially notice the contested exhibits and will consider these documents, their contents, and the fact of their filing. The Court will not assume the truth of statements in these exhibits, however, nor will the Court rely on the exhibits to resolve factual disputes such as GAAP adherence, the accuracy of Defendants' financial statements, or scienter.

The Court begins by addressing the uncontested exhibits.

### A. Exhibit 3: Excerpts from the PwC Revenue Guide, updated October 2024

Defendants argue that the court may take judicial notice of Exhibit 3 because it is a publicly available document. Dkt. 92 at 7. They note that courts "regularly take judicial notice of published accounting standards." *Id.* (quoting *Garcia v. J2 Glob., Inc.*, No. 2:20-CV-06096-FLA (MAAX), 2021 WL 1558331, at *10 (C.D. Cal. Mar. 5, 2021); then citing *In re Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at *4 (S.D. Cal. Jan. 13, 2023)). Plaintiffs do not respond. *See generally* Dkt. 95.

Judicial notice is appropriate for accounting rules as they are capable of accurate and ready determination by sources whose accuracy cannot be reasonably questioned. *Garcia*, 2021 WL 1558331, at *10 (collecting cases). The Court takes judicial notice of Exhibit 3.

### B. Exhibit 5: Transcript from ZoomInfo's Q2 2024 Earnings Conference Call on August 5, 2024

Defendants argue that Plaintiffs expressly reference and quote from this transcript in the complaint, incorporating it by reference and making it subject to judicial notice. Dkt. 92 at 2–3. Plaintiffs do not respond. *See generally* Dkt. 95.

A document may be deemed incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Garcia*, 2021 WL 1558331, at *5 (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)). To qualify as "extensively referenced," the complaint must cite the document at least more than once or quote from it at length; merely mentioning the existence of a document is insufficient. *Id.*

**\*11** Here, Plaintiffs cite the transcript thoroughly. Dkt. 81 ¶¶ 74–76, 224–26, 395, 397–99, 457–58, 498. Thus, the Court takes judicial notice of the transcript.

### C. Exhibit 10: Excerpts of FASB's Accounting Standards Codification Topic 250 ("ASC 250")

Defendants argue that the court may take judicial notice of Exhibit 10 because it is a publicly available document. Dkt. 92 at 8. Plaintiffs do not respond. *See generally* Dkt. 95. As explained above, courts "regularly take judicial notice of published accounting standards." *Garcia*, 2021 WL 1558331, at \*10; *see also, e.g.*, *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1179 (S.D. Cal. 2009) (taking judicial notice of accounting standards related to audit procedures for internal control); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 561 n.18 (N.D. Cal. 2009). Thus, the Court takes judicial notice of the FASB's accounting standards.

### D. Exhibit 11: Transcript from Canaccord Genuity 44th Annual Growth Conference and Private Company Showcase 2024 on August 13, 2024

Defendants argue Exhibit 11 is incorporated by reference into the complaint. Dkt. 92 at 2–3. Plaintiffs do not respond. *See generally* Dkt. 95. The transcript is quoted at Dkt. 81 ¶¶ 81, 230–31, 445, for alleged misstatements and omissions, and is noticeable. *See Khoja*, 899 F.3d at 1002–05.

### E. Exhibit 12: Transcript from Wells Fargo 8th Annual TMT Summit on December 4, 2024

Defendants argue that Exhibit 12 is incorporated by reference into the complaint. Dkt. 92 at 2–3. Plaintiffs do not respond. *See generally* Dkt. 95. The transcript is quoted at Dkt. 81 ¶¶ 446–47, for alleged misstatements and omissions, and is noticeable. *See Khoja*, 899 F.3d at 1002–05.

### F. Exhibit 17: Excerpts of Transcript from ZoomInfo's June 14, 2021 Analyst Day

Defendants argue Exhibit 17 is incorporated by reference into the complaint. Dkt. 92 at 2–3. Plaintiffs do not respond. *See generally* Dkt. 95. The transcript is quoted at Dkt. 81 ¶¶ 296–97, for alleged misstatements and omissions, and is noticeable. *See Khoja*, 899 F.3d at 1002–05.

### G. Exhibit 18: Excerpts of Transcript from ZoomInfo's Q4 2021 Earnings Conference Call on February 16, 2022

Defendants argue that Exhibit 18 is incorporated by reference into the complaint. Dkt. 92 at 2–3. Plaintiffs do not respond. See generally Dkt. 95. The transcript is quoted at Dkt. 81 ¶¶ 315–18, for alleged misstatements and omissions, and is noticeable. *See Khoja*, 899 F.3d at 1002–05.

### H. Exhibit 1: Excerpts of ZoomInfo's 2020 Form 10-K filed with the SEC on February 26, 2021.

Defendants argue that the 2020 Form 10-K is incorporated by reference. Dkt. 92 at 3. It is cited in the complaint at Dkt. 81 ¶¶ 34, 143, 151–53, 276–77, and 434. Plaintiffs contest judicial notice, arguing Defendants are introducing Exhibit 1 to establish the accuracy of their RPO estimates or dispute other allegations in the complaint, and the Court should not "take notice of the truth of any of the facts asserted in these documents." Dkt. 95 at 6 (citing *Wochos v. Tesla, Inc.*, 2019 WL 1332395, at \*2 (N.D. Cal. 2019)). For example, Plaintiffs also argue the Court should not consider Exhibit 1 "for the truth of the matter asserted regarding the Company's autorenewal policies." *Id*. at 7 (citing *Khoja*, 899 F.3d at 1003). Defendants reply that "Defendants cite Exhibit 1 simply to show that, contrary to Plaintiffs' claim, ZoomInfo in fact disclosed the details of its automatic renewal policy. S*ee* MTD at 14." Dkt. 98 at 5.

**\*12**  Courts may take judicial notice of "securities offerings and corporate disclosure documents that are publicly available." *Gerritsen v. Warner Bros. Entm't Inc.,* 112 F. Supp. 3d 1011, 1031 (C.D.Cal.2015) (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008)). Courts may also consider "[d]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir. 1996) (citation modified). For such documents that have been incorporated by reference into the complaint, the court may "consider the full texts of the documents which the complaint quotes only in part." *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997).

Case 8:24-cv-00285-JWH-KES    Document 133-1    Filed 12/02/25    Page 13 of 28   Page ID #:3449

The Court takes judicial notice of Exhibit 1 and finds Defendants may refer to its contents in moving to dismiss the complaint, including to contest arguments that Defendants failed to disclose details about ZoomInfo's auto-renewal policy. The Court finds helpful Plaintiff's citation to *Khoja*, where the Ninth Circuit indicated judicial notice was better suited for public documents like Exhibit 1, as opposed to defendants' own materials "to which the plaintiffs do not yet have access." 899 F.3d at 998; *see also Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1281–82 (C.D. Cal. 2016) (attempts to expand judicial notice are "particularly troubling in the common situation of asymmetry, where a defendant starts off with sole possession of the information about the alleged wrongdoing").

The Court agrees with Plaintiffs, however, that Defendants may not cite to Exhibit 1 to establish the validity of ZoomInfo's RPO calculations or the accuracy of any figures provided in the Form 10-K.

### I. Exhibit 2: Excerpts of Financial Accounting Standards Board's Accounting Standards Codification Topic 606 ("ASC 606")

Defendants argue that Exhibit 2 is incorporated by reference. Dkt. 92 at 3. ASC 606 is cited throughout the complaint. *See, e.g.*, Dkt. 81 ¶¶ 20, 133–35, 184, 264, 275, 277, 284. Plaintiffs argue that Defendants improperly offer Exhibits 2 and 4 "to rebut the Complaint's allegations that Defendants failed to comply with GAAP, and instead establish that they did indeed comply." Dkt. 95 at 7. Plaintiffs further argue that Defendants' compliance with GAAP is a question of fact that the Court may not address at the pleadings stage. *Id*. (citing *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *14 (C.D. Cal. 2012)). Defendants argue that the ASC 606 standard should be judicially noticed for the fact it does not require companies to perform credit checks to assess collectability, contrary to Plaintiffs' claims. Dkt. 98 at 5.

