# EXHIBIT A

Anne LeJeune (Texas Bar No. 24054286)
alejeune@ftc.gov; (214) 979-9371
Jason Moon (Texas Bar No. 24001188)
jmoon@ftc.gov; (214) 979-9378;
Tammy Chung (New York Bar No. 5745476)
tchung@ftc.gov; (214) 979-9399;
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 72501
Fax: (214) 953-3079

Matthew H. Fine (Cal. Bar No. 300808)
(Local Counsel)
mfine@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380

Attorneys for Plaintiff
Federal Trade Commission

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>               Plaintiff,<br><br>   v.<br><br>XPONENTIAL FITNESS, INC.,<br>a corporation;<br><br>XPONENTIAL FITNESS LLC,<br>a limited liability company;<br><br>XPOF ASSETCO, LLC,<br>a limited liability company; | Case No. 8:26-CV-00610<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

1

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

AKT FRANCHISE, LLC,
a limited liability company;

AKT FRANCHISE SPV, LLC,
a limited liability company;

CYCLEBAR FRANCHISING, LLC,
a limited liability company;

CYCLEBAR FRANCHISING SPV, LLC,
a limited liability company;

PB FRANCHISING, LLC,
a limited liability company;

PB FRANCHISING SPV, LLC,
a limited liability company;

YOGA SIX FRANCHISE, LLC,
a limited liability company; and

YOGA SIX FRANCHISE SPV, LLC,
a limited liability company,

                    Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," as amended (the "Franchise Rule"), 16 C.F.R. Part 436.  For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant

2

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and the Franchise Rule, 16 C.F.R. Part 436.

## SUMMARY OF THE CASE

2.      Since 2017, Defendants have sold fitness studio franchise opportunities to prospective franchisees throughout the United States and have grown to become one of the largest global franchisors in the boutique fitness market.  Defendants have offered franchises for at least ten well-known boutique fitness brands, including Club Pilates, Pure Barre, YogaSix, StretchLab, and BFT.  Defendants have claimed to be "the largest boutique fitness franchisor in the United States."  Indeed, Defendants have sold thousands of licenses globally and have approximately 2,500 studios currently operating in the U.S.  With an average initial fee of $45,000—not to mention the tens of thousands of dollars required to build out and operate the studio—consumers who purchase a franchise from Defendants take on significant financial risk.

3.      But in marketing franchises, Defendants have misrepresented or failed to provide key information that directly relates to the cost and risk of opening and operating a fitness studio franchised by Defendants.  Defendants' misrepresentations have included how long it typically took for franchisee studios to open, bearing on when franchisees could expect to begin generating recurring revenue to offset the significant costs of opening and operating a studio.

4.      In a franchise business model, franchisees operate a business under the franchisor's trademark.  Defendants have marketed their franchise opportunities as a business with "a playbook in place" and a "recipe" for success, promising substantial franchisor support.  This business model appeals to individuals who want to own their own business and either have little or no prior experience running a company or do not wish to create a business model of their own.  Thus, the truthfulness of the Defendants' representations about their

3

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

franchise opportunities is vital as franchisees rely on these representations to enter long-term contracts and invest hundreds of thousands of dollars in their franchise, with many incurring significant debt in the process.

5.      Promulgated in 1978, and amended in 2007, the Federal Trade Commission's Franchise Rule governs the disclosure responsibilities of franchisors like Defendants.  The Franchise Rule is a presale disclosure rule requiring a franchisor to provide to prospective franchisees a Franchise Disclosure Document ("FDD") at least 14 days before the franchisee makes a required payment or signs a binding contract.  The FDD must provide 23 items of material information, including information about the franchisor's executives, the franchisor's litigation and bankruptcy history, and how long it takes for franchises to get off the ground. Because of the scale of the investment required to own and operate a franchise, the Franchise Rule aims to protect consumers who seek to purchase a franchise by requiring that franchisors selling these opportunities provide clear and accurate information about the franchise.  This information is critical for consumers to evaluate the costs and risks of any such opportunity, and to compare alternative offerings.

6.      Defendants, nevertheless, have in numerous instances misrepresented or failed to provide the required information, leaving prospective franchisees in the dark about information important to evaluating the costs and risks of Defendants' franchise opportunities and deciding whether to invest in any such opportunity.

7.      For example, the Franchise Rule requires Defendants to provide consumers with the "typical length of time between the earlier of the signing of the franchise agreement or the first payment of consideration for the franchise and the opening of the franchisee's business."  Defendants have represented to consumers that franchisees typically get their franchise studios up and running, with buildout complete, within six months of signing the franchise agreement.  But these

4

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

representations are false.  As Defendants are aware and have represented to investors in SEC filings, their franchisees have typically taken more than a year after the signing of the franchise agreement to open their studios, if they opened at all.

8.      Additionally, in their FDDs, Defendants have failed to disclose to prospective franchisees that their founder, Anthony Geisler, was involved in their franchisors' businesses as either an officer or a manager with responsibility relating to the sale or operation of the offered franchises—and that he was involved in litigation that Defendants were required to disclose under the Franchise Rule. They have further misrepresented the extent to which franchisors, and their parents or affiliates who guarantee their performance, were involved in certain litigations and arbitrations.  Defendants have also misrepresented that no officers or managers had reportable bankruptcies.

9.      Defendants have, in many instances, also omitted the names of franchisees who had a studio that ceased to do business, or was terminated, cancelled, or not renewed, during the previous year, as required by the Franchise Rule.  And even when Defendants have disclosed the names of those franchisees, in numerous instances, Defendants have disclosed outdated contact information. As a result, Defendants have thwarted prospective franchisees' ability to assess studio turnover rates and obtain unvarnished experiences from prior purchasers.

10.      Finally, in many instances, Defendants have failed to provide the FDDs to prospective franchisees at least 14 days before the consumer signed the franchise agreement, as required by the Franchise Rule, thereby denying consumers the opportunity to meaningfully review crucial information before paying the substantial initial franchisee fee, averaging $45,000 per studio, and entering into a 10-year franchise agreement.

