GIBSON, DUNN & CRUTCHER LLP
MICHAEL D. CELIO, SBN 197998
  mcelio@gibsondunn.com
JEFFREY D. LOMBARD, SBN 285371
  jlombard@gibsondunn.com
310 University Ave
Palo Alto, CA 94301
Telephone:  650.849.5300
Facsimile:   650.849.5333

*Attorneys for Defendants*
*Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| IN RE XPONENTIAL FITNESS SECURITIES LITIGATION | CASE NO. 8:24-cv-00285-JWH-KES |
| | CLASS ACTION |
| | Hon. John W. Holcomb<br>Courtroom 9D, Santa Ana |
| | **DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO DKT. 142** |
| | Action Filed:  February 9, 2024 |

6000238648.4

## I.   INTRODUCTION

The Ninth Circuit's recent decision in *Construction Laborers Pension Trust v. Funko, Inc.* ("*Funko*"), 166 F.4th 805 (9th Cir. 2026), gets Plaintiffs nowhere—instead, it reinforces the arguments in Defendants' Motion to Dismiss and Reply at every turn. Where *Funko* and this case share common ground—falsity, puffery, the duty to disclose, and scienter—*Funko* confirms that Defendants had it right.  And the parts of *Funko* that cut against the defendants in that case have no parallel here.

*Funko* is unequivocally a defense opinion.  It confirms that aspirational business performance language is nonactionable puffery, that companies have no freestanding duty to supplement accurate aggregate metrics with granular adverse anecdotes, and that scienter cannot be inferred from generalized assertions that a topic was important to a company's business.

The two aspects of *Funko* that cut against the defense in that case—its holding on risk factor falsity and its finding that scienter was adequately pleaded under the core operations doctrine—have no application here.  Plaintiffs challenge no risk factor statements in this case.  And the anecdotal franchisee complaints they rely on bear no resemblance to the particularized, management-level knowledge that drove the scienter analysis in *Funko*.  Defendants' Motion should be granted, and this case should be dismissed with prejudice.

## II.   ARGUMENT

### A.   The Ninth Circuit's *Funko* Decision

*Funko* involved the rollout of a new Oracle-based enterprise resource planning (ERP) system at Funko's largest U.S. distribution center in Buckeye, Arizona.  166 F.4th at 812–15.  The plaintiffs alleged that Funko and its officers misled investors about the progress of the company's major warehouse relocation, the quality and management of its inventory, its information technology systems, and its distribution capabilities.  *Id.* at 819–20.  The Ninth Circuit affirmed in part and reversed in part the district court's dismissal.  *Id.* at 813.

On falsity, the panel affirmed dismissal of statements describing the Buckeye facility as "up and running," attributing elevated inventories in part to delayed shipments, and characterizing inventory as "generally high quality" and in a "really good healthy position." *Id.* at 822. The court held that "none of the statements [we]re demonstrably false or 'capable of objective verification.'" *Id.* (citation omitted). It also held that the CFO's statement that additional distribution capabilities would be needed "down the road" was forward-looking and protected by the PSLRA safe harbor. *Id.* at 829.

At the same time, the court revived claims targeting two categories of risk factor disclosures. *Id.* at 824–28. It held that warnings framed as risks that "could" occur may be misleading if those risks had, in fact, already materialized. *Id.* As pleaded, Funko's risk disclosures about inventory management and the effectiveness of existing IT systems[1] plausibly suggested that such problems had not yet arisen, while the complaint detailed significant, contemporaneous operational failures. *Id.*

Specifically, the plaintiffs alleged that by late May 2022, the Buckeye facility was massively overwhelmed. *Id.* at 816, 827. Storage racks were full, large volumes of inventory were stacked untracked on the floor, and employees conducted dozens of daily "investigations" to locate misplaced items—rising to roughly 120 per day by June. *Id.* at 816–17, 827. Fulfillment fell dramatically behind (about 50 days by August), partial shipments became common, and retailers began canceling time-sensitive orders. *Id.* at 818–19. As pandemic-delayed containers arrived in mid-2022, Funko stored 300 to 500 shipping containers in the facility's parking lot; because that inventory was neither scanned nor recorded, it could not be shipped to customers. *Id.* at 817, 827. Funko