The Court agrees with Plaintiffs that taking judicial notice of Exhibit 2 "to resolve disputed factual issues of GAAP compliance would be improper." *Baron v. Hyrecar Inc.*, No. 2:21-CV-06918-FWS-JC, 2022 WL 17413562, at *5 (C.D. Cal. Dec. 5, 2022); *see S.E.C. v. Cotton*, No. SACV 06-0905 AG(ANX), 2006 WL 6382128, at *8 (C.D. Cal. Dec. 21, 2006) ("Whether Lantronix's accounting practices and Defendant's actions were consistent with GAAP is a question of fact, best resolved by expert testimony.").

The Court takes judicial notice of Exhibit 2. "The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201." *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008).

### J. Exhibit 4: Excerpts of ZoomInfo's Q3 2020 Form 10-Q filed with the SEC on November 13, 2020

 **\*13**  Defendants argue that Exhibit 4 is incorporated by reference, cited at Dkt. 81 ¶¶ 134, 143, 263–64. Dkt. 92 at 3. Like Exhibit 2, Plaintiffs argue Defendants are using Exhibit 4 to contest the complaint's claims and show that Defendants developed a variable constraint model to assess collectability. Dkt. 95 at 7. Defendants reply that they are instead offering Exhibit 4 to "evidence ZoomInfo's *disclosure* that it determined forward-looking collectability." Dkt. 98 at 6.

The Court takes judicial notice of Exhibit 4, its contents, and the fact of its filing. The Court will not consider the truthfulness of Exhibit 4 or resolve the factual issue of whether Defendants modeled forward-looking collectability.

### K. Exhibits 6–9: Excerpts from ZoomInfo's Forms 10-K

Defendants argue that Exhibits 6–9 are incorporated by reference, cited at Dkt. 81 ¶¶ 143, 321–22, 453. Dkt. 92 at 3. Plaintiffs respond that Defendants are using these exhibits to contest the accuracy of bad debt expenses ("BDE") and the RPO figures. Dkt. 95 at 6.

As with Exhibit, 1, the Court takes judicial notice of these exhibits but will not consider them in determining the accuracy of financial figures disclosed therein. The Court rejects Defendants' arguments that it may consider these exhibits because they "create factual disputes with a plaintiff's *conclusory* allegations." Dkt. 98 at 4 (citing *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL

2042078, at *7 (N.D. Cal. Apr. 28, 2020)). As discussed further below, the Court finds that Plaintiffs' allegations regarding ZoomInfo's financial figures are well-pleaded and not conclusory.

**L. Exhibits 13–15: Compilation of Form 4s Containing Sales Transactions for Schuck, Hyzer, and Hays**
Defendants argue that Exhibits 13–15 are incorporated by reference as they are cited throughout the complaint. Dkt. 92 at 3–4. Plaintiffs argue that Defendants are improperly using the exhibits to establish (1) that they made non-discretionary trades pursuant to 10b5-1 trading plans and (2) that ZoomInfo's stock buyback should negate a finding of scienter. Dkt. 95 at 8. According to Plaintiffs, the Court should not assume the truth of these documents "for the purposes of disputing Plaintiffs' trading and scienter allegations." *Id*. (quoting *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 829 (N.D. Cal. 2019)).

The Court takes judicial notice of Exhibits 13–15 but agrees with Plaintiffs that the exhibits may not be used to contest Plaintiffs' trading and scienter allegations and will not assume the truth of the matters therein.

**M. Exhibit 16: Excerpts of ZoomInfo's Q2 2024 Form 10-Q filed with the SEC on August 6, 2024**
Defendants argue Exhibit 16 is incorporated by reference in the Complaint. Dkt. 92 at 4. Like the Form 10-Q contained in Exhibit 4, the Court takes judicial notice of Exhibit 16 but finds that the exhibit may not be used to contest Plaintiffs' trading and scienter allegations and will not assume the truth of the matters therein.

**V. DISCUSSION**

**A. Section 10(b) Claims (Counts I and II) Against ZoomInfo and the Individual Defendants**
The SEC promulgated Rule 10b-5 under authority granted to the agency through § 10(b) of the Securities Exchange Act of 1934. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–42 (2011) (citing 15 U.S.C. § 78j(b)). Based on § 10(b) of the Exchange Act, Rule 10b-5 requires the disclosure of material information:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instruments of interstate commerce, or of the mails or of any facility of any national securities exchange,...(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...in connection with the purchase or sale of any security.

**\*14** 17 C.F.R. § 240.10b-5. "In a typical § 10(b) private action" based on material misrepresentations or omissions, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)).

A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (quoting *Khoja*, 899 F.3d at 1008–09). In determining whether a statement is misleading, the court applies the objective standard of a "reasonable investor." *Id.* (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 699). When defendants "tout positive information to the market," they must "do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id.* (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016)). However, "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required

Exhibit A
Page 14

under these provisions only when necessary 'to make...statements made, in the light of the circumstances under which they were made, not misleading.' " *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).

*1. The Alleged False or Misleading Statements*

Defendants argue that Plaintiffs fail to plausibly allege any false or misleading statements by ZoomInfo, Schuck, Hyzer, Hays, or DO Holdings. Dkt. 91 at 18 (noting the PSLRA's "exacting requirements for pleading falsity") (quoting *Metzler Inv. GMBH*, 540 F.3d at 1070). This Court disagrees and finds that, at minimum, Plaintiffs have adequately plead the falsity of Defendants' RPO estimates.

Defendants assert that "Plaintiffs' challenge to the RPO estimates fails at the outset because the estimates are statements of opinion that are not alleged to be objectively or subjectively false." Dkt. 91 at 18. [4] They claim that "exercises of account judgment are considered opinions." *Id.* (citation modified).

In *Omnicare, Inc. v. Laborers District Council Construction Industries Pension Fund*, the Supreme Court held that "a statement of opinion is not misleading just because external facts show the opinion to be incorrect." 575 U.S. 175, 188 (2015). But, the Court noted, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* The Supreme Court explained:

> **\*15** Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." If the issuer makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry— rather than, say, on mere intuition, however sincere. Similarly, if the issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time. Thus, if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then § 11's omissions clause creates liability.

*Id.* at 188–89. Still, the Court added, "[a]n opinion statement [...] is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90.

As Defendants note, the Supreme Court has acknowledged that GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979) (citation modified); Dkt. 91 at 18. The Ninth Circuit has also recognized that the application of GAAP—at least sometimes—requires a company to exercise its judgment, such that a company's financial statements may constitute opinions. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (finding statements related to company's goodwill valuation were opinion statements subject to *Omnicare*).

In the wake of these cases, district courts have distinguished between applications of GAAP that constitute opinions and those that are made on "then-presently known facts." *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. 3:19-CV-04744-WHA, 2020 WL 2559939, at *5 (N.D. Cal. May 20, 2020).