5

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

11. Defendants' misrepresentations of critical information have induced prospective franchisees to pay Defendants tens of millions of dollars for the opportunity to open, or take over operations of, one or more franchised fitness studios. Because Defendants systematically understated the time needed to open franchised studios, franchisees have incurred substantial unanticipated additional costs during the time the studios remained unopened and not generating recurring revenue.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

14. The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Franchise Rule, 16 C.F.R. Part 436, which is a presale disclosure rule requiring a franchisor to provide a franchisee with an FDD before the franchisee makes a required payment or signs a binding contract.

## DEFENDANTS

15. Defendant Xponential Fitness, Inc. ("**XPOF**") is a Delaware corporation with its principal place of business at 17877 Von Karman Avenue, Suite 100, Irvine, California 92614 ("Xponential Corporate Offices"). XPOF owns a controlling interest in and in fact controls Xponential Fitness LLC ("XPO LLC"), which is the principal operating subsidiary of XPOF. XPOF has been the ultimate

6

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

parent company of and has operated more than ten franchised Xponential Brands, including: (1) Club Pilates, the largest Pilates brand in the U.S.; (2) CycleBar, the largest indoor cycling brand in the U.S.; (3) StretchLab, a concept providing individual and group stretching services; (4) Row House, the largest franchised indoor rowing brand in the U.S.; (5) AKT, a dance-centric cardio workout provider which combines toning, interval, and circuit training; (6) Yoga Six, the largest franchised yoga brand in the U.S.; (7) Pure Barre, a total body workout using a ballet barre to perform small isometric movements, and the largest barre brand in the U.S.; (8) Stride, a treadmill-based cardio and strength training concept offering; (9) Rumble, a boxing-inspired full-body workout; and (10) Body Fit Training, a functional training and strength-based program (hereinafter collectively the "Xponential Brands"). XPOF transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, XPOF has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

16. Defendant Xponential Fitness LLC ("**XPO LLC**") is a Delaware limited liability company, with its principal place of business at the Xponential Corporate Offices. XPO LLC is the principal operating subsidiary of XPOF and is controlled by XPOF. At all times relevant to this Complaint, XPO LLC has controlled, directly or through intermediaries, franchisors of the Xponential Brands. XPO LLC has marketed and sold franchises for the Xponential Brands, and XPO LLC officers and employees have participated in the preparation of FDDs for the Xponential Brands. XPO LLC transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, XPO LLC has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

17. Defendant XPOF Assetco, LLC ("**Assetco**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Offices. Assetco is a wholly owned subsidiary of XPO LLC, which is Assetco's sole member. Assetco is the direct parent and sole member of each of the SPV Xponential Brands and guarantees the franchisors' performance of their franchise registrations and franchise agreements. Assetco transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Assetco has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

*Brand Franchisors*

18. From at least January 2020 through March 2023, XPO LLC was the direct parent of several franchisors of the Xponential Brands, which were all organized as limited liability companies ("LLC Xponential Brands"). Each of the LLC Xponential Brands issued annual FDDs, participated in marketing and selling franchise licenses, and entered into franchise agreements with consumers for each respective brand. In March 2023, pursuant to a corporate reorganization, Defendants created a new group of franchisors directly under, and wholly controlled by, Assetco to perform these functions. These franchisors were organized as special purpose vehicle LLCs ("SPV Xponential Brands").

19. Defendants AKT Franchise, LLC; AKT Franchise SPV, LLC; CycleBar Franchising, LLC; CycleBar Franchising SPV, LLC; PB Franchising, LLC; PB Franchising SPV, LLC; Yoga Six Franchise, LLC; and Yoga Six Franchise SPV, LLC (collectively, the "Brand Franchisors") are a subset of the franchisors of the Xponential Brands.

20. Defendant AKT Franchise, LLC ("**AKT LLC**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate

8

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

Offices. AKT LLC is a wholly owned subsidiary of XPO LLC and was the franchisor of the AKT franchise system from 2018 into 2023. AKT LLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, AKT LLC has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

21. Defendant AKT Franchise SPV, LLC ("**AKT SPV**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Offices. AKT SPV is a wholly owned subsidiary of Assetco and began selling franchises for AKT studios in 2023. AKT SPV transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, AKT SPV has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

22. Defendant CycleBar Franchising, LLC ("**CB LLC**") is an Ohio limited liability company with its principal place of business at the Xponential Corporate Offices. CB LLC is controlled by XPO LLC via a wholly owned intermediary and was the franchisor of the CycleBar franchise system from 2015 into 2023. CB LLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CB LLC has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

23. Defendant CycleBar Franchising SPV, LLC ("**CB SPV**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Offices. CB SPV is a wholly owned subsidiary of Assetco and began selling franchises for CycleBar studios in 2023. CB SPV transacts or has transacted business in this District and throughout the United States. At times

9

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

relevant to this Complaint, acting alone or in concert with others, CB SPV has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

24.     Defendant PB Franchising, LLC ("**PB LLC**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Offices.  PB LLC is a wholly owned subsidiary of XPO LLC and was the franchisor of the Pure Barre franchise system from 2012 into 2023.  PB LLC transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, PB LLC has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

25.     Defendant PB Franchising SPV, LLC ("**PB SPV**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Offices.  PB SPV is a wholly owned subsidiary of Assetco and began selling franchises for Pure Barre studios in 2023.  PB SPV transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, PB SPV has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

26.     Defendant Yoga Six Franchise, LLC ("**Y6 LLC**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Offices.  Y6 LLC is a wholly owned subsidiary of XPO LLC and was the franchisor of the Yoga Six franchise system from 2018 into 2023.  Y6 LLC transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Y6 LLC has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

10

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

27.     Defendant Yoga Six Franchise SPV, LLC ("**Y6 SPV**") is a Delaware limited liability company with its principal place of business at the Xponential Corporate Office.  Y6 SPV is a wholly owned subsidiary of Assetco and began selling franchises for Yoga Six studios in 2023.  Y6 SPV transacts or has transacted business in this District and throughout the United States.  At times relevant to this Complaint, acting alone or in concert with others, Y6 SPV has advertised, marketed, distributed, or sold franchise opportunities to consumers throughout the United States.