---

[1] The Ninth Circuit, however, dismissed the plaintiffs' challenge to Funko's risk disclosures regarding its implementation of new technology—namely, warnings that delays or failures in implementing such technology could disrupt or harm its business. *Funko*, 166 F.4th at 827–28. These disclosures were not misleading as they "did not give investors the impression that the Oracle upgrade was completed or going well, nor warranty of Funko's operational capacity." *Id.* Moreover, the Ninth Circuit found that, at the time the statements were made, the warned-of risk had not yet materialized. *Id.*

ultimately had to rent overflow warehouses elsewhere in Arizona, which also filled quickly. *Id.* at 827. Operational defects compounded these problems. At launch, only 12 of 84 loading bays were operable and inbound loads were placed on any available rack without scanning or count checks. *Id.* at 815–16. The legacy Microsoft NAV system lacked adequate controls and made tracking "nearly impossible." *Id.* at 815, 828. Employees resorted to Excel spreadsheets and handwritten notes, while equipment misconfigurations impeded workflows. *Id.* at 815–16, 819, 828. The court held these allegations were sufficiently particularized to support falsity of the inventory management and existing technology risk factor statements at the pleading stage. *Id.* at 827–28.

On scienter, the panel held that the core operations doctrine supported a strong inference as to some (but not all) risk factor statements. *Id.* at 834. Inventory management and effective IT operations were so central to Funko's business—and the alleged dysfunction was sufficiently severe and pervasive—that it would be "absurd" to conclude that senior management lacked knowledge of problems described publicly as merely hypothetical. *Id.* at 832–33. Critically, the court emphasized particularized allegations tying these issues directly to senior leadership. The plaintiffs alleged that inventory needs and availability were discussed at monthly Sales Operations meetings attended by the CEO and CFO; beginning in June 2022, the COO took direct charge at Buckeye, spending one to two weeks per month on site "walk[ing] the floor" and observing the inventory and IT failures firsthand; and the CEO and CFO attended biweekly "Steering Committee" meetings that directly related to the transition to the new IT system. *Id.* at 814, 817, 832–34. These detailed, contemporaneous allegations—regarding the centrality of the functions, the scale and persistence of the breakdown, direct executive oversight, and regular high-level reporting—supported a strong inference of scienter under the core operations doctrine. *Id.* at 834.

In both respects, the panel's analysis turned on the same thing: concrete, particularized facts tying specific operational failures directly to the executives who made the challenged statements.

### B.    Plaintiffs' Omission Theory Has Nothing to Do With *Funko*

*Funko* addresses a risk-disclosure theory that is not present here.  The Ninth Circuit considered whether risk factor disclosures can be actionable when they warn that risks "could" occur even though those risks had already materialized, thereby misrepresenting present conditions.  *Funko*, 166 F.4th at 826–27.  That holding is narrow: it applies only where risk disclosures mischaracterize an existing condition as merely hypothetical.  *See id.*

Plaintiffs' claims do not fit that mold.  Plaintiffs do not allege that any risk factor statement was false or misleading.  Instead, they allege that Defendants made affirmative misstatements about the business while purportedly failing to disclose an alleged scheme and adverse facts about franchisee performance (*i.e.*, that most of Xponential's franchisees were suffering widespread losses).  *See e.g.*, Compl. ¶¶ 169–208, 216–26, 322–29.  This is a classic omission theory, not a *Funko*-type risk-disclosure claim. *Funko*'s falsity holding turns on something specific to risk disclosures: warning that a risk "could" occur tells investors, by implication, that it hasn't happened yet. Affirmative statements about business performance carry no such message.  Because none of the challenged statements involve representations about hypothetical harms that had supposedly already materialized, this aspect of *Funko* is inapposite.