For example, in *Granite Construction*, the defendant argued that the complaint's misrepresentation theory failed because it never alleges that "Granite management disbelieved what the company was saying" in its financial reports and earnings calls. *Id.* The court noted, however, that the plaintiff's complaint did "not premise its misrepresentation theory on forward-looking opinions, but rather on then-presently known facts." *Id.* The complaint alleged that defendants "knew of the cost overruns long

Exhibit A
Page 15

before Granite's 2Q and 3Q 2019 charges." *Id.* And the complaint alleged that a former employee stated that "the troubled Projects were discussed extensively at the board level and the disclosure committee level," and that the individual defendants "were involved in the discussions as well." *Id.* (citation modified). The court thus concluded that the "statements misrepresented existing, rather than future overruns." *Id.*

Similarly, in *Hayden v. Portola Pharmaceuticals*, the court considered statements made by the defendant regarding reserve estimates. No. 20-CV-00367-VC, 2021 WL 3506614, at *5 (N.D. Cal. Aug. 10, 2021), *rev'd in part on other grounds*, No. 20-CV-00367-VC, 2022 WL 4374962 (N.D. Cal. Jan. 20, 2022). The defendant argued that "the small amount left at the end of 2018 does not support an inference that [the defendant] knew when it made its original reserve estimate that it was under-reserved." *Id.* But the court explained that such an "argument frames the issue around the wrong point of reference. What matters is what Portola knew when it made the allegedly misleading statement of revenue[.]" *Id.* By the date of the alleged misstatement, "the company obviously knew that the vast majority of its returns reserve had already been depleted by actual returns." *Id.*

**\*16** Defendants attempt to distinguish these cases, for example, by arguing that Plaintiffs challenge a "forward-looking estimate of future revenue the Company had yet to deliver from existing subscriptions." Dkt. 91 at 9. But Plaintiffs have alleged numerous, specific, "then-presently known facts" "tending to seriously undermine" the RPO statements' accuracy. *Granite Construction*, 2020 WL 2559939, at *5; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (citation modified).

First, Plaintiffs allege that Defendants were not properly accounting for the high risk and low collectability of SMB contracts "they knew were almost certain not to be paid in full." Dkt. 81 ¶ 21. Multiple FEs [5] claim ZoomInfo had no due diligence or credit checks for new customers, with FE-1 describing the company's mentality as "get it done, we'll deal with [any problems] later." *Id.* ¶ 120. FE-10 recalled a similar approach of "we don't care, just sign them on and achieve renewals." *Id.* ¶ 121. FE-3 recalled Schuck's insistence that ZoomInfo "just sell, sell, sell, sell" and "sold to anyone with a pulse, basically." *Id.* ¶ 122. By focusing on sales and ignoring creditworthiness, ZoomInfo nearly doubled its customer base and welcomed more than 20,000 new customers, many of which were SMBs. *Id.* ¶ 112; Dkt. 94 at 4–5. These customers were "far riskier than ZoomInfo's historical subscriber list," however, because ZoomInfo did not conduct due diligence or require up-front payment by SMBs. *Id.* at 1, 7; Dkt. 81 ¶ 123.

Further complicating this problem, ZoomInfo's Accounts Receivable team did not develop a variable constraint model to understand its probability of collecting on contracts. *Id.* ¶ 137. "As the company grew, no one was paying attention to the necessity of actually collecting the cash," and ZoomInfo had no way of measuring how little its new contracts—when considering the high probability of nonpayment—would ultimately create in revenue. *Id.* ¶ 259. Later in the Class Period, Defendants adopted "coercive renewal tactics" to avoid opt-outs and reported automatic renewals as revenue, even when customers expressed after the opt-out period that they did not want to renew their contract with ZoomInfo. *Id.* ¶¶ 44–47.

Second, Plaintiffs allege that collectability was not merely a theoretical problem. As risky customers failed to pay, Defendants "allowed these accounts to remain in accounts receivable for hundreds of days, despite their ongoing delinquency." *Id.* ¶ 310. According to FE-3, delinquent accounts were kept on the books as long as 360 days before being written off as uncollectable. *Id.* Multiple internal metrics warned of nonpayment, including: (1) poor account health displayed in Gainsight, *id.* ¶¶ 440–43; (2) low utilization and login rates showing many customers were not using the platform to which they subscribed, *id.* ¶¶ 40, 443; and (3) data showing decreasing market share and increasing competition. *Id.* ¶¶ 159–60.

**\*17** Thus, Plaintiffs do not "premise [their] misrepresentation theory on forward-looking opinions, but rather on then-presently known facts." *Granite Construction*, 2020 WL 2559939, at *5. Plaintiffs allege ZoomInfo developed a risky business strategy that prioritized sales to customers without due diligence and coerced renewals from uninterested customers. This resulted in poor collectability evinced by low product utilization, increasing competition, and months of customer nonpayment. ZoomInfo ignored these facts and reported an inflated RPO that did not reflect the delinquency of its customers.

Defendants argue the complaint lacks detail about the falsity of ZoomInfo's RPO estimates, such as "*when* ZoomInfo purportedly used improper RPO accounting [or] *by how much* the RPO estimates were purportedly inflated." Dkt. 91 at 20. Defendants argue that plaintiffs pleading irregularities in revenue recognition "should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions. Plaintiffs need not allege each of those particular details, but they must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id*. (quoting *Kampe v. Volta*, 2024 WL 308262, at *11 (N.D. Cal. Jan. 26, 2024)); *see* Dkt. 98 at 6, n.9 (arguing the complaint lacks specific dates of fraud or "the approximate amount by which any specific RPO estimate was allegedly overstated") (citing *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1018 (9th Cir. 2005)).

Defendants' attempt to raise the pleading standard is unpersuasive. The four factors discussed above and in *Daou* concern GAAP violations *as evidence of scienter*. *Daou*, 411 F.3d at 1016 ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves") (quoting *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1273 (N. D. Cal. 2000)). Whether GAAP violations occurred is a separate question from whether those violations evince a given defendant's mental state. But even if this Court agreed with the district court in *Kampe* and applied the factors to the falsity inquiry, Plaintiffs sufficiently allege that any GAAP violations "constituted widespread and significant inflation of revenue." 2024 WL 308262, at *11–14. Plaintiffs allege specific details provided by over a dozen witnesses regarding ZoomInfo's sales strategy, data monitoring, and accounting practices. At this stage, Plaintiffs need not also engage in a rigorous analysis—likely requiring ZoomInfo's internal documents—to estimate a hypothetical "true" RPO.

Because Plaintiffs have alleged with particularity that ZoomInfo stated its RPO while omitting material facts that would have "shone a light on how inaccurate the estimate was," they have therefore satisfied the first element of an Exchange Act claim. *Hayden*, 2021 WL 3506614, at *5.[6]

### a. *"Maker" Liability Under Rule 10(b)-5(b) Applies to ZoomInfo, Schuck, and Hyzer.*

**\*18**  For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus*, 564 U.S. at 142–43. One who prepares or publishes a statement on behalf of another is not its maker. *Id*.

Plaintiffs have alleged with particularity that ZoomInfo made false statements when it reported its RPO estimates. These statements are also attributable to Schuck and Hyzer, who signed ZoomInfo's financial statements and are therefore the "makers" of the allegedly false RPO estimates. Dkt. 81 ¶¶ 89–90; *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *3 (N.D. Cal. Mar. 26, 2015) ("Courts have consistently held that the signer of a corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its contents") (citations omitted); *see In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1185 (D. Or. 2015) ("The signatories to those documents, and through them, Galena, are 'makers' of statements contained in those documents.").

### b. *"Scheme" Liability Under Rule 10b-5(a),(c) Applies to Hays.*

Claims under Rule 10b5-(a) and (c) are generally referred to as claims for "scheme" liability. While Rule 10b-5(b) claims are based solely on deceptive statements or omissions, scheme liability claims involve deceptive conduct, "which may include deceptive statements or omissions but must also include additional conduct." *Galena Biopharma*, 117 F. Supp. 3d at 1192. Further, "a defendant may not be held liable for aiding and abetting an alleged scheme— each defendant must be primarily

Exhibit A
Page 17

liable under the securities laws and engage in his or her own deceptive conduct." *Id*. (citing *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994)).