## COMMON ENTERPRISE

28.     Defendants XPOF, XPO LLC, Assetco, and the Brand Franchisors, and other Xponential Brands, have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices and other violations of law alleged below.  Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and shared revenues, office locations, and phone numbers.  Because Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

29.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *Overview*

30.     Since 2020, Defendants' franchisors have entered into thousands of franchise agreements with consumers to open, or take over operations of, individual fitness studios, which the Franchise Rule refers to as "outlets."

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

Franchisees have collectively paid tens of millions of dollars to Defendants to open these studios, which is a small fraction of their total costs, including payments to landlords, employees, and other third parties.

31.     Defendants' franchise sales tactics, through misrepresentations and omissions in the FDDs and elsewhere, lured prospective franchisees to enter into 10-year franchise agreements with Defendants.

32.     In selling these licenses, Defendants have understated the risks and difficulties of opening and operating a franchise.  In marketing to prospective franchisees, Defendants have promoted their franchise opportunity as a "semi-absentee, recurring revenue model" requiring a time investment of 10-15 hours per week.  Defendants have touted their "Xponential Playbook," as providing a "proven operational model … that helps franchisees generate compelling studio economics," and which delivers "a turnkey toolkit" for taking on ownership of one or more studios and brands.

33.     In reality, for consumers interested in opening an Xponential franchise, the investment of time and money is substantial.  For instance, franchisees have paid the Brand Franchisors, on average, an initial franchise fee of approximately $45,000 for each franchise agreement.

34.     In exchange for the franchise fee, Defendants have provided franchisees the right to establish and operate a fitness studio.  The franchise fee, however, is only a small portion of the investment required to open an Xponential studio.  Franchisees must also shoulder the costs of securing a location (usually through a lease), building out the studio, outfitting it with necessary equipment, obtaining products and supplies, marketing and advertising, and employee wages and training, among other costs.  Defendants have estimated a franchisee's initial investment to establish and operate a fitness studio can run into the hundreds of thousands of dollars in addition to the initial franchise fee.

12

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

35. Franchisees' timeline for buildout and opening of a studio is subject to Defendants' control, restrictions, and requirements for opening and operating a studio.  For instance, Defendants control approval of site locations for fitness studios, impose building design specifications, and require franchisees to use designated design and planning professionals and equipment and to purchase only approved services and products from approved vendors.

36. Defendants' franchise agreements bind franchisees with significant consequences during the franchise term, and upon exit.  For example, if a franchisee were to leave the system upon learning Defendants' presale disclosures omitted or provided inaccurate information, the hefty initial franchise fee is non-refundable.  Further, Defendants charge a fee to franchisees who transfer a fitness studio to another franchisee, with Defendants collecting millions in transfer fees since 2020.  In addition, the noncompete agreements or covenants not to compete that franchisees enter into with Defendants prohibit franchisees from opening another fitness studio not associated with Xponential during the franchise agreement term and for two years after the nonrenewal, transfer, or termination of the franchise agreement.

37. Because of the significant investment of time and money in opening an Xponential franchise, and the significant economic consequences of doing so, Defendants' representations to consumers about the risk associated with franchise opportunities are critical. However, as alleged within, Defendants frequently misrepresent and omit material information associated with those costs and risks.

38. In November 2024, the California Department of Financial Protection and Innovation entered a consent order with all Defendants and other Xponential franchisors and entities associated with Defendants.  That order specified numerous material misrepresentations and omissions in several of the Defendants' FDDs, in violation of the California Franchise Investment Law, and also included a

13

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

Desist and Refrain Order for injunctive relief and an administrative monetary penalty.  In August 2025, the State of Washington Department of Financial Institutions Securities Division entered into a consent order with Xponential Fitness LLC which imposed injunctive relief and a monetary order for costs. The Washington order was based on findings that the FDDs for the various franchise brands failed to disclose and misrepresented material information including, but not limited to, misrepresenting the opening timeline for their franchise locations and failing to disclose Geisler's involvement in the franchise brands.

***Defendants Have Misrepresented Key Information in the Disclosure Documents and Have Provided Untimely Disclosure Documents***

39.     For years, Defendants have entered into franchise agreements for fitness studios throughout the United States.

40.     Defendants have prepared FDDs for one or more of the Xponential Brands annually since 2018.  As alleged within, Defendants' FDDs have misrepresented and omitted key information, and in instances, Defendants have failed to timely deliver these FDDs.

41.     Defendants' FDDs have systematically understated the typical length of time between a franchisee signing a franchise agreement and the opening of the franchisee's fitness studio — a key metric for anyone considering opening a business.  The FDDs have misrepresented or omitted crucial, required information concerning officers, litigations, arbitrations, and bankruptcies.  Defendants' FDDs also have failed to identify many franchisees who had an outlet that ceased to do business, or was terminated, cancelled, or not renewed.  In other instances, Defendants' FDDs have provided outdated or inaccurate contact information for franchisees with a studio that had ceased to do business, or was terminated, cancelled, or not renewed. And, in many instances, Defendants have failed to

14

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

deliver the required presale franchise disclosure documents to prospective franchisees in a timely manner.