### C.    Plaintiffs' "Lifeblood" Theory Is Precisely What *Funko* Rejected

Plaintiffs' "lifeblood" theory is precisely the kind of generalized business-importance argument that *Funko* rejected.  In their opposition, Plaintiffs devoted six pages to argue that because franchisees were the "lifeblood" of Xponential's business, management must have known about franchisees' financial condition.  Opp. at 40–46. Plaintiffs invoked *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008), to suggest that business importance alone supports a core operations inference.  *See* Opp.

4

at 45.  But *Funko* relies on the same case and makes clear that business importance is not enough—the doctrine requires particularized allegations tying the specific problem directly to the executives who made the challenged statements.  *See Funko*, 166 F.4th at 831–34.   Indeed, *Funko*'s holding rested on something far more concrete and particularized.   The allegations described a warehouse central to the company's operations in visible, physical chaos—overrun with excess inventory and crippled by a failed IT system.  *See supra*, 2–3.   There were also particularized allegations that members of senior management were aware of these issues: the COO spent weeks on site walking the floor, and leadership held biweekly steering committee meetings where the specifically alleged operational failures were discussed directly.  *Funko*, 166 F.4th at 832–34.  On those facts, the Ninth Circuit concluded that this was one of the "rare circumstances" in which it would be "absurd" to suggest that management was without knowledge.  *Id.* at 831, 834.

Plaintiffs cannot meet this bar: they do not allege any visible, centralized operational breakdown known to the Company that would render Defendants' statements misleading.  Instead, they rely on anecdotal complaints from an unspecified number of franchisees—none tied to any particular internal report, meeting, or anything else concrete.  *See* Mot. at 17–22, 30–37; Reply at 2–5, 10–15.  Even worse, these "facts" are drawn entirely from unreliable sources: an anonymous short-seller report, unadjudicated allegations in franchisee lawsuits, news articles recycling those same allegations, and a Consent Order containing unadjudicated findings under California franchise law.[2]  *Id.*  Without alleging the specific "underlying knowledge" that may be

---

[2] Plaintiffs' own Notice of Subsequent Events, highlighting Xponential's settlements with the FTC (not the SEC) and with current and former franchisees (not the investors), confirms this dispute is fundamentally about alleged violations of franchise law.  *See* Dkt. 143.  The federal securities laws do not regulate franchise issues or transform ordinary business disputes into securities fraud.  Plaintiffs' attempt to recast franchisee issues as securities fraud must fail.

imputed to Defendants, there can be no inference of scienter. This is not one of those "rare circumstances." It is not close.

### D.    *Funko* Supports Dismissal of Plaintiffs' Claims

The *Funko* decision confirms that Defendants had it right all along. As explained in the Motion, the Company's statements about the Xponential Playbook, which conveyed its optimism about its model, are nonactionable as puffery. Mot. at 26. And Plaintiffs' attempt to recharacterize forward-looking Playbook statements as containing implied present-tense assertions is improper under binding precedent. *See* Reply at 7–8. Nor did Defendants have a freestanding duty to disclose gripes of disgruntled franchisees. Mot. at 24–25. *Funko* now confirms each of these positions and demonstrates why Plaintiffs' claims must fail.

### 1. The Playbook statements are nonactionable puffery.

*Funko* confirms what Defendants demonstrated in the Motion: the Playbook statements' references to "compelling," "strong," and "attractive" results constitute nonactionable puffery because they are vague, inherently subjective, and thus not capable of objective verification. Mot. at 26; *Funko*, 166 F.4th at 822–23. The Ninth Circuit in *Funko* held that the CFO's statements describing inventory as "generally high quality" and in a "really good healthy position"—even when made in direct response to an analyst question about inventory—were not actionable because they did not convey a "concrete description of the past and present," but instead amounted to "vague and generalized corporate commitments." *See id.* at 822–24.