"Regardless of whether the alleged conduct is considered 'manipulative' or 'deceptive,' Section 10(b) and Rule 10b-5(a) and (c) have been interpreted to prohibit a wide variety of conduct." *Id*. at 1196 (collecting cases); *see In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 579 (S. D. Tex. 2002) ("Market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company are other types of conduct prohibited by § 10(b) and Rule 10b-5 that do not fall within the category of misleading statements and omissions."). Although not subject to the PSLRA pleading requirements, the conduct underlying claims for scheme liability must be alleged with particularity under Rule 9(b). *Galena Biopharma*, 117 F. Supp. 3d at 1193.

Plaintiffs allege that FE-11 presented Hays with a marketing survey "show[ing] that the gap between ZoomInfo and its competitors was not as significant as the Company believed and there were even certain areas where ZoomInfo had been surpassed." Dkt. 81 ¶¶ 35–37. FE-11 also told Hays that the company's period of "hyper growth" was unsustainable. *Id*. ¶ 38. According to FE-11, however, this information was suppressed by Hays and the other executives because "it did not tell the story they wanted to tell." *Id*. ¶ 37. Plaintiffs allege Hays was responsible for sales development and conspired with Schuck and Hyzer "to conceal the demand and growth problems by directing the Company to sell to unqualified, unvetted customers with known collectability problems and to engage in undisclosed renewal tactics." *Id*. ¶¶ 25, 124, n.29.

**\*19** Hays's alleged misconduct—inflating ZoomInfo's RPO and share price by abandoning due diligence to sell to risky customers, suppressing unpleasant market data, and coercing renewals from customers unlikely to pay—certainly constitutes a manipulative scheme. *See, e.g.*, *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1194 (N.D. Cal. 2024), *motion to certify appeal granted*, No. 20-CV-07835-JSW, 2024 WL 4831889 (N.D. Cal. June 3, 2024) (scheme liability where executive "approv[ed] steep discounts and sales with known gray market sub-distributors in order to artificially inflate sales numbers" thereby resulting in "channel stuffing in those regions and a domino effect" and ultimately "lower prices, sales, and profits"); *Sec. & Exch. Comm'n v. Farnsworth*, 692 F. Supp. 3d 157, 190 (S.D.N.Y. 2023) (scheme liability for inducing customers to "use the service less than they otherwise would," thereby "creating misleading data about the Companies' business model."). Plaintiffs adequately allege scheme liability against Hays.

### 2. Scienter

Defendants next argue that Plaintiffs have failed to allege a "strong inference" of scienter. Dkt. 91 at 27.

"Scienter" as used in the federal securities laws means the "intent to mislead investors" or deliberate recklessness to "an obvious danger of misleading investors." *Glazer Cap. Mgmt.*, 63 F.4th at 765 (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1059 (9th Cir. 2014)). "Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud." *Id*. (quoting *Schueneman*, 840 F.3d at 705). Rather, "deliberate recklessness is an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id*. (citation modified). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id*. (quoting *Nursing Home Pension Fund, Local 144 v. Oracle Corp*, 380 F.3d 1226, 1230 (9th Cir. 2004)).

Plaintiffs' job here is thus to "allege sufficiently particular facts to demonstrate a strong inference of scienter—a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.' " *Schueneman*, 840 F.3d at 705 (first quoting *Matrixx Initiatives, Inc.*, 563 U.S. at 48; and then quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009)). "A complaint will survive," the Supreme Court has instructed, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Though not impossible, this "is not an easy standard to comply

with—it was not intended to be—and plaintiffs must be held to it." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam).

Courts conduct a dual inquiry when assessing whether the strong inference standard is met: first, they determine whether any one of the allegations "is alone sufficient to give rise to a strong inference of scienter"; second, if no individual allegations are sufficient, they conduct "a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Peters v. Twist Bioscience Corp.*, No. 22-CV-08168-EKL, 2025 WL 2532671, at \*11 (N.D. Cal. Sept. 3, 2025) (citation modified). Additionally, the Ninth Circuit follows a "general rule of imputation" that a corporation is responsible for a corporate officer's fraud committed within the scope of their employment or for misleading statements made by an employee or other agents with actual or apparent authority. *Ferris v. Wynn Resorts Ltd.*, No.218CV00479APGDJA, 2021 WL 3216462, at \*17 (D. Nev. July 28, 2021) (quoting *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015)).

 **\*20**  The Court finds that no one allegation gives rise to a strong inference of scienter alone, but that a holistic review of the facts below gives rise a strong inference of scienter with respect to ZoomInfo and the Individual Defendants.

*a. Stock Sales*

Defendants argue that Plaintiffs' allegations regarding Schuck, Hyzer, and Hays's stock sales during the Class Period fail to support a strong inference of scienter. Dkt. 91 at 33. They argue that "[s]tock sales are only indicative of scienter when 'they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Id.* (quoting *Metzler*, 540 F.3d at 1066–67). And they claim that the stock sales Plaintiffs allege "do not fit that description." They further claim that "Defendants' stock sales were largely non-discretionary pursuant to a Rule 10b5-1 trading plan" and thus "any inference of scienter is negated." *Id.* (citations omitted). Defendants also argue the transactions made outside of those plans were "related to non-discretionary tax liability dispositions, which courts have held do not contribute to an inference of scienter." *Id.* at 33.

Three factors that courts should consider "to determine whether stock sales raise a strong inference of deliberate recklessness are: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.' " *Zucco*, 552 F.3d at 1005 (quoting *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999)).

First, as alleged in the complaint, Defendants sold a substantial amount of stock during the class period. "[P]ersonal financial gain may weigh heavily in favor of a scienter inference[.]" *Tellabs*, 551 U.S. at 325. As Plaintiffs point out in their response, Schuck sold more than 67% of his holdings, Hays sold 65%, and Hyzer sold 32%. Dkt. 94 at 32–33 (citing Dkt. 81 ¶¶ 156, 406). Some courts have found that similar sales support a finding of scienter. *See Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (finding district court erred in concluding that stock sales of 20% of executive's stock did not support an inference of scienter); *Silicon Graphics,* 183 F.3d at 987 (finding that 43.6 percent and 75.3 percent are "somewhat suspicious" while percentages less than 10 were not suspicious); *Galena Biopharma*, 117 F. Supp. 3d at 1167 (concluding that sales of 87% of stock amounting to $3.8 million in proceeds, outside of 10b5-1 trading plan [7] raised a strong inference of scienter); *In re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2017 WL 4355072, at \*4 (N.D. Cal. Sept. 29, 2017) (finding that stock sales, "taken collectively with the allegations summarized" in the order, "also support[ed] a strong inference of scienter" at 40% and 30%).

Second, Plaintiffs allege that the Individual Defendants timed their stock sales "at or near Class Period highs" and "to maximize the personal benefit from undisclosed information." Dkt. 94 at 34 (quoting *City of Dearborn Heights*, 856 F.3d at 621); *see, e.g.*, Dkt. 81 ¶¶ 153–57 (Individual Defendants sold shares as soon as the lock-up period expired, one month after ZoomInfo reported record sales and raised its financial guidance for the year). The Individual Defendants also sold around $300 million in shares in November 2021, around when ZoomInfo reached a Class Period high price of $77.35 per share on November 17, 2021. *Id*. ¶¶ 176–77.