### *Defendants Have Misrepresented the Time to Open Franchises*

42. The Franchise Rule requires Defendants to disclose, in Item 11(2) of their FDDs, the typical length of time it takes a franchisee to open a studio after signing a franchise agreement. 16 C.F.R § 436.5(k)(2). Misrepresenting such information misleads prospective franchisees as to when the business is likely to begin generating recurring revenues, thereby requiring franchisees to incur unanticipated additional costs during months of delay before they can begin recouping their investment. Further, Defendants' misrepresentation of the time to open undermines the basis for Defendants' disclosures in Item 7 of the FDDs regarding the estimated initial investment.

43. In Item 11 of the Xponential Brands' FDDs for each of the years 2020 through 2024, Defendants have represented to prospective franchisees that the "typical length of time between the signing of the Franchise Agreement and the time you open your Studio is approximately three (3) to six (6) months;" or that the "typical length of time between the signing of the Franchise Agreement and the time you open your Studio is approximately six (6) months." In Item 11 of these FDDs, Defendants have further represented that the franchisee's "timeframe may be shorter or longer depending on the time necessary to … complete construction or remodeling" and "to complete the interior and exterior of the Franchise Business, including decorating, installing fixtures, equipment, and signs…." Thus, Defendants have represented that the typical length of time to open a studio, including construction, remodeling, and all other tasks necessary to open the franchise, is six months.

44. Consistently, the Xponential Brands' franchise agreements also have required studios to open within six months, and Defendants' management has

15

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

recognized that their timeline documents, presentations, and discussions "always refer to 6 months from Franchise Agreement Signing to Open" to encourage franchise partners to become "immediately actively engaged in working towards opening without delay."

45.     Nevertheless, Defendants' 2020 – 2024 FDDs' reporting of the typical length of time between the signing of the Franchise Agreement and the opening of a franchise studio dramatically understated the actual time it took franchisees to open a studio.  In reality, the average time Xponential Brand franchisees needed to open a fitness studio, with buildout complete, during the period from January 2020 through August 2024, exceeded 12 months.  For example, the Pure Barre franchisees who opened their studios in 2022 had signed their franchise agreements, on average, more than 17 months before studio opening.  The CycleBar franchisees who opened their studios in 2022 had signed their franchise agreements, on average, more than 15 months before studio opening.  And the Yoga Six franchisees who opened their studios in 2023 had signed their franchise agreements, on average, more than 15 months before studio opening.

46.     Defendants are aware that their franchisees have typically taken much longer to open their studios, if they opened at all.  Defendants have disclosed in Securities and Exchange Commission filings that, for all Xponential Brands, "[o]f the franchisees that entered into the system in 2021 or later and opened their first studio in 2023 on average it took approximately 15.0 months from signing the franchise agreement to open a studio," and that "[a]s of December 31, 2024, we estimate approximately 30% of our licenses contractually obligated to open in North America are over 12 months behind the applicable development schedule due to various circumstances and are currently inactive."  These filings are consistent with franchisee reports of delayed openings.

16

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

47.     These delayed openings have been widespread.  In internal documents and disclosures prepared for investors, Defendants have reported the vast majority of studios in the U.S. and Canada took longer than 12 months to open from the franchise agreement signing.  For example, in 2023, Defendants reported that for Brand Franchisor licenses sold in 2022, for studios in the U.S. and Canada, 0% of AKT studios, Row House studios, and Stride studios opened within one year of the license sold date; 1% of the Rumble studios, 2% of the BFT studios, 3% of the CycleBar studios, and 5% of the Yoga Six studios opened within one year of the license sold date; 10% of the Pure Barre studios opened within one year of the license sold date; and 5% and 11% of the Club Pilates studios and Stretch Lab studios opened within one year of the license sold date.  Moreover, among the thousands of franchise agreements that were signed between 2020 and 2024, hundreds of them never opened their studios for classes.

48.     During such delays, franchisees continue to incur substantial costs that dramatically worsen their investments.  One Yoga Six franchisee outlined some of the financial losses associated with her delay in opening as including: "*loss of revenue  *continued rent payments with no corresponding revenue  *continued payroll expense  *goodwill to the current members and the public  *goodwill with the [landlord]."  Additionally, during such delays, franchisees must pay other monthly overhead costs to third parties and numerous monthly fees to Defendants as required by the franchise agreements.

### *Defendants Have Misrepresented Anthony Geisler's Role in Franchise Sales and Operations*

49.     In 2017, Anthony Geisler founded XPO LLC, under which he proceeded to organize and acquire the Xponential Brands. Geisler founded XPOF in January 2020, has owned more than 10% of the common shares of XPOF, and has served as the Chief Executive Officer of XPOF.  He has been a "Manager on

17

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

[the] Board of Managers" and the Chief Executive Officer of XPO LLC, and has served as the Chief Executive Officer or, at minimum, had management responsibility relating to the sale or operation of franchises for all Xponential Brands. In May 2024, XPOF's board of directors indefinitely suspended Geisler as CEO of XPOF, and soon after, Geisler resigned as CEO of XPOF and XPO LLC, and left the other businesses named as Defendants.

50. At times relevant to this Complaint, Geisler has had the authority to control, and has directed, the actions of Defendants' officers and management. Geisler has participated in the Xponential Brands' promotion and sale of franchises, has interfaced with prospective franchisees, and has also been involved in negotiations related to franchise resales, reacquisitions, and relocations. Geisler has been involved in the details of each Xponential Brand's day-to-day business. Geisler has responded to individual franchisee complaints, and he has relayed franchisee complaints to Xponential service providers. He also has responded to franchisees' requests for help in negotiations with landlords and has been involved in efforts to help franchisees refinance outstanding loans. Further, Geisler has participated in regular Xponential Brand President's Council Meetings with franchisee representatives and in "Open Forum[s] with Anthony Geisler" for franchisees.