In their Opposition, Plaintiffs rely on *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747 (9th Cir. 2023), to argue that Playbook statements are actionable because they purportedly describe present business conditions. Opp. at 31–32. But *Funko* applies Plaintiffs' very authority and comes out the other way. In *Glazer*, executives responded to direct questions about whether contracts would close and whether the company would see revenue from those sales by giving detailed answers—attributing unimpressive sales figures to "deal timing," stating that contracts

"need a little bit more time in the oven," and pointing to "technology win[s]" even though sales had not closed. *Glazer*, 63 F.4th at 759. *Funko*, in distinguishing *Glazer*, observed that while those answers included optimistic language like "tracking very well" and "very large pipeline," that language—understood in context—summarized the specific, substantive answers the executive had provided about the status of deals. *Funko*, 166 F.4th at 823. Thus, the Ninth Circuit held that these "exaggerations taken as whole, exceeded mere puffery, because, rather than merely expressing optimism, they provided 'concrete' and false details that were part and parcel of the defendants' alleged fraud." *Id.* (quoting *Glazer*, 63 F.4th at 771). *Funko* thus directly refutes Plaintiffs' theory and confirms that the Playbook statements are nonactionable as a matter of law.

## 2. The Playbook statements are forward-looking.

*Funko* confirms what Defendants demonstrated in the Reply—the Playbook statements are protected by the PSLRA safe harbor. Reply at 7–8. The forward-looking nature of the Playbook statements are apparent from the explicit references to future results—*e.g.*, that the Playbook is "generally designed to generate, on average under normal conditions, an AUV of $500,000 in year two of operations" (Compl. ¶ 183). Nonetheless, Plaintiffs argue that the Playbook statements are actionable notwithstanding the PSLRA's safe harbor because they contain an implied present-tense assertion "about the playbook's effect on Xponential's business and on franchisee performance." Opp. at 31–32. *Funko* forecloses that argument.

In *Funko*, plaintiffs argued that the CFO's statement that Funko will need more distribution capabilities "down the road" was misleading because it was a "mixed" statement containing an implied present-tense representation of its distribution capabilities. *Funko*, 166 F.4th at 829. The Ninth Circuit disagreed, explaining that it is "not enough to plead that a challenged statement rests on subsidiary premises about how various *future* events will play out," because such assumptions underlying a forward-looking objective are themselves forward-looking. *Id*. (emphasis in original) (citation omitted). In other words, any supposed implication about current conditions did not

7

transform the statement into an actionable "mixed" statement. *Id.* The safe harbor applies.

### 3. Defendants had no duty to disclose adverse anecdotes concerning franchisees.

As Defendants—and now *Funko*—make clear, Xponential had no duty to disclose that most of its franchisees were "operating in the red" when discussing its company-level KPIs. *See* Mot. at 24; Reply at 6–7; *see Funko*, 166 F.4th at 824 (citing *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024)). Plaintiffs argue—relying on *Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016)—that once Defendants spoke positively about the AUV metric, they were required to disclose that most franchisees were suffering widespread losses. Opp. at 30. *Funko* rejects that expansive view of the duty to disclose.

In *Funko*, the CFO made specific statements about inventory being "in a really good healthy position" despite supply chain delays—in response to an analyst question to "dimensionalize inventory"—and how the company is "well positioned" to meet customer demand and deliver results. *Id.* at 823. Yet the Ninth Circuit held that "the Exchange Act imposes no 'affirmative duty' to disclose information" and that "a statement is not actionable just because it is incomplete." *Id.* at 824 (citation omitted). Thus, Funko was not required to supplement its general statements about the Buckeye facility with operational problems absent a showing that those omissions made the statements themselves misleading. *Id.* The challenged statements here about Defendants' aggregate KPI metrics (AUV, licenses sold, studios opened) are even further removed from franchisee-level profitability than the inventory statements in *Funko*. Plaintiffs' omission-based theory on the KPI metric statements therefore fails as a matter of law under *Funko*.

### III. CONCLUSION

The Court should dismiss the Amended Complaint in its entirety and with prejudice.

8

DATED:  April 10, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: *Michael D. Celio*
     Michael D. Celio

*Attorneys for Defendants Xponential Fitness, Inc., John Meloun, Mark Grabowski, Chelsea Grayson, and Brenda Morris*

DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO DKT. 142
CASE NO. 8:24-cv-00285-JWH-KES