**\*21**  Plaintiffs also allege the Individual Defendants often sold stock shortly before negative disclosures publicizing ZoomInfo's decline. *See, e.g., id*. ¶¶ 185–190 (Hyzer and Hays sold shares weeks before the November 1, 2022 announcement of decelerating growth that caused the price to fall 29%); ¶¶ 205–07 (Schuck and Hyzer sold shares weeks before the July 31, 2023 announcement of a decline in high-value ACVs that caused the price to fall 28%); ¶ 223 (Hyzer sold shares weeks before ZoomInfo revealed the $33 million bad debt charge that caused the price to fall 18%). Stock sales support scienter when made "near the stock's peak [...] and just prior to the stock's decline." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003).

Third, Plaintiffs do not plead any trading history. ZoomInfo's IPO occurred shortly before the Class Period and no history exists which could be contrasted against the suspicious trades. Dkt. 81 ¶¶ 112–18. The Court agrees with Defendants that "even if the defendant's trading history is simply not available, for reasons beyond a plaintiff's control, the plaintiff is not excused." Dkt. 91 at 34 (quoting *Zucco*, 552 F.3d at 1005). "A lack of trading history due to a recent IPO may foreclose a plaintiff from one avenue of pleading scienter." *Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 986 (N.D. Cal. 2024) (quoting *Curry v. Yelp Inc.*, 2015 WL 1849037, at \*13 (N.D. Cal. Apr. 21, 2015)).

Because no control period exists to which the Court can compare the allegedly suspicious trades, the Individual Defendants' stock sales do not give rise to an inference of scienter.[8]  Insider trading "is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Zucco*, 552 F.3d at 1005 (quoting *Silicon Graphics*, 183 F.3d at 986).

*b. The Former Employees' Statements Indicating Mental State*
Plaintiffs argue that "multiple FEs offer specific, corroborative details of the Defendants' mental state." Dkt. 94 at 29. Defendants contest that the FEs do not have reliable personal knowledge of the Individual Defendants' mental state, and therefore do not support a strong inference of scienter. Dkt. 91 at 28.

While the PSLRA does not necessarily require that a plaintiff name their confidential witnesses, plaintiffs must "reveal with particularity the sources of their information." *Glazer Cap. Mgmt.*, 63 F.4th at 766 (quoting *Daou*, 411 F.3d at 1015).

"A complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. First, the complaint must describe witnesses with sufficient particularity to establish their reliability and personal knowledge. *Id*. In determining whether a witness has personal knowledge of the events they report, courts consider "the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability." *Glazer Cap. Mgmt.*, 63 F.4th at 766 (citing *Zucco*, 552 F.3d at 995). Second, the statements reported by confidential witnesses must themselves be indicative of scienter. *Zucco*, 552 F.3d at 995.

**\*22**  The complaint satisfies the first requirement by describing all thirteen FEs and detailing their positions, responsibilities, and contacts at ZoomInfo during the Class Period. Dkt. 81 ¶¶95– 107. The complaint also explains how each FE would have known about a given statement by the Individual Defendants. *See, e.g., id.* ¶ 159 (FE-11 attended meetings every Thursday with Hays "to discuss the status updates on demand generation"). These facts are sufficient to establish the FEs' reliability and personal knowledge. *See Joyce v. Amazon.com, Inc.*, No. 2:22-CV-00617, 2023 WL 8370101, at \*10 (W.D. Wash. Dec. 4, 2023) ("[T]he witnesses' accounts, which are included in the CAC along with their job titles, experience, responsibilities, and periods of employment, comply with the applicable law because it is 'plausible' that the witnesses 'would know, or could reasonably deduce,' the information attributed to them.") (quoting *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).

Having found the FEs reliable, the Court identifies several FE statements which evince scienter.

First, FE-1, FE-2, FE-3, and FE-10 all claim that ZoomInfo pursued aggressive sales practices that abandoned credit checks and due diligence. Dkt. 81 ¶¶ 119–125. FE-2 and FE-3 further state that Schuck led ZoomInfo in this direction. *Id*. ¶¶ 427–30. FE-2 claims Schuck told employees that the Company needed "all-hands-on-deck" to sign up as many customers before the IPO, while FE-3 claims Schuck insisted the company "just sell, sell, sell." *Id*. ¶¶ 428–29. Defendants correctly note that "routine corporate objectives" such as improving sales are not, without more, sufficient to allege scienter. Dkt. 91 at 29 (quoting *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012)). But taken together with the other allegations, Schuck's statements indicate he knew about ZoomInfo's aggressive sales strategy and lack of due diligence controls and may have even directed these policies himself—something "at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

Second, FE-11 claims that she advised Schuck and Hays of ZoomInfo's looming downturn in 2021. FE-11 attended meetings every Thursday with Hays and, during one such meeting, presented a marketing survey she commissioned that "showed that the gap between ZoomInfo and its competitors was not as significant as the Company believed and there were even certain areas where ZoomInfo had been surpassed." Dkt. 81 ¶ 159. She also expressed to Schuck and Hays that ZoomInfo's "gravy train of growth" was slowing down and that the company's period of "hyper growth" was not sustainable. *Id*. ¶ 160. These facts indicate Schuck and Hays knew ZoomInfo was losing its competitive edge and that growth would slow.

Third, FE-4, FE-8, and FE-12 claim they were able to review account health information in Gainsight and SalesForce, and that this information reflected low utilization rates and a high likelihood of customer nonpayment. *Id*. ¶¶ 303–09. FE-4 claims Schuck and Hyzer presented these metrics at quarterly meetings (serving as "state of the union" addresses on account health) where FE-4 recalled thinking that account health was "not where we wanted to be." *Id*. ¶ 308. These facts suggest the Individual Defendants were aware of collectability issues, customer nonpayment, and low likelihood of renewal.

#### c. SOX Certifications

Defendants contest Plaintiffs' assertion that Defendants' signatures on ZoomInfo's Sarbanes-Oxley ("SOX") certifications support an inference of scienter. Dkt. 91 at 30 (citing Dkt. 81 ¶¶ 448–51). Defendants argue the Ninth Circuit has held that such certifications have no effect on the scienter analysis. *Id.* (quoting *Zucco*, 552 F.3d at 1003–04).

Plaintiffs respond that Defendants' position regarding the certifications "ignores the well-established holistic approach to the evaluation of scienter." Dkt. 94 at 39 (quoting *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016)). Plaintiffs' argument more accurately represents the law. The Ninth Circuit has held that "Sarbanes-Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." *Zucco*, 552 F.3d at 1004 (quoting *Glazer*, 549 F.3d at 747–48). "Plaintiffs, however, are not relying on these allegations alone." *Thomas*, 167 F. Supp. 3d at 1043. Rather, "[t]hey are arguing instead that the allegations are part of a broader picture from which a court may, at the initial pleading stage, infer a compelling claim of scienter. This is squarely in line with applicable case law." *Id.* (citing *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund.*, 320 F.3d at 944–45).

 **\*23** Thus, while the certifications are not dispositive, they slightly support a finding that Plaintiffs have adequately pled scienter at this stage. *See id.*

#### d. Core Operations and Close Monitoring

"The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citation omitted). The "core operations" doctrine allows courts "to infer 'that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers.' " *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008)). Allegations regarding management's role in a company may help satisfy the scienter requirement in three circumstances: "(1) in any form, as part of a holistic analysis; (2) on their own, where they are particular and suggest that defendants had actual access to the disputed information; and (3) on their own in a more bare

form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* (citation modified).

Plaintiffs argue that ZoomInfo's structure, coupled with the Individual Defendants' public admissions of close monitoring of customer and finance data, supports a finding of scienter. Dkt. 94 at 38–39. This Court agrees.