51. Under the Franchise Rule, Defendants are required to disclose, in Item 2 of their FDDs, the names and positions of their principal officers and those with management responsibility for selling or operating the franchises, as well as their principal positions and employers during the preceding five years. 16 C.F.R. § 436.5(b). In Item 2 of their 2019 through 2024 FDDs, Defendants' Brand Franchisors did not disclose anything about Geisler. Relatedly, Defendants also failed to disclose certain legal actions in which Geisler was held liable for fraudulent, unfair, or deceptive practices. During these years, Geisler served as

18

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

CEO of all Brand Franchisors and, as to all Brand Franchisors, he had management responsibility for selling or operating the franchises offered.

52. In Defendants' FDDs issued between 2017 and July 2018 for the then-existing Xponential Brands, Item 2 disclosed Geisler as the CEO or "Manager." On October 25, 2018, Geisler was named a third-party defendant in *Stretch Lab Franchise, LLC, et al. v. Stretch Lab, LLC, et al*., No. 2:18-cv-07816 (C.D. Cal. Oct. 25, 2018), which alleged Geisler fraudulently induced the third-party plaintiffs. As discussed in Paragraph 62-64, *infra*, while pending, this third-party action, alleging "fraud, unfair or deceptive practices," would have been required to be disclosed in Item 3 of all FDDs under 16 C.F.R. § 436.5(c)(1)(i)(A), if it related to any person disclosed in Item 2. Starting soon after the *Stretch Lab* lawsuit was filed and continuing through the 2024 FDDs, however, Defendants removed Geisler from the Item 2 reporting across all Xponential Brands.

53. Despite this removal from the FDDs, Geisler continued to act as an officer and manager of the Xponential Brands, as Geisler and Defendants acknowledged. For example, in 2019, Geisler attested that he was the CEO of the Xponential Brand Stretch Lab, and in 2020 and 2021, attested that he was the CEO of AKT LLC. Additionally, Geisler was appointed as CEO of all LLC Xponential Brands in approximately March 2021, and stayed in that role through February 2022. However, even after his 2024 suspension and resignation from Xponential, Geisler publicly reported in his Sequel Brands 2025 FDDs that he had been the CEO of each of the Xponential Brands during the period of 2021 through 2024. From his founding of XPO LLC in 2017 until his departure in May 2024, as alleged above, Geisler exercised the authority and control of an officer or manager with responsibility for selling or operating the franchises offered by each of the Xponential Brands. As such, Geisler was also required to be disclosed in Item 2 of Defendants' FDDs for the years 2019 through 2024.

19

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

54. Defendants' failure to disclose Geisler in Item 2 from September 2018 through the 2024 FDDs impeded prospective franchisees from conducting appropriate due diligence about Geisler's employment and, as alleged below, his litigation history. Defendants' failure to disclose Geisler's involvement in their business deprived prospective franchisees of essential information to assess the risk of opening a franchise through Defendants and violated the Franchise Rule.

### Defendants Have Misrepresented Relevant Legal Actions

55. For years, and across their brands, Defendants have misrepresented to franchisees that they were not involved in any relevant legal disputes, or that they had disclosed all such actions. In so doing, Defendants omitted cases in which Geisler was held liable for deception and fraud and disputes Defendants had with their franchisees or others.

56. Under the Franchise Rule, Defendants are required to disclose, in Item 3 of their FDDs, certain legal actions involving the franchisor, its guarantor, or any individual identified in Item 2 of the same FDD ("Specified Persons"). 16 C.F.R. § 436.5(c). The legal actions Item 3 requires to be disclosed include, but are not limited to: (a) pending civil actions, including arbitrations, against any of the Specified Persons "alleging fraud, unfair or deceptive practices, or comparable allegations"; (b) civil actions in the last fiscal year, including arbitrations, involving the franchise relationship, in which any of the Specified Persons was a party; and (c) where, in the 10-year period immediately before the FDD's issuance date, any of the Specified Persons has been "held liable" in a civil action, including arbitrations, "involving allegations of fraud, unfair or deceptive practices, or comparable allegations." 16 C.F.R. § 436.5(c).

57. In Item 3 of Defendants' 2019 through 2024 FDDs, for the AKT, CycleBar, Pure Barre, and Yoga Six brands, Defendants affirmatively represented that they had disclosed all relevant legal actions. These statements were false or

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

misleading, as Defendants failed to disclose several material legal actions, including certain legal actions involving Geisler, all of which they were required to disclose pursuant to the Franchise Rule.

*Legal Actions Involving Geisler*

58. Geisler, the founder and principal of Defendants' franchising enterprise, has been sued and held liable for deception and fraud in prior litigations. Defendants were required to disclose some of these actions, but did not, instead falsely claiming that they had disclosed all relevant legal actions.

59. *LA Boxing* lawsuit. In 2011, Geisler was found liable for a monetary judgment for making a false promise to an LA Boxing employee. *Christopher T. Poland v. LA Boxing Franchise Corporation and Anthony Geisler*, Case No. 30-2009-00121184 (Superior Court of California, Orange County, April 8, 2009). Even though this judgment held Geisler liable for deception, Defendants did not disclose it in the FDDs falling within the ten-year period following the judgment as required by 16 C.F.R. § 436.5(c)(1)(iii)(B).

60. Although Geisler was disclosed as an Item 2 officer in the 2017 and 2018 FDDs of the then-existing Xponential Brands (including, but not limited to, Cycle Bar and AKT), the *LA Boxing* judgment against Geisler was not disclosed in the same FDDs' Item 3. Instead, Defendants represented that no litigation was required to be disclosed.

61. Additionally, because Defendants should have disclosed that Geisler was an officer or a manager with responsibility relating to the sale or operation of the franchises offered in the Brand Franchisors' FDDs Item 2 for the years 2019 through 2024, Defendants should also have disclosed the *LA Boxing* judgment in Item 3 of their 2019 through 2021 FDDs. Defendants failed to do so and instead represented in each Brand Franchisors' 2019 through 2021 FDDs that "no litigation" or "no other litigations" were required to be disclosed.