Plaintiffs allege that 99% of ZoomInfo's revenue came from subscriptions to its intelligence platform, with Hyzer describing the model as a "100% subscription-based business." Dkt. 81 ¶¶ 452–53. Plaintiffs argue it would therefore be "absurd to suggest" that key officers like the Individual Defendants were unaware "of problems associated with the Company's only revenue source." Dkt. 94 at 30.

Plaintiffs support this assertion with several statements by the Individual Defendants indicating they maintained a "detail-oriented management style" that made them aware of ZoomInfo's misleading statements. *Id.* at 30–31; Dkt. 81 ¶ 435 (While responding to questions about "metrics that you report to the street," which Plaintiffs allege referred to RPO, Hyzer stated, "[t]hose are the metrics that I wake up every day and like think about, that Henry [Schuck] wakes up every day and thinks about"); ¶ 435 (Schuck stated "[t]here's a whole bunch of data that shows you the rhythm of the business. Without visibility, you cannot properly run the business."); ¶ 433 (Hyzer stated "we're tracking internally like usage on all of these different products, and where things are falling off. Where things are accelerating, and making sure we're staying focused on those metrics for the future."). Further, as discussed above, Plaintiffs allege that FE-11 regularly met with Hays and Schuck and advised them of increasing competition and decreasing demand for ZoomInfo's subscription services. *Id.* ¶ 159.

Taken together, the core operations doctrine and the statements by Individual Defendants suggesting they closely monitored company data support an inference of scienter. Plaintiffs do not rely "solely on the core operations doctrine and instead provide[ ] particularized facts" supporting the Individual Defendants' knowledge of the flawed RPO estimates. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1133 (N.D. Cal. 2020).

### e. Hyzer's Departure

**\*24**  Defendants also argue that Hyzer's departure—and replacement by O'Brien—does not support a strong inference of scienter. Dkt. 91 at 33. Defendants note that, though the announcement of Hyzer's departure and the accounting charge are temporally close, Plaintiffs fail to plead facts that suggest the departure was the result of wrongdoing. *Id.* (citation omitted).

Importantly, Plaintiffs do not allege "that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns." *Zucco*, 552 F.3d at 1002. The bare fact of Hyzer's retirement—even when it occurred on the same day as a corrective disclosure—does not imply a finding of scienter.

### f. Post-Class Period Admissions

Plaintiffs allege that several statements made after the end of the Class Period support an inference of scienter. Dkt. 81 ¶¶ 444–47.

First, Plaintiffs point to Schuck's August 13, 2024 statement that the root cause of the $33 million bad debt charge was that ZoomInfo "extended credit historically to customers who weren't creditworthy." *Id.* ¶ 445.

Second, O'Brien—the succeeding and current CFO—stated that same day:

> In June [2023], the receivable cohort that began to progress through actually had a higher risk of non-payment than we had previously estimated. And we applied that increased estimate to all the other cohorts

Case 8:24-cv-00285-JWH-KES    Document 133-1    Filed 12/02/25    Page 23 of 28    Page
ID #:3459
State Teachers Retirement System of Ohio v. Zoominfo..., Slip Copy (2025)

that were progressing though the aging at that time. That's what led to the revenue and bad debt charges you saw in our results in Q2.

*Id*. ¶ 445.

Third, O'Brien stated during the December 4, 2024 Wells Fargo TMT Summit:

And then[,] late in 2023 and into 2024, we started to experience incremental weakness in our SMB, our small and medium-sized businesses. And that showed up kind of in 2 forms. In late 2023, showed up in a increase in our write-off rate or our non-collection of cash. So, that led to more bad debt expense, that led to us upping reserves at that time. And then, in Q2 of this year, we saw an incremental increase there, a result of us taking a charge on the P&L in Q2, which effectively increased our estimates behind those rates and accounted for any P&L activity that had occurred to date.

So, what that did is effectively remove the volatility from kind of change in rates heading into the future. We also saw SMB retention get worse this year than it was year-to-date last year. And we view that as just a tougher economic environment at the tail end of potentially this economic cycle we're in.

*Id*. ¶ 446.

"A later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) (citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996–97 (9th Cir. 1999)). However, "[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." *Id.* (quoting *Yourish*, 191 F.3d at 997). Plaintiffs must allege some corroborating details to show that "Defendants were aware of the fraud during the Class Period." *Metzler Inv. GMBH*, 540 F.3d at 1068 n.12 (9th Cir. 2008); *see also In re Apple Computer, Inc.*, 127 F. App'x 296, 301 (9th Cir. 2005) ("We have rejected similar allegations based on post-class-period statements that do not specify when the defendant learned what he or she currently knows.").

**\*25** Nothing about Schuck's statement indicates he was aware of ZoomInfo's risky customer base or the falsity of ZoomInfo's RPO estimates. The Court agrees with Defendants that the statement says nothing about "*when* Schuck came to this understanding." Dkt. 91 at 32. Similarly, the Court finds that O'Brien's August 13, 2024 statement is not plausibly read as referring to June 2023 rather than 2024, and did not imply that ZoomInfo's officers "always knew" about the risky sales practices. *Lopes v. Fitbit, Inc.*, No. 18-CV-06665-JST, 2020 WL 1465932, at \*11 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021).

O'Brien's December 4, 2024 statement, however, supports an inference of scienter. Dkt. 81 ¶ 446. Specifically, O'Brien stated ZoomInfo was aware of "incremental weakness" in the SMB sector and an increased "write-off rate" and "non-collection of cash" as early as late 2023—months before (1) the May 2024 disclosure revealing that SMBs exhibited "weakness" during renewals and (2) the August 2024 disclosure revealing a $33 million bad debt charge due to "unexpected write-offs." *Id*. ¶¶ 215–227; 446. This statement "contradicts the substance" of ZoomInfo's RPO estimates in late 2023, *Lopes*, 2020 WL 1465932, at \*11, and it would have been critical context for investors before ZoomInfo's share price dropped from $18.40 in August 2023 to $9.80 in August 2024. Dkt. 81 ¶¶ 209, 228.

*g. Non-Fraud Inferences*

Under a holistic review of scienter, the Court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991. Defendants argue "the innocent inference is far more

Exhibit A
Page 23

compelling" here because (1) ZoomInfo reported honest RPO estimates with "clean audit opinions from KPMG all along the way" and (2) ZoomInfo repurchased its own stock in 2023 and 2024 for $700 million. Dkt. 91 at 34–35.

First, as discussed above, the Court judicially notices ZoomInfo's 10-K forms but not for the purpose of validating ZoomInfo's RPO. *See supra*, Section IV.H. The Court cannot assume on a Rule 12(b)(6) motion that the estimates of ZoomInfo's RPO are "honest."

Second, ZoomInfo cites *Costabile v. Natus Med. Inc.* to argue that spending $700 million to repurchase its own stock negates a finding of scienter, arguing "these repurchases would have made no sense" if ZoomInfo and its officers knew that the company's stock price was artificially inflated. 2018 WL 7134363, at *5 n.5 (N.D. Cal. Dec. 18, 2018). The Court need not consider the stock repurchase because it is not included in the complaint and not a valid subject for judicial notice. *See supra*, Section IV.L. In any event, the repurchase here does not undermine scienter.

While stock buybacks can weigh against a finding of scienter, they are not dispositive. *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 6482014, at *13 (N.D. Cal. Nov. 4, 2020). Stock buybacks are also less relevant for individual defendants, who do not spend their own money to buy back shares, but the company's. *Id*. And as Plaintiffs point out, the repurchase may have "augmented market demand" by letting Defendants offload shares "without depressing prices." Dkt. 94 at 33 (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1187 (C.D. Cal. 2008)). Plaintiffs argue that the buyback of $58 million in shares from Defendants in March 2023 therefore *supports* scienter. *Id*. Having weighed the competing inferences, the Court finds that ZoomInfo's repurchasing plan "weighs neither in favor of nor against an inference of scienter in this case." *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *18 (C.D. Cal. Oct. 1, 2013). In sum, however, the Court's holistic consideration of the factors set forth above supports a strong inference of scienter.