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

62. *Stretch Lab* lawsuit.  In 2018, Xponential's Stretch Lab Franchise, LLC sued the original founders of the Stretch Lab brand, including Stretch Lab, LLC, Saul Janson, and Timothy Trost.  *Stretch Lab Franchise, LLC v. Stretch Lab, LLC, et al.,* No. 2:18-cv-7816 (C.D. Cal. Sept. 7, 2018).  As part of the *Stretch Lab* litigation, on October 25, 2018, the original founders filed a third-party complaint against Geisler alleging fraudulent inducement.  *Id.* (Dkt. 21).  The entire action was resolved through settlement on or around September 17, 2019.

63. While pending, this third-party action, alleging "fraud, unfair or deceptive practices, or comparable allegations" against Geisler, would have been required to be disclosed in Item 3 of the FDDs, if it related to any person disclosed in Item 2, as required by 16 C.F.R. § 436.5(c)(1)(i)(A).

64. Because Defendants should have disclosed that Geisler was an officer or a manager with responsibility relating to the sale or operation of the franchises offered in the Brand Franchisors' FDDs Item 2 for the year 2019, Defendants should also have disclosed the *Stretch Lab* lawsuit, while pending, in Item 3 of the Brand Franchisors' 2019 FDD, as required by 16 C.F.R. § 436.5(c)(1)(i)(A). Defendants instead represented in each Brand Franchisors' 2019 FDDs that "no litigation" or "no other litigations" were required to be disclosed.

65. Defendants' misrepresentation of the legal actions pending against Geisler "alleging fraud, unfair or deceptive practices, or comparable allegations" and those in which Geisler was held liable for "fraudulent, unfair, or deceptive practices, or comparable allegations" deprived prospective franchisees of essential information to assess the risk of opening a franchise through Defendants and violated the Franchise Rule.

### Additional Legal Action

66. In addition to actions involving Geisler, Defendants have failed to disclose a material legal action relating to Defendants' relationship with their

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

franchisees, in violation of the Franchise Rule. Instead of disclosing this information, Defendants misrepresented that "no litigation" or "no other litigations" were required to be disclosed.

67. *Haran* arbitration. In the PB LLC 2021 and 2022 FDDs, Defendants failed to disclose an arbitration involving former Pure Barre franchisees. *PB Franchising, LLC and Xponential Fitness, LLC v. Melissa Haran and Kyle Haran* (AAA Case Number 01-20-0015-1033).

68. Defendants initiated the *Haran* arbitration in response to public comments made by former franchisees which allegedly violated the former franchisees' continuing non-disparagement and confidentiality contractual obligations to Pure Barre. The *Haran* arbitration directly related to the continued operation of the franchised business, namely the former franchisees' transferred studio. Defendants commenced the *Haran* arbitration in September 2020, and the matter was resolved in February 2021. Thus, in 2021 and 2022, Defendants had been "a party to any material civil action involving the franchise relationship in the last fiscal year." 16 C.F.R. § 436.5(c)(1)(ii).

69. Defendants did not disclose the *Haran* arbitration in Item 3 of PB LLC's 2021 or 2022 FDDs, as required by 16 C.F.R. § 436.5(c)(1)(ii), and instead represented in these FDDs that no other litigations were required to be disclosed.

70. Additionally, Defendants failed to disclose the *Haran* arbitration in AKT LLC's 2022 FDD. Beginning on March 31, 2022, PB LLC guaranteed AKT LLC's performance under all franchise agreements identified in the AKT FDD issued on April 1, 2022. Accordingly, Defendants should have disclosed in the AKT 2022 FDD the *Haran* arbitration involving its guarantor, PB LLC, as required under 16 C.F.R. § 436.5(c)(1). Instead, Defendants represented in this FDD that no other litigations were required to be disclosed.

23

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

71. Defendants' omission of the *Haran* action deprived prospective franchisees of essential information to assess the risk of opening a franchise through Defendants and violated the Franchise Rule.

### Defendants Failed to Disclose the Bankruptcy of Jason Losco

72. Defendants are required to disclose, in Item 4 of their FDDs, whether anyone with management responsibility relating to the sale or operation of the franchise has filed a petition or obtained a discharge in bankruptcy during the preceding ten years. 16 C.F.R. § 436.5(d). This information bears directly on the ability of the franchisors' managers with whom the prospective franchisee will be dealing.

73. In Item 4 of the Brand Franchisors' 2020 and 2021 FDDs, Defendants stated: "No bankruptcy is required to be disclosed in this item." This representation is false.

74. From May 2018 through February 2022, Jason Losco served as XPO LLC's Vice President of Franchise Development, and Defendants disclosed Losco as an Item 2 officer in the Brand Franchisors' 2019, 2020, and 2021 FDDs. As the XPO LLC Vice President of Franchise Development, Jason Losco was responsible for the marketing and resale of franchise licenses for the Xponential Brands, including AKT, CycleBar, Pure Barre, and Yoga Six.

75. Jason Losco filed for bankruptcy on May 5, 2019, and the Bankruptcy discharge order was entered on August 26, 2019. Nevertheless, Defendants failed to disclose Losco's May 2019 bankruptcy petition and August 2019 discharge order in the Brand Franchisors' 2020 and 2021 FDDs, although Losco was disclosed as an officer in Item 2 of the same FDDs.

76. Losco's bankruptcy is material to prospective franchisees. Losco filed for Chapter 7 bankruptcy primarily for business debts related to his operation of one or more UFC Gym franchised studios. In his role as XPO LLC Vice President

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

of Franchise Development, not only did Losco oversee the team responsible for marketing the resale of franchise license opportunities, but Losco also provided FDDs to prospective franchisees and worked directly with both existing and prospective franchisees, in connection with the resale and transfer of studios.  By failing to disclose this information, Defendants prevented prospective franchisees from assessing the risk of investing in a franchise relationship with Defendants and violated the Franchise Rule.