*3. Reliance, Economic Loss, and Causation*

 **\*26**  Next, Plaintiffs must show a connection between ZoomInfo's alleged misrepresentation and the purchase or sale of a security, reliance, economic loss, and loss causation. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014) (citation modified). Plaintiffs allege that "Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or impact of the fraudulent scheme. Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased ZoomInfo's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities." Dkt. 81 ¶ 504. Defendants do not contest these issues, and the Court finds that Plaintiffs state facts with particularity satisfying this portion of the securities analysis. *See Oregon Pub. Emps. Ret. Fund.*, 774 F.3d at 605 (holding that the Rule 9(b) standard applies to "all elements of a securities fraud action").

**B. Section 10(b) Claims (Counts I and II) Against the Sponsor Defendants**

*1. "Maker" Liability Under Rule 10(b)-5(b)*

Sponsor Defendants argue that the "Amended Complaint does not even come close to clearing the high bar set by *Janus*." Dkt. 87 at 12. "It plainly does *not* allege that TA Associates or Carlyle made any of the supposedly false or misleading statements." *Id.* [9] If anything, they claim, "this pleading is even weaker than that rejected in *Janus* because the Amended Complaint does not even make the sort of 'helper' or 'contributor' allegations that the Supreme Court so conclusively brushed aside as insufficient —*i.e.*, there are no allegations that they signed, reviewed, or had any role whatsoever in preparing ZoomInfo's SEC filings and press releases or any of the oral statements by the Individual Defendants on earnings calls or at investor conferences." *Id.*

This Court agrees. Although the complaint broadly alleges the Sponsor Defendants "control[led] the content of ZoomInfo's SEC filings, press releases, and other public statements" and "would have been provided with copies of the statements [...] before they were issued to the public," Dkt. 81 ¶ 466, Plaintiffs allege no facts explaining *how* these entities would review, approve, or provide input on the content of ZoomInfo's statements. Nor does the complaint explain how any of the Sponsor Defendants may

Exhibit A
Page 24

have had ultimate authority over statements made by ZoomInfo or the Individual Defendants. Instead, Plaintiffs simply make conclusory allegations that the Sponsor Defendants were controlling shareholders of ZoomInfo who "had a duty to disseminate prompt, accurate, and truthful information" with respect to ZoomInfo's business. *Id*. ¶ 465.

Plaintiffs fail to establish any such duty. Indeed, the Ninth Circuit has found claims for misleading SEC filings fail to meet the *Janus* standard where the defendant does not have "a statutory obligation to file with the SEC" and "there [was] no allegation that [the defendant] made the filings and falsely attributed them to the [filing defendant]" or that the defendant "had ultimate authority over the [filing defendant's] SEC filings." *Cesario v. Biocept, Inc.*, No. 23-CV-1803-WQH-BLM, 2025 WL 525120, at *13 (S.D. Cal. Feb. 18, 2025) (quoting *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011)).

The mere fact that Sponsor Defendants were controlling shareholders is insufficient to establish ultimate authority or a duty to correct misleading statements. *See United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 951 (D. Ariz. 2024), *reconsideration denied*, No. CV-22-02126-PHX-MTL, 2025 WL 371717 (D. Ariz. Feb. 3, 2025) ("Plaintiffs' maker liability allegations span 194 pages, yet not once do Plaintiffs allege a material misstatement or omission by Garcia Senior. Nor do Plaintiffs allege Garcia Senior—as a controlling shareholder—had a duty to correct an alleged omission or misrepresentation by the other Exchange Act Defendants."). Further, the Court agrees with Defendants that the cases Plaintiffs cite are inapposite because they concern responsibilities owed by officers "based on their positions and alleged responsibility for the statements." Dkt. 99 at 8 (citing *Zhou v. Faraday Future Intelligent Elec. Inc.*, No. 221CV09914CASJCX, 2022 WL 13800633 (C.D. Cal. Oct. 20, 2022), and then *In re Rocket Fuel, Inc. Sec. Litig.*, No. 14-CV-3998-PJH, 2015 WL 9311921 (N.D. Cal. Dec. 23, 2015)). Plaintiffs therefore fail to plausibly allege maker liability with respect to the Sponsor Defendants.

### 2. *"Scheme" Liability Under Rule 10b-5(a),(c)*

 **\*27** Plaintiffs similarly fail to plead scheme liability with respect to any of the Sponsor Defendants. As Defendants point out, "there are no allegations concerning what role anyone from TA Associates or Carlyle played in the supposed 'scheme.' " Dkt. 99 at 8–9. The Court agrees and finds the same is true for DO Holdings. Although the Court acknowledges that "the exact mechanism of the scheme is likely to be unknown to the plaintiffs" at the motion to dismiss stage, Plaintiffs here fail to allege any "fraudulent conduct" beyond the mere selling of stock. Dkt. 96 at 12 (citing *Galena Biopharma*, 117 F. Supp. 3d at 1193).

### 3. *Scienter*

Finally, Counts I and II against the Sponsor Defendants also fail because Plaintiffs do not plead facts supporting a strong inference of scienter. *Glazer Cap. Mgmt.*, 63 F.4th at 765. Plaintiffs simply allege that the Sponsor Defendants traded large amounts of ZoomInfo stock at suspicious times. Dkt. 81 ¶¶ 157, 166–67. As discussed above, however, the Court cannot infer scienter from these trades because no trading history exists upon which to compare them. *See supra*, Section V.A.2.a. Plaintiffs are also unable to identify what percentage of their holdings the Sponsor Defendants sold, further weakening any argument for scienter. *Reckstin Fam. Tr.*, 718 F. Supp. 3d at 986. And while Plaintiffs allege that DO Holdings was partially owned and controlled by Schuck and that it held some of his shares, Dkt. 81 at 126 n. 32, the complaint does not allege any facts that would impute Schuck's scienter to DO Holdings broadly, and Plaintiffs do not contest this issue in their Response. *See Backe*, 642 F. Supp. 2d at 1179 (a securities fraud claim must state with particularity facts giving rise to a strong inference "that *each defendant* acted with the intent to defraud or with deliberate recklessness") (emphasis added).

### C. Section 20(a) Claim (Count III) Against the Individual Defendants and the Sponsor Defendants

Plaintiffs allege that the Individual Defendants and Sponsor Defendants are liable under Section 20(a) as the "control persons" of ZoomInfo. Dkt. 81 ¶¶ 462–68. The Court finds that this claim survives against the Individual Defendants, but not against the Sponsor Defendants.

To establish liability under Section 20(a), Plaintiffs must "(1) prove a primary violation of federal securities law, and (2) 'that the defendant exercised actual power or control over the primary violator.' " *Montage Tech. Grp.*, 78 F. Supp. 3d at 1228 (quoting

*Howard v. Everex Sys.*, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)). Plaintiffs have already alleged with particularity a primary violation of securities law via Section 10(b), *see supra*, Section V.A, so the Court need only determine whether Defendants exercised actual power or control over ZoomInfo.

The "controlling person" analysis is an intensely factual one requiring inquiry into a "defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Bao*, 2015 WL 1906105, at \*5 (citing *Howard*, 228 F.3d at 1065). The plaintiff must allege specific facts concerning a defendant's responsibilities within the company that demonstrate their involvement in day-to-day affairs of the company or specific control over the preparation and release of allegedly false and misleading statements. *Id.*; *see No. 84 Emp.-Teamster Joint Council Pension Tr. Fund*, 320 F.3d at 927 (finding plaintiffs had adequately pleaded control-person liability against two large shareholders where the shareholders had "allegedly joined forces to exert undue influence" on the company, "taking advantage of their position as majority owners who controlled the Board of Directors and related committees.").