### Defendants Have Omitted Names, and Have Inaccurately Reported Contact Information, of Former Franchisees

77.     Item 20 of the Franchise Rule requires a variety of disclosures relating to the status and contact information of current and former franchise outlets. 16 C.F.R. § 436.5(t)(4) and (5).

78.     Defendants have violated this provision in numerous instances by omitting from the Brand Franchisor FDDs the names of numerous franchisees with an outlet that had been terminated, canceled, not renewed, or otherwise ceased to do business under the franchise agreement during the most recent fiscal year. These violations extended over multiple years.  For instance, in multiple instances, Defendants have failed to disclose in the Pure Barre FDDs numerous franchisees who were no longer operating their outlets because the outlets had been transferred to other owners.

79.     Further, even when Defendants have listed franchisees who had an outlet that had been terminated, canceled, not renewed, or otherwise ceased to do business under the franchise agreement, in numerous instances, Defendants have failed to provide complete and accurate contact information for these franchisees, as required by the Franchise Rule, 16 C.F.R. § 436.5(t)(5).

80.     Specifically, for multiple years, the Brand Franchisor FDDs listed, for the vast majority of former franchisees, only their franchisor-issued email

25

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

addresses or studio telephone numbers, to which franchisees lost access when they ceased to operate their studio. As a result, prospective franchisees would have been unable to contact these former franchisees using the disclosed information.

### *Defendants Have Untimely Delivered the Franchise Disclosure Document*

81. The Franchise Rule requires franchisors to furnish prospective franchisees with a copy of the franchisor's current disclosure document at least 14 calendar days before the prospective franchisee signs a binding agreement with the franchisor or an affiliate in connection with the proposed franchise sale. 16 C.F.R. § 436.2.

82. Defendants' Brand Franchisor FDDs for the years 2020 through 2025 are lengthy, averaging 263 pages, and contain detailed contractual, financial and operating information. Franchisees need sufficient time to review, and seek financial and legal advice regarding, the FDD's contents to allow them to make informed decisions regarding long-term, substantial financial investments and commitments.

83. Defendants have in numerous instances failed to furnish prospective franchisees with the FDD at least 14 calendar days before the franchisee signs the franchise agreement.

### *Defendants Are Violating or Are About to Violate the Law*

84. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things: Defendants have engaged in their unlawful acts and practices repeatedly over multiple years; Defendants have engaged in their unlawful acts and practices willfully and knowingly; and Defendants have earned significant revenues from participating in these unlawful acts and practices. Defendants continue to market and sell franchise opportunities, including but not limited to Pure Barre and Yoga Six

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

franchise opportunities, and maintain the means, ability, and incentive to continue their unlawful conduct at any time.

## VIOLATIONS OF THE FTC ACT

85. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

86. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I – Misrepresentations

87. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of franchises, Defendants have represented, directly, or indirectly, expressly or by implication that:

    a. the typical length of time between a franchisee signing a franchise agreement and the opening of the franchisee's outlet, with buildout construction completed, was six months;

    b. the FDDs disclosed all relevant officers or managers;

    c. the FDDs disclosed all material litigations or arbitrations;

    d. the FDDs disclosed all material bankruptcies; and

    e. the FDDs accurately and completely disclosed the identity of franchisees who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year, and their contact information.

88. In truth and in fact:

    a. the typical length of time between a franchisee signing a franchise agreement and the opening of the franchisee outlet, with buildout construction completed, was more than six months;

    b. the FDDs did not disclose all relevant officers or managers;

27

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

c. the FDDs did not disclose all material litigations and arbitrations;

d. the FDDs did not disclose all material bankruptcies; and

e. the FDDs did not accurately and completely disclose the identity of franchisees who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year, and their contact information.

89. Therefore, Defendants' representations set forth in Paragraph 87 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act.

## **VIOLATIONS OF THE FRANCHISE RULE**

90. The FTC promulgated the Franchise Rule to prevent "deceptive and unfair practices [in the sale of franchises] through presale disclosure of material information necessary to make an informed purchasing decision" and to prohibit "specified misrepresentations" in the sale of franchises. 72 Fed. Reg. 15445, 15448 (Mar. 30, 2007).

91. The Franchise Rule defines "franchise" as any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

a. The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

b. The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

28

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

c. As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate. 16 C.F.R. § 436.1(h)(1)-(3).

92. The Xponential brand opportunities that Defendants have sold are each a "franchise" pursuant to the Franchise Rule.

93. Under the Franchise Rule, a "franchise seller" is a person that offers for sale, sells, or arranges for the sale of a franchise. The term includes the franchisor and the franchisor's employees, representatives, agents, subfranchisors, and third-party brokers who are involved in franchise sales activities. It does not include existing franchisees who sell only their own outlet and who are otherwise not engaged in franchise sales on behalf of the franchisor. 16 C.F.R. § 436.1(j). One or more Defendants have been "franchise sellers" pursuant to the Franchise Rule.

94. A "franchisor" means any person who grants a franchise and participates in the franchise relationship. Unless otherwise stated, it includes subfranchisors. For purposes of this definition, a "subfranchisor" means "a person who functions as a franchisor by engaging in both pre-sale activities and post-sale performance." 16 C.F.R. § 436.1(k). One or more Defendants have been "franchisors" pursuant to the Franchise Rule.

95. The Franchise Rule requires a franchisor to provide prospective franchisees with an FDD, which must be current, 16 C.F.R. § 436.2(a), and marked with an issuance date, 16 C.F.R. § 436.3(e)(6). The franchisor must furnish a prospective franchisee with a copy of the franchisor's current FDD at least 14 days before the prospective franchisee signs a contract or makes a payment to the franchisor. 16 C.F.R. § 436.2(a). The Franchise Rule was drafted with the intent that "the 14 days commence the day after delivery of the disclosure document and

29

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

Exhibit A
Page 33

that signing of any agreement take place on the 15th day after delivery." 72 Fed. Reg. 15469. Thus, Section 436.2(a) "ensures that prospective franchisees have at least a full 14 days in which to review the disclosures." Franchise Rule Compliance Guide at 20. The FDD must contain twenty-three categories (or "Items") of information. Each Item typically is referred to by a number.