**\*28** Assuming the Individual Defendants were not liable under Section 10(b), Plaintiffs state an alternative theory of control-person liability under Section 20(a) with particularity. "Although a person's being an officer or director does not create any presumption of control, it is a sort of red light." *Montage Tech. Grp.*, 78 F. Supp. 3d at 1228 (quoting *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir.1996)). At the motion to dismiss stage, "[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control." *Id.* (quoting *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012)). Additionally, "numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status." *Id.* (quoting *Kyung Cho*, 890 F. Supp 2d at 1208).

Plaintiffs have alleged that each of the Individual Defendants had positions sufficient to establish control over the creation and publication of RPO estimates. Dkt. 81 ¶¶ 89–91. Additionally, as discussed above, Plaintiffs have alleged specific facts showing the Individual Defendants were either the authors of the alleged misstatements or heavily involved with day-to-day affairs of the company, or both. As such, Plaintiff's Section 20(a) claim against the Individual Defendants survives the motion to dismiss.

As to the Sponsor Defendants, however, this claim fails. Plaintiffs allege the Sponsor Defendants were controlling shareholders of ZoomInfo who "were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition." *Id.* ¶ 463. Plaintiffs also claim that ZoomInfo's Form 10-Ks stated the following:

> "[E]ach of TA Associates, Carlyle, and our Founders have designated a director to serve on our Board of Directors. Carlyle and our Founders have the right to designate at least one of our directors for so long as they beneficially own at least 5% of the voting power of all shares of our outstanding capital stock entitled to vote generally in the election of our directors. For so long as any such party has a designee continuing to serve on our Board of Directors, they will be able to significantly influence our management, business plans, and policies, including the appointment and removal of our officers, the composition of our Board of Directors, and decisions about whether to enter or not enter into significant transactions."

Dkt. 97 at 3, n.3.

But this allegation appears in Plaintiffs' response to the motion to dismiss, not the complaint. *Id.* Even if the Court allowed Plaintiffs to smuggle these allegations into the complaint without amendment and assumed their truth, Plaintiffs' argument of control-person liability still fails. Plaintiffs allege no facts supporting their conclusory assertions about Sponsor Defendants' involvement in the "day-to-day affairs of the company" or "specific control over the preparation and release of the allegedly false and misleading statements." *Bao*, 2015 WL 1906105, at \*5. Plaintiffs do not allege how much voting power the Sponsor Defendants held, whether it amounted to majority voting power, or whether or how they "acted together to [exercise] control." *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL 5412397, at \*13 (W.D. Wash. Dec. 29, 2008). Nor have Plaintiffs explained *when* the Sponsor Defendants exerted this control, or for how long (*e.g.*, how long their appointed directors continued to serve on the board).

Exhibit A
Page 26

**\*29**  Rather, Plaintiffs allege some high-level control via the Sponsor Defendants' ability to designate a director and a vague promise of "significant influence" over business operations and the appointment of officers. Dkt. 97 at 3. This is insufficient to plead control-person liability. Thus, Plaintiffs fail to allege any claims against the Sponsor Defendants, and they must be dismissed.

## VI. CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the motion to dismiss Plaintiffs' claims against ZoomInfo, Henry Schuck, Cameron Hyzer, Joseph Christopher Hays, and DO Holdings. Dkt. 91. Specifically, the Court DISMISSES all claims against DO Holdings.

The Court GRANTS the motion to dismiss Plaintiffs' claims against TA Associates and Carlyle. Dkt. 87.

If Plaintiffs wish to amend their complaint, they may file a motion for leave to amend that attaches a proposed amended complaint and explains why amendment is warranted, including, for example, how the proposed amended complaint cures any deficiencies relating to the dismissed Defendants.

The parties in this matter previously deferred filing a joint status report until briefing concluded on the motions to dismiss. Dkt. 25. As that time has now passed, the Court ORDERS the parties to submit a joint status report proposing a case schedule for the remaining claims by Wednesday, November 12.

## All Citations

Slip Copy, 2025 WL 3013683

---

## Footnotes

1   The parties refer to Schuck, Hyzer, and Hays as the "Individual Defendants." Dkt. 81 at 24 n.9; Dkt. 91 at 18.

2   *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 763–64 (2023) (citing 1 J. Bartlett, Equity Finance: Venture Capital, Buyouts, Restructurings and Reorganizations § 14.8, p. 333 (2d ed. 1995)) ("To prevent the stock price from falling once public trading begins, underwriters may require insiders to consent to a 'lockup agreement'—a commitment to hold their unregistered shares for a period of time before selling them on the new public market."). Here, a lock-up agreement prohibited Defendants from selling their shares of Class A common stock for 180 days after the date of ZoomInfo's prospectus (SEC Form 424B4). Dkt. 81 at 43 n.18.

3   Although the complaint states TA Associates and Carlyle Group sold these shares "without adopting" a 10b5-1 trading plan, this conflicts with the claim that those parties established plans on December 6, 2020, and June 22, 2021, respectively. *Compare* Dkt. 81 ¶¶ 166–167 *with* 44 n.19. Instead, it appears the companies were allegedly selling shares *outside* their 10b5-1 plans, as Plaintiffs acknowledge in their briefing on the present motions. *See* Dkt. 94 at 9–10, n.9 ("[T]he Sponsor Defendants' sale of $2.1 billion in connection with the two secondary offering[s] were not made pursuant to their 10b5-1 trading plan.").

4   Defendants also argue that they used the "portfolio approach" in assessing collectability, in compliance with GAAP requirements under ASC 606. Dkt. 91 at 13. This argument is improper on a motion to dismiss—the Court will not

accept it as true at this stage. Defendants also argue that their RPO estimates were audited and approved. Dkt. 91 at 14. As discussed above, this is a factual determination not suited for the motion to dismiss stage.

Defendants attack the former employees' statements as "conclusory" and note their limited contact with Individual Defendants. Dkt. 91 at 8–10; *see Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016) ("[T]he confidential witnesses in the FAC [...] did not work at SolarCity during the Class Period and can therefore offer 'little reliable insight into what occurred during the class period.' "). The FEs here, however, worked at ZoomInfo during the class period, had a mix of roles in different departments, and, in some cases, reported directly to the Individual Defendants. Dkt. 81 at 26–28, 45. The Court therefore relies on the FE statements throughout the complaint.

The complaint alleges numerous other misleading statements, including those made by Individual Defendants during earnings calls or via press releases. *See supra*, Section I.E. Because the Court has found particularized facts alleging the RPO estimates were false, however, the Court declines to address the other statements.

As noted above in the discussion of judicial notice, the 10b5-1 trading plans are not appropriately used here for disputing the truth of the allegations. *See supra*, Section IV.I. The Court thus does not consider this argument.

The hardline rule suggested by cases like *Zucco, Curry*, and *Reckstin Fam. Tr.*—that courts may never infer scienter from stock trades without a trading history—appears to conflict somewhat with a "holistic" review of scienter that examines all allegations in combination. *Glazer*, 63 F.4th at 766 (quoting *Zucco*, 552 F.3d at 992). The amount, percentage, and timing of the Individual Defendants' sales would support a scienter inference under a truly holistic review, but the Court need not consider these because Plaintiffs have pleaded other facts giving rise to a strong inference of scienter.

Although contained in a separate motion, Defendants make the same arguments with respect to DO Holdings. Dkt. 91 at 28, n.15.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit A
Page 28