96. Item 2 of the FDD must disclose the franchisor's principal officers and other individuals with management responsibility for the sale or operation of franchises, along with each officer's or other individual's principal positions and employers during the preceding five years. 16 C.F.R. § 436.5(b).

97. Item 3 of the FDD must disclose whether the franchisor, a parent or affiliate who guarantees the franchisor's performance, and any of the franchisor's directors, trustees, general partners, principal officers and any other individuals with management responsibility relating to the sale or operation of the franchise, has any certain pending and prior legal actions, including litigations and arbitrations, as well as current injunctive or restrictive orders. 16 C.F.R. § 436.5(c).

98. Item 4 of the FDD must disclose whether any of the franchisor's officers, or other individuals with management responsibility relating to the sale or operation of the franchise, have filed a petition or obtained a discharge under the United States Bankruptcy Code within the past 10 years. 16 C.F.R. § 436.5(d)(1)(i)-(ii).

99. Item 11 of the FDD must disclose the typical length of time to open the franchisee's business after the earlier of the signing of the franchise agreement or the franchisee's payment for the franchise. It must also describe the factors that might affect this period of time. 16 C.F.R. § 436.5(k)(2).

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

100. Item 20 of the FDD must disclose, *inter alia*, the names of all current franchisees and the address and telephone number of each of their outlets. 16 C.F.R. § 436.5(t)(4).

101. Item 20 of the FDD must also disclose, *inter alia*, the name, city, state and current business telephone number — or if unknown, the last home telephone number (or at the request of the former franchisee, other alternative contact information such as a home address, post office address, or personal or business email address) — of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year, or who has not communicated with the franchisor within 10 weeks of the disclosure document issuance date. 16 C.F.R. § 436.5(t)(5).

102. Under the Franchise Rule, "disclose" means to "present all material facts accurately, clearly, concisely, and legibly in plain English." 16 C.F.R. § 436.1(d). "State," "describe," and "list" all have the same meaning as "disclose." *Id*.

103. Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), and subparts B and D, 16 C.F.R. § 436.2 and § 436.6(a), violations of the Franchise Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

104. Defendants had knowledge of the requirements of the Franchise Rule as evidenced by the fact that they provided an FDD to prospective franchisees.

### Count II – Disclosure Violations

105. In connection with the offering for sale and sale of franchises, as "franchise" is defined in 16 C.F.R. § 436.1(h), in numerous instances, Defendants have furnished prospective franchisees with FDDs that fail to: (1) include all of the information required by the Franchise Rule, 16 C.F.R. § 436.5 and (2) follow

31

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

the instructions for preparing disclosure documents set forth in 16 C.F.R. § 436.6 of the Franchise Rule. For example, Defendants have failed to adequately disclose in the FDDs they have provided to prospective franchisees:

    a. the name and position of the franchisor's directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of the franchises, as well as their principal positions and employers during the past five years, along with the starting date, ending date, and location for each position, 16 C.F.R. § 436.5(b);

    b. whether the franchisor, a parent or affiliate who guarantees the franchisor's performance, any of the franchisor's directors, trustees, general partners, principal officers, and any other individuals with management responsibility relating to the sale or operation of the franchise, has certain pending and prior legal actions, including litigations and arbitrations, as well as current injunctive or restrictive orders, 16 C.F.R. § 436.5(c);

    c. whether any officer or person with management responsibility relating to the sale or operation of the franchise has, during the preceding 10-year period, (i) filed a petition as a debtor under the United States Bankruptcy Code, or (ii) obtained a discharge of debts under the Bankruptcy Code, 16 C.F.R. § 436.5(d);

    d. the typical length of time between the earlier of the signing of the franchise agreement or the first payment for the franchise, and the opening of the franchisee's business, 16 C.F.R. § 436.5(k)(2); and

    e. the name, city, state and current business telephone number — or if unknown, the last home telephone number (or at the request of the former franchisee, other alternative contact information such as a

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

home address or personal or business email address) — of every franchisee who had an outlet terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year, or who has not communicated with the franchisor within 10 weeks of the disclosure document issuance date, 16 C.F.R. § 436.5(t)(5).

106. Therefore, Defendants have violated subpart C, 16 C.F.R. § 436.5, and subpart D, 16 C.F.R. § 436.6, of the Franchise Rule, and Section 5(a) of the FTC Act.

### Count III – Failure to Provide FDDs to Prospective Franchisees

107. In connection with the offering for sale and sale of franchises, as "franchise" is defined in 16 C.F.R. § 436.1(h), in numerous instances, Defendants have failed to timely furnish a prospective franchisee with an FDD at least 14 days before the prospective franchisee signs a contract with, or makes a payment to, Defendants, as required by 16 C.F.R. § 436.2(a).

108. Therefore, Defendants have violated subpart B, 16 C.F.R. § 436.2(a), of the Franchise Rule and Section 5(a) of the FTC Act.

### CONSUMER INJURY

109. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the Franchise Rule and Section 5(a) of the FTC Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

### PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the Franchise Rule;

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

B.   Award monetary and other relief within the Court's power to grant; and

C.   Award any additional relief as the Court determines to be just and proper.

Dated: ___3/18/26___           Respectfully submitted,


_____

Anne LeJeune
Jason Moon
Tammy Chung
Federal Trade Commission
1999 Bryan St., Suite 2150,
Dallas, Texas 75201
(214) 979-9370; alejeune@ftc.gov
(214) 979-9378; jmoon@ftc.gov
(214) 979-9399; tchung@ftc.gov
(214) 953-3079 (fax)

Matthew H. Fine
(Local Counsel)
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
(310) 824-4300; mfine@ftc.gov

Attorneys for Plaintiff
Federal Trade Commission

34

COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF